IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PLASTRONICS SOCKET PARTNERS, LTD., AND PLASTRONICS H-PIN, LTD.<br><br>                 Plaintiffs,<br><br>vs.<br><br>DONG WEON HWANG, AND HICON CO., LTD.<br><br>                 Defendants. | Civil Action No. 2:18-cv-00014-JRG-RSP<br><br>JURY TRIAL DEMANDED |

**DONG WEON HWANG'S RESPONSE OPPOSING PLASTRONICS'
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Plastronics' Motion for Partial Judgment on the Pleadings rests entirely upon the question of whether the divisive merger between Plastronics Socket and Plastronics H-Pin constituted a transfer under the Assignment and Agreement ("Assignment Agreement"). Notably, they do not allege Mr. Hwang's factual allegations are lacking or fail to state breach-of-contract claims. Instead, Plastronics essentially assumes Mr. Hwang's factual allegations are sufficient and argues this Court's prior holding that Plastronics H-Pin was a co-assignee of the '602 Patent precludes Mr. Hwang from alleging certain aspects of his breach-of-contract counterclaims. As discussed below, Mr. Hwang concedes that the licensing portion of his counterclaim involving the Royalty Agreement should be dismissed and will therefore voluntarily dismiss those parts of his counterclaim. But to the extent this Court's previous order requires the dismissal of Mr. Hwang's breach of contract

1

allegations regarding Plastronics Socket's transfer of its rights to the '602 Patent to Plastronics H-Pin, Mr. Hwang respectfully requests this Court reconsider its holding for the reasons discussed below.

I. **APPLICABLE LAW**

Rule 12(c) authorizes a motion "for judgment on the pleadings" "[a]fter the pleadings are closed—but early enough not to delay trial . . . ."[1] A motion under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Moreover, counterclaims are subject to the same pleading requirements as complaints.[3] A district court may not dismiss a counterclaim under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[4] The pleadings should be construed liberally, and judgment on the pleadings should be granted "only if there are no disputed issues of fact and only questions of law remain."[5]

II. **ARGUMENT**

   a. **Mr. Hwang agrees to partially dismiss the Royalty Agreement Counterclaim.**

Mr. Hwang concedes to the extent the divisive merger between Plastronics Socket and Plastronics H-Pin transferred rights in the '602 Patent at all, the rights

---

[1] Fed. R. Civ. P. 12(c).
[2] *Gentilello v. Rege*, 627 F.3d 540, 543 (5th Cir. 2010).
[3] *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir.1999).
[4] *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 725 (5th Cir. 2002).
[5] *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001).

transferred were ownership rights rather than a license. He therefore agrees to voluntarily dismiss this portion of his counterclaim without prejudice.

### b. Mr. Hwang has stated a claim for breach of the Assignment Agreement.

In challenging Mr. Hwang's breach-of-contract claim, Plastronics rely on this Court's previous holding that "Plastronics H-Pin possesses rights in the '602 Patent and therefore has authority to practice the patent."[6] To the extent the Court's analysis applies to Mr. Hwang's breach-of-contract claim, Mr. Hwang urges the Court to reconsider its holding for three reasons:

(1) such an interpretation would undermine the parties' expressed intention in the Assignment Agreement;

(2) the divisive merger prejudiced Mr. Hwang by allowing Plastronics Socket to avoid its royalty obligations; and

(3) Texas's definition of merger conflicts with the underlying purposes of federal patent law and is therefore preempted.

> *i. The plain language of the Assignment Agreement forbids Plastronics Socket from engaging in any type of transfer without obtaining Mr. Hwang's written consent.*

Texas courts' "primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract."[7] Thus, courts "give words their plain, common, or generally accepted

---

[6] Dkt. No. 168 at 5.
[7] *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).

meaning unless the contract shows that the parties used words in a technical or different sense."[8] They also "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and avoid "unreasonable constructions when possible and proper."[9]

