| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE EASTERN DISTRICT OF TEXAS |
| 2 | MARSHALL DIVISION |

```
 3   PLASTRONICS SOCKET              )(
     PARTNERS, LTD., AND             )(
 4   PLASTRONICS H-PIN, LTD.,        )(      CIVIL ACTION NO.
         PLAINTIFFS,                 )(
 5                                   )(      2:18-CV-14-JRG-RSP
                                     )(
 6   VS.                             )(      MARSHALL, TEXAS
                                     )(
 7                                   )(
     DONG WEON HWANG,                )(      JULY 8, 2019
 8   HICON CO. LTD.,                 )(
         DEFENDANTS.                 )(      1:15 P.M.
 9
10                   TRANSCRIPT OF JURY TRIAL

11        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12           UNITED STATES CHIEF DISTRICT JUDGE

13

14

15   FOR THE PLAINTIFFS:      Ms. Katarzyna Brozynski
                              Mr. Antonio Devora
16                            Mr. Bart Dalton
                              Spencer Fane, LLP
17                            5700 Granite Parkway
                              Suite 650
18                            Plano, Texas  75024

19

20   COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                              Official Court Reporter
21                            United States District Court
                              Eastern District of Texas
22                            Marshall Division
                              100 E. Houston Street
23                            Marshall, Texas 75670
                              (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1
        FOR THE PLAINTIFFS:          Mr. Brian Bear
 2                                   Spencer Fane, LLP
                                     1000 Walnut Street
 3                                   Suite 1400
                                     Kansas City, Missouri  64106
 4
                                     Mr. Robert Christopher Bunt
 5                                   Parker, Bunt & Ainsworth, PC
                                     100 East Ferguson
 6                                   Suite 418
                                     Tyler, Texas  75702
 7

 8      FOR THE DEFENDANTS:          Ms. Elizabeth DeRieux
                                     Capshaw DeRieux, LLP
 9                                   114 East Commerce Avenue
                                     Gladewater, Texas  75647
10
                                     Mr. Russ Emerson
11                                   Mr. Charlie Jones
                                     Ms. Stephanie Sivinski
12                                   Ms. Debbie McComas
                                     Ms. Tiffany Cooke
13                                   Haynes & Boone, LLP
                                     2323 Victory Avenue
14                                   Suite 700
                                     Dallas, Texas  75219
15
                                     Mr. Samuel Lee
16                                   Mr. Jay Hoon Byun
                                     Yulchon LLC
17                                   Parnas Tower, 38F, 521 Teheran-ro
                                     Gangnam-gu, Seoul 06164, Korea
18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

  (Jury out.)

  COURT SECURITY OFFICER:  All rise.

  THE COURT:  Be seated, please.

  All right.  Let's bring in the jury, please.

  COURT SECURITY OFFICER:  All rise.

  (Jury in.)

  THE COURT:  Please be seated.

  Welcome back from lunch, ladies and gentlemen.

  We're going to try to keep the case running on a fairly straightforward schedule so that we can get everything completed by the end of the week, as I indicated to you during jury selection.

  Just so you'll know, it's my plan to start each day with you being brought into the courtroom as close to 8:30 as possible.  I'd like you assembled and in the jury room by not later than about 8:15 or 8:20.

  And we will take periodic recesses during each day, generally every hour and a half to two hours.  I don't watch the clock, and then when it strikes exactly one and a half hours, call a recess, or two hours and call a recess. It's generally a matter of when a witness finishes and we have a transition.  I look for a natural break to call a recess.  But I'm not limited to that if it's necessary.

1  And then we'll have lunch brought in each day and

2  recess for lunch approximately like we have today.

3  Also, I've found that during my time on the bench

4  that East Texas juries would much rather work longer hours

5  each day and be away from their homes and their businesses a

6  fewer number of total days than they had have short days and

7  be gone a longer number of days.

8  So, consequently, we will probably not stop each

9  day at 5:00 o'clock.  We will probably go at least to 5:30,

10  maybe even to 6:00, depending on, as I say, how the flow of

11  the evidence is going.  If there is a two-hour witness and

12  we've had him on the stand an hour at 5:00 o'clock, we'll

13  probably finish him.  I try to avoid illogical breaks in the

14  evidence so that we can keep things as intact as possible.

15  Also, I have some additional instructions that I

16  need to give you.  After I've given you these instructions,

17  then we'll have opening statements from the lawyers, and

18  then after opening statements from both Plaintiffs and

19  Defendants, then the Plaintiff will proceed to call their

20  first witness and put on their -- their evidence, which we

21  call the Plaintiffs' case-in-chief.

22  After the Plaintiffs have rested their

23  case-in-chief, then the Defendants will put on their

24  witnesses in what we call the Defendants' case-in-chief.

25  And when they've called all their witnesses, then they will

1    rest.

2          And when the Defendants have rested, there'll be

3    an opportunity for the Plaintiffs to call rebuttal witnesses

4    to rebut anything that the Defendants have put on.  If the

5    Plaintiffs call rebuttal witnesses, then when they have

6    completed their rebuttal case, then, at that point, all the

7    evidence will be in and before you, the jury.

8          When all the evidence is in, I will give you my

9    final instructions on the law that you're to apply, and I'll

10   also give you a list of questions that you're then to

11   answer.  That list of questions is called the verdict form.

12   And your answers to those questions will constitute the

13   verdict in this case.

14         And let me remind you, your answers to those

15   questions and your verdict in this case must be unanimous.

16         You've been sworn as the jury in this case, and as

17   the jury, you are the sole judges of the facts of this case.

18   And as the sole judges, you will decide what the facts are

19   in this case.

20         Now, my role as the judge, as I've told you, is to

21   give you instructions on the law, to decide any questions of

22   law that arise during the trial, including questions of

23   evidence or procedure, and to manage the flow of the trial

24   and maintain the decorum of the courtroom.

25         As I've said, at the end of the evidence, I'll

1    give you detailed instructions on the law to apply and then

2    a list of questions to answer.  Those questions are the

3    verdict form, and as I just told you, your answers to those

4    questions and your verdict in this case must be unanimous.

5           Let me briefly tell you what this case is about.

6           This case involves a dispute regarding one United

7    States patent, as well as the contractual rights to the

8    invention disclosed in that patent.

9           Now, I know that you've all seen the patent video,

10   but I need to give you some additional instructions now and

11   on the record about a patent and how one is obtained.

12          Patents are either granted or denied by the United

13   States Patent and Trademark Office, an agency of the U.S.

14   Government.  This agency is often called, for shorthand,

15   simply the PTO.

16          A valid United States patent gives the

17   patentholder the right to prevent others from making, using,

18   offering to sell, or selling the patented invention within

19   the United States or from importing it into the United

20   States without the patentholder's permission.

21          A patent is a form of property.  It's called

22   intellectual property.  And like other forms of property, a

23   patent can be brought, and it can be sold.  If more than one

24   person owns shares of ownership in a patent, the co-owner

25   does not have the right to prevent his fellow co-owner from

1   practicing the patent.

2          In other words, the practice of a patent by one

3   owner, even without the consent or involvement of the

4   owner -- other owner, does not violate the other owner's

5   rights in the patent.

6          Now, the violation of a patentholder's rights is

7   called infringement.  The patentholder may try to enforce

8   his or her patent against persons they believe to be

9   infringers by filing a lawsuit in federal court.  And that's

10  what we have in this case.

11         The process of obtaining a patent is called patent

12  prosecution.  To obtain a patent, you first file an

13  application with the PTO, the United States Patent and

14  Trademark Office.  Excuse me.  As I've said, the PTO is an

15  agency of the United States Government, and the PTO hires

16  and employs trained examiners who review applications for

17  patents.

18         Now, after the application is filed with the PTO,

19  an examiner reviews the application to determine whether or

20  not it's appropriate for patent protection and whether or

21  not the application adequately describes the invention

22  that's claimed.

23         In examining the application, the examiner reviews

24  certain information about the state of the technology at the

25  time the application is filed.  The PTO searches for and

1   reviews this type of information that is publicly available

2   or that was submitted by the applicant.  This type of

3   information is called prior art.

4         The examiner reviews this prior art to determine

5   whether or not the invention described in the application is

6   truly an advance over the state of the art at the time.  In

7   general, prior art includes information that demonstrates

8   the state of the technology that existed before the claimed

9   invention was made or before the application for the patent

10  was filed with the PTO.

11        After the prior art search and examination of the

12  application, the examiner informs the applicant in writing

13  of what the examiner has found and whether the examiner

14  considers any claim to be patentable, and if it is, then

15  it's considered to be allowed.

16        This writing from the examiner to the applicant is

17  called an office action.  If the examiner, however, rejects

18  the claims, the applicant has an opportunity to respond to

19  the examiner to try and persuade the examiner to allow the

20  claims.  The applicant has the opportunity to change or

21  amend the claims or to submit new claims.

22        Now, the papers generated during these

23  communications back and forth between the applicant and the

24  examiner are called the prosecution history.

25        Now, to help you follow the evidence in this case,

1  I'm going to give you a brief summary of the positions of

2  the two competing parties.

3          As you know, the parties that bring a lawsuit are

4  called the Plaintiffs, and in this case, the Plaintiffs are

5  Plastronics Socket Partners Limited and Plastronics H-Pin

6  Limited.  These two limited partnerships are domestic Texas

7  business entities.

8          The parties and I may, from time to time, simply

9  refer to these Plaintiffs as Plastronics Socket Partners or

10  PSP, and the parties may also refer to Plastronics H-Pin

11  Limited as Plastronics H-Pin or maybe even just H-Pin.

12          Now, as you know, the parties against whom a

13  lawsuit is brought are called the Defendants.  In this case,

14  the Defendants are Dong Weon Hwang individually and

15  D.W. Hwang doing business as HiCon Company, a sole

16  proprietorship, and HiCon Company Limited, a Korean business

17  entity.

18          Now, certain of the exhibits and testimony that

19  you may see over the course of the trial will refer to

20  Mr. Hwang as Dan Hwang.  So to avoid confusion, ladies and

21  gentlemen, I'm going to do my best to refer to the Defendant

22  individually as Mr. D.W. Hwang.

23          When he's acting as a sole proprietorship,

24  D.W. Hwang, doing business as HiCon Company, you'll hear him

25  referred to as the DBA.  DBA stands for doing business as.

1  And so when an individual does business as a sole

2  proprietorship, it's that person using that business name,

3  but it's still that individual conducting business.

4       To give you an example, Anne Smith, who is a

5  beautician, may have a business called Anne's Beauty Salon.

6  In that case, it's Anne Smith doing business as Anne's

7  Beauty Salon.  So if you hear DBA in this case, that refers

8  to Mr. Hwang doing business as HiCon Company.

9       Then in addition, there's HiCon Company Limited,

10  the Korean entity.  That entity will be referred to

11  throughout the trial simply as HiCon Limited.

12       Also, ladies and gentlemen, there's another entity

13  that you're going to hear about in this case who is not a

14  party, but you're going to hear about them, and they are

15  called HiCon USA.

16       HiCon USA is not HiCon Limited, and it's not

17  Mr. Hwang doing business as HiCon Company.  It's an

18  additional third party.  It's not a plaintiff; it's not a

19  defendant; but the name is similar.  And in that case,

20  you'll hear that entity referred to as HiCon USA.

21       So there'll be HiCon USA, which is not a party to

22  the lawsuit; HiCon Limited, which is the Korean business

23  entity, which is a Defendant in the case; the DBA, which is

24  Mr. Hwang doing business as HiCon Company; and then

25  Mr. Hwang individually.  Those are the Defendants in the

1　case, and we'll try to use those names consistently to avoid

2　any confusion during the course of the trial.

3　　　　　As I just mentioned, Mr. Hwang individually does

4　business as a sole proprietorship named HiCon Company.

5　　　　　A sole proprietorship is not a legally separate

6　entity.  It's just another name used by an individual person

7　for business purposes.  I gave you the example of the

8　hairdresser, Anne Smith, doing business as Anne's Beauty

9　Salon.  That's a sole proprietorship.

10　　　　　And in this case, Mr. Hwang doing business as

11　HiCon Company will simply be called, so you're clear and not

12　confused, the DBA, the doing business as.

13　　　　　All right.  As I mentioned during jury selection

14　earlier today, this case involves allegations of patent

15　infringement, and as I may have already mentioned, there is

16　one United States patent at issue in this case.  It is

17　United States Patent No. 7,025,602.

18　　　　　Now, patents are commonly referred to by their

19　last three digits.  So this patent will commonly be referred

20　to throughout the trial as the '602 or the '602 patent.  It

21　may also be called the patent-in-suit or the asserted

22　patent.  All of those terms mean the '602 patent. And this

23　patent general -- generally relates to contact pins used in

24　electronic devices.

25　　　　　You're going to have a complete copy of the

patent-in-suit, the '602 patent, in the juror notebooks that
are going to be passed out to you in a few moments.

Now, Mr. Hwang is the inventor of the '602 patent.
And Plaintiffs contend that an assignment agreement between
Mr. Hwang and Plastronics Socket Partners conveyed one-half
of all the right, title, and interest in this patent to
Plastronics Socket Partners.

Plastronics H-Pin later acquired and came into
possession of Plastronics Socket Partners' rights to the
'602 patent. However, the Defendants in this case dispute
whether the assignment agreement is a valid contract and
whether Plastronics Socket Partners or Plastronics H-Pin
have a valid interest in the '602 patent.

Plastronics H-Pin alleges that HiCon Limited, the
Korean business entity, is infringing the '602 patent by
making, using, selling, or offering to sell in the United
States or importing into the United States a product meeting
all the requirements of a claim of the '602 patent without
authority or permission to do so.

Plastronics H-Pin also alleges that HiCon Limited
is indirectly infringing the '602 patent by inducing other
entities to infringe without authority or permission to do
so.

The products that are alleged to infringe the '602
patent are the Hi-CONTACT pin, Hs-CONTACT pin, and the

1    Hr-CONTACT pin.  You may hear these referred to throughout

2    the trial collectively as the accused products.

3            HiCon Limited denies it's infringing the '602

4    patent.  HiCon Limited denies that it is selling the accused

5    products in the United States or induce other -- inducing

6    other entities to infringe.

7            Instead, the Defendants in this case contend that

8    the DBA, Mr. Hwang, doing business as HiCon Company, the

9    sole proprietorship, sells the accused products into the

10   United States and that because the DBA is Mr. Hwang's sole

11   proprietorship, it enjoys the same rights as Mr. Hwang to

12   sell the accused products in the United States and to allow

13   other companies to resell the products here.

14           Now, in most patent cases, ladies and gentlemen,

15   the parties dispute whether the accused products actually

16   meet all the limitations or elements of the claims of an

17   asserted patent.

18           However, in this case, the parties have agreed and

19   stipulated that the HiCon Hi-CONTACT, the Hs-CONTACT pin,

20   the Hr-CONTACT pin, the accused products, meet every

21   limitation or element of Claim 1 of the '602 patent.

22           As a result, the only contested issues related to

23   patent infringement are whether or not -- or excuse me --

24   are whether -- what person or entity, if any, makes, uses,

25   sells or offers for sale into the United States or imports

1  into the United States the accused products and whether that

2  person or entity or those entities are legally authorized to

3  do so.

4          Plastronics Partners -- excuse me -- Plastronics

5  Socket Partners and Plastronics H-Pin, the Plaintiffs, also

6  allege that Mr. Hwang breached two contracts and -- that he

7  had -- that he had with them related to the '602 patent.

8          These contracts are the Assignment Agreement and

9  the Royalty Agreement.  These will be introduced into

10 evidence during the course of the trial.

11         Mr. Hwang denies these claims of breach of

12 contract and contends that the Plaintiffs waited too long to

13 bring their claims and that his conduct was further excused

14 by the Plaintiffs' own conduct.

15         Mr. Hwang also claims that the two contracts are

16 not enforceable because the Plaintiffs induced him to enter

17 into those contracts by fraud.  That's the Defendants'

18 position.

19         Mr. Hwang also alleges that the Plaintiffs,

20 Plastronics Socket Partners and Plastronics H-Pin, have

21 breached the same two contracts related to the '602 patent

22 by failing to pay to him royalties that were owed to him.

23         The Plaintiffs deny these claims.  The Plaintiffs

24 also argue that Mr. Hwang's claim for breach of contract is

25 precluded as Plaintiffs' actions are excused due to

1  Mr. Hwang's wrongful actions.

2        Now, in order to determine whether any party has

3  breached a contractual obligation, you'll be called upon to

4  answer several questions.

5        First, whether a valid and enforceable contractual

6  obligation existed.

7        Second, whether any party violated any of its

8  contractual obligations.

9        Third, if a party violated any of its obligations,

10 whether there is a defense for that violation.

11       Now, as I mentioned, there are two contracts at

12 issue between the parties, a Royalty Agreement and an

13 Assignment Agreement.  The parties will discuss these in

14 great detail as they present their respective cases.  And

15 I'll give you more detailed instructions about these

16 agreements later in the case.

17       Right now, I want to give you a very broad and

18 general description of these two contracts that are at

19 issue.

20       Generally speaking, the assignment contract grants

21 both Mr. Hwang and Plastronics Socket Partners a 50 percent

22 ownership interest in the invention disclosed in the '602

23 patent.

24       The Royalty Agreement requires Mr. Hwang and

25 Plastronics Socket Partners to make certain royalty payments

1   to one another under certain circumstances if products

2   embodying the invention are sold.

3       Both agreements also require each party to receive

4   the other party's consent before licensing the invention to

5   others.

6       Now, a license gives the license holder permission

7   to use an invention.  While this is a broad overview of the

8   contracts at issue here, the specifics of what was assigned

9   by the Assignment Agreement and when a royalty is due and

10  how that royalty should be calculated under the Royalty --

11  under the Royalty Agreement and when a party must receive

12  consent of the other to license the invention are all

13  disputed issues between the Plaintiffs and Defendants in

14  this case.

15      Plastronics H-Pin now owns the interest

16  Plastronics Socket Partners originally had in these

17  agreements.  However, the Defendants dispute whether either

18  of these agreements are enforceable, and, therefore, whether

19  the Plaintiffs have any interest in the agreements at all.

20      Now, I've already construed most of the terms in

21  these contracts.  And I'll give you more detailed

22  instructions about the meaning of these terms later in the

23  case.

24      However, there are a few terms in these contracts

25  that I've found to be ambiguous.  Therefore, if you decide

1   that either or both of these contracts are valid and

2   enforceable, then it will be your job to determine what

3   these ambiguous terms mean.

4          The first of these ambiguous terms is the term

5   "H-Pin project", which is used in the Royalty Agreement.

6   You'll be asked to decide whether the term "H-Pin project"

7   includes any rights and interest to the invention disclosed

8   in the '602 patent in the Republic of Korea, which is also

9   known, as you know, as South Korea.

10         Similarly, you're going to be asked to construe

11  the phrase "throughout the world," which is used in the

12  Assignment Agreement, and you're going to be asked to

13  determine whether the phrase "throughout the world" was

14  intended to include or exclude South Korea.

15         You'll also be asked to construe the terms "third

16  party" and "another entity" which are used in the Royalty

17  Agreement.  You will be asked to determine whether the terms

18  "third party" and "another entity" mean any entity that is

19  not a party to the Royalty Agreement or whether they were

20  intended to exclude entities controlled by the parties to

21  the agreement, such as HiCon Limited, which is controlled by

22  Mr. Hwang.

23         In determining the meaning of these terms, you

24  should do your best to give them the meaning the parties

25  intended them to have at the time they entered into these

contracts, taking into account the business purposes of the contracts.

You should consider both contracts in light of the other. However, before you determine the meaning of any term, you must first determine whether any of these contracts are valid and enforceable.

And by instructing you on how to determine the meaning of these terms, you should not assume that I have any opinion one way or the other as to whether these contracts are valid and enforceable. That, ladies and gentlemen, is your issue to decide.

Plastronics Socket Partners and Plastronics H-Pin, the Plaintiffs, also allege that HiCon Limited, the Korean business entity, is tortiously interfering with the Plaintiffs' prospective business relations and that Mr. Hwang and HiCon Limited are conspiring with others to tortiously interfere with Plastronics Socket Partners and Plastronics H-Pin's prospective business relations.

Mr. Hwang and HiCon Limited deny these claims.

In determining whether HiCon Limited tortiously interfered with Plaintiffs' prospective business relations, you should consider whether there was a reasonable probability that the Plaintiffs would have entered into a business relationship with a third party, whether HiCon Limited acted with a conscious desire to prevent the

relationship from occurring or knew the interference was
certain or substantially certain to occur as a result of
HiCon Limited's conduct, whether HiCon Limited's conduct was
independently tortious or unlawful, whether the interference
proximately caused the Plaintiffs' injury, and whether the
Plaintiff suffered actual damage or loss as a result.

In determining whether Mr. Hwang conspired with
H -- with HiCon Limited to tortiously interfere with
Plaintiffs' prospective business relations, you should
consider whether HiCon Limited and Mr. Hwang sought to
accomplish these goals or objects, whether they reached an
agreement as to these goals or objects, whether one or more
unlawful overt act was taken in pursuit of such goals or
objects, and whether damages occurred as a proximate result
thereof.

If you find that any party committed patent
infringement, breached its contractual obligations,
tortiously interfered, or conspired to tortiously interfere
with another's prospective business relationships, then
you'll be asked to determine what amount of damages, if any,
should be awarded as compensation for these violations.

A damages award, ladies and gentlemen, must be
adequate to compensate an injured party but must not punish
the party who caused the injury.  You may not include in any
damages award an additional amount as a fine or a penalty

1  above what is necessary to fully compensate the injured
2  party.
3          Moreover, these damages cannot be speculative and
4  must be shown and proven by a preponderance of the evidence.
5          As I mentioned earlier, the case involves the
6  alleged infringement of a United States patent, the '602
7  patent.  A United States patent provides rights only in the
8  United States.  Therefore, if you find that HiCon Limited
9  infringed the '602 patent in the United States, you may not
10  award damages for injuries that occurred outside the United
11  States, unless you find that the Plaintiffs have shown by a
12  preponderance of the evidence that the injury was
13  proximately caused by infringement that occurred within the
14  United States.
15          However, the Royalty and Assignment Agreements
16  cover the rights to the invention disclosed by the '602
17  patent both in the United States and outside the United
18  States.
19          The precise geographical scope of the Royalty and
20  Assignment Agreements is a question that you'll be asked to
21  determine.  If you find that a contract covers a geographic
22  area and that the contract was breached but conduct that
23  occurred in that geographic area -- let me say that again.
24          If you find that a contract covers a geographic
25  area and that the contract was breached but the contract

1    occurred in that geographic area, then you may award damages

2    sufficient to compensate for that injury.

3         Finally, if you find that the Plaintiffs are

4    entitled to damages for tortious interference with their

5    prospective business relations, you're going to be asked to

6    determine whether HiCon Limited and Mr. Hwang acted with

7    malice.

8         Malice means that they specifically intended to

9    cause substantial injury or harm to the Plaintiffs.  Malice

10   must be shown by clear and convincing evidence.  And your

11   finding on malice must be unanimous.

12        If it is, you may award additional what are called

13   exemplary damages to the Plaintiffs in addition to the

14   comp -- to the compensatory damages.

15        Now, I'll give you more detailed instructions on

16   the calculation of damages at the conclusion of the trial.

17   However, the fact that I'm instructing you on damages does

18   not mean that the Plaintiffs or Defendants are or are not

19   entitled to recover damages.

20        Also, ladies and gentlemen, you're going to be

21   hearing from a number of witnesses throughout this trial.

22   And I want you to keep an open mind while you're listening

23   to the evidence and each witness and not decide any of the

24   facts in this case until you have heard all of the evidence

25   from both sides in this trial.

1    It is important while witnesses are testifying

2 that you keep in mind and remember that you, the jury, will

3 have to determine and decide the degree of credibility and

4 believability to allocate to each and every witness and all

5 of the evidence in this case.  That is an important part of

6 your service as jurors in this case.

7    So while these various witnesses are testifying,

8 you should be asking yourselves and thinking about things

9 like the following:  Does this witness impress you as being

10 truthful?  Does he or she have a reason not to tell the

11 truth?  Does he or she have any personal interest in the

12 outcome of the case?  Does the witness seem to have a good

13 memory?  Did he or she have an opportunity and ability to

14 observe accurately the things that they testified about?

15 Does the witness appear to understand the questions clearly

16 and answer them directly?  And, of course, does the

17 witness's testimony differ from the testimony of any other

18 witness or witnesses, and if it does, how does it differ?

19    These are some of the kinds of things you should

20 be thinking about while you're listening to each of the

21 witnesses during the course of the trial, but you alone,

22 ladies and gentlemen, as the jury, are to determine

23 questions of credibility and truthfulness of each and every

24 one of the witnesses.  You are to determine the

25 believability of all the evidence.  And in weighing the

1 testimony of the witnesses, you may consider the witness's

2 manner and demeanor on the witness stand, any feelings or

3 interest they might have in the case, any prejudice or bias

4 about the case, and any consistency or inconsistency in

5 their -- in their testimony when considered in the light of

6 the circumstances.

7 Has the witness been contradicted by other

8 credible evidence?  Has he or she made statements at other

9 times and places contrary to the statements they make under

10 oath as witnesses in this trial?  These are all some of the

11 things you should be thinking about and considering how to

12 weigh and believe and consider each of the witness's over

13 the course of the trial.

14 You should give the testimony for each witness the

15 credibility and the weight that you believe it deserves.

16 Even though a witness to a -- may be a party in a case and,

17 therefore, interested in the outcome, that testimony may be

18 accepted, if it's not contradicted by direct evidence or by

19 any inference that may be drawn from the evidence if you

20 believe that testimony.