The plain language of the Assignment Agreement states the parties agreed "not transfer *any* interest in . . . [the '602 Patent] without the written consent of all Assignees."[10] The plain meaning of the word "transfer" is "[a]ny mode of disposing of or parting with an asset or an interest in an asset," and the term "embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property."[11] Thus, by its plain language, the Assignment Agreement sought to prevent any mode of parting with the '602 Patent rights. But this is exactly what the divisive merger did—Plastronics Socket parted with its rights in the '602 Patent and indirectly conveyed those rights to Plastronics H-Pin, a separate legal entity. The Assignment Agreement's plain language demonstrates an intent to prevent any persons or entities other than Mr. Hwang or Plastronics Socket from having any rights in the '602 Patent absent an explicit agreement between both co-owners. By giving all its interest in the '602 Patent to Plastronics H-Pin, Plastronics Socket sought to undermine a key provision of the Assignment Agreement, and its actions therefore constituted a breach of the Assignment Agreement under its plain language.

---

[8] *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).
[9] *Id.*
[10] Dkt. #105-1 at ¶ 5 (emphasis added).
[11] Transfer, BLACK'S LAW DICTIONARY (10th ed. 2014).

4

Applying Plastronics' interpretation of Texas merger law would undermine the parties' intentions and conflict with the plain meaning of the term "transfer" because it would create a statutory exception to when a transaction would otherwise constitute a transfer under the term's plain meaning.[12] Thus, Plastronics' interpretation would result in an unreasonable construction that would undermine the very intent and business end the parties sought to achieve.[13]

> ii. *The divisive merger prejudiced Mr. Hwang by allowing Plastronics Socket to avoid contractual performance that was a material premise of the Assignment Agreement.*

Additionally, Plastronics' contention that Section 10.008(a) of the Texas Business Organizations Code is dispositive misconstrues how the statute—or similar statutes—have been interpreted by courts. In *TXO Production Co. v. M.D. Mark, Inc.*, a Texas court of appeals relied upon Section 10.008(a) to hold that a merger did not constitute a prohibited transfer, but it left the door open for reaching a different conclusion in situations where such a merger would "obviously prejudice[]" the non-merging party.[14] The court then listed two examples of what would constitute prejudice: (1) where a party would "gain[] access to a patent right it would not otherwise have had absent the merger" and (2) where a "non-merging party [is] forced to accept a partner with whom it did not agree to form a partnership."[15] Other courts have expressed similar caveats when interpreting

---

[12] C*f. Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 438 (6th Cir. 2009) ("A transfer is no less a transfer because it takes place by operation of law rather than by a particular act of the parties.").
[13] *See Plains Expl. & Prod. Co.*, 473 S.W.3d at 305 (stating courts must avoid unreasonable contract constructions).
[14] 999 S.W.2d 137, 139–41 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).
[15] *Id.* at 141.

virtually identical statutes from other states. Thus, where a transfer creates "unreasonable risks for the [non-merging party]" and performance by the other party was "a material premise of the Agreement," a merger constitutes a prohibited transfer.[16]

Here, allowing Plastronics Socket to create a workaround to the parties' contractual intent would "obviously prejudice[]" Mr. Hwang's right to exclude by allowing Plastronics H-Pin to "gain[] access to a patent right it would not otherwise have had absent the merger."[17] It is also comparable to forcing Mr. Hwang to accept a business partner with whom he did not agree to form a partnership—a situation where numerous federal courts have held a merger constituted a transfer.[18]

The divisive merger also created an unreasonable risk for Mr. Hwang by allowing Plastronics Socket to avoid performance that was "a material premise of the [Assignment] Agreement."[19] Before Mr. Hwang entered the Assignment Agreement with Plastronics Socket, Plastronics Socket agreed to pay Mr. Hwang royalties based on socket prices (i.e. where the socket included the pins) after it

---

[16] *Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*, CIV. A. 12507, 1993 WL 294847, at *9 (Del. Ch. Aug. 2, 1993), *aff'd*, 647 A.2d 382 (Del. 1994) (interpreting a similar Georgia statute); *see also* Restatement (Second) of Contracts § 317 (1981) (permitting an assignment of contract rights "unless it would materially increase the burden or risk imposed on [the obligor] or materially impair his chance of obtaining return performance or materially reduce its value to him").
[17] *See TXO Prod. Co.*, 999 S.W.2d at 141.
[18] *See, e.g.*, *Freeman Mgmt. Corp. v. Shurgard Storage Centers, Inc.*, 306CV0736, 2007 WL 1541877, at *8 (M.D. Tenn. May 23, 2007) (holding a merger constituted a prohibited transfer because it "would result in forcing the [non-merging parties] to accept as a partner a person with which they did not consent to become partners"); *Nicolas M. Salgo Associates v. Cont'l Illinois Properties*, 532 F. Supp. 279, 283 (D.D.C. 1981) (same); *see also Parks v. CAI Wireless Sys., Inc.*, 85 F. Supp. 2d 549, 554 (D. Md. 2000) (holding a merger constituted a transfer where it resulted in a new entity taking another's place in a joint venture).
[19] *Star Cellular Tel. Co., Inc.*, 1993 WL 294847, at *9.