21 You're not to decide this case, ladies and

22 gentlemen, by counting the number of witnesses who have

23 testified one way and then counting the number of witnesses

24 that have testified the other way.  Witness testimony is

25 weighed.  It is not counted.

1    The test is not the relative number of witnesses

2 but the relative convincing force and believability of the

3 witnesses and the evidence that they give under oath.

4    The testimony of a single witness is sufficient to

5 prove any fact, even if a greater number of witnesses

6 testify to the contrary, if after considering all of the

7 evidence you believe that single witness.

8    Also, I want to talk to you briefly about expert

9 witnesses. When knowledge of a technical subject may be

10 helpful to the jury, a person who has special training and

11 experience in that particular field -- we call them an

12 expert witness -- is permitted to testify to you about his

13 or her opinions on those technical matters.

14    However, ladies and gentlemen, you're not required

15 to accept an expert's or any other witness's opinions at

16 all. It's up to you to decide whether you believe an expert

17 witness or any witness for that matter and whether you

18 believe they're correct or incorrect and whether or not you

19 want to believe or disbelieve what they say.

20    Now, I anticipate that there will be several

21 expert witnesses testifying in support of each side in this

22 case, but when they're called to testify as an expert

23 witness, it will be up to you to listen to their

24 qualifications, listen to the opinions that they give and

25 the basis and rationale for them, explain that basis, and

1   then you will have to evaluate and determine whether you

2   believe what they have testified to.  And if so, to what

3   degree and what degree do you want to give it weight, if

4   any.

5          Remember, ladies and gentlemen, judging and

6   evaluating the credibility and believability of each and

7   every witness is an important part of your job as jurors.

8          Now, during the trial, it's possible there will be

9   testimony from one or more witnesses that are going to be

10  presented through what we call a deposition.

11         In trials like this, it's difficult, if not

12  impossible, to get every witness in court in person at the

13  same time.

14         So lawyers for each side, prior to the trial, take

15  the depositions of the witnesses.  In a deposition, the

16  witness is present, a court reporter is present, the witness

17  is sworn and placed under oath, and then they are asked

18  questions by the lawyers for each side.  And their answers

19  to those questions and the questions are taken down and

20  recorded.

21         Portions of these recordings -- they're often made

22  as video recordings -- of the questions asked and the

23  answers given from these witnesses can be played back to you

24  as a part of this trial so that you can see and hear those

25  witnesses and hear their testimony even though they're not

1   physically present in the courtroom.

2           That deposition testimony is entitled to the same
3   consideration insofar as possible and is to be -- and is to
4   be judged by you as to its credibility, weight, and effect
5   in the same way as if the witness had testified under oath
6   from the witness stand in open court and had personally been
7   here.

8           Now, during the course of the trial, it's possible
9   that lawyers for one side or the other side will make
10  objections.  And when they make objections, the Court will
11  give rulings on those objections.

12          It's the duty of an attorney for each side to
13  object when the other side offers testimony or other
14  evidence the attorney believes is not proper under the rules
15  of the Court and the rules of evidence.

16          Upon allowing the testimony or other evidence to
17  be introduced over the objection of an attorney, the Court
18  does not, unless expressly stated, indicate an opinion about
19  the weight or effect of that evidence.

20          Judging and determining the weight and that -- and
21  effect of that evidence is the responsibility of the jury.

22          As I've stated before, you are the sole judges of
23  the credibility and believability of all the witnesses and
24  the weight and effect to give to all of the evidence.

25          Now, ladies and gentlemen, I want to compliment

1    both the Plaintiffs' counsel and Defendants' counsel present

2    today because before you were empaneled in this jury, the

3    Court spent many hours with these attorneys going through

4    all the exhibits that would be offered for evidence during

5    the course of the trial.  And through these -- through these

6    pre-trial procedures, the Court has already considered and

7    ruled on the admissibility of many, many, many exhibits.

8            That has saved you a lot of time while you sit in

9    that jury box.  You may not understand it, but you have been

10   saved many hours of hearing objections and arguments and

11   then me ruling on exhibit after exhibit after exhibit.  All

12   of that's been done in advance of the trial.

13           And that means, when an exhibit has -- is shown to

14   you during the course of the trial, it means the Court has

15   already considered its admissibility.  And I've already

16   heard any arguments about that, and I've ruled on it and

17   found that it is admissible, so it can be shown to you

18   without having to go through that process during the course

19   of the trial.

20           And both sides have worked very hard to streamline

21   the issues so that the trial can move promptly and logically

22   through as we start today.

23           However, all that being said, it's still possible

24   that there may be objections raised over the course of the

25   trial.  If I should sustain -- if I should sustain an

1  objection to a question addressed to a witness, then you

2  must disregard the question entirely, and you may draw no

3  inference from its wording or speculate about what the

4  witness would have said if the Court had permitted them to

5  answer the question.

6           On the other hand, if I overrule an objection to a

7  question addressed to a witness, then you should consider

8  the question and the answer just as if no objection had been

9  made.

10          You should know, ladies and gentlemen, that the

11  law of the United States permits a United States District

12  Judge to comment to the jury regarding the evidence in the

13  case.  But such comments by the judge on the evidence are

14  only an expression of the judge's opinion, and the jury may

15  disregard those comments in their entirety.

16          Because, as I've told you, you, the jury, are the

17  sole judges of the facts in this case, you are the sole

18  judges of the credibility believability of the witnesses,

19  and you are the sole judges to determine the proper amount

20  of weight and effect to be given to the evidence presented

21  over the course of the trial.

22          And even though the law of the United States will

23  permit me to comment on the evidence to you, I can tell you

24  now, as I told you earlier, I am going to work very hard not

25  to comment on any of the evidence and not to let you know

1   what I think about any of the witnesses or the exhibits or

2   any of the evidence that's presented over the course of the

3   trial, and you should not take any expression or comment or

4   reaction or anything you see or hear or think you see or

5   hear coming from me as something to consider in determining

6   the ultimate facts in this case.

7         Also, ladies and gentlemen, our court reporter is

8   taking down everything that's said in the courtroom.  And

9   she will continue to do that throughout the trial.

10        However, the written transcript of everything that

11   she's taking down is not going to be available for you to

12   use when all the evidence has been presented and I instruct

13   you to retire to the jury room and consider and deliberate

14   on your verdict.

15        When you retire to the jury room to consider your

16   verdict, you are going to have to rely on your memories of

17   the evidence that's been produced over the course of the

18   trial, including your memories of the testimony from each of

19   the witnesses.

20        So in a moment, each of you are going to be given

21   a juror notebook, and in the back of that notebook, you'll

22   find a brand new legal pad that you can use, if you choose

23   to, to take notes and to write down thoughts so that when

24   you retire to the jury room to deliberate, you'll have the

25   benefit of that in recalling the evidence and testimony

1   that's been given over the course of the trial.

2            Again, you will not have the transcript from the

3   court reporter to review or to consider.

4            It's up to each of you to determine whether you

5   want to take notes over the course of the trial, and if you

6   do, how extensive you want those notes to be.  That's an

7   individual decision for each member of the jury.

8            But, remember, any notes that you take are for

9   your own personal use, and you're going to have to rely on

10  your memory of the evidence when you consider your verdict

11  in this case, and that's why you should pay close attention

12  to the testimony of each and every witness.

13           Also, ladies and gentlemen, you should not abandon

14  your own recollection of the evidence just because some

15  other juror's notes indicate something differently.  Your

16  notes that you take, if you choose to take them, are for

17  your recollection, and that's the only reason that you

18  should be keeping them.

19           I'm now going to ask our Court Security Officer to

20  pass out these jury notebooks to each member of the jury.

21           (Pause.)

22           THE COURT:  In these notebooks, ladies and

23  gentlemen, you'll see that you each have a copy of the

24  asserted patent, the '602 patent that we've talked about.

25           You'll also find a section for witness pages.  For

1    each witness who might testify in the trial, you should have

2    a separate page with their picture, a head and shoulder's

3    photograph superimposed at the top of the page, and their

4    name underneath.  Below that, you should find ruled lines

5    for additional note-taking, if that's something you wish to

6    do on each page.

7          Now, you should keep these notebooks in your

8    possession at all times.  They should either be in your

9    possession in the jury box, or when you leave each evening,

10    they should be closed and on the table in the jury room.

11    They should not be anywhere else.

12          Now, having said that, there may be times over the

13    course of the trial that we're going to take a brief recess

14    and we're not going to be out of the courtroom very long,

15    and I might tell you, ladies and gentlemen, you can simply

16    close and leave your notebooks in your chairs.

17          And in that case, you can leave them there, and

18    after the short recess, they'll be there when you come back.

19    But unless I tell you that, they should either be in your

20    possession or they should be closed and kept on the table in

21    the jury room at the end of each day.

22          Now, in a moment, the lawyers for each side, the

23    Plaintiffs and the Defendants, are going to give you their

24    opening statements.  These opening statements, ladies and

25    gentlemen, are designed to give you a roadmap of what each

1  side expects its evidence will show you.

2  You should remember throughout the trial that what

3  the lawyers tell you is not evidence.  These opening

4  statements are not evidence.  The statements and the

5  questions that they ask during jury selection are not

6  evidence.  The arguments that they will make at the close of

7  the evidence when they give you their closing arguments are

8  not evidence.

9  The evidence is the sworn testimony of the

10 witnesses, given under oath from the witness stand, subject

11 to cross-examination, and the exhibits that the Court has

12 considered and admitted as evidence in the case.  Those two

13 things are the only evidence in this case.

14 So I remind you again, what the lawyers tell you

15 is not evidence.  What the lawyers tell you is their

16 impression of what they believe the evidence will show you.

17 And they have a duty to point this out to you, but,

18 remember, what they tell you is not evidence.

19 Now, after the opening statements are given by the

20 Plaintiffs, then an opening statement will be given by the

21 Defendants.  After both sides have given their opening

22 statements, then the Plaintiffs will begin their

23 case-in-chief where they put on their evidence.  They will

24 call their witnesses, and they will present their evidence

25 through those witnesses to you.

1    When each witness has been examined by Plaintiffs'

2    counsel, then Defendants' counsel will have an opportunity

3    to cross-examine those witnesses.  And when Plaintiff has

4    called all their witnesses, they will rest their

5    case-in-chief.

6    At that point, the Defendants will present their

7    case-in-chief where they call their witnesses, and their

8    lawyers will examine those witnesses, and when the lawyers

9    have examined them, then the Plaintiffs' lawyers will

10   cross-examine them.  And when the Defendants have called all

11   of their witnesses, they will rest their case-in-chief.

12   Then when the Defendants rest their case-in-chief,

13   the Plaintiffs have an opportunity to call rebuttal

14   witnesses to rebut what -- anything that they believe needs

15   to be addressed that was put on during the Defendants'

16   case-in-chief.

17   When the Plaintiffs rebuttal witnesses, if any,

18   are through, then and at that point, you will have heard all

19   of the evidence in this case.  And at that point, I will

20   give you final instructions on the law that you are to apply

21   to the evidence that you've heard in determining the facts

22   of this case.

23   After I have given you my final instructions on

24   the law, that's sometimes called the Court's charge to the

25   jury, then the lawyers will present their closing arguments.

1   The Plaintiff will presents its first closing argument, then

2   the Defendants will present their closing arguments, then

3   the Plaintiff will present a final closing argument.

4           The Plaintiff goes first and the Plaintiff gets to

5   go last because the Plaintiff has the burden of proof.

6           After you've heard closing arguments from both

7   sides, Plaintiffs' counsel and Defendants' counsel, then I

8   will direct you to retire to the jury room to deliberate on

9   those questions that constitute the verdict form and to

10  reach a unanimous decision on how to answer each of those

11  questions, and those answers to those questions will

12  constitute the jury's verdict in this case.

13          Let me remind you again, my instruction not to

14  discuss or communicate about the case with anyone applies to

15  the eight of you among yourselves, and you are not to

16  discuss anything about the witnesses or the evidence or

17  anything that transpires in the courtroom until such time as

18  you have heard all the evidence and I have instructed you to

19  retire to the jury room to deliberate on your verdict.

20          At that point, at that important juncture, then it

21  becomes your duty to discuss among each other all the

22  evidence that you've heard in addressing the questions in

23  the verdict form and attempting to come to a unanimous

24  decision as to how to answer those questions.

25          But until I direct you to retire to the jury room,

1    after all the evidence is presented, and consider your

2    verdict, you are not to discuss or communicate with each

3    other about the case in any way.  And as I've already made

4    abundantly clear, you're not to discuss or communicate with

5    anyone else about the case in any way throughout the

6    process.

7         Let me also briefly remind you as I did before

8    lunch, the Court's instructed counsel and the parties and

9    the witnesses not to communicate with the jury in any way.

10         So, if you happen to pass one or more of these

11   good folks during the course of this week's trial, don't

12   hold it against them if they don't stop and talk to you

13   because they won't stop and they won't speak to you because

14   I've told them not to.  And when that happens, that's on me;

15   that's not on them.  Don't hold it against them.  Don't

16   think they're rude or unfriendly or inconsiderate.  That's

17   not the case.

18         Again, the evidence that you will consider in

19   answering the questions in the verdict form must be limited

20   to the sworn testimony in open court and the exhibits that

21   are introduced with -- by the Court -- or admitted by the

22   Court over the course of the trial.

23         All right.  With those instructions, ladies and

24   gentlemen, we will now hear opening statements from the

25   Plaintiff.

1      Plaintiff may now present its opening statement to

2  the jury.

3          MR. DALTON:  Thank you, Your Honor.

4          THE COURT:  Would you like a warning on your time?

5          MR. DALTON:  Five minutes, please, Your Honor.

6          THE COURT:  All right.  I'll give you a warning

7  when five minutes remain.

8          You may proceed with opening statements.

9          MR. DALTON:  May it please the Court.

10          My name is Bart Dalton.  I am one of the lawyers

11  for the Plaintiffs, Plastronics.  You've already talked with

12  my colleague here, Mr. Bunt.

13          You got a little taste of what this is about, but

14  really what this is about is Mr. Hwang came over here from

15  Korea to work for my client, Plastronics, up in Irving,

16  Texas.

17          When he got there, he had some ideas about a

18  design for a piece of technology that we're going to walk

19  through, but he needed Plastronics' money and he needed

20  Plastronics' help because of the costs that would be

21  incurred in trying to make this product.

22          So he entered into a couple of agreements with

23  Plastronics, and Plastronics followed through.  They made

24  the product.  They got it to the market.

25          Shortly after they got it to the market, Mr. Hwang

1    left back -- went to Korea.  When he went back to Korea, he

2    did a couple of things that Plastronics didn't know about

3    and which violated the contracts that he had formed with

4    Plastronics.

5         The first one of those was that he started his own

6    corporation, in which he's a 51 percent owner.  And the name

7    of that corporation is HiCon Company Limited.

8         The other thing that he did was that he licensed,

9    which is just giving permission, to that entity to produce

10   the same product that his former employer -- his former

11   employer, Plastronics, had helped create and make and put on

12   the market.

13        Since that time, he has been sending the same

14   product that Plastronics makes into the United States, and

15   that violates Plastronics' rights to that patent here in the

16   U.S.  He's also been trying to take away Plastronics'

17   customers.  So that's what we're here for.

18        A little bit about my client.  Plastronics is a

19   company.  It's based in Irving, Texas.  It employs about

20   100 people.  It was -- it was started in the 1980s by Ann

21   and Wayne Pfaff.  Unfortunately, Mr. Pfaff passed a few

22   weeks ago, but Ann Pfaff is still alive, and she might even

23   be here in the court.  But here's the pictures of them.

24        So the idea was, Wayne was an engineer.  He knew

25   how to do these things.  Ann was a high school teacher who

1   was a math teacher up in Irving High, and she was good at

2   numbers so she became the accountant.

3         Later on now, the president of the company now is

4   Mr. David Pfaff, and he's the gentleman who's over there to

5   the left.  He had been working with Plastronics as a kid.

6   He would go to the warehouse, help load boxes.  He would

7   work there during the summertime.

8         He did go to college in California, came back,

9   went to UT at Austin to get his graduate degree and started

10  with the company full time after he graduated.  So now he's

11  the current president of the company.

12        The story really begins in 2003, and this happens

13  in Germany.  Both -- Plastronics was working on a project

14  with a Korean -- Korean company, and they were trying to

15  sell a product to somebody -- a customer in Germany.

16        Mr. Pfaff went on behalf of Plastronics to

17  Germany, and the Korean company sent Mr. Hwang, who that was

18  his employer at the time.

19        After those meetings with the customers, Mr. Hwang

20  and Mr. Pfaff met for dinner.  At those -- at the dinner

21  conversation, Mr. Hwang told Mr. Pfaff that it's always been

22  a dream of his to have his sons be educated in the United

23  States.  That was a dream of his, and then he also ended up

24  asking Mr. Pfaff for a job here in Texas.

25        THE COURT:  Mr. Dalton, either pull the microphone

1  a little closer or speak up.

2          MR. DALTON:  Oh, I'm sorry.

3          THE COURT:  I want to make sure the jury hears

4  you.

5          MR. DALTON:  Okay.  He asked for a job.  When

6  Mr. Pfaff returned to Irving, he called Mr. Hwang's boss and

7  he wanted to make sure this was okay because this was a

8  friend of his, and he didn't want to step on any toes.

9          Mr. Hwang's boss said that was fine, and so then

10  the wheels started getting in motion getting Mr. Hwang over

11  here.  Mr. Pfaff offered him a salary of a hundred thousand

12  dollars.

13          He paid his moving expenses.  He paid for a law

14  firm to get his green card and immigration papers squared

15  away for he and his family, even provided some temporary

16  housing until he got his own place.  And because of the

17  problems that people have from foreign countries coming

18  here, Mr. Pfaff even cosigned personally on a car for -- for

19  Mr. Hwang.

20          So things started out well.  He -- Mr. Hwang is

21  now at Plastronics.  And we're going to jump to 2005.

22          Mr. Hwang comes to Mr. Pfaff and tells him that

23  shortly when he started at Plastronics, he -- he filed for a

24  patent on a design he had for a pin.  And let me give you a

25  little background on some of this technology because it will

1  be helpful.

2          This is a -- this is what this case is really

3  about.  Computer chip-makers, when they're testing their

4  chips, they need to make sure that they run like they're

5  supposed to.  So the computer chips that run your phones and

6  your computers, you've got to make sure those things work.

7          So there are companies that make these boards, and

8  then they hire other people to make these sockets.  And

9  that's what Plastronics does.  They make these sockets.  So

10 there's different computer chips that come so they have to

11 make it all custom to whatever computer chip that they

12 are -- they're testing.

13         On the back, you're going to see these little tiny

14 things.  They're called pins.  And we're going to be talking

15 about pins a lot because that's what this case is about, are

16 these pins.  And the pins basically are like a prong on an

17 electric socket.  They plug into the electricity source.

18         And so this will go into some electrical source,

19 and the pins connect, and then they run either hot or -- you

20 try to see, you know, if they work like they were designed

21 to do.  So that's the business.  So Plastronics makes

22 sockets, and they make the pins.

23         So we go back to -- about one year into

24 Mr. Hwang's tenure at Plastronics.  He tells Mr. Pfaff that

25 shortly after he started working at Plastronics, he had

filed for an idea for a patent for an idea he had for one of

these pins.  And he asked Mr. Pfaff for a little help.

He was running against a deadline.  There's a year

deadline in which, if you get a patent someplace and you --

you want to go apply in other countries, it's going to --

you've got to do it within a year.  If not, you lose the

protection anywhere else in the world.

So it's very important you get these things -- if

you're going to try to get patent rights in different

countries, that you get these applications.

Well, Mr. Hwang was running again -- up against a

wall on this one, and there's a few weeks left, so he

needed -- these patent applications are very -- they're

expensive.  They're not cheap.  You're going to have a

lawyer to do these things, and then you have to file them in

multiple countries, and so the cost is very substantial.  So

he wanted Mr. Pfaff's help in filing patents on this design

that he had for a pin.

He -- he also wanted to -- to have Plastronics try

to see if they could make an actual product out of this pin,

to undergo the research and development and invest the money

to see if this thing could be a viable product that somebody

would buy at a price that they could make it.

So it was -- he not only needed this help with the

patents, but he wanted to make sure this thing -- let's make

1    it a product.

2           So you'll see that Mr. Hwang sent a first draft --

3    first draft of an agreement to David Pfaff.  And I think

4    that's up on your screen here.  But you'll see that this is

5    Mr. Hwang's -- Plastronics will pay for the expense of the

6    patent, its applying fee, the attorney fee, and the pat --

7    patent maintenance fee, et cetera.

8           No. 4, Plastronics will pay a royalty to Mr. Hwang

9    as next, royalty percentage of -- of 3 percent of adjusted

10   gross sales.  And then after -- he talks about different

11   equipment and different costs that are going to be

12   associated with building this thing.

13          So he recognizes that there -- there's a -- a big

14   cost associated with making this equipment and that

15   Plastronics would have to make that money back before he was

16   paid any royalty.

17          And the royalty is just another term for, you

18   know, paying you -- just some money, a percentage of your

19   sales.  That -- that's what a royalty is.

20          Another thing that's going to be important in this

21   case is that -- it's the last sentence here.  PSP will pay

22   for the development of this invention and worldwide patent

23   rights where needed and be assigned the patent in all

24   worldwide areas jointly with Hwang except Korea.

25          So the agreement was that they would let Mr. Hwang

1  be the hundred percent owner of the Korean patent, but

2  everywhere else in the world where they wanted to go file a

3  patent, which hadn't been determined yet, they were going

4  to -- he would -- Plastronics would own it 50/50 with --

5  with Mr. Hwang.

6        Another important point that's going to be -- is

7  what is defined in this agreement, what was actually being

8  assigned.

9        If I could have the next slide, Ms. Bowron.

10       There's a definition in -- in the agreement.  And

11  the definition is the H-Pin Project.  And you'll see that

12  this -- this might be a source of -- it was -- Judge

13  Gilstrap said that there -- Defendants are saying there's

14  some ambiguity in this.

15       But you'll see that the -- that the exact language

16  of the -- the contract says that the H-Pin Project includes

17  the Korean patent.  Therefore, although -- so that --

18  Plastronics for putting in all this money in developing, it

19  still has -- exercise some rights over what Mr. Hwang can --

20  can do with the patent.

21       Next slide, please.  Thank you.  No. 12, please.

22       Now, in this Royalty Agreement, there's a Section

23  5.  And this says that the -- licensing the H-Pin Project

24  rights.  And remember, we defined the H-Pin Project as the

25  Korean patent.  And this particular clause says that neither

1    PSP or Hwang can grant a license for the patents covering

2    the H-Pin Project without approval from the other -- from

3    the other party.

4           This means that neither party could assign or give

5    somebody else permission to make this without the other

6    person allowing it or giving their permission.

7           And you'll see that this was a very important

8    right for Plastronics.  And because -- they weren't going to

9    put all this money into this project, the millions of

10   dollars that it took to do this, and then let Mr. Hwang

11   license or give somebody else permission that would wipe out

12   Plastronics, giving it to a big competitor, giving it to a

13   Samsung, giving it to somebody like that.

14          So that was always something that Plastronics --

15   and the evidence is going to show you that it's something

16   always -- Plastronics bargained for and -- and had in mind

17   in this provision.

18          These include corporations.  Plastronics was going

19   to give Mr. Hwang the ability to practice that patent by

20   himself, but they -- they weren't going to give him the --

21   the opportunity or give him permission to start a company

22   and start competing with Plastronics because a corporation

23   has certain advantages over a -- a sole proprietorship.

24          You kind of have to look at it like a -- it's a

25   foot race, and Plastronics says, well, look I'll -- I'll

race with you, but I'm not going to give you a 90-yard head

start.  You know, I got to get -- I've got to contain you in

some way.  You can do it in your garage, but I can't let you

do it through a company because you're going to -- it's a --

you know, we put way too much money in this, and we've got

to protect that investment.

So the parties finally -- they signed the Royalty

Agreement.  The -- Plastronics filed a patent in the U.S.,

and that's that '602 patent that Judge Gilstrap just told

you about.

So with that and the other applications they made,

there's another agreement that they came to, and it was

called the Assignment Agreement.  And the Assignment

Agreement is -- is between Plastronics and Mr. Hwang.  And

this -- the purpose of this agreement was that if -- if

Plastronics was going to pay for these patents and it was

going to pay for the development of this product or pay to

see if it would even be developed, there's always a risk,

that they needed to have some control over what Mr. Hwang

did with it in -- in the same way with Mr. Hwang would have

the ability to stop Plastronics from assigning this.

So in the highlighted portion here, it says:  The

assignees -- ands this is -- this is both Mr. Hwang and

Plastronics -- will say we agree not to transfer any

interest in or license the invention disclosed in said

1    application in the United States and throughout the world

2    without the written consent of all assignees.

3            So we've got two contracts in place.  We've got

4    the Royalty Agreement, and we've got the Assignment

5    Agreement.  And neither of those allow either party to

6    assign it to anybody else or let anybody else do it without

7    the other party saying it's okay.

8            So we're going to fast forward.  Mr. Hwang is

9    still working at Plastronics.  And it's the -- probably have

10   to call it a three-year odyssey of Plastronics to try to get

11   this thing into, you know, product.

12           And, you know, a patent application might have

13   some drawings, but it takes a whole lot to -- to take a

14   drawing and actually make it a product.  And it --

15   particularly, in this industry, because you've got to make

16   little tiny things, which then you've got to make sure that

17   they have some structural integrity so, you know, they don't

18   move, so it's a very difficult process.