6

recouped certain non-reoccurring capital costs.[20] The promise of these royalties induced Mr. Hwang to sell half of his rights in the '602 Patent to Plastronics Socket. But through the divisive merger, Plastronics Socket sought to avoid performance of its royalty obligations to Mr. Hwang by measuring royalties based solely on the pin price as opposed to the socket price, thereby internally deflating the value of the promised royalties and depriving Mr. Hwang of the very premise for entering the Assignment Agreement. Equity demands that Section 10.008(a) cannot be interpreted to bless such underhanded transactions, especially when involving intellectual property rights. Moreover, it would be unfair to allow an experienced business entity like Plastronics Socket—who is savvy in drafting contracts under Texas law—to take advantage of a Korean individual with limited English skills and little knowledge or understanding of Texas law.[21] Thus, under Texas law the divisive merger constituted a prohibited transfer.

> iii. *Texas statutory law on mergers is preempted because it conflicts with federal law.*

Even if the Court were to hold Texas law mandated that the divisive merger was not a prohibited transfer under the Assignment Agreement, the Texas definition of merger cannot apply because it is preempted by federal patent law. "Conflict preemption occurs when state law stands as an obstacle to the

---

[20] Dkt. No. 82-5 at 1.
[21] *Contra Salgo*, 532 F. Supp. at 283 (noting that "both parties involved in this dispute are extremely experienced business entities and should be savvy to the importance of accurately drafting contracts").

7

accomplishment and execution of the full purposes and objectives of Congress."[22] Federalism principles dictate that state law cannot be applied in a way that conflicts with federal patent law or its underlying purposes.[23]

"A patentee's right to exclude is a fundamental tenet of patent law."[24] Construction of patent-related contracts are typically a matter of state law.[25] But any state law resulting in a contractual construction that undermines a patentee's right to exclude cannot be applied to contract involving patent rights.[26] Moreover, "state law cannot create a collateral set of rights available as an adjunct or expansion to patent rights."[27]

Here, restrictions contained in the Assignment Agreement are precisely the type of restrictions contemplated by federal law. Under federal law, each co-owner of a patent is typically permitted to use, transfer, and sell the patented invention without the knowledge or consent of the other "[i]n the absence of any agreement to the contrary."[28] This statute shows an intent by Congress to allow patent co-owners, not the state, to decide the terms of ownership in a patent.[29] Accordingly, co-owners have the option to enter agreements limiting what each co-owner can do with a patent and how patent ownership may be transferred.[30] This is exactly what Mr.

---

[22] *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377 (Fed. Cir. 2005).
[23] *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479 (1974).
[24] *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51 (1989) (stating the federal patent system gives patentees "the exclusive right to practice the invention for a period of years").
[25] *See Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996).
[26] *See Kewanee Oil Co.*, 416 U.S. at 479.
[27] *Waner v. Ford Motor Co.*, 331 F.3d 851, 856 (Fed. Cir. 2003).
[28] 35 U.S.C. § 262.
[29] *Id.*; *see also id.* § 261 (stating "patents shall have the attributes of personal property").
[30] *See id.* § 262.

Hwang and Plastronics Socket did here by entering into the Assignment Agreement, and federal law demonstrates an intent to honor their Agreement as written.