19           You're going to hear from Plastronics about some

20   of the things that they had to do to get this thing

21   commercialized.  They -- and -- you know, one of these

22   things is these things don't come off the shelf -- you know,

23   there's not machines that you can go out and say, well, I'm

24   going to start making these pins.  You've got to go and

25   you've got to actually purchase -- or you've got to go to a

1    vendor to say I need you to make this for me.  And you've

2    got to pay money for these people to see if they can.  And

3    there's no guarantee they can.

4         Plastronics went to a couple of vendors in the

5    United States, and they said we can't even make this what

6    you're -- what you're trying to do.  This is way too tough.

7    We don't -- we can't do it.

8         They were forced to go overseas to try to find

9    some vendors to do it.  And they finally found somebody

10   who -- who could do what this product was meant to do, and

11   would have to do it at a cost -- you know, that the people

12   would actually buy it at.

13        So during this time, Mr. Hwang is working on this

14   H-Pin Project.  He's involved in this, and he's -- he's

15   still on his salary.  He's making his hundred thousand

16   dollar salary.  He's -- he's -- knows about the

17   manufacturing.  He knows about the customers.  He knows

18   about the pricing.

19        So as soon as this -- this pin -- this H-Pin is

20   ready to market, Mr. Hwang goes -- now says he's leaving

21   Plastronics, and he's going to head back to Korea.

22        I believe that's Slide 16, Ms. Bowron, please.

23        Mr. Hwang writes this in 2008:  Thank you so much,

24   David Pfaff, everybody here, and I had a great time.  Great

25   three and a half years.  Keep you in my memory.  And I'm

1  going to contact you in the future, and you can contact me

2  below when I open my company in Korea.  And then there was

3  no indication what that -- what that company would -- would

4  do.

5          But there -- there are two things that we

6  discussed that Mr. Hwang did do when he returned to Korea.

7  The first one was that he registered this corporation, HiCon

8  Company Limited.  And he -- and this was the Korean business

9  certification that he -- he calls himself the president,

10  Dong Weon Hwang.

11         The second thing he does is that he gives a

12  license from himself to this entity, HiCon Company Limited.

13  As we discussed in those two agreements, he needed

14  Plastronics's permission to do that.

15         So -- so he did the very thing that he had

16  contracted that he wouldn't do.

17         Plastronics was not aware of this.  This was -- he

18  gave this to himself.  So at the time, Plastronics had no

19  way of knowing that he had done this.

20         Now, in 2009, this -- the sockets and pins

21  industry, they have a conference every year.  It's called

22  the BiTS Conference, and it's in different cities in the

23  U.S.  But in 2009, Plastronics gets the brochure for the

24  2009 -- their conference, and the -- the brochure on there

25  says -- can I get Slide 20, please?  Thanks.

1    So the BiTS Conference in 2009 here in the states,
2  we've got Plastronics is going to be there sponsoring and
3  exhibiting and also this entity, HiCon Limited.  And so Mr.
4  Pfaff, who's -- who's very surprised that HiCon Company
5  Limited is here in the United States and -- and trying to
6  sell the exact same thing that he's selling is a little
7  astonished, a little surprised because that's not what he
8  bargained for.  He didn't -- he didn't make this technology
9  so that Mr. Hwang could go back to Korea and compete against
10 him.
11   So Plastronics ended up filing a lawsuit in 2009
12 up in Dallas.  And ultimately, Mr. Hwang said:  Let's --
13 let's renegotiate the contracts.  You dismiss the case, and
14 let's -- let's renegotiate.  And Mr. Pfaff said:  That's
15 fine.  Let's -- let's do that.  You know, let's not drag
16 this thing out.  Let's do that.
17   So now we're at 2009, and we're trying to
18 renegotiate -- renegotiate, but Mr. Hwang won't renegotiate.
19 And so -- but he does keep saying that -- demanding that --
20 Mr. Pfaff says:  I am writing -- I'm awaiting your consent
21 on licensing the H-Pin patent to HiCon ASAP, per the
22 agreement.
23   So this is after the fact that -- and you saw that
24 he had actually done this very thing.  So after the fact,
25 he's asking for Mr. Pfaff's consent, probably noticing that

1    he was wrong and so that he did actually get to say, yeah, I

2    needed his consent and I didn't ask for it, and now I've got

3    to go back in time, try to get his consent, or I'm going to

4    be in trouble.

5            So -- but Mr. Hwang turns down any offer.  They

6    can't get any traction on trying to settle this thing out.

7    And so -- but -- but since that time, HiCon Limited was

8    selling the H-Pins, the same product that Plastronics makes

9    in the United States.

10           They were -- and they're also trying to get

11   Plastronics's customers, same time.  They're going out in

12   the United States and saying:  Hey, why don't you buy these

13   pins from us.  Don't buy it from Plastronics, buy it from

14   him -- us.

15           And so as we -- you know, as Judge Gilstrap said

16   in his instructions, that violates the patent laws.  If --

17   if Plastronics has the right to sell that H-Pin in the

18   United States and -- and so somebody needs their permission

19   if they were to do that, and he did not give HiCon Limited

20   his permission.

21           So not a lot is heard of from Mr. Hwang in 2009.

22   All this stuff is going in kind of the background that

23   Mr. -- Plastronics and Mr. Pfaff are -- don't know about.

24           But in 2017, there was a deal that was made

25   between a -- an entity called HighRel and Mr. Hwang and

1   HiCon Company Limited.

2           HighRel is a company that sells the green boards,

3   and they don't actually make the pins and sockets, but they

4   sell the boards.  And for 20 years, HighRel had been using

5   Plastronics's pins and sockets on -- on their boards.

6           And so the way it works is that then HighRel will

7   go to a computer chip maker and say:  Yeah, here's -- here's

8   your boards, here's for your -- for your testing.

9           So they have a -- going to try to get all these

10  down.  There's NXP in Austin, is a semiconductor company

11  that they sell to.  ON Semi, Plano and Austin.  Intel, here

12  in Silicon Valley, got offices in Austin and Houston.

13  Micron based in Boise, but they have an office up in Allen.

14  All of those companies now -- those are the companies that

15  Mr. Pfaff and Plastronics was selling to up until this time.

16          So there is a -- there's a person at HighRel now

17  who took the job of president, and his name is

18  Mr. Schubring.  Mr. Schubring worked at Plastronics

19  previously, and he knew Mr. Hwang there.  So they kind of

20  reconnect.  And they -- they come to this agreement that now

21  HiCon Company Limited pins will be -- we're -- we're going

22  to replace the Plastronics pins and sockets on our boards,

23  and we're going to replace them with HiCon Company Limited

24  pins and sockets.

25          So that shuts Plastronics out of a huge amount of

1  the market.  And then after this, so they -- they sign this

2  Distribution Agreement, which is in front, probably not --

3  but I can't read that very well, but we'll get into that

4  during the trial.

5           And also the -- HiCon Company Limited announces

6  their -- their partnership with -- with HighRel.

7           Can you get 28 for me?

8           So here we go.  We have August 2017.  This is a

9  presentation from HiCon Company Limited, appointed HighRel,

10 Inc., as the exclusive distributor for HiCon products in

11 North America.

12          And so you're not lost on this, HiCon Company

13 Limited has no right to sell this into the United States,

14 but they're doing it.  And they -- they could sell it, but

15 they'd -- they'd need permission from Plastronics.  But

16 they're doing it anyway.  They're doing it open and

17 notorious, and -- and so now they're -- they've got a

18 distributor here in North America who's going to help them

19 do this.

20          Here's who we're suing and -- and why we're doing

21 it.  So one juror said there's a lot of mumbo jumbo, so I'm

22 going to try to cut through it.  So we're suing Mr. Hwang,

23 and we're suing HiCon Company Limited, okay?

24          We're suing Mr. Hwang because he breached his

25 agreements with Plastronics by assigning that patent to --

1   to HiCon Company Limited.  That was something that was

2   expressly prohibited in the agreement.  He did not get the

3   permission of Plastronics to do that.

4          THE COURT:  Five minutes remaining.

5          MR. DALTON:  We also have -- we're going to be --

6   we also have causes of action against -- against Mr. Hwang

7   for inducing infringing.  We have him for -- for assisting

8   and encouraging.  And we are also have -- our claims against

9   HiCon Company Limited -- yeah, and this is for patent

10  infringement.

11         You're going to see that they sell that -- the

12  same H-Pin in the U.S. that Plastronics sells without their

13  permission.  You're going to see that H-Pin -- that when --

14  that HiCon Company Limited employees are seeking out

15  customers here.  HiCon Company Limited is signing contracts

16  here.  They're going to trade shows.  They ship products to

17  the United States.  We have invoices that say that.

18         We're also suing HiCon Company Limited for

19  tortious interference with our -- our customers because they

20  fraudulently tell people that they have the right to sell in

21  the U.S. when they actually don't.

22         We also have conspiracy charges with Mr. Hwang

23  working with HiCon Company Limited to do those tortious

24  interference with prospective business relations.

25         Some of the -- the things that are going to be

1   discussed here at trial that the defense might say they're

2   going to talk -- you're going to hear a lot of talk about

3   HiCon Company -- Hwang's DBA HiCon Company.  He's going to

4   say that the DBA was actually selling products into the

5   United States so he had the right to do it.  That it wasn't

6   HiCon Company Limited and that they are the person behind

7   all this, so -- so he's -- that's fine, but he's not really

8   infringing the patent.

9           But there's -- there's some things that you -- you

10  need to keep in mind with this -- this Hi -- the DBA HiCon

11  Company.

12          DB -- HiCon -- the DBA sole proprietorship is only

13  Mr. Hwang.  It has no assets.  It has no marketing.  It

14  doesn't book its sales and records.  It doesn't have its own

15  books.  It uses the same address as HiCon Company Limited.

16  It has the same contact names in both registrations for the

17  DBA and HiCon Limited.  And it's not Mr. Hwang.  So it's an

18  employee of HiCon Company Limited.

19          You're going to see at some point in 2009,

20  Mr. Hwang started using this generic name HiCon.  And

21  basically he was trying to kind of make it murky between who

22  was it -- was it HiCon Company Limited or was it HiCon

23  Company?  And you'll see that -- the reason why he did this

24  is he wanted it both ways, right?

25          So he wanted -- when he was actually selling

1 products and being a big -- you know, trying to get million

2 and billion-dollar companies to -- to buy products for him,

3 he was the big corporation. He was HiCon Company Limited.

4 We also have -- Mr. Hwang has claims against Plastronics

5 about royalty payments. What these royalty payments -- as

6 you'll see in the Royalty Agreement, is that there are

7 certain costs that need to be paid back to Plastronics

8 before he actually gets a royalty.

9 You're going to hear from Mr. Pfaff about the

10 millions of dollars that Plastronics spent on this thing and

11 why it's affected their ability to pay him royalties under

12 the agreement.

13 And the last thing we're going to ask you to do

14 here today -- at the closing arguments, we're going to ask

15 you to compensate Plastronics for the harm that Mr. Hwang

16 has done in these companies.

17 So if you can get 46 on the screen, Ms. Bowron.

18 Thank you.

19 We're going to have our expert -- he's going to

20 come on, and he's a guy that does these calculations, and he

21 can -- he'll tell you what the lost profits are for -- for,

22 you know, Mr. Hwang's breach of contract.

23 So Plastronics has lost 25 million 859 -- 872,000

24 dollars in lost profits for Mr. Hwang's breach of these

25 assignment agreements. Plastronics has -- for the tortious

1    interference of contract, they've lost $11,231,676.  And for

2    the lost profits on the patent infringement case, we're

3    going to ask you to return a verdict of $4,205,228.

4            Thank you.

5            THE COURT:  All right.  Defendants may now present

6    their opening statement.

7            Mr. Emerson, would you like a warning on your

8    time?

9            MR. EMERSON:  I would like five and one, Your

10    Honor.

11            THE COURT:  I'll warn you when five minutes and

12    one minute remain.

13            You may proceed.

14            MR. EMERSON:  And, Your Honor, with the Court's

15    indulgence, I would like the opportunity to use the easel,

16    if I may?

17            THE COURT:  Well, tell me where you want to place

18    it.

19            MR. EMERSON:  I will place it wherever you would

20    like it, but I was thinking right about here.

21            THE COURT:  And where do you intend to stand while

22    you're using the easel?

23            MR. EMERSON:  Right here.

24            THE COURT:  Well, you're going to have to -- I'll

25    let you use it there, but you're going to have to make sure

1   you're heard by the jury.  If you're going to have your back

2   to the jury and speaking toward the easel without the

3   microphone, you're going to have to make sure you're heard.

4           MR. EMERSON:  Understood, Your Honor.  How about I

5   put it right here?

6           THE COURT:  I'm good with either place.  You pick.

7   I just want you to be heard by the jury.

8           MR. EMERSON:  The other indulgence that I would

9   ask, Your Honor, is if I can approach the jury box and show

10   them some models.  And I'll stand right here.

11           THE COURT:  Just while you're showing those

12   models.

13           MR. EMERSON:  Yes, Your Honor.

14           THE COURT:  Not any closer.  That's all right.

15           MR. EMERSON:  Thank you, sir.

16           THE COURT:  Proceed with your opening statement.

17           MR. EMERSON:  Thank you, Your Honor.

18           May it please the Court, court staff, Mr. Dalton,

19   and ladies and gentlemen of the jury.

20           Mr. Hwang has every right to practice his own

21   patent.  There's no dispute in this case that Mr. Hwang

22   invented the H-Pin.  There's no dispute in this case that

23   Mr. Hwang invented the H-Pin while he was living in Korea.

24           There's no dispute in this case that Mr. Hwang

25   invented the H-Pin before he came to Plastronics.  There's

1    no dispute in this case that no one from Plastronics helped

2    Mr. Hwang invent the H-Pin.

3           There's no dispute in this case that Mr. Hwang was

4    working at Plastronics when he invented the H-Pin.  There's

5    no dispute in this case that Mr. Hwang owns 100 percent of

6    his Korean patent on the H-Pin.  There's no dispute in this

7    case that Mr. Hwang owns 50 percent of the U.S. patent on

8    his H-Pin.

9           Now, with the Court's permission, I would like to

10   go to the jury box?

11           THE COURT:  You can stand where I've indicated.

12           MR. EMERSON:  And before I go any further, I just

13   want to talk to you guys a little bit about what the H-Pin

14   is.

15           Mr. Brockwell, will you put up the dime slide,

16   please?

17           These pins are tiny.  They're about the size of a

18   splinter you might get in your finger.  Before Mr. Hwang

19   invented the H-Pin, the main type of spring probe that was

20   in use in the industry was something called the Pogo Pin.

21   This is a model of the Pogo Pin that Mr. Hwang made to show

22   customers.

23           And the Pogo Pin has four parts.  Inside the

24   cylinder, there's a spring, and on either side of the

25   cylinder, there are these plungers, okay?  So it has a

1   little bit of give like this.  The problem with the Pogo Pin

2   and the problem that Mr. Hwang saw was that the Pogo Pin is

3   very expensive and time-consuming to make.

4           These plungers are machined.  What is that?  Some

5   of you may do woodworking or know people who do woodworking

6   and know what a lathe is.  These metal pieces are cut on a

7   lathe.  It's essentially carved out of a chunk of metal.

8   And it takes a while to carve these plungers out of a chunk

9   of metal.  So you have two of them that have to be machined.

10          And the cylinder is typically manufactured using a

11  technique called drawing, and that's also expensive and

12  time-consuming.

13          THE COURT:  You're going to have to speak up,

14  Mr. Emerson.

15          MR. EMERSON:  Thank you, Your Honor.

16          What Mr. Hwang saw was that as computer chips got

17  more and more complicated and more and more complex, they

18  had more and more contacts on them.  And those contacts,

19  when they're tested, need to be contacted by one of these

20  probes.  So the H-Pin was very expensive and very

21  time-consuming to make.

22          And this was his invention.  This is a model of

23  the H-Pin.  And before I go any further, I just want to say

24  something about the nomenclature.  For your convenience, for

25  everyone's convenience, I'm going to call this the H-Pin.

1    H-Pin is Plastronics' trademark.  That's what they call

2    their version of this device.

3         Mr. Hwang calls it something else.  But they are

4    essentially the same.  They're very similar.  And so to

5    avoid any confusing -- confusion, I'm just going to refer to

6    the H-Pin, okay?

7         So here's the H-Pin.  And the key difference is --

8    well, there are fewer parts.  You have these -- instead of

9    four parts, you have these two things here, upper and lower

10   contact pins, and a spring.  And the most important

11   difference is that these parts are not made by machine.

12   They're not carved out of metal.  They're stamped.

13        So what is stamping?  The easiest way to explain

14   how stamping is, is it's like making cookies.  When you make

15   cookies, you roll out a sheet of dough, like Christmas

16   cookies, and you've got a shape, and you stamp that shape

17   and go.

18        Same thing here.  You have a -- a sheet or a roll

19   of metal, and you have a tool that comes along, and the

20   metal proceeds along a path, and this tool stamps out these

21   parts at a very rapid rate.

22        You can make two of these plungers in a minute.

23   You can make -- well, let me say this:  It's 30 seconds to

24   make one plunger.  Two in a minute.  You can make 250 of

25   these in a minute stamping.

1       And I also have some actual H-Pins here.  You can

2  probably barely see them because they are really super tiny.

3  And, again, as I said, these are about the size of a

4  splinter you might get in your finger, small splinter.

5       Now, you're going to hear in this case that -- may

6  I go once more, Your Honor?

7       THE COURT:  You've been there enough, remain at

8  the podium.

9       MR. EMERSON:  I'm sorry.  One thing I was going to

10 show you, ladies and gentlemen of the jury, is just how

11 these -- how this goes together.  The spring goes around it,

12 and it just snaps in like that.  So it's very simple, very

13 easy, very cheap, and very fast compared to the Pogo Pin.

14      You're going to hear, ladies and gentlemen, that

15 this invention was Mr. Hwang's baby.  It was revolutionary.

16 It changed the world, at least the world that he lived in,

17 which was the world of testing semiconductor chips.

18      And you don't have to take my word for that.  You

19 can take Mr. Pfaff's word for that.

20      Let's pull up DX-250, please.

21      This is an email that Mr. Pfaff wrote to Mr. Hwang

22 in June of 2011.

23      And here he says there in the highlighted portion:

24 You have changed the world.

25      And he's talking about the H-Pin.  And how do we

1    know that he's changed the world?  Look at the sentence
2    before that.
3              All the spring pin companies are coming out with
4    stamped spring probes.
5              So not only does HiCon, Mr. Hwang, and Plastronics
6    make these type of stamped spring probes, but all the
7    companies that are in this business are doing that, and
8    you're going to hear testimony this week that there are a
9    lot of companies that make similar parts.
10             You're also going to hear testimony from a
11   gentleman that Mr. Dalton mentioned a few minutes ago, and
12   his name is Paul Schubring.  Paul Schubring works at HiCon
13   USA, and he used to work at Plastronics.  And before he
14   worked at Plastronics, he was the head of the socket
15   division, the entire worldwide socket division at Intel, who
16   you've probably heard of.
17             He left Intel to come to Plastronics because of
18   the H-Pin.  And you will hear him testify that the H-Pin was
19   a game-changer, that it was so revolutionary that he left a
20   very good job at Intel and went to Plastronics.
21             Now, as I said a moment ago, Mr. Hwang invented
22   the H-Pin in Korea before he came to America.
23             Mr. Dalton said in his opening that Mr. Hwang came
24   to Plastronics with a few ideas about this.  You're going to
25   learn this week that that's not true.  This was a fully

formed invention.  He had passed it on to his patent lawyer
before he left Korea.  He had invented it.  And there is no
dispute in this case that this invention was made by
Mr. Hwang.

So Mr. Hwang comes to the United States, and he
works for Plastronics.  And how did he get there?
Mr. Dalton mentioned this.  Mr. Hwang worked with
Plastronics when he was at another company in Korea called
MCS.  And he did want his kids to come -- he wanted to come
to America so that his kids could be educated in America,
like people all over the world dream of.

And so he's working with Mr. Pfaff, and he's in
the same industry, and Plastronics needs good socket
engineers, and he asked for a job.  And he was grateful to
get that job.  And this has changed his life and his
family's life, and he's very grateful for that.

He -- Mr. Hwang will tell you that he thought of
Plastronics as his family, in that Mr. Pfaff even used to
refer to him as his Korean brother.  And because he
considered Plastronics to be his family, he wanted to share
his prize possession with Plastronics, and that prize
possession was the H-Pin invention.

So he proposed a deal to Plastronics.  And that
was this:  That he would share his patent rights in America
and elsewhere in the world, except for Korea, in exchange

1  for two things.

2          First, Plastronics would pay for the patent

3  applications, and second, and most importantly, Plastronics

4  would pay him a royalty on the sales of all of their H-Pin

5  products and that they would do that until the patents

6  expired, whether he was at Plastronics or not.

7          And I want to make one other thing clear.  You

8  will learn that Mr. Hwang didn't come to Plastronics with

9  just one invention from his time in Korea.  He came with

10  three inventions from his time in Korea, and he offered them

11  all to Mr. Pfaff.  And the only one that they wanted to

12  commercialize or that they wanted to deal in was for the

13  H-Pin.

14          So what did he do with those other two?  He did

15  the patent filings himself.  These were patents --

16  inventions that he had come up with in Korea on his own.

17  Mr. Pfaff and Plastronics didn't want any part of them.  So

18  he handled the patent applications himself.  And he would

19  have done the same thing with the H-Pin had Plastronics

20  turned him down on that.

21          Finally, you're going to hear testimony that Mr.

22  Pfaff told Mr. Hwang that these royalties would make him

23  rich, that one day he wouldn't have to work anymore because

24  these royalties would be so lucrative to him.

25          With Your Honor's permission, I would like to go

1   to the easel?

2           THE COURT:  You may.

3           MR. EMERSON:  Ladies and gentlemen, I'm going to

4   put up a few numbers that are going to tell you a lot about

5   Mr. Hwang, they're going to tell you a lot about the H-Pin,

6   and they're going to tell you a lot about Plastronics.

7           The first number is 90 million.

8           The second number is $65 million.

9           Third number is 60 percent.

10          Fourth number is zero dollars.

11          This first number, 90 million, that's the number

12  of H-Pins sold by Plastronics.

13          $65 million, that is the value of the H-Pins and

14  the sockets containing H-Pins that Plastronics has sold.

15          60 percent, the H-Pin invention is responsible for

16  60 percent of Plastronics' business.

17          Zero, this is how much Plastronics has paid to

18  Mr. Hwang over the last 14 years, not a dime.

19          Now, Mr. Hwang always intended, or at least

20  considered the possibility, that one of these days, he might

21  go home to Korea.  After all, he came over here as a

22  middle-aged man.  Once his kids were established in college

23  and whatnot, he thought he might go home.

24          And that's what he told Mr. Pfaff.  And that's why

25  he kept his Korean patent for himself, and that's what the

1    documents say.

2           Mr. Brockwell, would you pull up DX-157, please?

3           Again, for your notes, this is DX-157, and it is

4    an email between Mr. Hwang and Mr. Pfaff while they were

5    negotiating the Royalty Agreement, and during that

6    negotiation, there's a time where Mr. Hwang says:  This item

7    contains I have the right I can form my own entity.

8           So he's telling Mr. Pfaff, I can form my own

9    entity later on.

10          And then read the next sentence.

11          Do you remember I promised you I will support you

12   any where or any time?  I don't know, but when I have chance

13   to set up my own entity, it will be for me and for you with

14   products.

15          Thanks, Dan.

16          And this tells us something else.  Mr. Hwang

17   always intended that if he went back to Korea and started

18   his own company, he wanted to work with Plastronics.  He

19   still wanted to work with Plastronics.  He wanted to

20   cooperate with them.  And you're going to see a lot of

21   documents that show that this week.

22          So why are we here today?  Well, we're here

23   because, in 2008, Mr. Hwang resigned from Plastronics to

24   start his own Korean socket company, just like he always

25   said he would do.

1        And this is DX-81.  This is Mr. Hwang's

2  resignation letter.  And Mr. Dalton touched on some of this.

3        To me and my family, the last three and a half

4  years was really good time and we will keep good memory and

5  miss you and your family and all members of Plastronics.

6        And then at the bottom, he says:  This time I am

7  planning to set up my own company in Korea.  We can discuss

8  anything for the future.  Please let me know when you have

9  time.

10        So, again, he's saying:  How can we work together

11  when I go to Korea and start my own company, which will be

12  for products for you and for me

13        And then -- but when he was -- for his obligations

14  to Plastronics, HiCon became HiCon Company, his DBA and his

15  sole proprietorship.

16        So in 2008, Mr. Hwang forms his Korean

17  corporation.  As the Court told you, we're going to refer to

18  that as HiCon Limited.  The full name is HiCon Company

19  Limited.  We're going to try to stick to HiCon Limited.

20        And this will be a key for you, when you're

21  looking at documents and when you're deliberating, is to

22  look for the "Limited."  If it says "Limited," it's talking

23  about his Korean corporation.  If is it doesn't, we're

24  talking more than likely about his sole proprietorship,

25  HiCon.  It's sometimes called HiCon Co.

1         And Your Honor has -- His Honor has instructed us
2    to try to refer to that as the DBA or Mr. Hwang doing
3    business as HiCon.
4         So he forms in 2008 HiCon Limited, and he begins
5    trying to sell about a year later into the United States.
6    He does sign up for this BiTS Conference that Mr. Dalton
7    told you about.
8         And after he signed up for this BiTS Conference,
9    Plastronics sued him, as Mr. Dalton told you.  And they sued
10   him for licensing the U.S. patent to HiCon Limited.
11        Now, because of the document I showed a few
12   minutes ago, Mr. Hwang believed, and he still believes, that
13   he had every right to start his own corporation, to practice
14   his own invention in his own company -- in his own country.