Conversely, applying Texas's definition of merger would impermissibly expand patent rights. When parties agree to restrict what would otherwise be an uninhibited right to use and transfer the patents as they see fit, it is the parties' agreement that defines their patent rights, including how those rights may be transferred and who may use the patent.[31] The contract therefore defines each patentee's right to exclude. Here, Mr. Hwang and Plastronics Socket agreed that they each had the right to exclude all other entities from possessing any interest in the '602 Patent absent a written agreement allowing for the transfer of such rights. By allowing Plastronics Socket to transfer its interest in the '602 Patent through a divisive merger without Mr. Hwang's consent, the Texas definition of merger expanded Plastronics Socket's patent rights by allowing it to transfer those rights in a way that would otherwise be forbidden by the plain language of the Assignment Agreement. Federal law does not permit state law to expand such rights.[32] Such a result also undermines Mr. Hwang's ability to exclude Plastronics H-Pin, a completely new legal entity with which he did not bargain.[33]

Moreover, allowing Texas law to create this kind of loophole in contracts regarding patent ownership would undermine "national uniformity in the realm of

---

[31] *See id.* § 262.
[32] *See Waner*, 331 F.3d at 856.
[33] *See CoreValve, Inc.*, 699 F.3d at 1314 (stating a "patentee's right to exclude is a fundamental tenet of patent law").

9

intellectual property," a fundamental purpose behind the federal patent system.[34] There are certainly states would likely hold a divisive merger would not constitute a prohibited transfer under the Assignment Agreement.[35]

But there are others that would likely reach the opposite conclusion.[36] A patent co-owner's right to exclude should not depend upon his state of residency but rather on the terms of any agreement made with other co-owners. To hold otherwise would be to undermine one of the fundamental purposes of the federal patent system. Therefore, Mr. Hwang has stated a plausible claim for breach of the Assignment Agreement.

### III.  CONCLUSION

Plastronics asks this Court to ignore the parties' expressed intention in the Assignment Agreement, equity, and the underlying purposes of federal patent law. Should the Court agree with Plastronics' interpretation of Texas law, it cannot apply here to the extent that it conflicts with federal patent law, and, as discussed above, those conflicts are significant and far-reaching. Therefore, the Court should deny Plastronics' Motion for Partial Judgment on the Pleadings regarding Count V

---

[34] *See Bonito Boats, Inc.*, 489 U.S. at 162; *Ultra-Precision Mfg., Ltd.*, 411 F.3d at 1378 (stating federal patent law exists to promote "nationwide uniformity").
[35] *See, e.g., Trubowitch v. Riverbank Canning Co.*, 182 P.2d 182, 184, 190 (Cal. 1947) (holding a surviving corporation could be required to honor an arbitration clause in a contract between the merged corporation and another party, despite a non-assignment provision in that contract).
[36] *See, e.g., Rother–Gallagher v. Mont. Power Co.*, 522 P.2d 1226, 1228 (Mont. 1974) (finding an assignment occurred by virtue of the dissolution of two corporate entities to a contract and the subsequent formation of a partnership which assumed all the duties and obligations of the two corporations); *Jackson v. Moskovitz Agency, Inc.*, 672 S.W.2d 400, 403 (Tenn. 1984) (finding an assignment occurred where one corporation was liquidated and its assets distributed to its shareholders who subsequently sold all their assets to another corporation).

and hold that Mr. Hwang has plausibly pleaded that the divisive merger breached the Assignment Agreement.

Dated: March 13, 2019.                    Respectfully submitted,

/s/ *John R. Emerson*
John R. Emerson
Texas Bar No. 24002053
russ.emerson@haynesboone.com
Stephanie N. Sivinski
Texas Bar No. 24075080
stephanie.sivinski@haynesboone.com
Jamie Raju
Texas Bar No. 24095717
jamie.raju@haynesboone.com

HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: 214 651 5000
Telecopier: 214 651 5940

Samuel Lee
(Admitted *pro hac vice*)
samuellee@yulchon.com
Jay Hoon Byun
(Admitted *pro hac vice*)
jhbyun@yulchon.com

YULCHON LLC
Parnas Tower, 38F, 521 Teheran-ro
Gangnam-gu, Seoul 06164
Republic of Korea
Tel +82-2-528-5200
Fax +82-2-528-5228

**ATTORNEYS FOR DEFENDANTS DONG WEON HWANG, HICON, AND HICON CO., LTD.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2019, I electronically transmitted the attached document to counsel of record for Plastronics via the Court's ECF system.

                                    */s/ John R. Emerson*
                                    John R. Emerson