15        However -- in fact, he still believes that.  And,
16   in fact, we're going to ask you at the end of the week to
17   find that the language in the agreement allows Mr. Hwang to
18   use his own corporation to practice these patents.
19        But in 2009 he has a choice.  He's been sued by
20   Plastronics.  What did he do about this?  He can sue back.
21   He can sue back and ask a court to -- to require Plastronics
22   to live up to the terms of the agreement, or he can work
23   with Plastronics to try to resolve this issue.
24        So how does he do that?  He asks for consent.  He
25   does.  He doesn't think he needs it, but he doesn't want to

1    fight.  So he asks for consent.  And you'll see a number of

2    documents this week that show him asking for consent, very

3    nicely, he's not demanding anything.

4          Here's one of them, and this, I believe, is DX-53

5    for your notes -- if you're taking notes.

6          An email from Mr. Hwang to Mr. Pfaff:  HiCon is my

7    company in Korea -- he's referring to the corporation now --

8    and I need to use H-Pin patent licensing.  I kind -- I want

9    you kindly to make consent for me.

10          And he asks a number of times, and he never gets

11   an answer.  He doesn't get a no.  He doesn't get a yes.  He

12   doesn't get anything.  And so now he's in a bind again.

13          So what does Mr. Hwang do?  He consults with his

14   Korean patent lawyer, and his Korean patent lawyer tells him

15   that he can still comply with these agreements.  Even under

16   Mr. Pfaff's interpretation, he can still comply with these

17   agreements if he will export outside of Korea using a sole

18   proprietorship.

19          And so that's what he does.  He sets up his sole

20   proprietorship, the DBA, which is called HiCon, sometimes

21   HiCon Co.  We're going to call it the DBA.

22          So he sets up the DBA, and he starts exporting

23   into the United States.  And he explains this to Mr. Hwang

24   [sic].  And even after he sets up the DBA, he still wants

25   consent for his corporation to sell into the United States.

1          Now, why is that?  Because as you'll learn later
2   on this week, in order to export into the United States
3   using a sole proprietorship, he has to buy those pins from
4   his corporation, and then sell them.  He has to report all
5   of those sales to the Korean government.  You're going to
6   see those documents.  He has to pay personal income taxes on
7   the net revenues for all of his sales.
8          So he pays personal income taxes on the net
9   revenues of the sales of these H-Pins into the United
10  States.  That costs him a lot of money.  There's -- it's a
11  lot of headache involved.
12         And so even after he set up the DBA, he said would
13  you please give me your consent.  So he explains this to
14  Mr. -- Mr. Pfaff.
15         This is DX-198.
16         And it says:  When you give me your consent
17  licensing my patents to HiCon Co. Limited for export, I plan
18  to start export through HiCon Co. Limited and start counting
19  for royalty and still waiting consent from you.
20         I told you it was going to be obvious that English
21  wasn't his first language.
22         Okay.  So here's what he's saying:  Give me your
23  consent, and I will pay you the royalty.  This was over 10
24  years ago, ladies and gentlemen -- I'm sorry, not quite 10
25  years ago.  It was October 2009.

1    Had Mr. Pfaff accepted this proposal, he would

2    have been paying royalties to Plastronics on every sale

3    outside of Korea for the last 10 years.

4    Now, I'm just going to point out another thing.

5    He also says, if you look below:  Hwang's personal corp --

6    and he here's referring to his DBA -- Hwang's personal corp

7    export to other countries no royalty.  HiCon Co. Limited,

8    when you give me consent, start counting for royalty.  This

9    opinion, based on the agreement and what I understanding, if

10   you have other opinion, let me know.

11   Well, let's take a look at his response.

12   Here's Mr. Pfaff's response, same day:  We have

13   nothing to discuss.

14   He doesn't say:  I disagree with you.  He doesn't

15   say:  You need my permission.  He doesn't say:  I won't give

16   you my permission.  He doesn't say:  The DBA doesn't have

17   the right to sell into the United States.  He says:  I have

18   nothing to discuss.

19   So Mr. Hwang continues to export the H-Pins

20   himself, doing business as HiCon, ever since then.

21   And then after Mr. Hwang has explained to Mr.

22   Pfaff how he has complied under the strictest reading of

23   these contracts, by setting up the DBA and only selling

24   through the DBA at significant expense to him personally.

25   A few months later, Mr. Pfaff dismisses the

1   lawsuit where he had sued Mr. Hwang for licensing the '602

2   patent to his corporation.

3           So you'll learn this week that Mr. Hwang thought

4   at that time, I have fixed the problem.  I have explained to

5   Mr. Pfaff how I fixed the problem, and he dismissed the

6   lawsuit.  So as far as Mr. Pfaff was -- Mr. Hwang, excuse

7   me, was concerned, the dispute was essentially over.

8           You will see some emails between 2011 and 2017

9   about the parties asking for money, but there's very little

10  of that.  Not like in 2009 and 2010.

11          Now, an important issue in this case is who's the

12  real seller?  Who actually sells into the United States and

13  elsewhere?  And Mr. Dalton told you, as if it were not in

14  dispute, that HiCon Co. Limited makes the sales into the

15  United States.

16          Did he show you a single sales document?  A single

17  invoice?  Anything that would prove that up?

18          He didn't.  And there's a reason for that.

19          We're going to show you a lot of them.  And this

20  is just one example.  This is DX-285.  As you can see, it's

21  an invoice.  It says:  HiCon.  In the upper left-hand side,

22  you see under shipper/exporter from Dong W. Hwang, HiCon.

23  That is the DBA.

24          If you look down in the lower left, you will see

25  HiCon Korean Tax ID 13 -- well, you have the number there.

1    Those numbers are important.  You will have the documents

2    that show you those numbers.  Those numbers identify which

3    company is doing what, HiCon Limited or the DBA.

4            If you look to the right, who's getting paid?

5    When we sell these products into the United States, who gets

6    paid?  The answer is HiCon, the DBA.

7            We'll also show you the bank book from HiCon.

8    That bank book has the same account number that you will

9    find on the invoices.

10           THE COURT:   Five minutes remaining.

11           MR. EMERSON:   Thank you, Your Honor.

12           We have thousands of those.  And don't worry,

13   we're not going to show them all to you, but you'll have

14   the -- the opportunity to inspect them.  And if you do,

15   you'll see that every single sale since he set up his DBA

16   has been through HiCon, the DBA.

17           Now, one final document I want to talk to you

18   about, and this is DX-52.

19           Now, we've been selling -- Mr. Hwang has been

20   selling into the United States as HiCon, the DBA, since

21   2009.  In the meantime, Plastronics has been selling a lot

22   of H-Pins, 90 million of them, $65 million worth of them.

23           And still Plastronics hasn't paid a dime to

24   Mr. Hwang.  And now we know, through Mr. Pfaff's own words,

25   that he never intended to pay Mr. Hwang anything.  This

1   document is called the Korean Conflict.  And this is for

2   your notes.  It is DX-52.  This is a document that Mr. Pfaff

3   wrote in 2011, and it expresses his frustration with

4   Mr. Hwang.

5        And this doc shows that Mr. Pfaff was -- was

6   frustrated that the agreements that he made with Mr. Hwang

7   didn't allow him to do what he wanted.  And at the end of

8   the document, he has a few options that he proposes.  This

9   document was written for a -- for a business consulting

10  group.

11       The first document is -- the first option is this:

12  Continue as is.  Sell more to move studio -- movie studio

13  cost recovery methods and move on.

14       You're going to hear later this week from our

15  expert, Dr. Woods, exactly what movie studio cost recovery

16  methods are.  And I'll give you a hint.  Cost -- movie

17  studio cost recovery methods are a way of manipulating

18  expenses so that it looks like you're not making any money.

19  That's what Dr. Woods is going to tell you.

20       Number 3, spin off all the H-Pin businesses into

21  an entity and sell at cost to Plastronics as a master

22  distributor, therefore, never worrying about royalties.

23       Well, that's exactly what Mr. Pfaff did just a

24  year later.  You heard about H -- Plastronics's H-Pin.

25  That's the entity that he spun the H-Pin business off into.

1    Now, if you can pull up DX-237 quickly.

2    This is an email that Mr. Pfaff sent to his

3 accountant, just a month after the Korean Conflict document.

4 And in this document, he says to his accountant:  Need to

5 discuss spinning off the H-Pin business.

6    And his accountant answers back:  Ready when you

7 are.  How does spin off save cash?

8    And here's Mr. Pfaff's answer.  Future royalty to

9 Hwang.  Can't control it better.

10    You're going to learn, ladies and gentlemen, that

11 the only reason Mr. Pfaff set up Plastronics's H-Pin was to

12 keep from paying anything to Mr. Hwang.

13    Let's go to Option 6 on DX-52.  Here's the final

14 option:  Wait him out until he'd completely out of cash and

15 has to sell his IP and block all deals until I get what I

16 want.

17    THE COURT:  One minute remaining.

18    MR. EMERSON:  Thank you, Your Honor.

19    Would you pull up, please, DX-218?

20    Now, we are going to be asking for some money for

21 Mr. Hwang.  We're going to be asking for the fair amount of

22 the royalties he should have been paid since 2014.

23    But let me tell you this.  Had Mr. Hwang not been

24 sued in this court, we would not be here.  He would not have

25 sued Mr. Pfaff over those royalties.

1          And this document pretty much sums it up.  It's an

2     email from Mr. Hwang to Mr. Pfaff on May the 30th, 2013.

3     And he says to David Pfaff:  I don't think some royalty

4     money is critical to me, but I think I lost a man who I

5     knew, David.

6          So ladies and gentlemen of the jury, on behalf of

7     Mr. Hwang, on behalf of his family and his company, we thank

8     you for being here.  And we look forward to telling you the

9     story this week.

10          Thank you.

11          THE COURT:  All right.  Counsel, if you'll move

12     the easel back and turn it to a clean sheet, please.

13          MR. JONES:  Yes, Your Honor.

14          THE COURT:  Does either side wish to invoke the

15     Rule?

16          MR. EMERSON:  Yes, Your Honor.

17          THE COURT:  Does either side wish to invoke the

18     Rule?

19          MR. EMERSON:  Yes, Your Honor.

20          MR. BUNT:  Yes, Your Honor.

21          THE COURT:   All right.  Is the request that the

22     Rule be invoked to include or exclude experts?  I assume you

23     want your experts present during the trial?

24          MR. EMERSON:  Yes, Your Honor.

25          MR. BUNT:  Yes, Your Honor.

1          THE COURT:  All right.  The Rule has been invoked,

2     excluding experts.  That means if you are a fact witness in

3     this case, not a corporate representative or a party, not an

4     expert witness, then you must excuse yourself from the

5     courtroom until the time you're called to the witness stand.

6          Expert witnesses may remain.  Parties and

7     corporate representatives may remain.

8          All right.  Ladies and gentlemen, you've heard the

9     opening statements from both Plaintiffs and Defendants.

10    We'll now proceed to the Plaintiffs' case-in-chief.

11          Plaintiffs, call your first witness.

12          MR. BUNT:   Your Honor, we would call Mr. David

13    Pfaff.

14          THE COURT:  All right.  If you'll come forward and

15    be sworn, please, sir.

16          (Witness sworn.)

17          THE COURT:  If you'll come around, sir, and have a

18    seat on the witness stand.

19          MR. BUNT:   Your Honor, may I approach the

20    witness?

21          THE COURT:  You may approach the witness.

22          MR. BUNT:   Your Honor, may I approach the witness

23    one more time?  I apologize.

24          THE COURT:  You may.

25          MR. BUNT:  Mr. Pfaff, is the circuit board up

1  there beside you?

2  　　　　THE WITNESS:  No, it's not.

3  　　　　THE COURT:  And you may approach the witness

4  again, even though you said it was the last time.

5  　　　　MR. BUNT:  I apologize, Your Honor.

6  　　　　THE COURT:  All right.  Let's proceed.

7  　　　　MR. BUNT:  Thank you, Your Honor.

8  　　　　DAVID PFAFF, PLAINTIFFS' WITNESS, SWORN

9  　　　　　　　　DIRECT EXAMINATION

10  BY MR. BUNT:

11  Q.  Mr. Pfaff, would you introduce yourself to the jury,

12  please, sir?

13  A.  I'm David Wayne Pfaff.

14  Q.  And where do you live?

15  A.  I am born and raised in Irving, Texas, and still live in

16  Irving, Texas.

17  Q.  Are you a married man?

18  A.  I'm married 18 years to Sharon, and we have two

19  children, 16-year-old Andrew and 13-year-old Kate.

20  Q.  And can you tell the jury where you work?

21  A.  I work at Plastronics Socket Company.

22  Q.  And what is your job title there?

23  A.  Managing partner.

24  Q.  In addition to your work at Plastronics and Plastronics

25  H-Pin, do you serve on any civic or community organizations?

1    A.   Yes.   I'm the head of legislative advocacy affairs to

2    the Irving-Las Colinas Chamber.  I'm also the incoming

3    president for next year for the Irving-Las Colinas Chamber.

4    Very active in the Boy Scouts since my son was in first

5    grade.  I'm a wood badge and Eagle Scout coach and Assistant

6    Scout Master in Troop 730 in Dallas.  Also president of the

7    La Buena Vida Foundation in Irving, which we help local

8    youth out with homelessness.

9    Q.   Can you tell the jury what Plastronics Socket Partners

10   does?

11   A.   Yes.  You kind of got a little sample here during the

12   opening statement as you were getting to listen in.  We make

13   connectors that computer chips will go into for testing, and

14   I'll show you that -- this a little bit more in a minute.

15   Q.   Why do semiconductor or chip companies have to test

16   their computer chips?

17   A.   Right.  So your chip is a very complex part, and it

18   needs to be tested multiple times through the process.  It

19   goes to a wafer test, to a functional test.  We specialize

20   in what's called a burn-in test.  And the way I describe it

21   is if I put you in a sauna on a treadmill going 20 miles an

22   hour and put you in there for four hours and made you run

23   and you didn't die, we know you're good for another 20

24   years.  So this is a very high-level stress test on a chip

25   that really takes off the first year of its life.  So you

1  know the -- the early failures are gone, and it ends up

2  lasting for another 20 years.  So it's called a bathtub

3  curve.  So you get failures at the beginning, and, of

4  course, end of life failures.  And that's what burn-in

5  testing is.

6  Q.  Does Plastronics perform the burn-in testing or any of

7  the testing on the chips?

8  A.  No.  So a good example is Texas Instruments.  So Texas

9  Instruments is a good customer in Dallas.  They'll have --

10  either internally they'll be doing these tests or they're

11  outsources to testing houses that are around the globe,

12  depending on where they make the products.

13  Q.  So what is Plastronics's role in the testing of computer

14  chips?

15  A.  So we make the -- we make the connector.  So all these

16  connectors are custom for every chip.  So every new chip

17  that TI comes with, they're going to be in a custom

18  connector to make it.  Sometimes they need 80.  Sometimes

19  they need a few thousand.  So we never know how much -- how

20  much testing they're going to do.

21  Q.  And are the chips that we're talking about being tested,

22  do these go in products that the jury would be familiar

23  with?

24  A.  Yes, computer screens, your cars, automotive.

25  There's -- there's a whole host of different applications.

1   Your cell phones are full of 20 of these chips, so there's a

2   lot of chips -- computer chips throughout the -- almost

3   everything we touch every day.

4   Q.  And can you give the jury a little more information on

5   what a socket is?

6   A.  Yes.  The socket makes a connection between -- the chip

7   goes into the socket.  The socket to the circuit board.

8   Circuit board to a test equipment.  So the test equipment is

9   out here, connected here, running the electrical signals

10  into the socket.

11          Now, what we do in the socket here is let's say

12  you're in a production environment and you're making

13  thousands of chips.  Well, you can't test them all at the

14  same time, so you'll put as many chips as you can in your

15  board, test them, take them out, and then take those chips

16  out and send them to your customer.

17          In your cell phone, if you cracked it open -- and

18  this might get a little boring on the technical side, but on

19  your cell phone, if you crack it open, there will be a

20  circuit board in there with all the chips.

21          Those chips are soldered.  So that's almost like a

22  permanent gluing, melting the metal on there to make the

23  chips permanent on there.  This connector allows you to test

24  them, temporarily put it in there for testing, then take it

25  back out, then ship it to the customer.

1        So it's not a soldering process; it's a connection

2   process that's temporary, kind of like the wall plug.  You

3   can take a lamp, go plug it in, see if it works, check it

4   out, and then unplug it and put it somewhere else rather

5   than like your light fixture on the wall, which is wired in,

6   and you really can't take it out.  It's kind of a similar

7   type of thing with a connector.

8        MR. BUNT:  Ms. Bowron, can we have Slide No. 1,

9   please.

10  Q.  (By Mr. Bunt)  Mr. Pfaff, can you tell the jury what

11  we're seeing on this?

12  A.  Yeah.  So this would be a typical socket from us.  You

13  open up the socket.  Inside are the contact pins, and that

14  would be, let's say, a computer chip from Intel.

15  Q.  Okay.  And who --

16  A.  Pardon me.  I cut myself on my circuit board here.

17       THE COURT:  Let's do this, ladies and gentlemen.

18  Let's take a brief recess.  We'll get Mr. Pfaff a Band-Aid,

19  and we'll continue in a moment.

20       As you return to the jury room, you can simply

21  close and leave your notebooks in your chairs.  I don't

22  expect this to be a long -- a long recess, and follow all my

23  instructions, including not to discuss the case among

24  yourselves.

25       With those instructions, the jury is excused for

1  recess.

2          COURT SECURITY OFFICER:  All rise.

3          (Jury out.)

4          THE COURT:  You can step down, Mr. Pfaff.  And if

5  you can find a Band-Aid or something to stop that bleeding,

6  that will be fine.

7          And while he's doing that, let me talk to counsel

8  for a minute.

9          I really don't want to have people ask me about

10  placement of easels and standing beyond the podium and

11  demonstrating things to the jury on the fly for the first

12  time as I sit up here with the jury in the box.

13          If you want to be more than an arm's length from

14  the podium or if you want to use something besides your

15  notes at the podium, ask me about it in advance, outside the

16  presence of the jury, where I have an opportunity to fully

17  understand what you intend to do.

18          Mr. Emerson, you asked me if you could show those

19  to the jury, and you stood there 10 minutes and lectured

20  about them.  That was a whole lot more than showing them to

21  the jury.  If you had raised this with me in advance and

22  outside the presence of the jury, we could have talked at

23  greater detail about what you intended.

24          One thing I don't like are surprises.  So, if you

25  want to be more than one arm's length from the podium

1  through the rest of this trial or if you want to use that

2  easel and put it somewhere outside of the immediate

3  proximity of the podium so that you can be within one arm's

4  length, I want to hear about it in advance.  I want to hear

5  about it outside the presence the jury so that there's an

6  ample opportunity to discuss what you really have in mind,

7  okay?

8          MR. EMERSON:  I understand, sir.

9          THE COURT:  All right.  Have we got a Band-Aid?

10          THE WITNESS:  We do.  Thank you, Your Honor.

11          THE COURT:  One other thing before we take a short

12  recess ourselves, and then I'll bring the jury back in,

13  Mr. Pfaff you are going to have to slow down.  I'm sure this

14  is something you don't do every day, and you may be a little

15  nervous, but you are talking way too fast.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  If you'll talk as slow as Mr. Bunt,

18  I'll be happy.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  All right.  We're going to take a

21  five-minute recess, and then we're going to return.

22          The Court stands in recess.

23          COURT SECURITY OFFICER:  All rise.

24          (Recess.)

25          COURT SECURITY OFFICER:  All rise.

1    THE COURT:  Be seated, please.

2    All right.  Mr. Pfaff, you may return to the

3 witness stand.

4    Mr. Bunt, are you prepared to continue with your

5 direct examination?

6    MR. BUNT:  Yes, Your Honor.

7    THE COURT:  All right.  Let's bring in the jury,

8 please.

9    COURT SECURITY OFFICER:  All rise.

10    (Jury in.)

11    THE COURT:  Welcome back, members of the jury.

12    Please be seated.

13    All right.  We'll continue with the direct

14 examination of Mr. David Pfaff by the Plaintiffs.

15    Mr. Bunt, you may continue.

16    MR. BUNT:  Thank you, Your Honor.

17 Q.  (By Mr. Bunt)  Mr. Pfaff, who buys sockets from

18 Plastronics?

19 A.  You have semiconductor companies, such as TI, Intel,

20 nVidia.  Also military customers, when they're doing their

21 testing, people like Raytheon, Lockheed, Fluor.  We sell to

22 medical device companies that need to do any burn-in to make

23 sure their -- the chips that goes in pacemakers and things

24 like that.

25    Those are the direct customers that would be

1  buying sockets from us.  The indirect would be people at

2  maybe TI or one of these companies asked to do their

3  testing, so -- or a circuit board company that has test

4  equipment.

5          So there's two different routes.  A majority of

6  the time we sell directly to the device manufacturers like

7  TI or Intel.

8  Q.  And what are these Plastronics sockets made?

9  A.  So 100 percent of the sockets that we -- we make and

10 ship are coming out of Irving, Texas.  So we have a tool and

11 mold shop there.  We have an assembly plant.  We have

12 automation or engineering staff.  So everything is still

13 done in Irving, which, I think, we're one of the last

14 burn-in socket makers in America.

15 Q.  And what are these pins that we've heard about?

16 A.  The pins is the H-Pin.  I think they covered it quite

17 well in the -- in the opening to be -- to be frank.

18 Q.  Okay.

19 A.  But I can -- I have some samples here, too.

20 Q.  All right.  So --

21          MR. BUNT:  Let's go to Slide No. 2, if we can,

22 Ms. Bowron.

23 Q.  (By Mr. Bunt)  Can you tell the jury what this shows?

24 A.  This is the patent.  So you're going to see an upper

25 contact, a lower contact, and a coil spring.  So this would

1   be a three-piece contact system.

2   Q.   And do you have a model of the H-Pin similar to what

3   Mr. Emerson was using?  Do you have it up there?

4   A.   Yes.

5   Q.   And could you show that to the jury?

6   A.   Mine is a little bit smaller, but --

7   Q.   Okay.  And then how does that fit together?

8   A.   So very similar to what y'all saw before, three

9   components, coil spring comes on top, goes there, and then

10  the -- the second component comes in, and these snap lock

11  together, so it's a retain spring pin.

12  Q.   Now, do you have any of the actual size pins up there

13  with you, as well?

14  A.   Yes.  So this is the biggest one we make, and there's

15  about -- in terms of hairs, that's about 10 hairs thick, so

16  10 hairs in diameter.  This is the smallest one we make, and

17  it's about three hairs in diameter.  And they all look very

18  similar to this.

19  Q.   So all of those pins have an upper part, a lower part,

20  and a spring?

21  A.   Yes.

22  Q.   And then roughly, how many are -- that vial that has the

23  smallest pins in it, roughly -- the other one?

24  A.   This is about 5,000 pins.

25  Q.   And then how many pins do you think are in the other --

1   A.   About 15,000.

2   Q.   All right.

3   A.   So very tiny.

4   Q.   So what sort of customers need H-Pins?

5   A.   So if -- if you look at the market in general --

6           THE WITNESS:  And I'll be careful this time so I

7   don't get anymore blood everywhere, Your Honor.

8   A.   These sockets are made for every chip, and there's

9   sockets all over the place.  Most sockets in the -- in the

10  burn-in environment are a single piece stamping.  So if I

11  took this and just said, you know, we had a little one-piece

12  like this that has a little -- that could like buckle,

13  that's the majority of the market, and I'd say a big

14  percentage of it.

15          The issue with the single piece that's doing the

16  buckling is you can't carry a lot of amperage through it.

17  So what customers would need an H-Pin?  Customers that have

18  a high amperage part, so maybe a processor or a starter in

19  an automotive -- automobile.

20          The other thing is that we can make these a lot

21  more tiny, and -- than a little C-beam because you've got a

22  lot of room with a C-beam.  So when they make them tiny,

23  they can carry a lot more frequency.  So you hear of

24  automotive 5G, 4G, and 3G.  As these things happen, what's

25  happening is the frequency is going faster and faster, so

1  the signal speed needs to get to the chip faster.

2          So it's really a specialized pin that does a lot

3  of -- a lot of performance.  We can never cost compete with

4  a single stamping, though.  Single stampings will always be

5  cheaper because it's one piece versus three piece and an

6  assembly process to get all these together.

7          So -- so that's kind of the -- that's kind of the

8  burn-in socket contact world.

9  Q.  So not all customers need H-Pins?

10 A.  No, they don't.

11 Q.  But the ones who do, they have to have them; would that

12 be fair?

13 A.  That'd be a -- a fair assessment.

14 Q.  So does Plastronics Socket Partners make H-Pins?

15 A.  No, Plastronics H-Pin Company does.

16 Q.  And then how do those H-Pins get from Plastronics H-Pins

17 to Plastronics Sockets?

18 A.  They're sold.

19 Q.  And then what does -- does Plastronics Sockets sell the

20 H-Pins loose, or does it put them in sockets?  Or how does

21 that work?

22 A.  Sometimes they'll buy -- they'll buy big volume and then

23 break them down and sell them loose, but majority of the

24 time, they're in sockets shipped out the door.

25 Q.  And does Plastronics sell any third-party sockets?

1   A.   Not anymore.

2   Q.   How long does the sales process for one of these H-Pins

3   take?

4   A.   So if it's something that we have tool and ready to go,

5   it could be a matter of weeks.  If you came to us and said,

6   we want a new H-Pin and we need this volume, it could take

7   anywhere from four months to 18 months to get a brand new

8   one out the door.  There's a lot of complexities into making

9   a new H-Pin.

10  Q.   Turning back to the background of Plastronics, when was

11  it founded?

12  A.   1983, by my mom and dad.

13  Q.   And how was it that they got involved in the socket

14  business?

15  A.   So my dad, back in the '70s, was doing work for TI,

16  making automation equipment that would load sockets.

17  Different back -- back in the '70s.  So he made -- he made

18  equipment that loaded it.

19       And 1980, sold that automation company, and kind

20  of was sitting there and knew a bunch of guys at TI, and

21  they came over and said, hey, we've got these sockets, can

22  you make a better socket for us?

23       So in 1983, he's like, okay, I'll make a better

24  socket.  My mom was at the time a retired math teacher from

25  high school.  So she did the books, my dad did the

1  designing, and they outsourced the manufacturing and just

2  kind of -- kind of grew from there.

3  Q.  And when did you join the company?

4  A.  I graduated from college in '92 and came back and worked

5  for two years doing a lot of sales work and marketing work

6  for -- for my dad and then went to graduate school -- to UT

7  from '94 to '96.

8  Q.  And what were you studying there?

9  A.  I got my MBA.  And the last semester while I was getting

10 my MBA, two other classmates and I were in the small

11 business entrepreneurship class.  We learned accounting and

12 marketing for small business.  And we had a project that you

13 take a small business and say, okay, what can you do -- can

14 you write a full business plan for these business owners

15 that don't have the -- just need a little help.

16         So we picked Plastronics.  And at the time, I

17 think it was doing about one -- $1.2 million, you know, good

18 little company.  So we wrote a business plan that covered

19 the marketing, the strategy, the product development, the

20 target markets, and all these -- all these things that you

21 see in a real good business plan.  And once I graduated, of

22 course, I worked with my dad on it.  Said:  Hey, dad, you

23 know, let me -- let me run with this and go start making

24 this business plan happen.

25 Q.  And did you do that -- or did he let you do that?

1  A.  Yes.

2  Q.  And so you returned to the company in 1996?

3  A.  Yes.

4  Q.  And at what point did you become head of the business?

5  A.  Well, my dad, in 2001, got colon cancer.  That slowed

6  him down a lot, so I started taking over a lot more of his

7  roles.  And then officially in 2009, when the heart problems

8  started.

9  Q.  Is Plastronics a public -- publicly-traded company?

10  A.  No.  It's still a family company today.

11  Q.  And when you first joined Plastronics, about how many

12  employees were working there?

13  A.  Approximately 15.

14  Q.  And how many are there now?

15  A.  97 here.  And we opened -- we have a two-man shop in

16  Singapore to take care of our customers, and one person in

17  Taiwan to help out there, also.

18  Q.  How did you first meet Mr. Hwang?

19  A.  So if we go back to 2001, 2000 time period, I met a

20  company called MCS, which was a Korean company at one of the

21  trade shows.  So this Korean company -- and I talked about

22  that business plan we wrote.  We were really concentrating

23  on microcontrollers and processors, really things that were

24  done here in the U.S.

25          Memory had moved overseas for the most part.  So

1   they were a very good little memory socket company.  And one

2   of my sales guys said:  Hey, why don't you look and see if

3   you want to partner with them to bring their memory sockets

4   to America and we can add on a distribution-type of business

5   with them.

6           So met with them, got a relationship, started

7   doing that, started selling little bits of memory sockets

8   here and there.  And we had a customer that -- in -- in

9   Germany called Infineon, which is one of the bigger

10  semiconductor manufacturers in -- in Germany.  And we had

11  a -- a pretty good relationship with them on some products

12  we were doing.  And they had asked us, can you see if you

13  can get our memory products into -- because they had a

14  memory division still in Germany.

15          So we said, yeah.  And this was 2003 time period.

16  I flew over there.  And they sent Mr. Hwang, who was their

17  chief engineer at MCS.  So this is a Korean company.  So

18  that's where we met.

19  Q.  How was it that he came to be employed by Plastronics?

20  A.  So we went, saw Infineon, made the -- you know, the

21  sales pitch like we do all the time everywhere.  And went to

22  dinner that night.  And Mr. Hwang says:  You know, I want to

23  come work for you in America and get my kids educated in

24  America.  And I'm like, okay -- and this is over dinner.  He

25  said:  I've got some ideas.  I've got some ideas.

1          And I said:  Okay.  Okay.  But, you know, I'm a

2     partner with your company.  I'm not touching this thing

3     until you talk to Mr. Yang about this.  Mr. Yang is the

4     owner of MCS.  So I said:  You've got to talk to Mr. Yang

5     about this because I don't poach partner employees, and

6     nothing's going to happen unless Mr. Yang gives approval.

7     So that's where that started.

8          Ended up, he went back and talked to Mr. Yang.

9     And he either emailed me or Mr. Yang emailed me.  I said:

10    You know, this is -- this is kind of weird.  You know, the

11    chief engineer coming over to America and all these things.

12    And said:  Mr. Yang, you know, I'm going to come over to

13    Korea and meet with you face-to-face to make sure this is

14    okay.  And I don't want any ill blood.

15         So I flew over to Korea for a day just to meet

16    with Mr. Yang and make sure everything was okay, that, you

17    know, his chief engineer is coming over.  And even Mr. Yang

18    says:  You know, okay.  You know, we need him.  And will you

19    let -- will you let him work on a project for me at least

20    when he gets there if we need help.

21         And I'm like, you know, absolutely, because we're

22    partners in some products.  And I said:  Yes.  I'll let him

23    work -- finish any projects you need or any help, so we --

24    we did that.

25    Q.  So did Mr. Hwang mention to you at that meeting in

1  Germany his idea for an H-pin?

2  A.  Yeah, in -- we're at dinner so it's -- gets a napkin out

3  and draws a -- what -- a rudimentary drawing of the H-Pin.

4  Q.  And what did you think about the idea?

5  A.  So just like I said, a majority of the market then and a

6  majority of the market today is a single stamp contact.  So

7  it's a single piece that you can make in volume, and it's

8  much cheaper than a three-piece contact.

9      So I told him, you know, it's an interesting idea.

10 Don't see a lot of three-piece contacts out there.  Don't

11 know if there's a market, but, you know, it's an interesting

12 idea.

13 Q.  And did he have a patent on the idea at the time?

14 A.  No, he did not.

15 Q.  So did you hire Mr. Hwang because of the H-Pin idea?

16 A.  No.  Going back to our industry and -- you know, we are

17 one of the last in America -- most of our industry had moved

18 overseas, even in the mid-2000s.  So the whole business

19 overseas, a lot of the connector companies and the engineers

20 were -- were either old or retired or they transferred a lot

21 of their design over to Asia.

22     So I'm always struggling to find senior engineers.

23 So anytime I have a senior engineer that knows what they're

24 doing, my ears are perked up.

25     And the biggest reason was Mr. Hwang was the chief

1   engineer at MCS, and I knew he knew how to design a socket.

2           Even today, we have -- we have three senior

3   engineers, but if we get interns and hire fresh out of

4   University of North Texas from their engineering department

5   and we have to train them.  And that takes two, three, four

6   years to train our engineers to get up to a point where

7   they're doing new designs and things like that, rather than

8   prints and checking and things like that.  So anytime I see

9   a senior engineer, it's a very big deal.

10  Q.  So what steps did you take to hire Mr. Hwang?

11  A.  So the first step, as I told you, I flew over and met

12  Mr. Yang, and then got that approval.  And then at that

13  point was getting Mr. Hwang a green card.

14          So we hired a law firm to get his green card,

15  which takes awhile.  So I don't know if four months, six

16  months, whatever that -- so -- and his whole family was

17  moving over here.  So we've got to find a place for him to

18  live, a temporary apartment, going to a house, and all this.

19  So I hired a consultant that specializes in bringing expats

20  over.  So the consultant looks at, you know, the living

21  arrangements, all these things that we don't think about --

22  you know, get a driver's license, turn on electricity, and

23  -- you know, just making sure it's a smooth transition for

24  him to come over here.

25  Q.  And did you help co-sign on a car note for Mr. Hwang?

1    A.   Yes.  So Mr. Hwang didn't have any credit in the United

2    States, so I -- when he wanted to get -- get a car, I

3    co-signed on a note to make sure he got a -- you know, got

4    credit and a low interest rate and he wasn't -- and I looked

5    over documents to make sure there wasn't any problem.

6    Q.   So what was Mr. Hwang's job title when he came to work

7    at Plastronics?

8    A.   We made him -- the job title of chief technology

9    officer.

10   Q.   And did he receive a salary when he came to Plastronics?

11   A.   Yes, he did.

12   Q.   And roughly how much money was that?

13   A.   I believe it was a hundred thousand dollars.

14   Q.   And did he receive 401-K and health benefits and other

15   things like that?

16   A.   Yes.  And, in fact, my toolmakers, my assembly people,

17   everybody in our company has got -- gets 401-K and health,

18   so we -- we do that for all our employees.

19   Q.   So did Mr. Hwang file a patent application for his H-Pin

20   idea in Korea after leaving MCS?

21   A.   I know the filing date was October 6th, 2004, and he

22   joined Plastronics October 1st, 2004.

23   Q.   And what was Plastronics working on when Mr. Hwang came

24   onboard?

25   A.   We were working on another socket that had a single --

1  single piece -- one that stamping is actually a -- wound --

2  wound single piece, but it's still a single piece, for a new

3  specialty project that we were working, I think, with Intel

4  at the time.  We're always working on projects for various

5  companies at all states.  TI's got projects, six or seven

6  for us all the time, so we're always working on projects.

7  And that was the one I think we put him on first.

8  Q.  At what point did he ask for help in filing a U.S.

9  patent for the H-Pin?

10  A.  I think it was, you know, around August -- July, August

11  2005 that really started getting heated up because one

12  interesting thing about that Intel project was it was a very

13  low inductance.  So this goes back to the electrical signal.

14  So we needed a very low inductance pin, and it's very tough

15  to do that in a single stamping.  So that was kind of --

16  this might be an interesting concept to go explore.

17  Q.  So if Mr. Hwang had already filed for a Korean patent

18  application, why do you think he wanted to bother with a

19  United States patent?

20  A.  Well, Korea patent just covers Korea.  United States

21  would cover United States, and plus, you could -- what's

22  call PCT is where you spread it out around the world.  So

23  that was one of the big reasons why.

24  Q.  Did Plastronics agree to assist Mr. Hwang with the U.S.

25  patent application?

1  A.  Yes.  As long as we had a Royalty Agreement and an

2  Assignment Agreement done, we did.

3  Q.  And was the U.S. patent application just a matter of

4  hauling off and filing a patent application, or was there

5  more to it than that?

6  A.  No.  You got -- you have to get a patent prosecutor.

7  You got to do the filings.  And then once you do that, you

8  got to file around the world, so it's -- not super time

9  consuming, but it's costly.  So we spent all the money doing

10  that for the patents.

11       MR. BUNT:  Ms. Bowron, could you pull up Slide No.

12  3?

13  Q.  (By Mr. Bunt)  And, Mr. Pfaff, can you tell the ladies

14  and gentlemen of the jury what this is -- this is a picture

15  of?

16  A.  Yeah.  This is a Royalty Agreement.

17  Q.  And we've got it marked as Plaintiffs' Exhibit No. 30.

18  Is that the entirety of the agreement that we've got up

19  there in front of you?

20  A.  To be frank with you, this is so blurry, I'm not sure if

21  it is.  But I would assume if it's the right exhibit.

22  Q.  And do you recall it being a page -- about a page and a

23  half, this document?

24  A.  Yes, sir.

25  Q.  All right.  Was this entered before the U.S. patent

1  application was filed?

2  A.  Yes.  Patent application was filed on October 1st.  And

3  this was September 24th.

4  Q.  And who wrote the agreement?

5  A.  Well, Mr. Hwang wrote the first draft, which basically

6  it was all about him.  So I said:  Now I need to put

7  language in there that's going to protect Plastronics.

8  Q.  Why did Plastronics want this Royalty Agreement?

9  A.  So it had a few things in there.  It had what the

10 royalties would be.  It would have what the parties agreed

11 to.  And also the -- part of the licensing portion of it.

12 Q.  How long did it take to negotiate the agreement?

13 A.  I think it was about two weeks, if I recall correctly.

14 Q.  And was there a deadline coming up from Mr. Hwang with

15 filing a U.S. patent application?

16 A.  Yes.  The -- anytime you file a patent anywhere around

17 the world, that becomes -- and don't hold me to these legal

18 terms -- prior art, so you've got a year to file a patent

19 from the time you file it to get other patents around the

20 world.  So you've got to do it within a year.

21 Q.  So at this point in time when you were negotiating the

22 royalty agreement, were you a hundred percent certain that

23 Plastronics could successfully make H-Pins?

24 A.  I had no certainty at all because you're talking about

25 components that are tiny.  We have to be able to make them

1    in volume with the commercialization of it.  So you're going

2    to have to have -- find some way to assemble a lot of pins

3    together, and the features.

4          So if we go back in time to 2005, this was a big

5    pin.  We were looking at a pin that was half this size to

6    start with.  So it was about three times that size, about

7    half that size, and that was the starting point for the

8    program we needed to hit at Intel.

9          MR. BUNT:  Ms. Bowron, could you pull up Slide No.

10   4?

11   Q.  (By Mr. Bunt)  And this is, again, the Royalty

12   Agreement.  And can you read Paragraph 1 of the Royalty

13   Agreement for the ladies and gentlemen of the jury?

14   A.  The whole paragraph or the highlighted?

15   Q.  Let's -- let's go ahead and read the whole paragraph.

16   A.  Okay.  Background.  Mr. Dong W. Hwang, a resident of

17   South Korea, current employee of Plastronics Socket

18   Partners, and an H1-B holder in the USA, patented an

19   invention in South Korea on October 6th, 2004, hereby known

20   as the H-Pin Project.  PSP will pay for the development of

21   this invention and worldwide patent rights where needed and

22   be assigned the patent in all worldwide areas jointly with

23   Hwang except Korea.

24   Q.  And what was your understanding of what this provision

25   meant?

1   A.   That, oh, Plastronics and -- and Hwang would file

2   patents worldwide, and PSP will pay for the development and

3   be assigned the patent rights.

4   Q.   And would both parties have worldwide patent rights?

5   A.   Yes.

6   Q.   And would both parties be assigned the patent throughout

7   the world except in Korea?

8   A.   Yes.

9   Q.   And did you understand that this -- to mean that you

10  would not be selling H-Pins in Korea?

11  A.   Correct.   Yes.

12  Q.   And what invention is being discussed in this paragraph?

13  A.   The -- the H-Pin.

14  Q.   All right.   And was that -- at that time, had that been

15  disclosed anywhere other than in the Korean patent

16  application?

17  A.   That was the only place it was.

18  Q.   Did you understand this provision to mean that Mr. Hwang

19  could do anything he wanted with the Korean patent in Korea?

20  A.   You got to look -- look at the whole contract because

21  down in 5, we made sure that he can't license a company.   So

22  patent ownership and licensing are two different things.

23  Q.   All right.   So let's move to the next slide, Slide No.

24  5, which is, I believe, Paragraph 3 of the Royalty

25  Agreement.

1            And what was your understanding of this paragraph?

2   A.   So this would be -- if Plastronics sold things, they

3   paid 3 percent of gross sales on the inventions that are

4   patentable after all non-recurring costs, which include all

5   the stamping tools, all the tooling equipment, all the

6   assembly equipment, the test equipment, and patent costs,

7   were all paid for.

8   Q.   All right.  So that has to do with royalties that would

9   go toward Mr. Hwang, correct?

10  A.   Yes.

11            MR. BUNT:  And then let's show Slide No. 6, which

12  I believe is Paragraph 4.

13  Q.   (By Mr. Bunt)  And can you tell the ladies and gentlemen

14  of the jury what this provision was for.

15  A.   Yeah.  So this is remuneration to Plastronics.  So this

16  is the part where Plastronics gets paid.

17            So in the event the patent royalties are paid by a

18  third party -- so if I can stop there real quick, this is if

19  we go license -- Tyco is the biggest company in the

20  connector world, so let's say Tyco comes and does a royalty,

21  and whatever the royalty rate is, Plastronics and Hwang will

22  split that royalty 50/50.  So this is an outside company.

23            So the second portion of this:  In the event Hwang

24  works directly for a different entity, Plastronics Socket

25  Partners will be entitled to 1.5 percent of royalty, and

1    Hwang can keep 1.5, of gross sales of patented products from

2    the H-Pin Project from this entity.

3              So if Hwang works directly for another entity, PSP

4    will be entitled to 1.5 percent of royalty, PSP and Hwang

5    will split the royalty 50/50 respectfully of gross sales of

6    patented product from the H-Pin Project from this entity.

7              MR. BUNT:  And then if we can pull up Slide No. 7,

8    which is Paragraph 5 to the royalty agreement, and it's

9    listed at the bottom.

10   Q.  (By Mr. Bunt)  Can you read that whole paragraph for us,

11   please, sir?

12   A.  Yes.

13             Licensing the H-Pin Project patent rights.

14   Neither PSP or Hwang can grant a license for the patents

15   covering the H-Pin Project without the approval from the

16   other party.

17   Q.  And what was your understanding of what this provision

18   meant?

19   A.  That neither Plastronics nor Hwang can license this

20   patent to anybody, period.

21   Q.  And how do you know -- and how do you know that this

22   refers to the Korean patent?

23   A.  The Korean patent was the only patent where it's

24   referenced in the Royalty Agreement.

25   Q.  And did both you and Mr. Hwang sign the agreement?

1   A.   Yes.

2   Q.   After the agreement was entered, what steps did

3   Plastronics take to obtain these international patents that

4   you discussed?

5   A.   So filed the U.S. patent and then had patent attorneys

6   in all the countries that -- and we really kind of followed

7   where Texas Instruments was doing all their business because

8   they're in the Germany and the Philippines and Taiwan and

9   China.  So we filed patent licenses in most of those

10  countries, Japan.  So we filed patents all over there.

11  Q.   Who paid for the lawyers to file these patent

12  applications?

13  A.   Plastronics.

14  Q.   And did Mr. Hwang pay for any portion of those fees?

15  A.   No.

16  Q.   Has Plastronics paid maintenance fees on the upkeep of

17  all these patents?

18  A.   Every time they come up.

19  Q.   And has Mr. Hwang or HiCon Limited ever paid for the

20  maintenance of the '602 patent -- of the '602 patent?

21  A.   No.

22           MR. BUNT:  So if we can go to the next slide,

23  Slide No. 8.

24  Q.   (By Mr. Bunt)  Can you tell the ladies and gentlemen of

25  the jury what this agreement is?

1   A.   So this is the Assignment Agreement.   This first one

2   will say the Royalty Agreement.   This will be the Assignment

3   Agreement.   This is where the legal assignment goes.

4            MR. BUNT:   And for the jury's benefit, this is

5   Exhibit -- Plaintiffs' Exhibit 16.

6   Q.   (By Mr. Bunt) So do you recall when this -- this

7   agreement was entered?

8   A.   I believe October 4th is the date that they signed it.

9            MR. BUNT:   And if we can go to Slide No. 9,

10  Ms. Bowron.

11  Q.   (By Mr. Bunt)   If we look at the second paragraph of the

12  Assignment Agreement -- and, again, the jury will have the

13  entire document in front of them, if they want to see it,

14  but the second paragraph, who is listed as the assignees,

15  the folks who are being assigned the patent under this

16  agreement between Plastronics and Mr. Hwang?

17  A.   Dong Weon Hwang, an individual, and Plastronics Socket

18  Partners, the Texas Limited Partnership.

19           MR. BUNT:   And then if we can go to Slide No. 10.

20  Q.   (By Mr. Bung) This next paragraph that begins:   Now,

21  therefore, and the highlighted portion, can you read the

22  highlighted portion?

23  A.   Right.

24           I do hereby sell, assign, and transfer one-half,

25  50 percent, each unto said assignees, their successors,

1  assigns, and legal representatives the full and exclusive

2  right, title, and interest in and to said invention and in

3  and to said application and all patents which may be granted

4  therefor.

5  Q.  So was it your understanding that Mr. Hwang and

6  Plastronics were receiving each 50 percent of the patents?

7  A.  Yes.

8  Q.  So --

9       MR. BUNT:  Then if we could go to Slide No. 11,

10  Ms. Bowron.

11  Q.  (By Mr. Bunt)  The last paragraph, I believe it's

12  highlighted.  Would you mind reading the highlighted

13  portion?

14  A.  The assignees do hereby jointly agree not to transfer

15  any interest in or license the invention disclosed in said

16  application in the United States and throughout the world

17  without the written consent of all assignees.

18  Q.  Why was this provision important to Plastronics?

19  A.  Well, when you're going to develop a project, you don't

20  want to be competing with the world on a patented thing, so

21  it benefited Mr. Hwang and Plastronics to be the assignee,

22  and it benefited Plastronics that Mr. Hwang would be an

23  assignee but no one else could bid.

24  Q.  Is the invention that's disclosed in the U.S.

25  application the same as the one that's disclosed in the

1   Korean patent?

2   A.   Yes.

3   Q.   So after this '602 patent application was filed, did

4   Plastronics start making H-Pins?

5   A.   No.

6   Q.   Why not?

7   A.   So now you got to go figure out how you're going to make

8   it.   So, once again, we got three pieces, and we've got to

9   put them together.

10          So these stampings, we use probably the biggest

11  stamper in America.   And, as I said, our first one was about

12  halfway between these two that would hit the program target.

13  So we did the drawings, got that, and the stampers in

14  California and -- said:   Can you make it?   No.

15          So Mike Ramsey, our chief engineer, had other

16  stamping vendors in the U.S., so -- of course, you've got to

17  get non-disclosures with them because you don't want them to

18  share the knowledge, and everything takes a little time to

19  even send them a drawing.

20          So we sent the drawings to another place in the

21  U.S., and they're like no.   So we went to MCS, which was

22  what I was talking about, the Korean partner, they had a

23  stamping partner in Japan --

24          THE COURT:   Mr. Pfaff, you're going to have to

25  slow down.

1          THE WITNESS:  Am I too quick?

2          THE COURT:  You're too quick.

3          THE WITNESS:  Sorry, Your Honor.

4          THE COURT:  It's important for the jury to follow

5     your testimony.

6          THE WITNESS:  Okay.

7          THE COURT:  It's important to your case for the

8     jury to follow your testimony.  So slow down.

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Let's continue.

11          THE WITNESS:  Okay.

12     A.  So the stamping in Japan, they said yes.  Well,

13     sometimes when a Japanese vendor says yes, they don't really

14     mean yes, but we'll try.

15          So we sent it to them to go try, and it took

16     multiple iterations, over and over.  Mr. -- we sent

17     Mr. Hwang -- I don't know how many times over there to sit

18     there and try to figure out how to make the stamping tool to

19     make this stamping correct.

20          So we got through all of that, found a coil spring

21     maker.  And, once again, we have to be commercially

22     successful, so -- successful.  So we can't go spend a lot of

23     money on these components.

24          So we found a coil spring maker that could meet

25     the price targets we needed for the coil spring.  Then we

1  had to put it together.

2          So Mr. Hwang designed a little hand fixture where

3  you could put -- basically make 400 of them per hour in this

4  hand fixture to put them all together.  Anytime you do

5  things by hand like that, it's -- there's always some

6  sloppiness and mistakes.

7          So a lot of the pins that came off, you know, we

8  had to weed them out and make sure they work, and it was

9  just a process that took really about a year to -- to get

10 that -- just to get a handmade part made off of stamping

11 dies.

12 Q.  (By Mr. Bunt)  Well, let me back up just a second.

13         Didn't you have a patent application at this point

14 in time?

15 A.  Yes.  The patents were all filed.

16 Q.  Well, so doesn't that give you instructions on how to

17 build the H-Pin?

18 A.  A patent just kind of shows you the prints and how

19 they're supposed to work.  They don't tell you how to go

20 find a vendor or find automation or make it commercially

21 successful.  They don't tell you anything like that.

22 Q.  So how much time -- did you mention that you had a

23 Japanese company that originally told you that they could

24 build part of -- they could stamp part of these pieces?

25 A.  Yes.

1  Q.  And did that actually pan out, or did you have to go to

2  somebody else?

3  A.  It panned out.

4        So the next process was, if we wanted to do this

5  in any volume, we had to automate it.  So it was kind of

6  funny.  One time Mr. Hwang and I were talking, and he said:

7  David, I think we can get 20 people with the hand fixtures

8  to make a billion pins a year.

9        And I did the math, and I said, you know, 400 per

10  hour times 20 and all this, it's -- that's 72 million.

11  There's a lot of pins, but it's a far cry from a billion

12  pins.  So we've got to automate this.

13        So, once again, we go back to our U.S. vendors who

14  had automated a lot of things in our factory already, and we

15  said:  Can you put these three pieces together?  Two of them

16  said no.  Just flat out didn't even want to do it.

17        The other one told us:  Yeah, we can do it for

18  $2.5 million.  I'm like, well, that's definitely not

19  commercially viable for us to do a $2.5 million machine.

20        So we went to a stamper we used for one of our

21  single stampings in Pennsylvania, and I asked the owner:  Do

22  you know any really good automation vendors?

23        He's like:  Well, we've got one, but they're in

24  Japan.

25        I'm like:  Okay.

1        So we talked to the Japanese company, and they

2   said:  Okay.  We can do it.

3        And it was about 450,000 before all the change

4   kits and everything, and that's the biggest expense I had

5   probably ever seen in Plastronics' history.

6        So I sat down with Mike Ramsey, our chief

7   engineer, and said:  You know, Mike, this is a pretty big

8   bet on this thing.

9        And so we ended up doing it, making the bet.  And

10  the automation company was awesome.  They were just a great

11  company.  So they got these pins working together.

12       And then they said:  You know, we've got this

13  inspection on every pin coming through this machine now

14  before -- before the assembly, so it's inspected a few

15  times.  And that stamping vendor is not really that good.

16  We've got another stamping vendor we'd like you to go try.

17       And I'm like:  Oh, great.  Now I get to go spend

18  more money on a stamping guy.

19       And that was probably one of the best things we

20  did.  We went to the number one stamping company in Japan.

21  They quoted it and made it, and we use them to this day

22  because of their precision and tolerances.

23       I still can't get my U.S. guys to do this.  This

24  pin is actually made from U.S. stampings.  So my U.S. guys

25  will do the big ones, but they won't do the small ones.  So

1  we've probably got the supply chain worked out, and that was

2  about two and a half years.

3  Q.  So from start to finish, for Plastronics to come up with

4  a way of building these H-Pins in a cost-efficient manner,

5  it was how long?

6  A.  Two and a half years.

7  Q.  Okay.  And roughly how much did that cost Plastronics?

8  A.  So this -- this is -- and we'll talk about accounting

9  later on because it's -- kind of got brought up in opening,

10  too.  I'm trying to slow down a little bit.

11       But it was a million dollars in hard cost that we

12  spent.  How much time, how much fixturing, how much pain and

13  suffering, you know, it was a lot went into it, a lot of

14  blood, sweat, and tears.

15  Q.  Did Mr. Hwang or HiCon Limited pay for any of these

16  expenses?

17  A.  No.

18  Q.  If the development of the H-Pins had not panned out and

19  Plastronics had not been able to make H-Pins, would

20  Mr. Hwang have been obligated to pay anything back to

21  Plastronics?

22  A.  No.

23  Q.  If the development of the H-Pins had not panned out and

24  Plastronics had not been able to make H-Pins, would

25  Mr. Hwang still have had his job at Plastronics?

1    A.   Yes.

2    Q.   So, by the way, do the Plastronics H-Pin products

3    practice the technology of the '602 patent?

4    A.   Yes.

5    Q.   So when did Mr. Hwang leave Plastronics?

6    A.   It was about six months after we finished all this

7    commercialization, and that was October -- or April of 2008.

8    Q.   As part of his duties at Plastronics, did he have access

9    to all the research and development that went into building

10   the H-Pins?

11   A.   Yes.

12   Q.   And as part of his duties, did he have access to all the

13   data about tolerances and manufacturing techniques for the

14   H-Pin?

15   A.   Yes.

16   Q.   Did Mr. Hwang learn about all the customers who were

17   interested in H-Pin through his employment at Plastronics?

18   A.   Yes.

19   Q.   Did Mr. Hwang know the general pricing that Plastronics

20   offered for the H-Pin products while he was working for

21   Plastronics?

22   A.   Yes.

23   Q.   Under the agreement that Plastronics and Mr. Hwang

24   signed, what was your understanding of what Mr. Hwang could

25   do with respect to H-Pin-type products?

1   A.   Yeah.   So Hwang individually could do H-Pin products,

2   just not assign the -- assign it to anybody.

3   Q.   So under your reading of the contract, could he do

4   work -- or could he sell them under HiCon Limited?

5   A.   No.

6   Q.   When did you first learn that Mr. Hwang might be selling

7   H-Pins?

8   A.   So I think it was mentioned in the opening statements,

9   but there's a big show every year in Arizona called BiTS,

10   which is burn-in test sockets, which pretty much hits our

11   industry to a T.

12   So we all show up at the BiTS Conference, but

13   beforehand, you get a pamphlet.   I'm not sure if it was

14   online at that point or not, but probably.   And I see this

15   HiCon exhibiting H-contacts, and that's the first I learn of

16   it.

17   Q.   And how did that make you feel?

18   A.   So -- and you've got to look at the time frame of this

19   whole thing.   So this is 2000 -- in the 2008 -- probably

20   December/November when this comes out.   We had blood, sweat,

21   and tears for two and a half years in trying to

22   commercialize this product and making one size and trying to

23   get another size because not every customer wants a little

24   one.   They want a -- you know, it's this product

25   development.

1          And the world is coming to an end.  I don't know
2   if y'all remember 2008, that was the greatest recession we
3   were ever supposed to have.  Bigger than the depression.
4   And a lot of bad things happened.  And I think Lehman
5   Brothers, in 2008, was the -- September, that started this
6   whole thing.
7          So now you're getting into a tailspin of an
8   economy, a macro economy that's going into a tailspin.  And
9   I look up and, wow, this guy would develop a product with --
10  now he's coming to America to compete directly with me,
11  directly with Plastronics, directly with all these employees
12  that I'm trying to save in this economy.
13          THE COURT:  All right.  Counsel, approach the
14  bench, please.
15          (Bench conference.)
16          THE COURT:  I'm not going to have this guy sit up
17  here and play the America first, I'm saving jobs, I'm the
18  only one left in America card.  He has done that since he
19  got on the witness stand.  And I'm going to raise it in
20  front of the jury if he keeps doing it.  That's not fair.
21  It's prejudicial.  It's not probative, and it has no
22  business in this trial.
23          MR. BUNT:  I understand, Your Honor.  I'm not
24  asking him questions that elicit that.
25          THE COURT:  I know you're not.  He's been

1   non-responsive since he got on the witness stand, too.  But

2   there haven't been any objections.  But that's highly

3   prejudicial --

4           MR. BUNT:  I understand, Your Honor.

5           THE COURT:  -- and I'm not going to permit it.

6           MR. BUNT:  I don't know what you want -- if you

7   want to take a break, I will talk to him.

8           THE COURT:  No, no.  I'm telling you that if this

9   continues, I'm going to address it in front of the jury and

10  instruct them not to pay any credence to that kind of

11  reference.

12          MR. BUNT:  Yes, Your Honor.

13          THE COURT:  All right.  Let's continue.

14          MR. BUNT:  Thank you.

15          (Bench conference concluded.)

16          THE COURT:  All right.  Continue with your

17  examination, Mr. Bunt.

18  Q.  (By Mr. Bunt)  What did you do after learning that --

19  about this BiTS Conference, the display that Mr. Hwang had

20  sent out saying that HiCon Limited might be selling

21  business -- might be selling H-Pins?

22  A.  We got with our attorneys and sent out a warning letter.

23  Q.  And did -- was ultimately a lawsuit filed?

24  A.  Yes.

25  Q.  And was that suit -- what happened in that lawsuit?

1    A.  Well, at the -- when we got to BiTS, Mr. Hwang had

2    called me multiple times to work something out, saying,

3    please, please, please, let's work something out instead,

4    and that lawsuit ended up being -- I don't think Hwang

5    answered the lawsuit, and it was dismissed.

6    Q.  Did you voluntarily dismiss the suit to try to negotiate

7    some sort of agreement?

8    A.  Yes.

9    Q.  And were you able to work out differences?

10   A.  No.

11   Q.  Do you recall what Mr. Hwang wanted from Plastronics

12   when you were trying to negotiate with him?

13   A.  Consent, and that's the only thing that he wanted.

14   Q.  Consent to what?

15   A.  To license HiCon Limited.

16   Q.  And did Plastronics give Mr. Hwang consent to grant a

17   license to HiCon Limited?

18   A.  No.

19   Q.  Why not?

20   A.  So, first, he's coming in as HiCon Limited to a trade

21   show, and if I gave him a license right then, it's just a

22   red carpet to come steal all my customers in the United

23   States.  So at that point, there needed to be a new deal.

24   Q.  And were you able to work out a new deal with him?

25   A.  No.

1    Q.   Did you try to?

2    A.   Yes.

3    Q.   So let's turn to Slide No. 12, which was referenced in

4    the opening statements today.

5    A.   Yes.

6    Q.   And this is Defendants' Exhibit No. 423.

7              And it's a document titled The Korean Conflict

8    Memo.  Can you tell the jury what this document is?

9    A.   So this is -- I meet with a business group of other

10   owners in the DFW Metroplex, people that run a book

11   publishing company, a trash company, just different --

12   different owners.  And what you do is you bring your issues

13   to them and see if you can -- if they can help you and also

14   learn from you, so it's kind of a shared learning, plus

15   giving feedback back to you to try to help you out on a big

16   business problem.

17   Q.   So the title of this document, The Korean Conflict:  A

18   story of IP and shoddy paperwork, what did you mean by that

19   when you put that title in there?

20   A.   So the -- the IP is intellectual property, and the

21   shoddy paperwork is that we didn't have a -- a lawyer draft

22   of that agreement.  And that's -- it was a good agreement,

23   but a lawyer would have made a lot of this -- things

24   unnecessary that we're doing today.  And I don't really want

25   to be here, but this is kind of where we're at.

1  Q.  So the first box in there says:  David Mistake No. 1.

2  What -- what was that mistake?

3  A.  So we did all this paperwork to come in, you know, with

4  green cards, got a consultant doing all this stuff, but his

5  employment papers didn't have -- weren't signed on Day 1.

6  And as a company, you're looking after your -- not only your

7  employees but your company and the longevity in the future.

8  Most intellectual property -- and I'd say 99.9 percent of

9  people who work at your company when they're filing patents,

10  you'll be assigned those patents inside the company.  And

11  that didn't happen.

12  Q.  And then David Mistake No. 2, says:  This contract has a

13  ton of holes in it, and is what I call a chicken scratch

14  document instead of a good legal contract.

15       Why did you say that?

16  A.  Well, I said that kind of -- going back to shoddy, but

17  there needs to be, you know, arbitration clauses, venue

18  clauses.  It's clauses that a lawyer thinks about where

19  there's no possibility of confusion in that document at all,

20  but it's -- you know, it's a legal document, but could have

21  been -- could have been better, and that's it.

22  Q.  So if we turn to Slide No. 13, which is the second page,

23  I believe, in this document, it has a number of options.

24  And the first one says:  Continue as is -- sell more, do

25  movie -- movie studio cost recovery methods and move on.

1          What -- what did you mean by that?

2    A.  So -- so to me -- just to let you know also, I don't

3    write this in a vacuum.  I have the -- our group has a guy

4    that comes by every month for two hours and sits down and

5    says, okay, let's work on your presentation what you're

6    going to present about.  And these were the options that I

7    think he came up with or I came up with at the same -- you

8    know, just working together.  He said movie studio -- you

9    need to get the cost where your actual costs are in this

10   company where you know what you're doing.

11         We have engineers running around, people working

12   on projects.  We have stamp contacts.  We have single

13   beam -- you know, we have all the different products that

14   are all boiled into that one company.

15   Q.  The next point, 2:  Work with a guy in Korea who will

16   not propose anything and only ask for money.

17         What did you mean by that?

18   A.  Well, every time we sent a -- sent a contract or I'd get

19   an email from Mr. Hwang or do anything, we'd send him the

20   bullet points that we need to fix the whole contract, we

21   need to -- we need to redo the contract if he wants consent.

22   And he'd say:  Just give me consent.

23         So very -- just one line, okay.  Have an attorney

24   send me a contract so we can edit it, and we'd do that, and

25   then get back very little.

1  Q.  But the only thing that Mr. Hwang wanted was consent to

2  license.  As far as trying to do a new contract, the only

3  thing he would ever say was:  I need to have consent to

4  license?

5  A.  Yes.

6  Q.  So then if we go to the next slide -- is this the last

7  sentence on that memo?

8  A.  Right.  So this was the very last line through the whole

9  document, and it's based on your feedback.  And this is 12

10  to 14 people listening to me.  So based on your feedback,

11  I'll send him another proposal.  Not sure how to handle this

12  mess other than that, other than KOKO, which means keep on

13  keeping on.

14  Q.  So did you create a new company in December of 2012?

15  A.  So about a year and a month after this, we did what's

16  called a divisive merger.  It's a Texas law.

17  Q.  And so what happened as a result of the divisive merger?

18  A.  So it's basically taking -- if a company's like this,

19  you take and split it into two, and you put the assets in

20  one company and the other assets in the other company, so

21  they're just split as two legal entities.

22  Q.  So what were the two companies that came out of that

23  divisive merger?

24  A.  One was Plastronics Socket Company, and one was

25  Plastronics H-Pin.

1  Q.  And what assets were placed in the H-Pin business?

2  A.  So the assets were all the inventory of pins, all the

3  stamping, all the stamping dies, all the automation

4  equipment, all the test equipment, everything was put into

5  that company that had anything to do with H-Pins.

6  Q.  And all the sales of the H-Pins, that was in that side

7  of the business?

8  A.  Yes.

9  Q.  And so why did you want to do this divisive merger where

10  you'd have an H-Pin business and a Plastronics Sockets

11  business?

12  A.  So there's -- the -- the biggest reason is the connector

13  industry is a pretty big industry, and we had three or four

14  people wanting to invest in Plastronics or come in, and I

15  didn't want a 40-year-old company with a lot of burn-in.  So

16  this was a great vehicle to raise money and to have people

17  come in and invest in it and be partners in the H-Pin

18  business.

19       Every time we came up with a new pin or a new --

20  new one of these, I'm looking at 400,000 to 600,000 to a

21  million dollars, depending on stampings and automation.  So

22  it's a great vehicle for another company to be able to come

23  in, and Mr. Hwang can tell me I can't license anybody, but

24  Mr. Hwang can't tell me if I can have anybody invest in my

25  company or be partners with me.

1    Q.    And so have you been able to get inventors to get into

2    Plastronics' H-pins yet?

3    A.    Oh, we have -- we have interest, but we don't have

4    anybody today -- kind of awaiting some -- you know, all this

5    agreements and everything.

6    Q.    So doesn't this divisive merger -- doesn't it -- doesn't

7    this allow you to play accounting games and decrease the

8    royalties owed to Mr. Hwang?

9    A.    No.    And first, we don't play accounting games.    H-Pin

10   sells the -- the pins to Plastronics Socket Partners that

11   they use and that they sell at a mark-up.    So this is not

12   ever selling at cost.    It's always on a mark-up.    And so,

13   no, we don't -- we're not playing games.

14   Q.    Does Plastronics Socket charge Plastronics H-Pin a

15   management fee?

16   A.    We charge them a marginal fee.    We have a consultant in

17   Japan that works for H-Pin Company that goes into the three

18   vendors -- actually retired from one of them, so he's --

19   speaks Japanese and helps us translate anything.    And any

20   kind of ordering, invoicing, any type of website work,

21   marketing or sales, it's in that little -- in that

22   management fee.

23   Q.    So does H-Pin currently own the H-Pin patents?

24   A.    Yes.

25   Q.    Or its half of the H-Pin patents?

1  A.   It's half of the assignment.

2  Q.   And then Mr. Hwang owns the other half, correct?

3  A.   Correct.

4  Q.   So can you tell the ladies and gentlemen of the jury

5  what is HighRel company?

6  A.   So HighRel is -- let me --

7       THE WITNESS:  I'm going to pick up this board,

8  Your Honor.

9  A.   HighRel is one of the companies that makes this green

10 circuit board there.  This is not theirs, but they make very

11 similar type.  So they make circuit boards.

12      What they do is they make circuit boards and

13 either will buy sockets from Plastronics or other vendors,

14 and then sell that to, let's say, NXP, which is a -- or TI.

15 TI is an easy example.  Or TI will tell them we're buying

16 new sockets.  We're going to ship it to you as a board

17 house.  You're going to make this board for us and ship us

18 the board.

19      So they're a -- a printed circuit board house and

20 assembly of the board with the components on it.

21 Q.   (By Mr. Bunt)  What was Plastronics's relationship with

22 HighRel prior to 2017?

23 A.   We had -- you know, a good 20-plus year relationship

24 with Gordon Cowan, the owner.  And just a

25 vendor/customer-type relationship for a long time.

1  Q.  Did that relationship change in 2017?

2  A.  Yes.  We got a letter from Mr. Cowan stating:  We will

3  now be the authorized distributor of HiCon products.

4           MR. BUNT:  Let me pull up Slide No. 15?

5  Q.  (By Mr. Bunt)  Is this the letter that you received?

6  A.  Yes.

7  Q.  And I believe that's designated as Plaintiffs' Exhibit

8  No. 21, and it's a letter from HighRel to you; is that

9  right?

10  A.  Yes.

11  Q.  And they said that they were going to do what?

12  A.  HighRel has just signed an exclusive agreement to be the

13  sole U.S. distributor for HiCon Company based in South

14  Korea.

15  Q.  Was this the first time that you knew that Mr. Hwang was

16  actually selling in the United States under HiCon Limited?

17  A.  Yes.

18  Q.  You said -- you said -- told us that in 2009, you had

19  seen the BiTS Conference display.  Why didn't you know then

20  that he was selling in the United States?

21  A.  We just never had gotten any reports or accounting from

22  him for anything.

23  Q.  So what do you see is the issue between you and

24  Mr. Hwang?

25  A.  Well, the -- the issue is, you know, we're -- got, you

1  know, a lot of -- a lot of work done, but we've got to get

2  the -- an agreement on all this because we spent tons of

3  money and doing all this and he's coming and licensing HiCon

4  Limited to really take our business and hurt Plastronics.

5  Q.  And why is it you believe HiCon Limited does not have a

6  right to do that?

7  A.  Because we did not assign -- all -- both agreements, we

8  have to be able to approve a license, and we never approved

9  a license to any of this.

10  Q.  Do you believe that Plastronics H-Pins has lost sales

11  from Defendants' actions?

12  A.  Yes, definitely.

13  Q.  How do you know that Plastronics H-Pins is taking

14  business away from you?  Isn't there some other company that

15  could be doing these sales other than Plastronics H-Pins?

16  A.  So as we talked about, most of the markets is a single

17  stamping.  If you can't use a single stamping, you have to

18  use a -- a project like the H-Pin that can do all the -- all

19  the performance levels.  And there's no other product on the

20  market that does this performance at this cost level.

21  Q.  Does Plastronics have the capacity to make additional

22  sales if HiCon Limited was not making those sales?

23  A.  Yes.  The automation machines we have are running

24  probably about 20 percent level.  We have to build them just

25  because not every size can be made on all the machines.  So

1  we can crank up the volume on any one of the products at any

2  time.

3          MR. BUNT:  I'll pass the witness, Your Honor.

4          THE COURT:  Cross-examination by the Defendants.

5          MS. SIVINSKI:   Your Honor, may I approach to hand

6  out the binders?

7          THE COURT:  You have leave to hand out binders.

8          MS. SIVINSKI:  Thank you.

9          THE COURT:  All right.  Mr. Emerson, you may

10  proceed with cross-examination.

11          MR. EMERSON:  Thank you, Your Honor.

12          Mr. Brockwell, would you pull up PX-21, please?

13  Would you call out the second paragraph, please,

14  Mr. Brockwell?

15                      CROSS-EXAMINATION

16  BY MR. EMERSON:

17  Q.  Mr. Pfaff, I'm going to read the first sentence of the

18  second paragraph:  HighRel, Inc. has just signed an

19  exclusive agreement to be the sole U.S. distributor for

20  HiCon Company, based in South Korea.

21          Did I read that correctly?

22  A.  Yes.

23  Q.  And you understand that the Court has defined today

24  HiCon Company to be HiCon -- Mr. -- Mr. Hwang's DBA or sole

25  proprietorship, right?

1   A.  I believe that was the -- the Judge's instructions this

2   morning.

3   Q.  And so this letter from HighRel, Inc., to Plastronics

4   tells you that HighRel has signed an exclusive agreement to

5   be the sole U.S. distributor for Mr. Hwang's DBA, right?

6   A.  It says:  HiCon Company.

7   Q.  Right.  And you heard the Judge today say that HiCon

8   Company means Mr. Hwang, DBA HiCon, the sole proprietorship,

9   correct?

10  A.  Yes.

11  Q.  All right.  So when this sentence says HighRel, Inc.,

12  has just signed an exclusive agreement to be the sole U.S.

13  distributor for HiCon Company, that means that HighRel has

14  signed an agreement with -- with the DBA, right?

15  A.  The date's August 2017, so at the time, who knows.

16          THE COURT:  Counsel, approach the bench, please.

17          (Bench conference.)

18          THE COURT:  Mr. Emerson, I didn't say every

19  reference to HiCon Company in every document means the DBA.

20  I said, as far as my instructions go, to make sure there's

21  no confusion about all these entities.

22          MR. EMERSON:  Understood.

23          THE COURT:  Mr. Hwang doing business as HiCon

24  Company the sole proprietorship was going to be called the

25  DBA.  You're trying to take my instructions and read them

1   into the admitted exhibits as some kind of confirmation of

2   your position by the Court.  That's not proper.

3            MR. EMERSON:  Understood.

4            THE COURT:  And I can fix it or you can fix it,

5   but it's going to have to be fixed.

6            MR. EMERSON:  I understand.

7            THE COURT:  All right.  Let's proceed.

8            (Bench conference concluded.)

9   Q.  (By Mr. Emerson)  Mr. Pfaff, you know who HiCon Company

10  Limited is, right?

11  A.  Yes.

12  Q.  HiCon Company Limited is Mr. Hwang's Korean corporation,

13  correct?

14  A.  Yes.

15  Q.  And you know who HiCon Company is, right?

16  A.  Today I do, yes.

17  Q.  Today you do.  And you know that HiCon Company is what

18  Mr. Hwang calls his DBA, right?

19  A.  From today, I do, yes.

20  Q.  From today.  So as of today, your understanding, then,

21  of this document is that HighRel, Inc., signed an exclusive

22  agreement to be the sole U.S. distributor for Mr. Hwang's

23  DBA, right?

24  A.  Yes.

25  Q.  Okay.  Mr. Pfaff, who invented the H-Pin?

1    A.   Mr. Hwang is the inventor.

2    Q.   Mr. Hwang is the inventor.  And when did Mr. Hwang -- or

3    let me ask you this.  Do you know when Mr. Hwang invented

4    the H-Pin?

5    A.   I can tell you based on when we met in Germany, he had

6    the idea for the H-Pin in 2003, when we were -- when we were

7    there together -- when he was at MCS.

8    Q.   And he wasn't working for Plastronics at that time,

9    right?

10   A.   Yes.

11   Q.   No one at Plastronics helped Mr. Hwang invent the H-Pin,

12   right?

13   A.   The invention?

14   Q.   Right.  The invention?

15   A.   No, no.

16   Q.   He invented the H-Pin in Korea, correct?

17   A.   I would assume so, yes.

18   Q.   And he invented the H-Pin before he came to Plastronics?

19   A.   I don't know when he actually invented it.  The filing

20   was done --the filing date was October 6, so soon.

21   Q.   I'm sorry?

22   A.   The filing date was October 6th.  I don't have his --

23   any data of when he did anything.

24   Q.   You're not claiming here that he did any work on the

25   H-Pin at Plastronics, right?

1  A.   Any work on the --

2  Q.   On -- on inventing the H-Pin while at Plastronics?

3  A.   No.

4  Q.   Right.  Okay.  Plastronics didn't have the H-Pin

5  technology available to it before Mr. Hwang came to

6  Plastronics, correct?

7  A.   Correct.

8           THE COURT:  Let me interrupt just a minute.

9           Ladies and gentlemen, a few minutes ago,

10 Mr. Emerson referenced a document that referred to HiCon

11 Company.  And he asked the witness to confirm that the Court

12 had indicated that HiCon Company meant Mr. Hwang doing

13 business as HiCon Company, the sole proprietorship.

14          My explanation about the sole proprietorship in my

15 instructions to you earlier today was simply to avoid any

16 confusion among these various people and entities with

17 similar names.  I did not indicate to you and I am not

18 indicating to you that I have reviewed the specific exhibits

19 and held that that particular reference means the sole

20 proprietorship.  That's an issue for you to decide.

21          My instructions about the DBA being the sole

22 proprietorship were simply to avoid any confusion in my

23 instructions when talking about all these various entities

24 to you.  I did not want you to wrongly assume from the

25 questions that were asked that the Court had somehow put its

1    stamp of approval on that specific reference out of that

2    specific document.

3            So with those instructions, we'll clear that up,

4    and we'll continue with the cross-examination.

5            MR. EMERSON:  Thank you, Your Honor.

6    Q.  (By Mr. Emerson)  Now, the -- in the decade before

7    Mr. Hwang joined Plastronics, Plastronics didn't have any

8    U.S. patents issued to it, did it?

9    A.  I'd have to check.

10           MR. EMERSON:   Mr. Brockwell, would you pull up

11   DX-19, please?  Would you go to Table 3?

12   Q.  (By Mr. Emerson)  This -- this is a tax credit study,

13   correct, sir?

14   A.  Yes.

15   Q.  And this tax credit study, is this something that's

16   submitted to the government?

17   A.  This is something that's submitted to the IRS.  It's

18   government, yes.

19   Q.  Okay.  And Table 3 lists the patent activity at -- at

20   Plastronics, correct?

21   A.  The following table lists the five U.S. patents awarded

22   to the company for innovations in technology as the title,

23   yes.

24   Q.  And the last one before the H-Pin patent was issued --

25   or rather filed on June the 10th, 1994, right?

1   A.   That's what this says.

2   Q.   All right.  Now, you saw the document earlier on DX-250

3   where you said that Mr. Hwang's invention changed the world,

4   right?

5   A.   Yes.

6   Q.   And you don't dispute that, do you?

7   A.   To -- to answer that to an email in 2013 to Mr. Hwang --

8   is it 2013 or 2011?

9   Q.   Well, we can pull that up.

10  A.   Yeah.  It was 2011.

11  Q.   DX-250.

12  A.   Yeah.  2011.  You have changed the world.  Really trying

13  to work with Hwang to get something done.  And anytime you

14  work with engineers or people, you may bloviate a little

15  bit, change the world.  I think it's a great product, and

16  I'll always say it's a great product, no doubt about it.

17  Change the world might be bloviating a little bit, but it's

18  a great product.

19  Q.   So you don't stand by that statement?

20  A.   You know, change the world is a big statement.

21  Q.   You made it, though, right?

22  A.   Yes, I did.

23  Q.   Do you stand by it?

24  A.   I probably wouldn't write that again today.

25  Q.   The H-Pin accounts for 60 percent of Plastronics'

1 business, right?

2 A.  I'd have to check the exact numbers.

3 Q.  Do you recall in your deposition when we asked you how

4 much of Plastronics' business was related to the H-Pin?

5 A.  Yes.  And I think at that time, I said I'd have to check

6 the numbers.

7       MR. EMERSON:  Mr. Brockwell, would you pull up his

8 December 7 -- correction -- his February 7th deposition at

9 25/18, through 25/23.

10       (Videoclip played.)

11       QUESTION:  How much of Plastronics' business would

12 you say is related to the H-Pin?

13       ANSWER:  We should have exact numbers for you on

14 all that.

15       QUESTION:  Okay.

16       ANSWER:  Somewhere in the 60 percent range.

17       QUESTION:  Okay.

18       (Videoclip ends.)

19 Q.  (By Mr. Emerson)  Does that refresh your recollection,

20 sir?

21 A.  I said 60 percent range, but the first thing I said was

22 you should have numbers on that so I didn't have to guess

23 that number.

24 Q.  Well, your answer eventually was that the portion of

25 Plastronics' business devoted to the H-Pin was somewhere in

1   the 60 percent range, right?

2   A.   I believe so.

3   Q.   Okay.  Now, the H-Pin is an important product for

4   Plastronics, isn't it?

5   A.   Yes.

6   Q.   In fact, it's the most important product for

7   Plastronics, correct?

8   A.   It's the most capital we put into any product, also,

9   yes.

10  Q.   The H-Pin is the most important product line for

11  Plastronics, correct?

12  A.   That's probably a good statement, yes.

13  Q.   Does Plastronics brand itself as the H-Pin guys?

14  A.   Yes.  That's one of our -- on our website.

15  Q.   And Plastronics has made over $65 million from the sale

16  of the H-Pins and related sockets, correct?

17  A.   I'd have to look at those numbers again.

18          MR. EMERSON:  Can we pull up DX-41, please, sir,

19  Mr. Brockwell, and go to Page 27?

20          I'll try to find it myself here on this big

21  spreadsheet.

22          There we go.  Thank you.

23  Q.   (By Mr. Emerson)  The very top line under H-Pins and

24  H-sockets, do you see that number?

25  A.   Yes.

1  Q.  Right.  And the top number is 65,231 dollars -- 205 --

2  I'm sorry -- $65,231 -- 231,205 dollars.  I'll get it right

3  eventually.

4  A.  Yes.

5  Q.  And those are your gross revenues devoted to or related

6  to the H-Pin, right?

7  A.  Yes.

8  Q.  And thus far, you have sold more than 90 million H-Pins,

9  correct?

10  A.  I think it's about that.

11  Q.  Thus far, Plastronics has made $65 million but hasn't

12  paid a penny to Mr. Hwang.

13  A.  Over 13 years, yes.

14  Q.  Has Plastronics paid Mr. Hwang any royalties whatsoever?

15  A.  No.

16  Q.  You don't disagree that the -- that the Royalty

17  Agreement requires Plastronics -- well, strike that.

18           The Royalty Agreement provides a provision that

19  has royalties to Mr. Hwang, correct?

20  A.  Yes.

21  Q.  And those royalties are 3 percent of gross sales on

22  inventions after all non-reoccurring capital costs, right?

23  A.  Yes.

24  Q.  And you also promised to pay royalties on sockets,

25  correct?

1  A.  That was in the agreement, yes.

2  Q.  And it's the same amount there, right, 3 percent?

3  A.  Yes.

4  Q.  Now, your position in this case is that you won't pay

5  Mr. Hwang until Plastronics' profits from the H-Pin business

6  cover the non-recurring capital costs, right?

7  A.  Correct.

8         MR. EMERSON:  Would you pull up PX-30, please?

9         And if you could call out Paragraph 3.

10  Q.  (By Mr. Emerson)  Now, under remuneration to Hwang, the

11  word profit isn't in that paragraph, is it?

12  A.  No.

13  Q.  In fact, the only thing that's deducted from gross

14  revenues is non-reoccurring capital costs, right?

15  A.  After all non-reoccurring capital costs, that's what it

16  says, yes.

17  Q.  It's the only thing to be deducted from gross revenues.

18  A.  Well, it's --

19  Q.  I'll read it again.

20         PSP current handbook policy to pay 3 percent of

21  gross sales on inventions that are patentable by persons

22  employed at PSP after all non-reoccurring capital costs.

23         Right?

24  A.  After they're paid for, yeah.

25  Q.  Well, what it says is:  3 percent of gross sales after

1   non-reoccurring capital costs.

2   A.   Right.

3   Q.   So we deduct non-reoccurring capital costs from gross

4   sales.

5   A.   Not my interpretation.

6   Q.   Not your interpretation.

7   A.   Correct.

8   Q.   Okay.  But nothing in Paragraph 3 mentions specifically

9   profits, right?

10  A.   No.

11  Q.   Now, when you and Mr. Hwang were negotiating the Royalty

12  Agreement, you-all talked about what would go into

13  re-occurring expenses.

14  A.   I believe so, yes.

15          MR. EMERSON:  Would you pull up DX-157, please.

16          And would you call out Paragraph 3.

17  Q.   (By Mr. Emerson)  This is an email from Mr. Hwang to

18  you, September of 2005, correct?

19  A.   Yes.  Okay.

20  Q.   Okay?

21          MR. EMERSON:  You can put that down.

22          Would you go to the next page, please?

23          All right.  Let's call out the email on the bottom

24  from David to Mr. Hwang.  This is September 21st, 2005.

25  A.   Okay.

1    Q.   (By Mr. Emerson)  And do you see where Mr. Hwang says:

2    Capital costs are still not clear and too much and what are

3    other -- and other non-reoccurring capital costs I think

4    normally cost for just tooling for developing and assembling

5    and patent is reasonable.

6              So he's asking you about what are non-reoccurring

7    capital costs, correct?

8    A.   Yes.

9    Q.   And then you answered him at the top of this document.

10   Do you see that?

11   A.   Yes.

12   Q.   And your answer is:  I don't understand --

13              THE COURT:  Slow down, Mr. Emerson.

14              MR. EMERSON:  I'm sorry.

15   Q.   (By Mr. Emerson)  Your answer is:  I don't understand.

16   NRE is a simple concept.  We need to spend capital on tools,

17   assembly equipment, test equipment, and patents.

18              Correct?

19   A.   Yes.

20   Q.   And these are one-time charges, right?

21   A.   Yes.

22   Q.   Non-reoccurring charges.

23   A.   Non-reoccurring.

24   Q.   Okay.

25              MR. EMERSON:  All right.  Mr. Brockwell, will you

1    please pull up DX-169?

2    Q.  (By Mr. Emerson)  Now, Mr. Hwang made it clear to you,

3    didn't he, that he wanted to leave open the possibility of

4    starting a company in Korea after Plastronics, right?

5    A.  At what time frame are you talking about?

6    Q.  Well, let's look at the email on the bottom here from

7    October 3rd, 2006.

8    A.  Okay.

9    Q.  So on October the 3rd, 2006, Mr. Hwang says:  Korean

10   market is reserved for me, as you know.

11            Do you see that?

12   A.  Yes.

13   Q.  So Mr. Hwang wanted to make sure that he had the Korean

14   market, right?

15   A.  It looks that -- from that email, yes.

16            MR. EMERSON:  Let's go up to the email on the top,

17   Mr. Brockwell.

18   Q.  (By Mr. Emerson)  And the third line -- or the third

19   paragraph there, it says:  I will also make sure any

20   partnership understands you will have Korea.

21            Do you see that?

22   A.  Yes.

23   Q.  So you're acknowledging that he's -- he has Korea for

24   himself, right?

25   A.  He has the patent rights -- the assignment in Korea,

1  yes.

2  Q.  The Royalty Agreement itself contemplates that Mr. Hwang

3  might go work somewhere else, right?

4  A.  Yes, an entity.

5            MR. EMERSON:  Pull up DX-154, please.

6            Next page.  I believe it's the last page.

7            And would you highlight 4 and below.

8  Q.  (By Mr. Emerson)  Now, this is an email that Mr. Hwang

9  sent you during the negotiation of the Royalty Agreement,

10  correct?

11  A.  Yes.

12  Q.  And you can see in the line before -- below the draft

13  Paragraph 4 that Mr. Hwang says:  And this item contains I

14  have the right I can form my own entity.

15      Right?

16  A.  Yes, that's what it says.

17  Q.  And then below that, he says:  Do you remember I

18  promised you I will support you anywhere or anytime?  I

19  don't know, but when I have the chance to set up my own

20  entity, it will be for me and for you with products.

21  A.  For me and for you with products.

22  Q.  Right.

23  A.  Okay.

24  Q.  So he was going to provide you with products and make

25  products for himself, right?

1   A.   That's what it sounds like he's saying.

2   Q.   Right, when he set up his own entity.

3   A.   It looks like that's what he's saying.

4        MR. EMERSON:  Now let's go to the September --

5   Q.   (By Mr. Emerson) This is DX-154, Mr. Brockwell, at

6   September 21st, 4:27.

7        MR. EMERSON:  Move up, Mr. --

8   Q.   (By Mr. Emerson)  All right.  Here's the September 21st,

9   4:27 p.m. email from Mr. Hwang to -- to you.  And you see

10  there in the middle:  And for Item No. 1, let's put

11  exception in Korea.

12       Do you see that?

13  A.   Yes.

14  Q.   And so he wanted to except Korea from the scope of the

15  Royalty Agreement, right?

16       MR. BUNT:  Your Honor, I need to object.  This

17  calls for speculation because he's talking about what

18  Mr. Hwang wanted or what Mr. Hwang thought.

19       THE COURT:  Do you have a response, Mr. Emerson?

20       MR. EMERSON:  I'll rephrase, Your Honor.

21       THE COURT:  All right.  Restate the question.

22  Q.   (By Mr. Emerson)  Mr. Pfaff, Mr. Hwang told you -- or

23  told you to put an exception in for Korea when negotiating

24  the -- the Royalty Agreement, didn't he?

25  A.   Looks like he's asking, yes.

1   Q.  Yes.

2         Now, Plastronics -- Mr. Hwang owns the entire

3 Korean patent, right?

4   A.  The assignment, yes.

5   Q.  I'm sorry.  Mr. -- Mr. Hwang owns the Korean patent on

6 the H-Pin, right?

7   A.  The patent, yes.

8   Q.  Okay.  And he owns that entirely.

9   A.  He doesn't have licensing rights for it.

10   Q.  I'm sorry.  Mr. Hwang owns the Korean H-Pin patent,

11 correct?

12   A.  The patent has assignment and licensing.  He has

13 assignment of the patent in Korea.

14   Q.  It's been assigned to him.

15   A.  Yes.

16   Q.  Okay.  And only to him.

17   A.  Yes.

18   Q.  Plastronics doesn't own any share of the Korean

19 counterpart to the H-Pin patent.

20   A.  Correct.

21         MR. EMERSON:  Pull up PX-16, please,

22 Mr. Brockwell.

23         And if you could call out the last paragraph.

24   Q.  (By Mr. Emerson)  This is the -- the Assignment

25 Agreement, correct, Mr. Pfaff?

1  A.  Yes.

2  Q.  And the Assignment Agreement provides that:  Each

3  assignee shall be entitled to an accounting from the other.

4        Correct?

5  A.  Yes.

6  Q.  Has Mr. Hwang ever asked you for an accounting?

7  A.  Yes.

8  Q.  Have you ever given him an accounting?

9  A.  No.

10  Q.  Now, we talked earlier about the dispute that arose in

11  2009.  Do you recall that?

12  A.  Yes.

13  Q.  And Mr. Hwang, once he learned that -- that you had

14  taken the position that he couldn't license his own company

15  to his own patents, he didn't sue you, did he?

16  A.  Do you mind repeating that question?

17  Q.  Sure.

18        In 2009, you sued Mr. Hwang for licensing his --

19  licensing the '602 patent to his Korean corporation, HiCon

20  Limited.

21  A.  The big part was the trademark, but yes.

22  Q.  But you did sue him for licensing the '602 patent to

23  HiCon Limited.

24  A.  I'd have to look at the lawsuit.  The biggest thing was

25  the trademark with H-contact.

1  Q.  Do you dispute that you sued Mr. Hwang for licensing the

2  '602 patent?

3  A.  I'd have to see if that's the language that was in

4  the -- in the lawsuit --

5  Q.  In any event --

6  A.  -- but there was a lawsuit in 2009.

7         THE COURT:  All right.  Gentlemen, we're going to

8  talk one at a time.

9         And, Mr. Pfaff, if you don't know, just say you

10 don't know.

11        THE WITNESS:  Okay.

12 A.  I don't know.

13 Q.  (By Mr. Emerson)  In any event, you took the position in

14 2000 -- 2009, communicated that to Mr. Hwang, that you felt

15 he wasn't allowed to license the '602 patent to his

16 corporation, right?

17 A.  I believe that's true.

18 Q.  And that happened after the BiTS show -- or after you

19 learned that he was going to be exhibiting at the BiTS show

20 in 2009?

21 A.  Yes.

22 Q.  And after that, Mr. Hwang asked you to give your

23 consent, right?

24 A.  Yes.

25 Q.  And he asked several times?

1   A.   Yes.

2   Q.   Probably more than several times?

3   A.   I don't know the exact count.

4   Q.   All right.  But you obviously never gave him that

5   consent, right?

6   A.   No.

7   Q.   And you never told him no either, did you?

8   A.   I believe the conversations were -- there was more than

9   just consent for the agreement.

10          MR. EMERSON:  Let's pull up DX-198, please.

11  Q.   (By Mr. Emerson)  Now, this email we talked about

12  earlier, this is in October of 2009 email exchange between

13  you and Mr. Hwang, correct?

14  A.   Yes.

15  Q.   And here, Mr. Hwang tells you that because HiCon Co.

16  Limited doing business -- doing Korean business in Korea and

17  you don't have Korean patent, I don't need to report.

18          Did I read that correctly.

19  A.   You did.

20  Q.   And if I need to export, I think I can do at Hwang's

21  personal corp and in this case I don't need to report

22  anything to you based on interpretation of the agreement.

23          Do you see that?

24  A.   Yes.

25  Q.   And then he says under No. 3:  When you give me your

1  consent licensing my patents to HiCon Co. Limited to export,

2  I plan to start export through HiCon Co. Limited and start

3  counting for royalty.

4  　　　　　Do you see that?

5  A.　Yes.

6  Q.　So he's offering to start exporting through HiCon Co.

7  Limited and paying you, Plastronics, a royalty if you would

8  give him consent, right?

9  A.　Yes.

10  Q.　All right.　So he's -- so he's setting forth two choices

11  here.　He can export through his personal DBA, right, or

12  through HiCon Co. Limited?

13  A.　Yes.

14  Q.　And he asked you if you disagreed with that, right?　The

15  line below reads:　This opinion based on the agreement and

16  what I understanding, if you have other opinion, let me

17  know.

18  　　　　　Do you see that?

19  A.　If you have other opinion, let me know.　I was looking

20  for disagree, but I didn't -- I didn't see that word in

21  there.

22  Q.　My apologies.　So he asked you if you had another

23  opinion about those two choices?

24  A.　That's what he -- looks like he wrote, yes.

25  Q.　And your answer was:　We have nothing to discuss.

1    A.   Yes.

2    Q.   All right.  Let's talk about Plastronics H-Pin.

3    Plastronics H-Pin manufacturers H-Pins, right?

4    A.   Yes.

5    Q.   Doesn't make sockets?

6    A.   No.

7    Q.   Doesn't sell sockets?

8    A.   No.

9    Q.   And this allows you, for royalty purposes, to count the

10   sales from H-Pin to Socket, correct?

11   A.   Yes.

12   Q.   And those don't include sockets, right?

13   A.   Correct.

14   Q.   So the royalty base there is going to be less than the

15   royalty base was when Plastronics Socket owned the '602

16   patent?

17   A.   Between those entities, yes.

18   Q.   And so this results in lower royalties to pay Mr. Hwang,

19   correct?

20   A.   Only if we don't get a big partner that comes in and

21   buys lots of pins.

22   Q.   Sure.  If you get a huge partner that comes in and buys

23   lots of pins, then maybe there's some big money, right?

24   A.   Yes.

25   Q.   All right.  But barring that, setting it up so that

1  Plastronics H-Pin owns the '602 patent means that the

2  royalty base for Mr. Hwang is only on pins and not on pins

3  and sockets, right?

4  A.  Yes.

5  Q.  And you did that to -- to minimize the royalty base,

6  correct?

7  A.  No.

8  Q.  It was at least one of the reasons, wasn't it?

9  A.  The biggest reason is to get a big connector partner.

10        MR. EMERSON:  Object to that as non-responsive.

11        THE WITNESS:  Okay.

12  Q.  (By Mr. Emerson)  I asked you what --

13        THE COURT:  Wait a minute.  If you're going to

14  object to non-responsive, then you're going to need to stop

15  asking questions until I respond to that.

16        MR. EMERSON:  I'm sorry, Your Honor.

17        THE COURT:  And I'll sustain that objection.  Now

18  you may ask your next question.

19        MR. EMERSON:  My apologies.

20  Q.  (By Mr. Emerson)  Mr. Pfaff, my question is this.  One

21  of the reasons -- at least one of the reasons that you

22  formed Plastronics H-Pin was to minimize royalties to

23  Mr. Hwang, right?

24  A.  The answer is small reason, so...

25  Q.  It's a small reason?

1    A.   Not the reason.

2    Q.   Not the reason.  So I'm not asking if there are multiple

3    reasons.  At least one of the reasons for setting this up

4    was to minimize your royalties to Mr. Hwang, correct?

5    A.   I would not characterize it as that.

6    Q.   You wouldn't?

7    A.   No.

8    Q.   How many employees does Plastronics H-Pin have?

9    A.   No employees.

10   Q.   And Plastronics H-Pin only sells H-Pins to Plastronics

11   Socket, right?

12   A.   Yes.

13   Q.   Plastronics Socket is Plastronics H-Pin's only customer,

14   correct?

15   A.   Yes.

16   Q.   Plastronics H-Pin does not make sockets?

17   A.   No.

18   Q.   Does not sell sockets?

19   A.   No.

20   Q.   Now, when Plastronics bids jobs using H-Pins, it

21   sometimes competes with Yamaichi, does it not?

22   A.   Rarely.

23   Q.   When Plastronics bids jobs using H-Pins, it sometimes

24   competes with Yamaichi?

25   A.   Let me think about that for a second.

1  Q.  Is rarely sometimes?

2  A.  I'm struggling because a lot of times we don't know who

3  we're -- who we compete against on certain orders at

4  different places.  So rarely sometimes.

5  Q.  Okay.  So sometimes you compete with Yamaichi?

6  A.  I'm trying to recall when we've competed against them on

7  H-Pins.

8  Q.  All right.  What about Enplas?

9        THE COURT:  Just a minute.  The question wasn't

10  when have you done it.  The question is:  Have you competed

11  with this other company, Yamaichi or however it's

12  pronounced.  You either know, you don't know --

13        THE WITNESS:  I don't know.  Thank you, Your

14  Honor.

15  Q.  (By Mr. Emerson)  What about Enplas?

16  A.  Enplas, yes.

17  Q.  What about Aries?

18  A.  So it's hard to say.  Their product didn't work, and

19  they needed an H-Pin to replace Aries on the ones we did

20  because of the H-Pin performance.

21        MR. EMERSON:  Mr. Brockwell, would you pull up

22  DX-327, please?

23  Q.  (By Mr. Emerson)  This is the email where you're talking

24  about spinning off H-Pin --

25  A.  Yes.

1  Q.  -- with your accountant, correct?

2  A.  Yes.

3  Q.  I'm sorry.  Mr. Pfaff, DX-327 is the email where you

4  were discussing with your accountant spinning off the H-Pin

5  business, correct?

6  A.  Can I -- can I have a chance to look at the complete

7  exhibit?

8  Q.  Sure.

9  A.  Yes.

10  Q.  And your accountant asked you how spinning off the H-Pin

11  business would save cash?

12  A.  Yes.

13  Q.  And your answer to him was:  Future royalty income to

14  Hwang.  Can control it better.

15  A.  Yes.

16  Q.  And that's the only reason you gave him, correct?

17  A.  Only reason I gave?

18  Q.  Your accountant with whom you're communicating here?

19  A.  Yeah.

20         MR. EMERSON:  All right.  Let's pull up DX-52,

21  please.

22  Q.  (By Mr. Emerson)  Do you recall this document,

23  Mr. Pfaff?

24  A.  Yes.

25  Q.  Is it your testimony that someone else drafted this?

1   A.   No.

2   Q.   These are your words, right?

3   A.   I typed it, yes.

4   Q.   Okay.  Well, are they your words?

5   A.   Some are, some aren't.

6   Q.   So some came from someone else?

7   A.   Yes.

8   Q.   It's written in the first person, isn't it?

9   A.   Yes.

10         MR. EMERSON:  Let's go to David Mistake No. 1.

11   A.   Yes.

12   Q.  (By Mr. Emerson)  All right.  And the last sentence in

13  that -- or the second to the last sentence in that first

14  paragraph reads:  The subtle difference makes it almost

15  impossible to go back and capture any IP that was brought

16  into the company.  Our new employee contracts cover this.

17         Do you see that?

18   A.   Yes.

19   Q.   And, again, this is -- this is about an employee

20  contract that would cover IP brought in by an employee

21  joining Plastronics, right?

22   A.   Yes.

23   Q.   So learning from Mr. -- Mr. Hwang when he brought his

24  invention to Plastronics, you guys didn't own that, did you?

25   A.   No.

1  Q.  No.  In fact, he shared that invention with you;

2  correct?

3  A.  Shared, what -- I don't know what the word choice is,

4  but --

5  Q.  Well --

6  A.  -- he brought it.  I think I said, yes, he brought it

7  into Plastronics.

8  Q.  He brought it into Plastronics, and you guys co-own all

9  of the patents on it except for in Korea, right?

10  A.  Yes.

11          MR. EMERSON:  Let's go to the second mistake.

12  Q.  (By Mr. Emerson)  And here you call the contract a

13  chicken scratch document instead of a good legal contract,

14  right?

15  A.  Yes.

16  Q.  And this is the Royalty Agreement that you and Mr. Hwang

17  drafted together?

18  A.  Yes.

19  Q.  And it has a ton of holes in it?

20  A.  Yes.

21  Q.  Not particularly clear in some places, right?

22  A.  Could be clearer.

23  Q.  Now, in the second paragraph, you state that in

24  September of 2005, we filed the U.S. patent.  That's the

25  H-Pin patent, right?

1    A.   Yes.

2    Q.   And you state that our patent attorney has a contract

3    among all assignees of patents which they cannot license or

4    sell their assignment worldwide without the agreement of

5    other parties.

6              Do you see that?

7    A.   Yes.

8    Q.   Next sentence:  This is a very major clause that went

9    unnoticed by Hwang when he signed the agreements.

10             Right?

11   A.   What's the question?

12   Q.   This document states that this is a very major clause

13   that went unnoticed by Hwang when he signed the agreements.

14             Right?

15   A.   Yes.

16   Q.   And that -- that clause prevents him from assigning the

17   rights to make, use, or sell the patents, right?

18   A.   Yes.

19   Q.   And you -- and you tell your colleagues at Vistus --

20   what's the name of the organization?

21   A.   Vistage.

22   Q.   Vistage.  You're telling your colleagues at Vistage that

23   the assignment is in Plastronics's name on the one hand, but

24   in Mr. Hwang's name on the other, right?

25   A.   Yes.

1  Q.  All right.  And that means that Plastronics can go out

2  and commercialize this thing, but it will be really hard for

3  Mr. Hwang, right?

4  A.  Mr. Hwang?

5  Q.  Yes.

6  A.  He can do what he wants.  What's the question?

7  Q.  Okay.  Mr. Hwang needs to assign his rights to his

8  company to make, use, or sell, to practice the patents.

9  A.  That's what it says.

10  Q.  All right.

11        MR. EMERSON:  Let's go to Page 3.  Let's go to the

12  Pros.

13  Q.  (By Mr. Emerson)  All right.  Pro No. 5 reads:  Hwang

14  can't enter any other market than Korea without our

15  approval.

16        Right?

17  A.  Yes.

18  Q.  Since he needs to license his own company?

19  A.  Is that a question or are we just reading?

20  Q.  Did I read that properly?

21  A.  Yes.

22  Q.  Hwang can't enter any other market, other than Korea,

23  without our approval since he needs to license his own

24  company.

25        MR. BUNT:  Your Honor, I need to object.  I don't

1    hear a question in here.

2            THE COURT:  Overruled.  That's a question.

3            Restate your question, and then the witness will

4    answer.

5            MR. EMERSON:  Thank you.

6    Q.  (By Mr. Emerson)  Mr. Pfaff, Mr. -- Mr. Hwang does not

7    need your permission or approval to enter the Korean market,

8    right?

9    A.  Mr. Hwang?

10   Q.  Hwang can't enter any other market than Korea without

11   our approval?

12   A.  That's what it says, yes.

13   Q.  Since he needs to license his own company?

14   A.  Yes.

15   Q.  So he can license his own company in Korea?

16   A.  I don't think it says that.

17           MR. EMERSON:  Let's go down to the Cons.

18   Q.  (By Mr. Emerson)  No. 3, it says:  We -- we do not have

19   any rights in Korea.

20           Do you see that?

21   A.  Yes.

22   Q.  And that's because he has the patent there, right?

23   A.  He has the assignment there, yes.

24   Q.  He has the patent there, correct?

25   A.  The -- the patent assignment there, yes.

1      THE COURT:  All right.  You heard the question.

2  He didn't ask you:  Did he have the patent assignment there?

3  He asked you:  Did he have the patent there?  And the answer

4  is either he did, he didn't --

5      THE WITNESS:  He did.

6      THE COURT:   -- or you don't know.  But you're

7  giving back a different answer.

8      THE WITNESS:   Okay.  Sorry, Your Honor.

9      THE COURT:  Intentionally not answering the

10  question.

11      THE WITNESS:  Sorry, Your Honor.

12  A.  So, yes, the patent.

13  Q.  (By Mr. Emerson)  He owns the entirety of the patent in

14  Korea?

15  A.  I don't know if I'd characterize it as that.  I don't

16  know.

17  Q.  What rights does Plastronics have?

18  A.  To prevent any licensing.

19  Q.  That's not what this document says, though, does it?

20  A.  This is not a legal document, and it does not say

21  that -- and it says that, but this is not a legal document.

22  Q.  That's not what I'm asking you, sir.

23      This document, which these are your words,

24  correct?

25  A.  Yes.

1  Q.  And you are telling your Vistage group that Plastronics

2  has no rights in Korea, correct?

3  A.  That's what it says.

4  Q.  You don't say that I have the right to prevent Mr. Hwang

5  from licensing his Korean company in Korea, right?

6  A.  I'm sorry, what?

7  Q.  You don't tell your Vistage colleagues that Plastronics

8  has the right to prevent Mr. Hwang from licensing his Korean

9  patent?

10  A.  I'm trying to -- I apologize.  I'm trying to follow the

11  question, but I'm not understanding your question.

12  Q.  Okay.  No. 3 on Cons.

13  A.  Yes.

14  Q.  You say:  We do not have any rights in Korean.

15       Right?

16  A.  That's what it says.

17  Q.  You have no rights in Mr. Hwang's Korean contract or

18  Korean patent?

19  A.  Are you saying the words here, or are you asking me the

20  questions about it?

21  Q.  I'm asking you, sir, whether you acknowledged in 2011

22  that you -- that Plastronics has no rights in Korea?

23  A.  No.

24  Q.  That's not what you said here.  We do not have any

25  rights in Korea.  Are these your words?

1  A.  This is a presentation to --

2          THE COURT:  Wait a minute.  We're not going to

3  talk at the same time.  I've already instructed you all

4  about that.  The court reporter can't write two

5  conversations taking place at the same time, and we're going

6  to have an accurate record in this case.

7          So you all are not going to talk at the same time.

8  This is the second time I've made that clear.  I don't

9  intend to have to make it clear a third time.

10          And we're not going to have an argument all

11  afternoon back and forth about the same question that's been

12  asked about eight or 10 times already.  You're going to ask

13  this question one more time, Mr. Emerson, and, Mr. Pfaff,

14  you're going to answer it, and we're going to move on, okay?

15          State your question, counsel.

16  Q.  (By Mr. Emerson)  Mr. Pfaff, Plastronics has no rights

17  in Korea, right?

18  A.  Incorrect.

19          THE COURT:  Next question.

20          MR. EMERSON:  Let's go to the Options,

21  Mr. Brockwell.

22  Q.  (By Mr. Emerson)  Now, are these your words, Mr. -- Mr.

23  Pfaff?

24  A.  My typed words.

25  Q.  Mr. Pfaff, are these your words?

1    A.   I had help writing this.

2    Q.   Are they your options?

3    A.   These are the options to the group to -- for discussion.

4    Q.   And who proposed those options to the group for

5    discussion?

6    A.   Me and the Vistage coach.

7    Q.   The Vistage coach.  Are you telling us that the Vistage

8    coach wrote these options?

9    A.   I typed them.  We discussed them before I typed them.

10   Q.   Do you know what movie studio cost recovery methods are?

11   A.   I believe we talked about that.

12   Q.   Sir, do you know what movie studio cost recovery methods

13   are?

14   A.   I -- I know what my interpretation of it is.

15   Q.   Okay.  No. 3, one of those options:  Spin off the H-Pin

16   business into an entity and sell at cost to Plastronics.

17            Do you see that?

18   A.   Yes.

19   Q.   And, in fact, you did spin off the H-Pin business into

20   an entity, right?

21   A.   It is spun off -- it's not -- it's technically a

22   divisive merger, which is not a spin-off.

23   Q.   Okay.  It's effectively the same thing, though, right?

24   A.   I don't know what effectively a spin-off is.  I know

25   what a divisive merger is.

1  Q.  Well, in any event, the H-Pin business no longer resides

2  with Plastronics.

3  A.  Socket.

4  Q.  Socket, right.

5  A.  Yes.

6  Q.  And No. 6:  Wait him out until he is completely out of

7  cash and has to sell his IP and block all deals until I get

8  what I want.

9          Correct?

10 A.  Yes.

11 Q.  And that's in the first person, right?

12 A.  Yes.

13 Q.  These are your words.

14 A.  My words with my help with my Vistage coach because I

15 typed them.

16 Q.  So you're not standing by these words.

17 A.  I'm standing by the words.

18 Q.  Okay.  So they're your words.

19 A.  I typed them down with help from a Vistage coach talking

20 about these.

21          MR. EMERSON:  DX-51, please.

22 Q.  (By Mr. Emerson)  Who was your Vistage coach?  Was it

23 Mark Winters?

24 A.  Yes.

25 Q.  And here you're emailing this document to Mark Winters,

1    right?

2    A.  Yes.

3    Q.  And you tell Mr. Winters:  I'd rather hand this one out

4    for them to read and then destroy.

5            Do you see that?

6    A.  Yes.

7    Q.  Do you know if your Vistage colleagues destroyed the

8    copies that you gave them?

9    A.  I'm pretty sure we -- the process is hand them out and

10   everybody gets them and returns them back with notes, so --

11   Q.  And so there were certain things you didn't want to put

12   in this document, correct?

13   A.  It looks like I said:  I left off some details that I

14   don't want to put on paper as well.

15           MR. EMERSON:  Mr. Brockwell, would you pull up

16   DX-422?

17   Q.  (By Mr. Emerson)  Mr. Pfaff, do you hate Koreans?

18   A.  No.

19   Q.  This is an email from you to Chuck Butler in 2013.

20           The Japanese and I bond over a mutual hatred of

21   the Koreans.

22           Do you see that?

23   A.  Yes.

24           MR. EMERSON:  Pass the witness.

25           THE COURT:  Redirect, Mr. Bunt?

1      MR. BUNT:  Yes, Your Honor.

2      Ms. Bowron, can you pull up Plaintiffs' Exhibit

3  No. 21 first?

4                  REDIRECT EXAMINATION

5  BY MR. BUNT:

6  Q.  Do you recall Mr. Emerson asking you a question about

7  HiCon -- the name HiCon Company being listed in this

8  document, Mr. Pfaff?

9  A.  Yes.

10  Q.  Do you -- is this a document from HighRel?

11  A.  Yes.

12  Q.  And do you know whether HiCon Company or -- whether it

13  is HiCon Company Limited that is actually doing sales to

14  HighRel?

15  A.  No.

16  Q.  When was the Korean patent application filed?

17  A.  October 6, 2004.

18  Q.  And can you remind me as to when it was that Mr. Hwang

19  came to work for Plastronics?

20  A.  October 1st, 2004.

21  Q.  So the patent application in Korea was filed five days

22  after he came to work for your company?

23  A.  Yes.

24  Q.  There have been some questions about who invented the

25  patent.  Is there any -- any question in your mind that the

1   product, the H-Pin product, could have been made without all

2   the development that Plastronics put into it?

3   A.   Is there any question?

4   Q.   Yes.

5   A.   No.

6   Q.   Why is that?

7   A.   This development process was long and difficult.  You've

8   got very tight tolerance parts that are tiny.

9          THE COURT:  Try to slow down.  I apologize.

10  A.    It's just a lot of work, and it takes, you know,

11  engineering talent and knowhow.

12  Q.   (By Mr. Bunt) You were asked some questions about

13  $65 million in sales.  Is that for both sockets and H-Pins?

14  A.   I believe so.

15  Q.   And can you explain to us how it is that gross revenues

16  fit into this royalty agreement?

17  A.   Say that again, please.

18  Q.   Yes.

19          Can you explain to us how it is that royalties for

20  Mr. Hwang are -- are calculated or supposed to be calculated

21  under your interpretation of the contract?

22  A.   So, if you look at the sales, there's a cost of sales,

23  but then there's also all the -- all of the people I need,

24  the buildings, and you have a lot of costs associated with

25  getting it.  And then at the end of the day, you have to

1  make a profit to pay back the capital.  So the capital has

2  got to be paid back from profit.

3  Q.  Were there negotiations that were made back and forth

4  between you and Mr. Hwang before he signed the Royalty

5  Agreement?

6  A.  Yes.

7  Q.  Ultimately is the Royalty Agreement the actual contract

8  that was signed between the parties?

9  A.  Yes.

10          MR. BUNT:  And can we pull up PX-30?

11          Actually, if we could pull up the slides,

12  Ms. Bowron, from the direct examination.  And if we could

13  pull up the slides that go to Royalty -- this Royalty

14  Agreement.

15          Actually, I've got it here.

16          Ms. Lockhart, can we switch over to the document

17  camera?

18  Q.  (By Mr. Bunt)  So, after the parties had negotiated back

19  and forth -- well, first of all, did Mr. -- Mr. Hwang have

20  things that he wanted in the contract?

21  A.  Yeah.  I'm sure there are.  They went back and forth.

22  Q.  And did you have things you wanted in the contract?

23  A.  Yes.

24  Q.  And is this ultimately the contract that was reached?

25  A.  Yes.

1  Q.  And on Part 5 of this agreement, can you -- do you need

2  to blow that up, or can you read Part 5?

3  A.  I think I can read it.

4  Q.  What does that say?  If you don't mind reading it to the

5  jury.

6  A.  Okay.  Licensing the H-Pin Project patent rights,

7  neither PSP or Hwang can grant a license for the patents

8  covering the H-Pin Project without approval from the other

9  party.

10  Q.  And so under your interpretation of this agreement, can

11  Mr. Hwang grant a license without your permission to HiCon

12  Limited?

13  A.  No.

14  Q.  And under this contract -- well, let me go back.

15         There were questions asked to you about the Korean

16  patent.  Do you recall you were being asked questions about

17  the Korean patent?

18  A.  Yes.

19  Q.  And you seemed to be qualifying he -- that Mr. Hwang had

20  the assignment of that patent.

21         Do you recall that question?

22  A.  Yes.

23  Q.  What did you mean by saying that he had the assignment?

24  A.  That's the assignment of the patent in Korea.

25  Q.  Well, does that mean that he had the right to assign

1  that patent or license that patent to anybody he wanted

2  without Plastronics' permission?

3  A.  No.

4  Q.  And is that because of this provision that we just read

5  in this exhibit, the Royalty Agreement?

6  A.  Yes.

7  Q.  You were asked some questions about Yamaichi and Enplas

8  and Aries, and you seemed to have some hesitation about

9  whether you were competing against those companies for

10  H-Pins.  What was that hesitation about?

11  A.  Well, they have other sockets that we -- when we sell

12  H-Pins, like the Aries question, the Aries sockets didn't

13  have the performance needed so they went with H-Pin products

14  from us.  So it's -- we don't compete H -- I'm sorry.  I'm

15  going to slow down.

16         We don't compete H-Pin to stamp contacts.  We

17  compete H-Pin to either a Pogo Pin, and we're a lot less

18  expensive, or it's an H-Pin to an H-Pin.

19  Q.  So do you consider them to be an outright competitor to

20  Plastronics H-Pins or the H-Pin business?

21  A.  No.  There's enough differentiation between our

22  projects -- products.

23  Q.  Can you explain to us the purpose of the divisive merger

24  that Plastronics Socket Partners went through.

25  A.  I'm sorry.

1    Q.   Sure.

2         Can you explain to us why Plastronics Socket

3    Partners did the divisive merger.

4    A.   So the -- the biggest thing is, to get this pin and

5    volume and to have enough capital to make it, every time we

6    have to reinvest a lot of money.  So I've been looking for a

7    big partner, and we've had people who want to come in and

8    partner with us.

9         Those are in other places where they think they

10   can use an H-Pin, and it's got to be something that is board

11   to board connector market, just a little bit more stable

12   than the semiconductor market that's big swings and arrows.

13        And that's what we still deal with today.  We go

14   up, we go down, we go up, we go down, and it's just a big --

15   much bigger market out there to be able to get enough volume

16   of these pins going where we can lower the cost down

17   continually in the future.

18   Q.   If you were able to get a large partner to invest, how

19   would that have affected the sales revenue for

20   Plastronics-Pins?

21   A.   It would pretty much explode it.

22   Q.   What effect would that have on Mr. Hwang's royalties?

23   A.   It would increase them.

24   Q.   So, if Plastronics H-Pins were making more sales as a

25   result of having a partner involved, Mr. Hwang's royalties

1  would be quicker to be paid, right?

2  A.  Yes.

3  Q.  So have you had opportunities to grow the H-Pin business

4  that you had to turn down?

5  A.  Yes.

6  Q.  Why were those opportunities -- why did you have to turn

7  those down?

8  A.  We've run into a few things on trying to negotiate and

9  getting any kind of agreement done with them, a lot of it

10  the Korean patent and getting Mr. Hwang's approval.  We had

11  a few things in -- early on that were very difficult to get

12  done.  It's just -- it's very difficult with Mr. Hwang

13  involved with some of this stuff like that.

14  Q.  Under this exhibit, Plaintiffs' Exhibit No. 30, the

15  Royalty Agreement, remind us, is it -- under Part 4, it

16  says:  Remuneration to Plastronics Socket Partners.

17        Do you see that?

18  A.  Yes.

19  Q.  And is it your understanding that under this provision,

20  there are situations where Mr. Hwang would need to pay

21  royalties to Plastronics -- Plastronics H-Pin?

22  A.  Yes.

23  Q.  And when you were negotiating your agreement with

24  Mr. Hwang, did you expect that if this provision was met,

25  that you would be receiving royalties from Mr. Hwang?

1  A.  Yes.

2  Q.  Has Mr. Hwang paid any royalties to Plastronics?

3  A.  No.

4  Q.  You were asked a question about hatred of Koreans.  Do

5  you recall that?

6  A.  Yes.

7  Q.  Do you recall what was going on with your negotiations

8  with Mr. Hwang when you made that statement?

9  A.  Do you remember what exhibit that was so I can look at

10  it?

11  Q.  Let me short-circuit and say, do you know if you were

12  frustrated from dealing with Mr. Hwang when you wrote that

13  email?

14  A.  Yes.  I think it was more in response to my buddy's

15  comment.

16  Q.  Do you have an animus against Koreans?

17  A.  No.

18  Q.  Do you do business frequently with Koreans?

19  A.  Yes.

20  Q.  Do you have friends who are Koreans?

21  A.  Yes.

22  Q.  Have you tried to maintain friendly relations with

23  Mr. Hwang despite all of your contract problems?

24  A.  Yes.

25          MR. BUNT:  Ms. Bowron, could you pull up

1  Exhibit -- Plaintiffs' Exhibit 314.

2         That's a little hard to see.  Let me -- let me

3  switch to the ELMO again.

4         Thank you, Ms. Lockhart.

5  Q.  (By Mr. Bunt)  Is this an email that you wrote to

6  Mr. Hwang?

7  A.  Yes.

8  Q.  And what's the date on that email?

9  A.  January 9th, 2010.

10  Q.  And at the top, you say:  Before discussing any product

11  planning, we need to resolve our many outstanding issues and

12  have a clear agreement moving forward covering all the

13  points in our back-and-forth discussion.

14  A.  Yes.

15  Q.  Why did you feel like you needed to have a clear

16  agreement, and why did you feel like there were outstanding

17  issues?

18  A.  Because there were outstanding issues, and it was a lot

19  of back and forth.  We needed to meet together face-to-face

20  and iron this thing out.

21  Q.  Every time you wanted to talk to Mr. Hwang, what was his

22  response?

23  A.  Too busy or call me at 10:00 p.m. or some -- just

24  something that seemed to -- avoidance.

25  Q.  And so on the third paragraph, there's an earlier email

1  where he's saying:  Let's -- let's try to discuss this.

2  Let's try to work something out.

3          And you -- the second paragraph, do you say:  I

4  agree; we need to discuss this matter together sincerely and

5  in good faith?

6          Do you see that?

7  A.  Yes.

8  Q.  And then you said:  But Dan, we need to -- by Dan, you

9  mean Mr. Hwang?

10  A.  Yes.

11  Q.  We need to do this face-to-face.  We cannot do it

12  through email because email is not effective, and we need to

13  do this soon as the court has allowed us too much time

14  already, and the federal court date will approach very soon.

15          Are you referring to the 2009 lawsuit that arose

16  out of the BiTS Conference show?

17  A.  Yes.

18  Q.  And you say -- do you say:  I have a proposal?

19  A.  Yes.

20  Q.  And then will you read the next paragraph that begins

21  with:  Come with your wife?

22  A.  Come with your wife and meet us in a U.S. city of your

23  choosing.  We will spend as many hours together as we need

24  to make a final agreement and move forward with our

25  respective businesses.  I will show my good faith by paying

1  for your tickets to come to the U.S. and paying for a

2  Korean/U.S. translator from a business translation service

3  at the meeting to make sure we are completely clear on an

4  agreement moving forward.  You and your wife show your good

5  faith by coming to meet with us.

6  Q.  And then did you also suggest that you could fly them to

7  Chicago or Los Angeles or Honolulu or San Francisco?

8  A.  Yes.

9  Q.  And did you offer Chicago because you knew that

10  Mr. Hwang -- at least one of Mr. Hwang's sons was studying

11  there in Chicago --

12  A.  I believe so.

13  Q.  -- and maybe they'd like to go see him during their trip

14  to America?

15  A.  I believe so.

16  Q.  And then you said:  I look forward to a quick resolution

17  to all the issues that we have today and await your

18  response.

19          Is that correct?

20  A.  Yes.

21  Q.  And so throughout all this, were you trying to work some

22  sort of arrangement with Mr. Hwang?

23  A.  Yes.

24          MR. BUNT:  I pass the witness.

25          THE COURT:  Further cross-examination?

1          MR. EMERSON:  No recross.

2          THE COURT:  All right.  You may step down,

3    Mr. Pfaff.

4          Counsel, approach the bench, please.

5          (Bench conference.)

6          THE COURT:  Mr. Furman is next?

7          MR. BUNT:  Yes, Your Honor.

8          THE COURT:  How long do you expect his direct and

9    his cross to be?

10         MR. BUNT:  Probably about 30 minutes.

11         THE COURT:  What do you anticipate the cross to

12   be?

13         MR. EMERSON:  I can ask my colleague.  I'm not

14   crossing him.

15         THE COURT:  Ask your -- ask your colleague.

16         MR. BUNT:   Your Honor, may I ask my colleague

17   because I'm not --

18         THE COURT:  Both of you check and come back.

19         MR. BUNT:  Thanks.

20         MR. EMERSON:  20 to 30 minutes.

21         THE COURT:  How long do you expect your direct

22   with Mr. Furman to be?

23         MR. DEVORA:  About 45 minutes.

24         THE COURT:  Mr. Emerson tells me the Defendants'

25   cross will be 20 to 30.  That's going to put us here to

1   nearly 7:00 o'clock.  I'm not going to keep the jury that

2   late.  We'll recess for the day, and we'll start with

3   Mr. Furman in the morning.

4            MR. DEVORA:  Understood.

5            MR. BUNT:  Thank you, Your Honor.

6            THE COURT:  Have a seat.

7            (Bench conference concluded.)

8            THE COURT:  Ladies and gentlemen, the next witness

9   appears to be one that will take at least an hour and 15 or

10  20 minutes.  I'm not going to hold us that late today.

11  We'll take advantage of this juncture as a good place to

12  recess for the day.

13           As you leave the courtroom through the jury room,

14  if you'll make sure you leave your juror notebooks closed

15  and on the table in the jury room.

16           Let me remind you to follow all the instructions

17  I've given you, including, as you would expect me to say,

18  don't discuss this case with anyone.  And like I said

19  earlier, unless you live at home -- unless you live alone,

20  you're going to get that question when you walk through the

21  door, so be ready for it, blame it on me, and don't try to

22  answer it.

23           Travel safely to your homes.  As I told you

24  earlier, I'd like to start as close to 8:30 as possible in

25  the morning, so please try to be here by 8:15 or 8:20 at the

1    latest.

2          Don't bring your electronic devices back into the

3    courtroom.  Follow all the other instructions I've given

4    you.  And travel safely to your homes, and we will see you

5    tomorrow morning.

6          The jury is excused for the evening.

7          COURT SECURITY OFFICER:  All rise.

8          (Jury out.)

9          THE COURT:  All right.  Be seated, please.

10          Counsel, I apologize for the temperature in here.

11   It's been pretty warm this afternoon.  I understand there's

12   some problem, and it's being worked on.  I hope the

13   courtroom will be cooler when you return tomorrow.  We're

14   going to do our best to get it that way before tomorrow

15   because, quite honestly, with this robe, I'm probably the

16   hottest person in the courtroom.

17          Also, on a separate matter, in light of the

18   objections that have been raised to several of the

19   Plaintiffs' asserted causes of action, specifically whether

20   certain causes of action exist or are supported by the

21   pleadings, I'm ordering the Defendants to submit a bench

22   brief no later than 8:00 p.m. tomorrow, July the 9th,

23   setting forth their position as to any claim they challenge

24   in this matter.

25          And any response from the Plaintiffs as to the

1   Defendants' bench brief shall be due not later 8:00 p.m. on
2   Wednesday, July the 10th.
3           Additionally, the evidence so far has made it
4   clear to the Court that the parties dispute the
5   interpretation of several terms in the Royalty Agreement and
6   the Assignment Agreement, including but not limited to the
7   interpretation of the royalty calculations provision in
8   Paragraph 3 of the Royalty Agreement and when an accounting
9   is due under the sixth paragraph of the Assignment
10  Agreement.
11          For any terms other than those that the Court has
12  already found to be ambiguous, that the parties believe are
13  in dispute or that a party wishes the Court to construe as a
14  matter of law for the jury, the parties need to submit bench
15  briefing setting forth their respective positions as to any
16  of those terms.
17          Plaintiffs' bench brief on these matters, being
18  interpretation of the Royalty Agreement and Assignment
19  Agreement, is due not later than 8:00 p.m. tomorrow, July
20  the 9th.
21          Defendants' response, if any, is due not later
22  than 8:00 p.m. on Wednesday, July the 10th.
23          After that briefing is received, the Court will
24  take those issues up further with the parties.
25          Also, for your time keeping purposes, the

1    Plaintiff has used an hour and 15 minutes of its allotted

2    trial time today.  The Defendants have used 49 minutes of

3    their allotted trial time today.

4            Also, let me remind you of my earlier instructions

5    to you that before I bring in the jury in the morning, I'm

6    going to expect a representative of each side to be prepared

7    to go to the podium and read into the record any of the

8    items from the list of pre-admitted exhibits that have been

9    used during today's portion of the trial.  So have someone

10   prepared on that before 8:30 in the morning.

11           Additionally, I will expect you to continue to

12   meet and confer on any disputes or other issues where you're

13   not in complete agreement.  And if you need or desire the

14   guidance of the Court on those issues, I'll be in chambers

15   by 7:30 in the morning.  And between 7:30 and 8:30, I'll be

16   available to take those up with you.  You need to report any

17   of those disputes in the manner that we've already discussed

18   in pre-trial.

19           All right.  With those reminders and additional

20   instructions, are there any questions from either Plaintiffs

21   or Defendants before we recess for the evening?

22           Anything from the Plaintiffs?

23           MR. BUNT:  Sorry.  No, Your Honor.

24           THE COURT:  Anything from the Defendants?

25           MR. EMERSON:  No.

1          THE COURT:  We stand in recess until tomorrow

2    morning.

3          COURT SECURITY OFFICER:  All rise.

4                (Court adjourned.)

5                ****************************

6

7

8

9                        CERTIFICATION

10

11               I HEREBY CERTIFY that the foregoing is a

12   true and correct transcript from the stenographic notes of

13   the proceedings in the above-entitled matter to the best of

14   my ability.

15

16

17   /s/Shelly Holmes                          7/8/19
     SHELLY HOLMES, CSR, TCRR                   Date
18   OFFICIAL COURT REPORTER
     State of Texas No.: 7804
19   Expiration Date: 12/31/20

20

21

22

23

24

25