1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   PLASTRONICS SOCKET            )(
     PARTNERS, LTD., AND           )(
 4   PLASTRONICS H-PIN, LTD.,      )(       CIVIL ACTION NO.
         PLAINTIFFS,               )(
 5                                 )(       2:18-CV-14-JRG-RSP
                                   )(
 6   VS.                           )(       MARSHALL, TEXAS
                                   )(
 7                                 )(
     DONG WEON HWANG,              )(       JULY 10, 2019
 8   HICON CO. LTD.,               )(
         DEFENDANTS.               )(       12:50 P.M.
 9

10                   TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12             UNITED STATES CHIEF DISTRICT JUDGE

13

14

15   FOR THE PLAINTIFFS:      Ms. Katarzyna Brozynski
                              Mr. Antonio Devora
16                            Mr. Bart Dalton
                              Spencer Fane, LLP
17                            5700 Granite Parkway
                              Suite 650
18                            Plano, Texas   75024

19

20   COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                              Official Court Reporter
21                            United States District Court
                              Eastern District of Texas
22                            Marshall Division
                              100 E. Houston Street
23                            Marshall, Texas 75670
                              (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1
      FOR THE PLAINTIFFS:       Mr. Brian Bear
 2                              Spencer Fane, LLP
                                1000 Walnut Street
 3                              Suite 1400
                                Kansas City, Missouri  64106
 4
                                Mr. Robert Christopher Bunt
 5                              Parker, Bunt & Ainsworth, PC
                                100 East Ferguson
 6                              Suite 418
                                Tyler, Texas  75702
 7

 8    FOR THE DEFENDANTS:       Ms. Elizabeth DeRieux
                                Capshaw DeRieux, LLP
 9                              114 East Commerce Avenue
                                Gladewater, Texas  75647
10
                                Mr. Russ Emerson
11                              Mr. Charlie Jones
                                Ms. Stephanie Sivinski
12                              Ms. Debbie McComas
                                Ms. Tiffany Cooke
13                              Haynes & Boone, LLP
                                2323 Victory Avenue
14                              Suite 700
                                Dallas, Texas  75219
15
                                Mr. Samuel Lee
16                              Mr. Jay Hoon Byun
                                Yulchon LLC
17                              Parnas Tower, 38F, 521 Teheran-ro
                                Gangnam-gu, Seoul 06164, Korea
18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              (Jury out.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Be seated, please.

5              All right.  Defendants, are you prepared to call

6    your next witness?

7              MS. DERIEUX:  We are, Your Honor.

8              THE COURT:  All right.  Let's bring in the jury,

9    please?

10             COURT SECURITY OFFICER:  All rise.

11             (Jury in.)

12             THE COURT:  Welcome back from lunch, ladies and

13   gentlemen.  Please be seated.

14             Defendants, call your next witness.

15             MS. DERIEUX:  Defendants call Dr. James Woods.

16             THE COURT:  All right.  Dr. Woods, if you'll come

17   forward and be sworn, please.

18             (Witness sworn.)

19             THE COURT:  Please come around, sir.  Have a seat

20   on the witness stand.

21             MR. JONES:  Your Honor, permission to pass out the

22   binders?

23             THE COURT:  Yes.

24             MR. JONES:  Thank you.

25             THE COURT:  All right.  Ms. DeRieux, you may

1   proceed with your direct examination.

2          MS. DERIEUX:  Thank you, Your Honor.

3          JAMES WOODS, Ph.D., DEFENDANTS' WITNESS, SWORN

4                    DIRECT EXAMINATION

5   BY MS. DERIEUX:

6   Q.  Dr. Woods, please introduce yourself to the jury.

7   A.  A little housekeeping.  Just a second.

8          Good afternoon.  My name is James D. Woods.  I'm a

9   principal with Economic Analytics Consulting in Houston,

10  Texas.

11         I live in Houston with my wife and my two young

12  adult children.  My daughter -- they both go to Texas A&M.

13  My daughter is studying public health, and she just finished

14  her freshman year.  And my son just finished his junior

15  year, and he's in the Corps of Cadets, and he hopes to get

16  a contract with the Marines to be a Marine aviator.

17         THE COURT:  Pull the microphone a little closer to

18  you, please, Dr. Woods.

19  Q.  (By Ms. DeRieux)  Without diving into the details of

20  your analysis, what are you here to testify about today?

21  A.  I'm here to testify about damages in this matter.  I'm

22  going to provide my opinions about Mr. Perry's report,

23  Mr. Perry's opinions, and the damages that are suffered by

24  Plastronics assuming liability and the damages that were

25  suffered by Mr. Hwang.

1  Q.  Are you being compensated for your time that you've

2  spent on this case?

3  A.  Yes, I am.  My firm receives $495 an hour for the time I

4  spend on this matter.

5  Q.  Does your compensation depend on the outcome of the case

6  in any way?

7  A.  It does not.

8  Q.  You said you were here to testify about Plastronics's

9  damages.  Does that mean Plastronics should win on its

10  claims?

11  A.  No.  Just like Mr. Perry's testimony previously, as a

12  damages expert, I have to assume liability in order to

13  calculate damages.  And so that's the assumption that I

14  hold.  I don't have an opinion one way or the other.

15  Q.  What qualifies you as an expert in damages, Dr. Woods?

16  A.  I have experience, education, and training in economics

17  and finance, and for over 20 years, I've helped clients in

18  settings like this, in litigation settings, provided my

19  opinion on damages, as well as working for clients to value

20  intellectual property used in -- in licensing negotiations

21  or for strategic purposes.

22  Q.  Have you created a slide presentation to help us

23  understand your analysis?

24  A.  I have.

25          MS. DERIEUX:  Could we have Slide No. 2, please?

1  Q.   (By Ms. DeRieux)   What education do you have that

2  contributes to your expertise in damages?

3  A.   I have an undergraduate degree from the University of

4  Missouri Columbia, an MBA from the University of Missouri

5  St. Louis, and a doctorate degree in finance from Texas A&M

6  University.

7  Q.   Please describe the types of courses you've taken.

8  A.   I have advanced training in microeconomics --

9  macroeconomics, econometrics, statistics, operations

10 management, and -- and accounting.

11 Q.   Where do you currently work?

12 A.   Currently I work at Economic Analytics Consulting.

13 Q.   And what do you do there?

14 A.   Economic Analytics Consulting has three primary lines of

15 business.   The first is working with, you know, lawyers or

16 clients on intellectual property that's in a dispute, like

17 today.   The second deals with economic impact studies.   And

18 the third is a general economic advisory practice.

19 Q.   Can you tell us what an economic impact study is,

20 Dr. Woods?

21 A.   Sure.   When people visit a community -- they don't live

22 there, but they go there, they bring their money.   Now, when

23 they bring their money, they spend the money in that

24 community.   And my firm calculates the economic impact of

25 that money.   We -- we figure out how much money they bring

1    to the community, how they spend that money in the

2    community, and then how that money affects the community.

3            And so the -- the -- a simple example of an

4    economic impact study would be for the Super Bowl.  My firm

5    did the economic impact study for Houston's 2017 Super Bowl.

6    And we also just recently finished an economic impact study

7    for the Houston Livestock Show and Rodeo.

8    Q.  What other kinds of works do you do -- work do you do

9    for the Economic Analytics clients?

10   A.  We also have a general economic advisory practice where

11   we'll do pricing studies, where we'll provide strategic --

12   help them with strategic decisions like doing a SWOT

13   analysis you may have heard of.

14           Also, we do a thing called a royalty investigation

15   or a royalty audit, and that's where we're hired by somebody

16   that has an agreement with another party, and they're

17   licensing the technology, and money is being paid for the

18   use of the technology.

19           My firm is engaged to examine the books and

20   records and the products and information to determine if the

21   correct amount of royalties are being paid.

22   Q.  What kinds of clients are you typically engaged by?

23   A.  The clients range from all the different sizes.

24   Sometimes we're hired by individual inventors, people just

25   starting out, all the way up to Fortune 100 clients.  So,

1  for example, a few years ago, Nortel was a big client of

2  ours.

3  Q.  Please describe your experience working with licenses

4  for patents.

5  A.  So I'm not a lawyer, so I'm not hired to actually

6  negotiate a licensing deal, but I am an economist.  And so

7  I'll be hired by either the lawyers or one of the parties

8  that are negotiating to provide help about the economic

9  terms of the contract.

10           I may be asked to help them determine the royalty

11  rate, or I may be consulted with to determine the language

12  of the agreement to make sure that the parties get --

13  accomplish their economic goals.

14  Q.  Have you ever testified in a court such as this about

15  damages before today?

16  A.  Yes, I have.  I've testified -- I think it's 15 times on

17  a wide variety of matters.  A few of them are contract

18  matters.  The bulk of them are intellectual property, either

19  patents or trademarks, or something like that.

20  Q.  Do you have any relevant finance experience outside of

21  your work with Economic Analytics?

22  A.  Yes.  Over the last 12 years, I've been an adjunct

23  professor of finance at the University of Houston.  I teach

24  financial statements analysis, primarily to the MBAs and the

25  master students.

1  Q.   And are you currently teaching a class?

2  A.   I -- right now it's the summer session semester, so I

3  don't have a class, but I'm scheduled to teach in the fall.

4           MS. DERIEUX:  Your Honor, at this time, we'd

5  proffer Dr. Woods as an expert on damages.

6           THE COURT:  Is there objection?

7           MR. BEAR:  No objection, Your Honor.

8           THE COURT:  Without objection, the Court will

9  recognize the witness as a designated witness -- or excuse

10 me -- as an expert in the designated field.

11          Go ahead, Counsel.

12          MS. DERIEUX:  Thank you, Your Honor.

13          Could we get Slide No. 3, please?

14 Q.   (By Ms. DeRieux)  Dr. Woods, can you please summarize

15 the conclusions that you've reached in this case?

16 A.   Yes.  It is my opinion that in this case, lost profits

17 is not an economically fair measure of damages and that if

18 HiCon infringed the '602 patent, damages are best measured

19 by a reasonable royalty of 622 -- $622,606.00 and that

20 Mr. Hwang is owed $1,361,860 in royalty for the

21 Plastronics's use of the technology described in the '602

22 patent.

23 Q.   In reaching these conclusions, did you perform all of

24 the work relating to the analysis by yourself?

25 A.   No, I did not.  Economic Analytics Consulting, I had

1  three other people that helped me go through the large

2  volume of information in this case.

3          MS. DERIEUX:  Can we have Slide 4, please?

4  Q.  (By Ms. DeRieux)  How did you go about your work?

5  A.  So in general, working on a case like this involves five

6  steps.  They're -- they're not necessarily done completely,

7  start it, finish it, and then goes on to the next, but,

8  generally speaking, it progresses through a predictable

9  path.

10         You start by gathering the facts, and then you

11  move on to taking those facts and analyzing them in a

12  framework along with some kind of assumptions.

13         And in this case, the next step was to evaluate

14  and analyze and understand Mr. Perry's opinions.  Then I --

15  I -- based on all of that information, I formed my opinion

16  of the damages for Plastronics.

17         And then finally, I switched the emphasis and

18  flipped around to look at the damages that were due to

19  Mr. Hwang under the Royalty Agreement.

20         MS. DERIEUX:  Slide 5, please?

21  Q.  (By Ms. DeRieux)  What does the first step,

22  fact-finding, include?

23  A.  As I was mentioned, fact-finding is trying to gather all

24  the relevant information.  And this is something that

25  continues on throughout the entire process.

1                But it typically begins with reading the

2     pleadings, understanding what the litigation is from the --

3     from the filings with the Court, and reading depositions,

4     understand what other testimony has been provided before

5     today, and then once again, reviewing a large number of

6     documents that have been produced in the case, and then

7     conducting interviews and -- and finally independent

8     research, things that my -- myself and my team has done to

9     gather information that's not necessarily in the record.

10    Q.   Who -- you said you did some interviews.  Who did you

11    interview?

12    A.   I interviewed Mr. Schubring, Mr. K.T. -- J.T. Kwon and

13    Mr. Hwang.

14    Q.   And that was the Mr. Schubring that testified earlier in

15    this trial?

16    A.   That's correct.

17    Q.   And Mr. Hwang, who also has -- the jury's heard his

18    testimony as well?

19    A.   That's correct.

20    Q.   Why did you think it was important to talk to

21    Mr. Schubring?

22    A.   So from my previous work on other cases, I was aware of

23    testing of semiconductors.  I was aware -- I didn't know all

24    the different types of pins, but I understand what

25    semiconductor -- how they were packaged and I understood the

1   need to test these products.

2              And so I had a basic idea that there had to be

3   some kind of socket that held the IC while it was being

4   tested.  But, you know, that -- that was kind of the extent

5   of my knowledge.

6              And so in order to understand this market, as an

7   economist, I had to start by gathering information, and one

8   of the things I thought was really important was to talk to

9   somebody that was knowledgeable in the market, and

10  Mr. Schubring was available for my interview.

11  Q.  You also mentioned Mr. Hwang and Mr. Kwon.  What did

12  you -- what information or fact-finding were you doing when

13  you interviewed them?

14  A.  So for Mr. Hwang, he provided a lot of information or

15  the same types of information as Mr. Schubring did from his

16  perspective.  So it was -- it was a way to cross-reference

17  and ask better questions by understanding what Mr. Hwang

18  thought of the marketplace as well.

19             And then Mr. Kwon provided information about HiCon

20  Limited's financial statements and inside information about

21  the products, as far as what the -- what the ratio is of

22  pins to sockets and their sales.

23  Q.  Did you take any steps to verify the information that

24  you received from Mr. Schubring, Mr. Hwang, and Mr. Kwon?

25  A.  Definitely.  I've been doing this for a long time, and

1   efficiency and -- and learning and, you know, valuing

2   people's time is really important.  And it's also, you know,

3   quality control.

4           And so for every interview that I do, before I

5   begin the interview, I have my own fact-finding.  And so I

6   either research on the Internet or research in the documents

7   or whatever.  I gather information and kind of form the

8   questions.

9           You never know where the interview is going to go

10  because I don't know what he's going to say, but I have a

11  framework that I'm starting with of information.  And then

12  as I'm asking questions and he's providing information, I

13  can look at my framework and say, does it match what I

14  think, or do I need to probe differently, or is there

15  something -- miscommunication?

16          And so that process continues as I'm going through

17  the interview process.  And so I get a general feel of am I

18  communicating with the person I'm interviewing, and is the

19  information they're providing reliable?

20  Q.  Did you talk to any Plastronics personnel?

21  A.  No, I did not.  But I did interview -- did attend the

22  deposition of Mr. Furman and Mr. Pfaff.

23  Q.  And have you been in the courtroom during the whole

24  trial of the case so far?

25  A.  Yes, I have.

1  Q.  And you've heard all the witnesses that have testified

2  up to today?

3  A.  I have.

4  Q.  Did you read the Royalty Agreement between Mr. Hwang and

5  Plastronics?

6  A.  Several times.

7  Q.  Have you also read the Assignment Agreement between

8  Mr. Hwang and Plastronics?

9  A.  Yes.

10  Q.  And have you looked at the '602 patent?

11  A.  Yes, I have.

12        MS. DERIEUX:  May I have Slide 6, please?

13  Q.  (By Ms. DeRieux)  Can you explain the timeline of

14  important events that led up to this case?

15  A.  Yes.  I -- I -- earlier in the opening statement, you --

16  you were shown a -- a timeline of significant events, and I

17  don't need to go through all of these, but I wanted to put

18  on the slide of the relevant time periods for the damages so

19  you can have a perspective of how it all fits together.

20        You know, the case begins back in 2004 when

21  Mr. Hwang invents the technology that ultimately --

22  ultimately becomes the '604 [sic] patent or the H-Pin.

23        But the damages period begins January 19 of 2012

24  for the patent damages calculations, and for the contracts,

25  which includes the royalty, it begins two years later, on

1  January 19th of 2014.

2          MS. DERIEUX:   Slide 6 -- excuse me -- Slide 7,

3  please.

4  Q.  (By Ms. DeRieux)  What is the second step of your

5  analysis?

6  A.   So the second step has to do with the framework and

7  assumptions, and so the general assumptions are the most

8  important.  So I have to assume that the '602 patent is

9  valid, I have to assume that HiCon Limited sales infringes

10  the '602 patent, Mr. Hwang breached his contracts with

11  Plastronics, and that the Plastronics H-Pin breached its

12  contract and its royalties to Mr. Hwang.

13  Q.   Have you made an assumption about who is selling the

14  HiCon pins in the United States?

15  A.   Yes.  I understand, for there to be patent infringement

16  damages, HiCon Limited -- what we were calling HiCon

17  Limited, has to be the entity selling the products into the

18  United States, and so that's my assumption.

19          MS. DERIEUX:   Slide 8, please.

20  Q.  (By Ms. DeRieux)  What is the third step of your

21  analysis?

22  A.   The third step is to analyze and understand Mr. Perry's

23  opinions.

24  Q.   And do you agree with Mr. Perry's conclusions?

25  A.   I do not.  Mr. -- Mr. Perry stated that he believed that

1   lost profits was the fair measure of damages in this case,

2   and I do not believe that that's true.  I believe that

3   Mr. Perry's but-for analysis is flawed and that he

4   improperly analyzed what we'll call the Panduit factors.

5           And I also believe that the correct measure of

6   damages will be a reasonable royalty.

7   Q.  Let's start with Mr. Perry's lost profits theory.

8           What are lost profits, Dr. Woods?

9   A.  So the concept of lost profits is that if a -- a

10  defendant infringes a patent or breaches a contract and that

11  breach causes the plaintiff to lose sales, then you would

12  say that there's -- that those sales led to the plaintiff

13  losing profits, and that -- that's the calculation of lost

14  profits.

15  Q.  Do you agree with Mr. Perry that lost profits is an

16  appropriate measure of damages here from an economic

17  perspective?

18  A.  I do not.

19  Q.  Why not?

20  A.  From an economic perspective, in order to have lost

21  profits, the analyst has to show what's been called but-for.

22  And but-for means that the Plaintiff would have made those

23  sales but-for the actions of the Defendant.

24  Q.  What methods did you use to determine whether

25  Plastronics would have made HiCon Limited sales but for the

1  alleged bad acts?

2  A.   So the -- the but-for test -- you can satisfy the

3  but-for test.   It can be tested, or it can be analyzed by

4  using what's called the Panduit factors.   And the Panduit

5  factors are a set of four factors that are both economically

6  important and have a basis in prior cases that relate to

7  calculating lost profits in contract and patent damages

8  cases.

9           MS. DERIEUX:   May I have Slide 9, please?

10  Q.   (By Ms. DeRieux)   Is the Panduit case a well-established

11  method for analyzing lost profits?

12  A.   Yes, it is.

13  Q.   And could you just list for us what those factors are?

14  A.   Yes.   So in order to conclude that the Plaintiff would

15  have made the sales but-for the Defendants' bad action, the

16  analyst has to conclude four things.

17           He has to conclude that there's demand for the

18  patented product, that there's no availability

19  non-infringing substitutes that could be sold by anybody

20  else to satisfy the needs of the -- the Defendants'

21  customers.

22           You have to establish that the Plaintiff has both

23  the manufacturing and marketing capacity in order to make

24  the sales that were made by the -- the Defendant.

25           And finally, you have to be able to accurately

1  calculate the profits that were lost due to those lost

2  sales.

3  Q.  Did Mr. Perry perform a proper Panduit analysis?

4  A.  No, I do not believe that he did.

5          MS. DERIEUX:  Slide 10, please.

6  Q.  (By Ms. DeRieux)  Can you explain, to begin with, what

7  this first factor requires?

8  A.  Yes.  The first factor is demand for the patented

9  product.  We need to be able to show that -- the analyst

10 needs to be able to show that there's demand for the product

11 that's covered under the patent in order to begin the

12 Panduit analysis.

13         MS. DERIEUX:  Slide 11, please.

14 Q.  (By Ms. DeRieux)  What was your conclusion on the -- on

15 that first factor?

16 A.  In this case, the -- the patented product is the H-Pin,

17 and both Plastronics and HiCon sell H-Pin -- they sell

18 H-Pins, and so it's pretty clear that there is demand for

19 the patented product because people are buying the H-Pins.

20         But that's not -- that's not where the analysis

21 ends because while the factor is just demand for the

22 patented product, this is also a launching point for the

23 rest of the Panduit analysis because the question becomes,

24 well, the products contain many features other than the

25 patented feature of the '602.  So the question becomes what

1  other factors of the product drove demand.  Did customers

2  buy things just because of the patent, or did they buy

3  thing -- the products for other reasons?

4            MS. DERIEUX:  Slide 12, please.

5  Q.  (By Ms. DeRieux)  On the second of the Panduit factors,

6  what does the second factor look at?

7  A.  So the second factor is this -- is absence of

8  non-infringing alternatives.  And the idea here is we're

9  going to -- we're going to look at a marketplace, and we're

10  going to take out the Defendants' sales.  And the question

11  is, is there anything else that could have been sold in

12  place of the Defendants' products other than the Plaintiffs'

13  product.

14            MS. DERIEUX:  Slide 13, please.

15  Q.  (By Ms. DeRieux)  What is the first step in analyzing

16  what would happen if HiCon Limited could not sell its pins?

17  A.  As an economist, the first thing that -- that we do when

18  we start talking about the sale of products and changes and

19  consumer preferences and things like that is to define the

20  market.  You have to have a general idea of what the

21  marketplace is so we can have an organized discussion of

22  what would happen when we change that marketplace.

23  Q.  What methods do economists typically use to define a

24  market?

25  A.  So generally speaking, an economist can define a market

1   in two ways.  It can be defined quantitatively or it can be

2   defined qualitatively.

3   Q.   What does Mr. Perry say about the market in his

4   analysis?

5   A.   Mr. Perry -- if I understand his testimony correctly

6   even today, Mr. Perry does not define the market.  He does

7   not do a quantitative analysis, which would be giving

8   information about products and prices and trying to

9   determine what happens when you change a product to see --

10  when you change a price to see what happens with the other

11  products.

12              I'll give you a simple example.  We know that the

13  price of strawberries goes up.  So the price of strawberries

14  goes up, what happens to the sale of raspberries?  If the

15  price of strawberries going up makes you buy more

16  raspberries, they would say that product -- that people

17  consider strawberries and raspberries substitutable.

18  They're -- they're in competition.  That's a -- that's a

19  quantitative analysis.

20              Mr. Perry doesn't -- doesn't do that.

21              There's also a thing called qualitative analysis,

22  and a qualitative analysis is gathering information in a

23  different way.  It's about asking questions and -- and

24  analyzing the information from those questions.

25              So, for example, if you were -- wanted to

1  understand the market for travel and you said I want to

2  know -- I want to know what the market looks like for

3  traveling 700 miles in one day.  Well, yeah, you could

4  drive, but more likely than that, you're going to fly.  And

5  so if you're interested in understanding that market, almost

6  for sure airlines are going to be the products that compete

7  in the marketplace because each airline is a substitute for

8  the other.

9          But in a qualitative analysis, you can see already

10  when it gets a little hard to understand what you're talking

11  about, because even with an airlines, there could be some

12  differences to account for because some people might think

13  that United doesn't compete with Southwest.  They're both

14  airlines, but they're somewhat different.  And so you have

15  to understand the differences between the airlines to

16  understand -- some differences in the airlines and the

17  differences in the customers to understand how they compete.

18  Q.  So what did Mr. Perry say about who competes in the

19  market for H-Pins?

20  A.  Mr. Perry con -- concludes that -- that there is a

21  market for H-Pins, it's a two-player market, and that that's

22  the only thing that he needs to be concerned about in his

23  but-for analysis.

24  Q.  Did Mr. Perry perform either a quantitative or a

25  qualitative analysis of this market?

1   A.   He -- he did not perform a quantitative analysis for

2   sure.   I -- I don't believe that he formed a qualitative

3   analysis either, but he may differ with me on that.

4   Q.   Is there qualitative information available to support

5   Mr. Perry's conclusion about the market that H-Pins are sold

6   into?

7   A.   Could you re-ask that question, please?

8   Q.   Yes.   Does the qualitative information available support

9   Mr. Perry's conclusions about the market that H-Pins are

10  sold into?

11  A.   No, it does not.

12  Q.   Why not?

13  A.   Because there's a lot of information that indicates that

14  there's more competitors in this marketplace, other than

15  just HiCon and Plastronics.

16  Q.   What is usually the next step after you identify the

17  relevant market?

18  A.   Once you identify the relevant market, you list the

19  competitors and start to figure out how they compete and how

20  they're -- they would change if one was removed from the

21  marketplace.

22  Q.   Who did Mr. Perry list as competitors?

23  A.   Mr. Perry only considers HiCon and Plastronics.

24  Q.   How did he determine that only HiCon and Plastronics

25  were the relevant competitors?

1   A.   I believe he relied on statements from Mr. Pfaff and

2   Mr. Furman, and I also believe that from -- from his

3   testimony, he believes -- he appears to understand that

4   customers may reveal a preference for a product by their

5   purchasing decisions, and, therefore, in -- in this case,

6   since customers bought the H-Pin, the only thing they would

7   buy is an H-Pin because that's what they indicated that they

8   bought.

9   Q.   Under Mr. Perry's view of the market, if HiCon Limited

10  could not sell its pins, who would -- who would compete with

11  Plastronics?

12  A.   Under -- under Mr. Perry's view of the world, the only

13  alternative would be Plastronics.

14  Q.   If Mr. Perry doesn't define the market, how can he

15  figure out who the competitors are?

16  A.   I -- I believe he -- he either relies on the testimony

17  from Mr. Pfaff and Mr. Furman or he uses this revealed

18  preference framework.

19  Q.   Is revealed preference a term that economists use?

20  A.   They do.   Revealed preference is a -- a very famous area

21  of economics where economists have spent a lot of time

22  determining under what circumstances consumers actually

23  reveal their preferences based on their purchasing behavior.

24            MS. DERIEUX:   Next slide, please.

25  Q.   (By Ms. DeRieux)   Can you explain for the jury how

1   revealed preference theory works?

2   A.   Yes, I can.   And I think we have a -- the next slide

3   as -- as an example.

4            So if -- if you believe that a customer was

5   interested in an import car, and so there are imports and

6   they're considering buying a Honda Civic -- next slide --

7   no, next -- there you go -- and -- but somebody said that

8   they can't buy the Civic for -- for whatever reason, would

9   you believe that their revealed preferences of buying an

10  import car indicates that they would buy a Ferrari?

11  Probably not because there's a huge pricing difference

12  between a Ferrari and a Honda Civic.   More likely than not,

13  the revealed preferences indicate that they'd buy something

14  closer to a Corolla which is priced similarly -- similarly

15  to a Civic.

16  Q.   Are there other factors, other than price, that would

17  factor into a revealed preference theory analysis?

18  A.   Yes.   Anytime you do a revealed preference analysis, and

19  this is what makes revealed preference difficult to use, is

20  to isolate the effect of one preference, you have to control

21  for all the other different aspects of the product.

22  Otherwise you don't know what you're measuring and what

23  you're -- and what you're concluding is driving the product

24  decision.

25            MS. DERIEUX:   Next slide, please.

1   Q.   (By Ms. DeRieux)   What factors did you observe in the

2   burn-in and testing markets that you would need to control

3   for in a revealed preference analysis?

4   A.   So there's probably dozens or maybe -- or maybe a dozen

5   factors.   But ones that I have to talk about today are

6   specifically price, quality, and lead time.   And these seem

7   to be the ones that have been mentioned most in the trial

8   and are the easiest to get a handle on because everyone

9   understands price.

10          Quality is difficult to understand, but it ranges

11   anywhere from does the product actually accomplish what it's

12   supposed to accomplish or does the product, you know, look

13   nice, does it last a long time, does it have other quality

14   features?

15          And then, finally, it's important in most

16   environments, most -- most corporate testing environments --

17   you know -- you know, when you go to buy a car, oftentimes

18   you don't care whether the car is delivered today or

19   tomorrow or next week because you just need the car.

20          But in these industries, there's a multi-step

21   process, right?   I'm -- I'm buying these products to -- to

22   do this testing and get online in time to bring my product

23   to market.   And so the lead time that's provided by the

24   suppliers -- all the suppliers is really important.   And so

25   that's another aspect that you need to control for in the

1    decision-making process.

2    Q.  What would happen if you used the revealed preference

3    approach without controlling for these other factors?

4    A.  So let me give you a little more complicated example to

5    understand -- to help you understand why revealed preference

6    can be difficult to use, and it's -- it's another car

7    example.

8         You -- you may know that Audi sells cars in the

9    United States.  All Audis that are sold in the United States

10   are four-wheel drive vehicles.  In Europe, they sell

11   two-wheel drive, but in the United States they only sell

12   four-wheel drive vehicles.

13        And so someone could look at this and say, oh,

14   when an American purchases an Audi, they've revealed their

15   preference for four-wheel drive.  So you might -- you might

16   draw the conclusion that if Audi left the U.S. market, all

17   Audi buyers would buy four-wheel drive vehicles, or they'd

18   buy a Jeep or something like that.

19        We know that that's -- we know that that's not

20   true because I think if you -- if you look at cars, you can

21   see that Audis are a combination of performance,

22   entertainment systems, quality leather, German engineering,

23   lots of other features.  And more likely than not, if Audi

24   is not available in the States, these people did not reveal

25   their preference for four-wheel drive, they revealed their

1    preference for maybe German engineering so maybe they buy a

2    Mercedes or maybe they buy a BMW or maybe the smaller luxury

3    cars, and they buy a Cadillac.

4              So since these products have multiple futures and

5    multiple items drive the decision-making, trying to

6    understand what would happen when you change just one

7    feature can be difficult.

8    Q.   So in your opinion, does Mr. Perry incorrectly use the

9    revealed preference theory?

10   A.   Yes, I think he does.

11   Q.   What about complexities in the customers' purchasing

12   decisions for products containing H-Pins, would you need to

13   control for those complexities?

14   A.   Yes.   I -- I think that it's been made clear by

15   Mr. Furman and by Mr. Schubring and Mr. Hwang that the

16   decision-making process that goes into the selections of

17   these products is complex.   And people -- the customers make

18   the decision of which product they're going to purchase

19   based on a number of factors.   And so if you're trying to

20   figure out what a customer would do, if you remove their

21   ability to buy an H-Pin, you'd have to control for these

22   other factors in order to get the right conclusion.

23   Q.   Did Mr. Perry control for any variables in his revealed

24   preference theory?

25   A.   Mr. Perry does not control for any variables.   He just

1   concludes that if a customer bought an H-Pin and could not

2   buy that H-Pin from HiCon, he would buy the H-Pin from

3   Plastronics.

4   Q.  Did Mr. Perry discuss the effect of prices for products

5   in this market?

6   A.  No.  Mr. Perry testified that he -- that he didn't know

7   what the prices were.  And that's a big problem in the

8   case -- in a case like this, as cited in my example

9   previously.  And we also have information from Mr. Furman

10  that he believes that HiCon's prices are -- are less

11  expensive or lower than Plastronics's prices.

12         And I've seen in the record that Mr. Pfaff

13  indicated that they were up to 30 percent lower, so that's a

14  significant pricing difference and that pricing difference

15  would affect any kind of revealed preference analysis.

16  Q.  Would it even be possible to use revealed preference in

17  a market as complex as this one?

18  A.  I mean, I think you probably could.  I think you could

19  develop questionnaires and -- and isolate the various

20  factors -- various competitors in the marketplace, and --

21  and determine what customers are revealing in their

22  preferences buying different products.  But it would be very

23  difficult.

24  Q.  Does Plastronics face competition from firms other than

25  HiCon Limited?

1   A.   Yes.   I think today, you've heard -- today and yesterday

2   you've heard a lot of information to indicate -- indicating

3   that Plastronics faces competitors -- many competitors.

4   Q.   Does Plastronics face competition from others that are

5   selling sockets with H-Pins?

6   A.   Yes.   It was -- I'm trying to remember the witness --

7   you heard earlier that Plastronics sells the H-Pins to

8   Sensata.   And then Sensata takes those H-Pins and puts it in

9   their socket, which indicates beyond -- beyond doubt that

10  Plastronics faces competitions for -- competition for H-Pin

11  products from HiCon and at least Sensata.

12  Q.   So in your opinion, is Mr. Perry's two-player conclusion

13  correct?

14  A.   No, I think it's -- there are -- there are other

15  reasons.   We'll talk about them in a few minutes, but just

16  on its face, we know for sure that this is not a two-player

17  market because Plastronics sells socket -- sells H-Pins to

18  other socket manufacturers that then put those pins in their

19  socket which creates competition for Plastronics.

20  Q.   Is there any information that Plastronics competes with

21  pins other than HiCon Limited's pins?

22  A.   Yes, there is.   We've heard testimony about the type of

23  pin that the H-Pin is.   It's a stamped spring pin and that

24  there -- Mr. Schubring explained earlier today that there

25  are many companies that make stamped spring pins, and all of

1    these are in competition with the H-Pin.

2           MS. DERIEUX:   Slide 16, please.

3    Q.  (By Ms. DeRieux)  Who are the competitors who are listed

4    here on Slide 16?

5    A.  I mentioned previously I conducted interviews.  Early in

6    my work on the case, I interviewed Mr. Schubring and

7    Mr. Hwang, and one of the focuses of my interview was

8    what's -- what's the competition look like?  If somebody

9    could not buy an H-Pin, just period, could not buy an H-Pin,

10   what products would they purchase or what products would

11   they consider and why would they consider those?

12          And Mr. Hwang and Mr. Schubring identified --

13   identified nine companies that he -- that they both believe

14   provide products that are competitive to H-Pins and would be

15   considered if HiCon's products were not on the market.

16          So they mentioned Ardent Concepts, Enplas

17   Corporation, IWIN Solutions, Micro Contact Solutions, OKins

18   Electronics Company, Sensata, Veeco, Xcerra, and Yamaichi

19   Electronics.  And you may remember most of those were

20   mentioned just recently by Mr. Schubring.

21   Q.  Did you find any information that Plastronics believed

22   it had competitors other than HiCon Limited?

23   A.  Yes, I did.  I saw in the record emails and at least one

24   PowerPoint presentation where Plastronics outlines the

25   competition it faces.

1          MS. DERIEUX:   Next slide, please.

2    Q.  (By Ms. DeRieux)  If you would take a look at DX-403.

3    And what does this email tell us about the competitors in

4    the H-Pin market?

5    A.  So this email is -- is from David Pfaff to Mr. Hwang,

6    and it's dated June 22nd, 2011.  And Mr. Pfaff is explaining

7    that he's thinking about exploring a lawsuit with ECT, but

8    he's not going to pursue it right now, which indicates that

9    he believes that ECT --

10          MR. BEAR:  Objection.  Improper expert testimony

11   about the state of mind of Mr. Pfaff.

12          THE COURT:  Overruled.

13   A.  I believe it indicates that ECT has a product that is

14   similar enough to the H-Pin to be potentially infringing the

15   '602 patent, which implies that it would be similar enough

16   to be in competition with the H-Pin.

17          And then the next paragraph, the fourth paragraph

18   down, he says that, you know, he would like to explore more

19   detail how we can dominate, him and Mr. Hwang, but the

20   important sentence comes next.

21          All the spring pin companies are coming out with

22   stamped spring probes.  That matches and correlates with the

23   testimony provided by Mr. Schubring that there are many

24   stamped spring probes that can compete with the H-Pin and

25   that if you say in the marketplace that we remove HiCon's

1   products, you cannot automatically conclude that all sales

2   would go to Plastronics.

3            MS. DERIEUX:  Next slide, please.

4   Q.  (By Ms. DeRieux)  What does DX-058 here on your screen

5   tell us about what Plastronics believed about the

6   competition in the market?

7   A.  This email is similar to the previous one.  It provides

8   a little more detail.  It's from David Pfaff to -- to

9   Mr. Hwang, also.  And it's dated March 12th, 2010.

10            And it appears that Mr. Pfaff is coming back from

11   a show -- it's a trade show -- and he mentions that Foxconn,

12   ECT, MJC, Yamaichi, Enplas, Aries all have stamped contacts

13   with springs.

14            And I think this is referring to the other email.

15   Says:  Only the ECT one looks like infringement.  So it must

16   be the closest to the H-Pin.  But he's mentioning that all

17   of these suppliers have products that are stamped spring

18   probes, which indicates that they are likely in competition

19   with Plastronics's H-Pin.

20            And interesting, also, he mentions that LEENO has

21   a small Pogo Pin, a very, very small Pogo Pin.  And that is

22   one of the advantages of the H-Pin is it's very, very small.

23   And so he's also indicating that that he's at least

24   concerned about LEENO's very small Pogo Pin.

25            And he continues on to say that it's urgent that

1   they license a competitor company to get the H-Pin in

2   production -- I believe to get the H-Pin in production, so

3   it can compete with other stamped steel springs.

4           MR. BEAR:  Objection.  The witness is speculating,

5   Your Honor.

6           THE COURT:  Well, he's an expert witness.  He's

7   entitled to offer an opinion.

8           Is your objection, Counsel, that the opinion

9   offered is not disclosed in his report, or is it that he

10  doesn't have the ability to -- to offer an opinion as to

11  this matter?

12          MR. BEAR:  I believe both, Your Honor.  I believe

13  it's for the jury to determine the intent of this email, not

14  for an expert to tell them what Mr. Pfaff intended.

15          THE COURT:  So you're telling me that you believe

16  that that opinion is outside the scope of what's disclosed

17  in his expert report?

18          MR. BEAR:  Yes, Your Honor.  And I also believe

19  it's improper testimony.

20          THE COURT:  All right.  Ladies and gentlemen, this

21  is a matter that I'll have to resolve outside of your

22  presence.  I'm going to ask you to close your notebooks,

23  follow all my instructions, and retire briefly to the jury

24  room.  I'll have you back as soon as I can get this

25  resolved.

1          The jury is excused at this time.

2          COURT SECURITY OFFICER:  All rise.

3          (Jury out.)

4          THE COURT:  Be seated, please.

5          Ms. DeRieux, do you believe there's support within

6     the expert witness's report for the opinion testimony called

7     for by your questioning, given by his answer, and if so, can

8     you clarify where in the report you believe that support

9     exists?

10          MS. DERIEUX:  Yes, Your Honor.  It's in his

11    rebuttal report at Page 13, Notes 19 and 21.

12          And I know that -- that it's a reference to Bates

13    numbers rather than this exhibit number because at the time

14    the exhibits weren't numbered, but those are the references

15    to DX-058 that we're relying on.

16          THE COURT:  What's your response to that,

17    Mr. Bear?

18          MR. BEAR:  Your Honor, I believe that this crosses

19    the territory into not having support.  Just because he

20    cites an email or a piece of evidence in his report doesn't

21    mean that he is authorized to testify about the subjective

22    intent of another fact witness, and I think it's improper

23    for an expert to opine.

24          I think it is proper for him to talk about

25    competitors, but when he says, Mr. Pfaff intended X, Y, or Z

1    on an email, I think that's improper, and I think it

2    broaches the province of the jury.

3            THE COURT:  Well, you told me that the objection

4    was rooted in your belief that the opinion offered by the

5    witness was outside the scope of his expert reports.  That's

6    why I sent the jury out.

7            MR. BEAR:  I understand.

8            THE COURT:  If that's not the basis of your

9    objection, then you need to clarify that for me now.

10           MR. BEAR:  It's a two-part.  That's what I just

11   said.

12           And also I don't think that there was any

13   disclosure that Mr. Pfaff's subjective -- that he was

14   testifying as to Mr. Pfaff's subjective intent in the

15   report.

16           So, I mean, I -- I think it -- I didn't see

17   anything in the report that indicated he was going to talk

18   about, you know, a -- a fact witness's intent in sending an

19   email.

20           THE COURT:  Well, quite honestly, I think your

21   objection that it's outside the scope of the report is not

22   well-founded.  Your better objection is that it calls for

23   speculation beyond the stated area of expertise of this

24   witness.

25           Do you have a response to the speculation

1    objection, Ms. DeRieux?

2            MS. DERIEUX:  I believe Dr. Woods was drawing a

3    conclusion based on David -- David Pfaff's written position

4    as revealed in his own words in this email that he wrote to

5    Mr. Hwang.

6            THE COURT:  Can you put the email back on the

7    screen for me?

8            All right.  Considering the evidence before me,

9    I'm going to overrule the objection.  I think the question

10   calls for and the answer given addresses more of what is

11   contained within DX-058 than subjectively speculating about

12   the underlying intent of the author, Mr. Pfaff.

13           So the speculation objection is overruled.  The

14   outside the scope of the expert's report objection is

15   overruled.

16           Let's bring the jury in.

17           MR. BEAR:  Thank you, Your Honor.

18           COURT SECURITY OFFICER:  All rise.

19           (Jury in.)

20           THE COURT:  Thank you for your indulgence, ladies

21   and gentlemen of the jury.  Please be seated.

22           For the record, the objection is overruled.

23           Proceed with either the completion of this answer

24   or your next question, Ms. DeRieux.

25           MS. DERIEUX:  Let's call up Slide 19, DX-441,

1    please.

2    Q.   (By Ms. DeRieux)  Dr. Woods, did you review any internal

3    Plastronics documents that mentioned competitors?

4    A.   Yes, I did.   This is a Plastronics internal document

5    from 2011 where Plastronics is explaining or looking at its

6    main competitors, and you can see that they mention the

7    competitors that we've been talking about previously.   They

8    mention Yamaichi, Enplas, Sensata.   And then under others,

9    they have Foxconn and a company called OTAX.   I don't think

10   that was on the list before.   And there's some other niche

11   players with products like Plastronics.

12          It's also important to note the relative size of

13   the competitors that they're displaying on the screen here.

14   Yamaichi has $250 million.   It's $250 million in sales.   So

15   they're much, much larger, probably over ten times larger

16   than Plastronics.

17   Q.   Has there been any testimony from any Plastronics

18   employees that indicated Plastronics competes with products

19   other than HiCon pins?

20   A.   Yes.   Mr. Furman indicated that Plastronics competes

21   against Yamaichi, Enplas, and Sensata but mentioned that the

22   pins are included -- H-Pins are included in Sensata's

23   products.

24   Q.   How does Mr. Perry include this information in his

25   analysis?

38

1    A.   As I discussed before, Mr. Perry doesn't include this

2    information at all.  He ignores it.

3    Q.   What kind of analysis would be needed for a market with

4    more than two players?

5    A.   So anytime you have more than two players and you're

6    doing a lost profits analysis, you're removing one of the

7    players, but if there's more than two, then that means, when

8    you review one, you still have two.

9            So you have to take the Defendants' sales and

10   allocate those sales among the remaining participants in the

11   marketplace.  And that can be done in multiple ways, but one

12   way is to simply look at the market's share of the

13   competitors and say, well, if they're the biggest supplier

14   in the marketplace, they get the bigger amount of sales.

15           There are other more qualitative ways to do it,

16   too, but no matter what you do, you have to -- if there are

17   more than two players in the marketplace and you remove one,

18   you have to allocate those sales among the remaining

19   competitors with some kind of market share or some kind of

20   analysis.

21   Q.   Has Mr. Perry presented any kind of market share

22   analysis like you described?

23   A.   He has not.

24   Q.   Based on your analysis of the second Panduit factor,

25   have you come to a conclusion about lost profits?

1  A.   Yes.   That lost profits is not a fair measure of damages

2  in this case primarily so far because there is -- you cannot

3  show an absence of non-infringing substitutes.   Therefore,

4  you cannot conclude that the but-for test is met and that

5  lost profits is the proper measure of damages.

6          MS. DERIEUX:   Slide 20, please.

7  Q.   (By Ms. DeRieux)   What is the third Panduit factor?

8  A.   So as we work -- walk through these, if you believe that

9  the first two are satisfied, the first two Panduit factors

10  are satisfied, then the next one to look at would be to

11  determine if the Plaintiff had the capacity to manufacture

12  and market the -- the number, the type of products that were

13  sold by the Defendant so that the Plaintiff could

14  essentially step into the shoes of the -- the Defendant in

15  your but-for world.

16  Q.   Whose marketing -- marketing capacity are we looking at

17  here, Plastronics H-Pin or Plastronics Socket?

18  A.   It would be Plastronics H-Pin.

19  Q.   Why -- why H-Pin and not Socket?

20  A.   Because it's my understanding that Plastronics H-Pin

21  holds the patent and holds the contract that -- that's at

22  issue in this case; therefore, that is the party that is

23  trying to recover its lost profits.

24  Q.   And who does Plastronics H-Pin sell to?

25  A.   As -- as you heard earlier, Plastronics H-Pin sells pins

1   only to Plastronics Socket Partners.

2          MS. DERIEUX:   Slide 21, please.

3   Q.  (By Ms. DeRieux)  Have you seen any information that

4   Plastronics H-Pin conducts any marketing?

5   A.   Plastronics H-Pin has no employees -- or it -- it

6   doesn't conduct any marketing, and in the but-for world, it

7   would have no ability to market products because its only

8   customer is Plastronics Socket.

9   Q.   So is there information that Plastronics H-Pin has the

10  marketing capacity to make HiCon Limited sales?

11  A.   No, there's no information to support that conclusion.

12  Q.   What does manufacturing capacity mean?

13  A.   So manufacturing capacity is exactly what it sounds

14  like.  Does -- do the Plaintiffs have the ability to

15  physically manufacture the type and quantity of products

16  that would be necessary to satisfy the needs of the

17  Defendants' customers?

18          MS. DERIEUX:   Slide 22, please.

19  Q.  (By Ms. DeRieux)  What was your conclusion about

20  Plastronics's H-Pin manufacturing capacity to make H-Pins?

21  A.   And -- and so I believe you heard when Mr. Perry was

22  testifying that -- that we -- we know that Mr. Furman

23  testified that Plastronics H-Pin could make more pins.  But

24  we don't know exactly how many more pins they could make.

25          But we also don't know how many pins they would

41

1   need to make in order to satisfy HiCon's customers' needs

2   because it's never been disclosed how many pins HiCon

3   customers needed.

4   Q.   If Plaintiffs are seeking lost profits on sockets, do

5   they also have to show capacity to manufacture sockets?

6   A.   Yes.   If Plastronics H-Pin is going to collect damages

7   on the lost profits sales, it would need to be able to

8   manufacture sockets.   And as was explained previously,

9   Plastronics H-Pin does not manufacture sockets.

10  Q.   What is your conclusion about whether Plastronics H-Pin

11  has the necessary manufacturing capacity to make the

12  sockets?

13  A.   Plastronics H-Pin does not have manufacturing capacity

14  to make sockets.   So, therefore, it could not have the

15  capacity.

16  Q.   Even if we consider Plastronics Sockets instead, have

17  you seen any information about Plastronics Socket's

18  manufacturing capacity to make the number of sockets sold by

19  HiCon Limited?

20  A.   Even if we look at Plastronics Socket Partners, it's the

21  same problem as what we discussed for H-Pins.   While we have

22  some information that Plastronics Socket Partners could make

23  more sockets, there's no information available of how many

24  sockets they would need to make in order to satisfy the

25  needs of HiCon's customers.   So you can't conclude that

1  Plastronics Sockets has enough manufacturing capacity to

2  meet the sales.

3  Q.  Did Mr. Perry analyze any information about the number

4  of sockets Plastronics Socket could manufacture?

5  A.  He did not.

6  Q.  Did you see any information about whether Plastronics

7  could manufacture the kinds of pins and sockets that HiCon

8  Limited sold?

9  A.  No.  There's -- there's no information about the

10  specific kinds of sockets that HiCon's customers needed or

11  wanted and whether or not Plastronics could actually make

12  those sockets.

13        Additionally, you heard earlier that HiCon makes

14  three different types of pins.  There's different tops on

15  the pins.  And that's what HiCon's customers are buying.

16        There's no information in the record that

17  indicates that Plastronics H-Pin could manufacture those

18  specific types of pins.

19  Q.  Does Mr. Perry determine if Plastronics could have made

20  sockets that were acceptable to HiCon Limited's customers?

21  A.  He does not.

22  Q.  Did you review Plastronics's sales records in connection

23  with analyzing Plastronics's manufacturing capacity?

24  A.  Yes.  There was information provided in Mr. Furman's

25  testimony, as well as information provided by Mr. Perry,

1  that indicates that Plastronics believes that it could sell

2  two to three times its level of sales in order to meet

3  HiCon's needs.

4         MS. DERIEUX:  Slide 23, please.

5  Q.  (By Ms. DeRieux)  This is DX-041.  Is this a copy of

6  Plastronics's sales information that you reviewed?

7  A.  This is a copy of information that I and Mr. Perry both

8  reviewed.

9  Q.  And what does this document show?

10  A.  This is -- this is a multi-page document that indicates

11  the financial statements or the detailed financial records

12  of Plastronics H-Pin and Plastronics Socket Partners.

13  Q.  Did Mr. Perry provide a summary of Plastronics's

14  financial information?

15  A.  Yes.  In the process of doing his work, he provided

16  several summaries.  But one of them will be helpful to

17  understand and evaluate this concept of three times the

18  level of sales capacity for Plastronics.

19         MS. DERIEUX:  Slide 24, please.

20  Q.  (By Ms. DeRieux)  What did Mr. Pfaff tell Mr. Perry

21  about Plastronics's manufacturing capacity?

22  A.  So Mr. Pfaff told Mr. Perry that Plastronics could sell

23  three times the level of sales during the damages period.

24  Q.  Can you explain how you used Plastronics sales numbers

25  to determine manufacturing capacity?

1  A.   Yes.   And so the only information that I -- was

2  available to me about their manufacturing capacity was the

3  level of sales that -- that they could accomplish.   And so

4  Mr. Perry provided the -- the summary that's on the screen

5  now indicating -- indicating that during the damages period,

6  Plastronics sold $56,491,995.00 worth of sockets -- pins and

7  sockets.   That was their sales during the damages period.

8          And the damages period is -- on the slide here is

9  6.75 years.   And so if you divide 56.5 by 6.75, you get

10 approximately $8.4 million.   So that's on -- that's on

11 average during the damages period what Plastronics's sales

12 were per year.

13         And so Mr. Pfaff said that they could do three

14 times that amount, which means we multiply the 8.4 by 3, and

15 you get 25.1.

16 Q.   Does $25.1 million per year indicate that Plastronics

17 had enough capacity to make all of its sales and all of

18 HiCon Limited's sales?

19 A.   It does not.

20         MS. DERIEUX:   Slide 25, please.

21         If you would, clear the screen so the jury --

22 yes -- can see the document.

23         All right.   Slide 25.

24         THE WITNESS:   Sorry to erase the whole screen.

25 Q.   (By Ms. DeRieux)   Okay.   Can you explain your analysis

1   here on -- on this chart -- using this chart?

2   A.   Yes, I can.   So this chart takes some of the information

3   from the previous screen and so forth.   For 2015 through

4   2018, it shows Plastronics's sales.   And then next to it, it

5   has HiCon sales during those same years.   And it works

6   across from there, but I'm going to -- I'm going to start by

7   looking at just one year.

8            So if you look at 2015, Plastronics sold $8.2

9   million worth of products, and HiCon sold 32.9.   So almost

10  $33 million worth of sales.

11           So in order to make both its sales --

12  Plastronics's sales and HiCon's sales, in 2015, Mr. Perry

13  needs to conclude that Plastronics could sell $41,244,589.00

14  worth of products.

15           But as I described previously, based on the

16  statements from Mr. Pfaff that their capacity is three times

17  their level of sales, their sales capacity is only

18  $25,107,553.00.   And that means that Mr. Perry's calculating

19  lost profits damages on $16,117,036.00 more than Plastronics

20  could have actually produced by Mr. Pfaff's statements.   And

21  that leads to Mr. Perry overstating damages by

22  $6,333,995.00.

23           MS. DERIEUX:   Slide 26, please.

24  Q.   (By Ms. DeRieux)   After analyzing the third Panduit

25  factor, what is your conclusion about lost profits?

1   A.   So Mr. Perry cannot conclude that -- cannot establish

2   the but-for conditions have been met, so, therefore, lost

3   profits is not a fair measure of damages.

4            And clearly, the market is not a two-player

5   market.   We know for sure it's at least a three-player

6   market, but most likely there may be more than three

7   players.   There may be as many as 12.

8            And then, finally, Plastronics can't show that the

9   correct entities had the right -- had enough manufacturing

10  and marketing capacity in order to make the sales.

11  Q.   Up to this time we've been talking about the Panduit

12  factors, but other than the Panduit factors and establishing

13  that but-for causation, is there other economic --

14  economically relevant information to consider about whether

15  the lost profits were caused by the alleged bad acts?

16  A.   Yes.   So Plastronics might not have made sales for a

17  wide variety of -- wide variety of reasons, such as its

18  prices are too high, its -- quality doesn't match

19  expectations, or does not -- doesn't have the ability to

20  meet the lead times that are necessary in the market.

21  Q.   Did you see any information in this case that HiCon

22  Limited's acts did not cause Plastronics's claimed lost

23  profits?

24  A.   I observed some emails that indicate that that may be

25  the case.

1          MS. DERIEUX:  Slide 27, please.

2     Q.  (By Ms. Derieux)  Take a look at DX-065.  What does

3     this -- what does this email tell you about Plastronics's

4     ability to compete on the basis of price?

5     A.   And so this email is from -- I think it's Justin

6     Lawrence at Micron to Larry Furman at Plastronics from

7     August 25th of 2009.  And Mr. Lawrence is explaining that

8     they can't justify paying more for a socket that does the

9     same job as the current solution.  In other words, he is

10    saying that if they -- if Plastronics wants Micron to

11    consider its products, it needs to lower its price by 20 to

12    25 percent just to be considered.

13          And then Mr. Lawrence goes on to reiterate that it

14    doesn't make sense, you know, to pay more for a socket

15    unless you get significant performance improvements.  And

16    this goes back to this complicated nature of the -- the

17    products.  You can't conclude that price is the only thing

18    that drives sales or that performance is the only thing that

19    drives sales.  It's a combination of the two.

20          MS. DERIEUX:  Slide 28, please.

21    Q.  (By Ms. DeRieux)  What does this email, DX-350, tell you

22    about Plastronics's ability to compete on the basis of

23    price?

24    A.   And once again, this email provides information that

25    Plastronics's prices may be too high at some times.  It's an

1    email from Mr. Brown at NW Test Solutions, which it's my

2    understanding that NW Test Solutions buys products from

3    other -- from many different vendors and -- and re-sells

4    those products either on the board or individually.

5              And the -- the email is from Mr. Brown to

6    Mr. Furman.  And in the highlighted section, it says:

7    There -- I believe they're talking about Micron again, that

8    Micron was paying 20 to $30.00 per elastomer.  That's a type

9    of socket.  And that these elastomer sockets has 200 pins,

10   and they're buying the quantities of 50 to a hundred sockets

11   at a time and that Plastronics and NW Solutions can't

12   compete with -- with that price point.

13   Q.  Did you see any other information that Plastronics had

14   higher prices than its competitors?

15   A.  Yes.  As I mentioned before, earlier in the trial,

16   Mr. Furman testified that it was his understanding that

17   Plastronics's prices -- that HiCon's prices are 30 percent

18   lower than Plastronics's prices -- I'm sorry, Mr. Furman

19   said they were lower.  And Mr. Pfaff said previously that

20   they were 30 percent lower.

21   Q.  What does this information show you about whether

22   Plastronics's lost sales were caused by HiCon Limited's

23   alleged bad acts?

24   A.  It -- it's possible that HiCon's [sic] inability to sell

25   is related to things other than HiCon's sales.

1    Q.   Did you see any information that shipping times were

2    important?

3    A.   I did.

4              MS. DERIEUX:   Slide 29, please.

5    Q.   (By Ms. DeRieux)   What does the email in DX-443 tell you

6    about the importance of delivering a product on time in this

7    market?

8    A.   So this is an email from Mr. Pfaff to Mr. Durrett,

9    D-u-r-r-e-t-t, who's also a Plastronics employee.   It's from

10   November 26th of 2012.   And there -- there -- from their

11   email chain, I think they're discussing a business plan or

12   business opportunity.

13             They're -- they're talking about, in the

14   highlighted section, that Plastronics's pricing in Taiwan is

15   higher than competitors'.   And they also mention that

16   delivery time is -- is important -- at least -- at least if

17   you commit to a delivery time, actually making that

18   commitment is really important, especially in the -- in the

19   Asian market.

20   Q.   What does this information show you about whether

21   Plastronics's lost sales were caused by HiCon's activities?

22   A.   It provides information that there may be other factors

23   at play beyond HiCon's conduct -- alleged bad conduct in

24   this case.

25             MS. DERIEUX:   Slide 30, please.

1    Q.   (By Ms. DeRieux)   What is the last Panduit factor?

2    A.   And the last Panduit factor is the calculation phase.

3    And if you believe that the other three are met, you still

4    can't necessarily conclude that lost profits are the fair

5    measure of damages unless you can calculate what the lost

6    profits are.   And so the last step is calculating the lost

7    profits.

8    Q.   Given your conclusion that lost profits is not the

9    appropriate economic measure, did you calculate what you

10   think lost profits would be if they were to apply?

11   A.   Yes, I did.

12   Q.   Did you calculate lost profits on sockets or pins or

13   both?

14   A.   The lost profits calculation would be on pins alone.

15   Q.   Why is that?

16   A.   Because Plastronics H-Pin is the entity claiming that it

17   lost sales, which means that it would have lost profits.

18   Q.   Did you calculate lost profits based on U.S. revenue or

19   worldwide revenue?

20   A.   Just based on U.S. revenue.

21   Q.   And why is that?

22   A.   My understanding that the -- the patent is a U.S.

23   patent, and the only way you can claim damages

24   internationally on a U.S. patent is if the infringement

25   happened in the United States.   So if -- if HiCon sold

1    products into the United States that were then exported out

2    of the United States, that could cause -- my understanding

3    is that could cause patent infringement damages.  But I have

4    seen no information that indicates that happened.

5           MS. DERIEUX:   Slide 31, please.

6    Q.   (By Ms. DeRieux)  So can you explain your calculation of

7    lost profits in the U.S. on pin sales?

8    A.   Yes.  So this slide shows on the first row -- it shows

9    the U.S. pin sales of Plastronics from the beginning of 2012

10   -- beginning of the time period from 2012 to 2018, showing

11   that -- do this here -- try that again -- there we go --

12   showing that total pin sales were $41,507,098.00, but that

13   is not total pin sales.

14           I'm sorry, I may have misspoke.  That's the total

15   socket sales.

16           In order to determine the pin sales, we need to

17   know how much of that sales -- how much of those sales are

18   related to pins.  HiCon did not keep records to separate

19   these, and this was part of my interview process.  I spoke

20   with Mr. Kwon, and we worked together to determine what his

21   best estimate would be and what the revenue related to pins

22   would be.  And he said:  It's -- it's difficult to say,

23   but -- but on average, for the customers that we're talking

24   about, and he went back and looked at the different sockets,

25   he -- he concluded that 40 percent was his best estimate,

1  which means that there's $16,602,839.00 of pin sales into

2  the United States.  And so that would be the sales base.

3          And then in order to figure lost profits, we need

4  to know what the profit margin would be, and so I analyzed

5  the financial information from Plastronics H-Pin and

6  concluded that their incremental profit margin as about 15

7  and a half percent, indicating that damages for patent

8  infringement related to lost profits on pin sales is

9  $2,575,388.00.

10  Q.  We heard Mr. Perry testify that -- about two lost profit

11  measures for patent infringement.  Mr. Perry testified

12  4.2 million would be appropriate.  Why is that number higher

13  than your calculation of 2.6?

14  A.  Mr. Perry's calculations include worldwide sales.

15  Q.  Mr. Perry also testified that 26.2 million was the

16  proper measure of contract-related lost profits.  Why is

17  that number 10 times higher than your calculation of 2.5

18  million?

19  A.  Right.  So you remember from the first slide on the

20  timeline, there's a slight timing difference between the

21  patent -- a two-year timing difference between the patent

22  time period for damages and the contract time period for

23  damages.

24          So on my slide, the contract damages would be --

25  the  $2,481,906.00, which is for a two-year shorter time

1  period and that's different than Mr. Perry's number for two

2  reasons.

3          First, Mr. Perry is including -- in his contract

4  damages, he includes lost profits for the socket sales, and

5  it's on a worldwide basis, whereas, my number is just for

6  the pin sales only in the United States.

7  Q.  Why is it wrong, from an economic point of view, to

8  include the sockets?

9  A.  As I explained before, Plastronics H-Pin is the entity

10  that owns the contract and the entity that owns the patent,

11  and, therefore, it's the entity that suffered lost profits,

12  and so that's -- the profits need to be based on the product

13  itself, which is pins.

14          MS. DERIEUX:  Slide 32, please.

15  Q.  (By Ms. DeRieux)  Can you summarize your criticisms of

16  Mr. Perry's lost profit calculation?

17  A.  Yes.  Mr. Perry's overstating the lost profits because

18  he's including the sales of sockets.  He's using

19  Plastronics's higher profit margin, because when he

20  calculates the sale of the sockets as opposed to H-Pin's

21  lower profit margin, then he includes sales outside the

22  United States.

23  Q.  Can you now summarize your lost profits analysis for the

24  jury.

25  A.  Can we go to the next slide, please?

1    Q.   I'm sorry.

2    A.   So trying to pull this all together, I conclude that

3    lost profits is not a fair measure of damages in this case

4    because there's multiple players in the market, which means

5    that Mr. Perry could not support his but-for analysis.  He

6    can't conclude the Panduit factors support his analysis.

7            If lost profits aren't the correct measure of

8    damages, then -- so if lost profits are the correct measure

9    of damages, the damages should be based solely on U.S.

10   sales, the pin sales, and that would mean that damages would

11   be $2,575,388.00.

12           MS. DERIEUX:   Could you clear the screen, please?

13   Q.   (By Ms. DeRieux)  If Plastronics's lost profits is not

14   the correct measure of damages, is there another method to

15   determine the economic damages to Plastronics for breach of

16   contract?

17   A.   No.   It's my understanding that the economic damages for

18   a breach of contract are essentially lost profits.  And if

19   the Plaintiff cannot show that it can support, in the

20   but-for world, that it lost profits, there's no measure of

21   damages.

22   Q.   What about the patent infringement cause of action?

23   A.   So the patent infringement cause of action is a little

24   different because under the patent statute, there's a rule

25   or section that says the damages, if they're not lost

1  profits, they're, at a minimum, a reasonable royalty.

2  Q.  So is a reasonable royalty in addition to or an

3  alternative to lost profits?

4  A.  It's an alternative to lost profits only for the patent

5  damage claim.

6            MS. DERIEUX:  Could you put up Slide 34, please?

7  Q.  (By Ms. DeRieux)  How do you calculate a reasonable

8  royalty?

9  A.  And so a reasonable royalty is calculated by taking a

10  royalty base and multiplying it by a royalty rate to

11  conclude what the reasonable royalty is.

12  Q.  And what is the proper royalty base here?

13  A.  So -- so in this case, the royalty base would be HiCon

14  sales that -- that are subject to a royalty in this

15  agreement -- in this situation, which would be HiCon sales

16  of pins and sockets.

17            MS. DERIEUX:  Slide 35, please.

18  Q.  (By Ms. DeRieux)  How do you calculate that royalty

19  base?

20  A.  So this slide shows HiCon sales from 2012 to 2018, which

21  covers the damage period for the patent damages showing that

22  during that time period, HiCon sold $41,507,098.00 worth of

23  pins and sockets that would be subject to a royalty if they

24  infringed this '602 patent.

25  Q.  Once you've established the royalty base, what is the --

1  what is the next step in calculating a reasonable royalty?

2  A.  We need a royalty rate.

3  Q.  What is the proper royalty rate that HiCon Limited would

4  need to pay if it was required -- if it required a license

5  to the '602 patent?

6  A.  The -- the -- the established royalty rate is 3 percent,

7  but that royalty rate is actually paid to the patent owners

8  which are both Mr. Hwang and Plastronics.

9  Q.  So they would each get 3 percent?

10  A.  No.  They would share the 3 percent.

11         MS. DERIEUX:  Slide 36.

12  Q.  (By Ms. DeRieux)  Do you have an example illustrating

13  how you determine the correct royalty rate of 1.5?

14  A.  Yes.  So this slide illustrates just the basic typical

15  example.  You have a technology user that's using technology

16  that's covered by a patent under a license, and that

17  technology user pays a royalty to the patent owner.

18         And it could be in a dollar amount or a percentage

19  of sales, but the important thing is the technology user

20  pays to the patent owner.

21         MS. DERIEUX:  Slide 37, please.

22  A.  So in this case, the license agreements, which we'll

23  talk about in a moment -- the license agreement indicates

24  that the royalty rate is 3 percent.  So -- the technology

25  user is HiCon Limited.  So HiCon Limited pays 3 percent,

1   but, importantly, it's paying to the patent owners, and

2   there's two patent owners, Mr. Hwang and Plastronics.

3           Therefore, effectively, Mr. Hwang gets one and a

4   half percent, and Plastronics gets one and a half percent.

5   And so in this case, since Plastronics is -- you know, is

6   the Defendant in this matter, that's the only thing that

7   matters.  I'm sorry.  Plastronics is the Plaintiff in this

8   case.  That's the only part of the tree that matters.

9           MS. DERIEUX:  Slide 38, please.

10  Q.  (By Ms. DeRieux)  Is this the Royalty Agreement that you

11  testified earlier that you had reviewed?

12  A.  Yes.

13  Q.  And it's the same Royalty Agreement that has been

14  testified about from other witnesses before you today?

15  A.  Yes.

16  Q.  Same document.

17          Does the Royalty Agreement say anything about

18  splitting royalty received from a third party?

19  A.  Yes, it does.

20  Q.  And what does it say?

21  A.  The Royalty Agreement says that in the event patent

22  royalties are paid by a third-party, PSP and Mr. Hwang will

23  split the royalty 50/50.

24          MS. DERIEUX:  Slide 39, please.

25  Q.  (By Ms. DeRieux)  Dr. Woods, how do you calculate the

1  royalty after you determined the appropriate rate was

2  1.5 percent?

3  A.  So now we can pull it together, and on the screen, you

4  can see we take the royalty base of $41,507,098.00 times the

5  royalty rate, which is 1.5 percent, determining that the

6  reasonable royalty is $622,606.00.

7         MS. DERIEUX:   Slide 40, please.

8  Q.  (By Ms. DeRieux)  What is your final conclusion about

9  damages that Plastronics is owed?

10  A.  So finishing out this section, the lost profits is not

11  the correct measure of damages.  And if HiCon Limited

12  infringed the '602 patent, the reasonable royalty is

13  $622,606.00.

14         MS. DERIEUX:   If you would clear the screen,

15  please.

16  Q.  (By Ms. DeRieux)  Dr. Woods, did you also calculate

17  damages that Plastronics owes to Mr. Hwang?

18  A.  I did.

19  Q.  And what -- what are the damages owed to Mr. Hwang for?

20  A.  For the use of the '602 patent.

21  Q.  And how did you calculate the royalties that Mr. Hwang

22  is owed under the Royalty Agreement?

23  A.  I refer back to the Royalty Agreement and understood

24  what the Royalty Agreement specifies.

25         MS. DERIEUX:   Slide 41, please.

1  Q.  (By Ms. DeRieux)  What does the Royalty Agreement say

2  about what Plastronics owes to Mr. Hwang?

3  A.  The Royalty Agreement explains that -- so the Royalty

4  Agreement explains that Mr. Hwang is to receive 3 percent of

5  gross sales, and then after -- after deducting

6  non-reoccurring capital costs.

7  Q.  What -- what is gross revenue?

8  A.  The -- the term on the document is gross sales, which is

9  very similar to gross revenues, but gross sales is very

10  simply the total amount of money that's received from the

11  sale of products.

12  Q.  Are these sales of sockets or sales of pins?

13  A.  Other -- another place in the agreement, it specifically

14  says that sockets are sold with pins.  The gross sales

15  include both the sale of the sockets and the pins.

16  Q.  What are non-reoccurring capital costs referenced here

17  on -- on Slide 41?

18       MR. BEAR:  Objection, Your Honor.  Mr. --

19  Dr. Woods is not here to testify about the meaning of the

20  contract.  I believe that's outside the scope of his

21  testimony.

22       THE COURT:  Response, Ms. DeRieux?

23       MS. DERIEUX:  Dr. Woods is here to testify about

24  the damages owed to Mr. Hwang under this contract, and he's

25  explaining to the jury the basis for his calculation of

1  those damages.

2          THE COURT:  Is it your position that this

3  testimony is set forth and disclosed in his reports?

4          MS. DERIEUX:  It is, Your Honor.

5          THE COURT:  Do you contest that point, Mr. Bear?

6          MR. BEAR:  I do not contest that point, Your

7  Honor.  I just believe it's improper testimony.

8          THE COURT:  Well, your objection is overruled.

9          Let's continue.

10 Q.  (By Ms. DeRieux)  What are the non-reoccurring capital

11 costs referenced in the -- the Royalty Agreement?

12 A.  So just like gross sales is a very clear accounting or

13 finance term, non-reoccurring capital costs is also a very

14 clear finance and accounting term, and it refers to the

15 expenditures that are made on the production capacity.  It's

16 the -- it's the types of expenditures are made in order to

17 have the ability to produce products.

18         And the document gives examples like stamping

19 tools, tooling equipment, assembly equipment, test

20 equipment.  And it includes those types -- defines the

21 capital costs include things like that, and that's

22 consistent with the definition that capital costs are the

23 expenditures made to have the capacity to produce.

24         It goes on and adds one thing, which is not

25 necessarily considered a capital cost, and it's this patent

1    cost.  But in my experience, that's not unusual to include

2    this because it's also kind of a one-time expense in order

3    to secure the patent rights in order to be able to sell the

4    products.

5    Q.  Just for clarity, can you give us an example of

6    recurring costs?

7    A.  So recurring costs generally refer -- refer to costs

8    that are incurred as you sell products.  So costs of goods

9    sold is a recurring cost and the materials that go into

10   products, rent, salaries, utilities, those types of costs

11   that are related to the -- the actual production and sale of

12   individual products is -- was a recurring cost.

13   Q.  And does the Royalty Agreement itself provide examples

14   of non-reoccurring capital costs that can be deducted from

15   Plastronics's gross revenues?

16   A.  Yes, it does, like the stamping tools and tooling

17   equipment and assembly equipment.

18   Q.  Did you have information to figure out what

19   Plastronics's capital expenditures were?

20   A.  Yes, I did.  They provided that information.

21              MS. DERIEUX:  Slide 42, please.

22   Q.  (By Ms. DeRieux)  DX-042, is this the document you used

23   to calculate Plastronics's capital expenditures?

24   A.  Yes, I did.  Yes, it is.  It's a multipage document.

25   And this is just the first page of a listing of the capital

1  costs that were disclosed by Plastronics.

2  Q.  Were there any costs, other than those in DX-42, that

3  you deducted from Plastronics's gross revenues in your

4  calculation?

5  A.  Yes.  As I mentioned, the license agreement specifically

6  also includes the patent costs, and those are deducted from

7  my analysis as well, but they came from a different

8  document.

9  Q.  So you got Plastronics's patent costs where?

10  A.  It was from the -- it was in the last page of the

11  financial statements.  I don't remember the DX number.

12  Q.  So which costs did you include?

13  A.  I -- I included the cost -- the capital cost related to

14  the production of H-Pins and the patent cost related to

15  H-Pins.

16  Q.  How often would -- should Plastronics calculate the

17  royalties for Mr. Hwang under this contract?

18  A.  So almost all royalty agreements have a time period, and

19  sometimes their royalties are paid monthly; sometimes

20  they're paid quarterly; sometimes they're paid yearly.

21          In this particular case, the Royalty Agreement

22  states that Plastronics is to pay Mr. Hwang every six

23  months, twice a year, which means that the calculation of

24  the royalties due needs to occur every six months.

25          THE COURT:  Counsel, approach the bench, please.

63

1              (Bench conference.)

2              THE COURT:  How much more time do you believe you

3    have on your direct examination of this witness?

4              MS. DERIEUX:  About 20 minutes.

5              THE COURT:  Do you have any idea what your cross

6    is going to be?

7              MR. BEAR:  I believe it's going to be pretty

8    short, Your Honor.

9              THE COURT:  Well, we've been going almost -- more

10   than an hour and a half.  We're going to take a short

11   recess.  We'll come back and finish your direct, okay?

12             MR. BEAR:  Thank you, Your Honor.

13             (Bench conference concluded.)

14             THE COURT:  Ladies and gentlemen of the jury,

15   we're going to use this moment in time to take a short

16   recess.  If you'll leave your notebooks simply closed and in

17   your chairs, follow all the instructions the Court's given

18   you, including, of course, you would expect me to remind

19   you, not to discuss the case with each other.

20             Take a few moments to get a drink of water and

21   stretch your legs, and we'll be back shortly to continue.

22   The jury is excused for recess.

23             COURT SECURITY OFFICER:  All rise.

24             (Jury out.)

25             THE COURT:  The Court stands in recess.

1          (Recess.)

2          COURT SECURITY OFFICER:  All rise.

3          (Jury out.)

4          THE COURT:  Be seated, please.

5          Ms. DeRieux, are you prepared to continue with

6  your direct examination of the witness?

7          MS. DERIEUX:  I am, Your Honor.

8          THE COURT:  All right.  Let's bring in the jury,

9  please, Ms. Denton.

10          COURT SECURITY OFFICER:  All rise.

11          (Jury in.)

12          THE COURT:  Please be seated.

13          We'll continue with the Defendants' direct

14  examination of the witness, Dr. Woods.

15          Continue, counsel.

16          MS. DERIEUX:  Thank you, Your Honor.

17  Q.  (By Ms. DeRieux)  Dr. Woods, just before the break, I

18  had asked you how often should Plastronics calculate the

19  royalties for Mr. Hwang?  Would you remind us of that

20  answer?

21  A.  Yes.  The royalty agreement specifies that the royalty

22  calculation should be made twice a year or every six months.

23          MS. DERIEUX:  May I have Slide 43, please?

24  Q.  (By Ms. DeRieux)  Is there a formula you use to

25  determine royalties that Plastronics owes to Mr. Hwang?

1  A.   Yes.  Based on the royalty agreement, as we were looking

2  at it before, the royal agreement requires that gross

3  revenues are -- sorry, that non-reoccurring capital costs

4  are subtracted from gross revenues to give you the royalty

5  base and that royalty base is multiplied by the royalty rate

6  of 3 percent which indicates the amount of royalties that

7  are owed to Mr. Hwang.

8  Q.   Over what time frame is Mr. Hwang permitted to obtain

9  royalties?

10  A.   As we discussed before, the royalty agreement is a

11  contract, and so it has the shorter damages time period,

12  which is January 18th of 2014 to 2018.

13             MS. DERIEUX:   Slide 44, please.

14  Q.   (By Ms. DeRieux)  Did you compare Plastronics's

15  revenues, capital expenses, and patent costs for each

16  six-month period covered by the royalty agreement?

17  A.   Yes, I did.

18  Q.   And is -- are those calculations reflected in Slide 44?

19  A.   Yes.  On the slide -- you see here on Slide 44, I have

20  taken the information provided by Plastronics and grouped it

21  essentially by six-month time periods back to the beginning

22  of the information that's available.

23  Q.   Why did you start back in 2006, if Mr. Hwang is only

24  allowed to recover damages from 2014?

25  A.   Because we were talking before about the -- the capital

1   costs are things that are used or purchases that are made in

2   order to have the productive capacity to do the -- the

3   production of -- of the H-Pins.  There could be times when

4   the capital costs exceed the sales.  And so we need to

5   figure out what the -- over time, how these match up to make

6   sure we get the right amount in each individual six-month

7   time period.

8           And so if you start in the middle, you don't know

9   what the total amount of capital costs versus the sales are.

10  So I had to start from the very beginning to make sure I got

11  the right answer.

12  Q.  When was the first six-month period where Plastronics's

13  revenues exceeded its non-reoccurring capital costs?

14  A.  Based on information and the data that was provided, the

15  first time period that's shown is the second six months of

16  2006.  During that time period, there were sales but no

17  other costs, so a royalty would be due on those sales.

18  Q.  Were there any six-month periods where Plastronics did

19  not need to pay Mr. Hwang a royalty since 2006?

20  A.  Yes, there was one.

21  Q.  And can you show us which one that is?

22  A.  During the first part of -- of 2008, the -- the purchase

23  of machine -- the purchase of the machine was larger than

24  the sales, therefore, during that time period, there was no

25  royalty rate to be calculated -- royalty amount to be

1   calculated.

2   Q.   How much revenue was -- has Plastronics made on the sale

3   of H-Pins and sockets containing H-Pins since 2006?

4   A.   As shown in the lower right-hand corner, since 2006,

5   Plastronics has generated $65,231,205.00 in total sales of

6   sockets and pins.

7   Q.   And how much has Plastronics spent on patent costs since

8   2006?

9           MR. BEAR:   I'm going to object, Your Honor.   The

10  question is vague, confusing.   She's not using the

11  nomenclature you instructed about Plastronics Socket

12  Partners and Plastronics H-Pins, which are different

13  entities.

14          THE COURT:   Well, I'll overrule the objection

15  with regard to substance, but I'll direct counsel to

16  rephrase the question.

17  Q.   (By Ms. DeRieux)   How much has Plastronics H-Pin spent

18  on patent costs since 2006?

19  A.   Since 2006, Plastronics H-Pin has spent 66,848 -- sorry,

20  I couldn't read the number.   $66,848.00 on patent costs.

21  Q.   And how much has Plastronics H-Pin spent on

22  non-reoccurring capital costs since 2006?

23  A.   $1,818,025.00.

24  Q.   So over the course of the entire business relationship,

25  how much should Plastronics have paid Mr. Hwang?

1   A.   Over the entire time period, if the royalties were made

2   during each six-month time period, the total due to

3   Mr. Hwang would have been $1,900,390.00.

4               MS. DERIEUX:   Slide 45, please.

5   Q.   (By Ms. DeRieux)   I believe you stated earlier that

6   Mr. Hwang could only recover from 2014 to 2018?

7   A.   That's correct.

8   Q.   How much should Plastronics have paid Mr. Hwang in that

9   time frame?

10  A.   And so the slide on the screen now takes the information

11  from the previous slide and summarizes it down and flips it

12  on its side.  So it only covers the first quarter of 2014

13  through the end of 2018 -- the date of 2018, showing that

14  Mr. Hwang is due royalties of $1,361,860.00.

15  Q.   Did you calculate Plastronics H-Pin's net profit?

16  A.   No, I did not.

17  Q.   Why not?

18  A.   The contract -- the Royalty Agreement doesn't speak or

19  doesn't require or rely upon the calculation of net profit.

20  Q.   Do you have any understanding about why if they owed

21  Mr. Hwang 1.36 million, Plastronics hasn't paid him

22  anything?

23  A.   Based on my review of the information, as well as the

24  testimony of Mr. Pfaff earlier in the case, Plastronics

25  indicates that it believes that it doesn't owe a royalty

1  until the net profits of Plastronics H-Pin or what -- or

2  whatever entity, till those net profits fully pay back all

3  the capital costs.

4  Q.   Is there an economic or financial basis for basing the

5  royalties on net profits?

6  A.   No.   It's not in the Royalty Agreement.   And from an

7  economic standpoint, it -- it doesn't make sense that you

8  pay royalties out of the net profits.   The royalties are

9  actually a cost, just like any other cost that a business

10  faces when it's selling products, and so the royalties are a

11  deduction from sales.

12  Q.   What about non-reoccurring capital costs, is there an

13  economic or financial basis to argue that these costs

14  include things like rent or salaries?

15  A.   No, no.   As I was explaining before, the very fact that

16  they say they're non-reoccurring capital costs, those words

17  are designed to eliminate the confusion that -- that these

18  costs include the recurring things like rent, salaries, cost

19  of goods sold, those types of things.

20  Q.   Even if we assume that Plastronics's position is correct

21  and they can deduct all of their costs, should they still

22  have paid Mr. Hwang a royalty?

23  A.   Yes.   I've seen information in the record, and I showed

24  you previously that there have been time periods when

25  Plastronics H-Pin had positive net income which indicates

1    that it did cover its costs.  And so during those time

2    periods, at a minimum, they should have paid a royalty.

3              MS. DERIEUX:  Slide 46, please.

4    Q.  (By Ms. DeRieux)  Did you review DX-052 in forming your

5    opinions?

6    A.  Yes, I did.

7    Q.  Specifically, did you review the portion where Mr. Pfaff

8    writes that he plans to use movie studio cost recovery

9    methods to avoid paying royalties?

10   A.  Yes, I do see it.

11   Q.  Can you explain what movie studio cost recovery means?

12   A.  Yes.  Movie studio cost recovery is a phrase that refers

13   to shifting costs between related entities to reduce or

14   eliminate the profits in one of the entities.  It's -- it's

15   called movie studio cost recovery because if you're into

16   movies, you know people talk about how much money movies

17   make and which movies are profitable.  But there's a large

18   amount of information that indicates that many of the

19   largest most successful movies didn't show a profit to the

20   production company because the actual owners of the

21   production -- of the other production companies, so you have

22   two production companies, one that actually makes the movie

23   and one that owns the production company, what they do, the

24   owners of this guy allocate lots of costs to the movie.  So

25   even though the movie will gross --

1           MR. BEAR:  Objection, Your Honor.  I think it's an

2    improper narrative.  He's going into the intent of this --

3    of this document and what -- this document means.  I think

4    that's improper testimony, Your Honor.

5           THE COURT:  Overruled.  Continue with the answer.

6    A.   So what -- what the -- the one movie studio -- the

7    larger movie studio allocates costs to the actual movie

8    production company so that it loses money.  And so if you're

9    -- if you're into movies -- my daughter is really into

10   movies and so -- movies like the Return of the Jedi and some

11   of the Harry Potter things came in years where movie studios

12   made lots of money.  And if you find the records -- and

13   there's been lawsuits on this -- and you can see that those

14   movies don't have any profits, and it's because this main

15   production company has allocated all of these costs to the

16   movie from other parts of the business so that they don't

17   have to pay royalties -- or net profits are called points,

18   they don't have to pay points to people that have residuals

19   of the movies.  That's why it's called movie studio

20   accounting.

21   Q.   Are Plastronics H-Pin and Plastronics Sockets related

22   entities?

23   A.   Yes, they are.

24           MS. DERIEUX:  Slide 47, please.

25   Q.   (By Ms. DeRieux)  Did you review DX-426?

1  A.   I did.

2  Q.   And is that the independent accountant's statement?

3  A.   It is.   This is the independent accounting report for

4  Plastronics Socket Partners.

5  Q.   And does this exhibit tell you about H-Pin's relation

6  to -- excuse me, Plastronics H-Pin's relationship to

7  Plastronics Sockets?

8  A.   Yes.   The document explains that Plastronics H-Pin and

9  Plastronics Socket Partners both have common ownership.

10  It's not exactly the same, but it's very, very close to

11  exactly the same, which means that they're related parties.

12  Q.   Does DX-426 indicate how -- how the two companies are

13  related?

14  A.   They're -- through common ownership.

15  Q.   Have you seen any information that Plastronics Socket

16  and Plastronics H-Pin engaged in this kind of, quote, movie

17  studio cost recovery?

18  A.   Yes, I have.

19  Q.   And can you give us an example of the evidence that --

20  that you believe falls into this category?

21  A.   Yes, I can.   I think, to answer the question fully,

22  though, I need to describe the accountant's report that

23  indicates what they thought the relationship between the two

24  parties and what that indicates.

25          And what the accountants are saying, as shown on

1    the screen, is that:  Transactions involving related parties

2    cannot be presumed to be carried out on an arm's-length

3    basis, and the existence of the common ownership could

4    result in operating results or financial position of the

5    company to be significantly different than those that would

6    have been obtained if the entities were autonomous.

7            That's a very complicated way of saying, when you

8    have related parties, the operating results -- that's the

9    income statement -- and the financial position -- that's the

10   balance sheet -- of the individual parties may be different

11   than it would have been had the companies been actually

12   separate.

13           And that's what we're talking about here and what

14   we're concerned about is movie studio accounting and the

15   allocation of costs between Plastronics H-Pin and

16   Plastronics Socket.

17   Q.  Does DX-426 say anything about Plastronics Socket

18   shifting costs to Plastronics H-Pin?

19   A.  It doesn't specifically mention shifting costs, but it

20   does describe a management fee that's paid from Plastronics

21   H-Pin to Plastronics Socket Partners.

22           MS. DERIEUX:  Slide 48, please.

23   Q.  (By Ms. DeRieux)  Has that management fee that you

24   referred to had any impact on Plastronics H-Pin's ability to

25   generate a profit?

1    A.   Yes.   Yes, it does.

2              On the screen now, I have provided -- provided

3    information about Plastronics H-Pin's net income from 2013

4    to 2018.   And the management fee that I mentioned before,

5    it's -- it's -- I said, at a minimum, $8,150 a month, which

6    works out to $97,800 each year.

7              And so what I'm showing on the screen is, if you

8    take the net income and adjust out the management fee -- and

9    so if Plastronics H-Pin did not have to pay the management

10   fee, how would its net income differ over a time period.

11             And you can see in the column -- the first column,

12   Column A, that in the time period, with the management fee,

13   Plastronics H-Pin loses over half a million dollars.   But

14   that loss is due primarily to the management fee.   If there

15   were no management fee, it would basically break even.

16   Q.   Is this an example of what you described as movie studio

17   accounting?

18   A.   It could be considered as such.

19   Q.   We've also heard some testimony about Plastronics's

20   divisive merger.   How could the divisive merger impact the

21   royalties owed to Mr. Hwang?

22   A.   So I understand that in general, divisive merger cannot

23   be undertaken to avoid a financial obligation.   So a

24   divisive merger should not affect the royalties that are

25   due.

1           MS. DERIEUX:  Slide 49, please.

2    Q.  (By Ms. DeRieux)  How might the divisive merger allow

3    Plastronics to reduce the royalty base?

4    A.   However, the divisive merger could allow Plastronics to

5    reduce the royalty base because Plastronics believes the

6    right royalty base is H-Pin sales, and Plastronics, as an

7    entity, controls the sales between Plastronics H-Pin and

8    Plastronics Socket; therefore, it can set an artificially

9    low price between the two, which has the effect of lowering

10   the royalty rate -- royalty base.

11   Q.   Does that result in an opportunity to avoid a royalty

12   obligation?

13   A.   Yes.  Once again, as the previous slide, I illustrated

14   that the management fee can cause Plastronics H-Pin to

15   either have a profit or not have a profit, and if

16   Plastronics believes that the royalty -- the royalty that's

17   due is dependent upon net profit or the net operating

18   results of Plastronics H-Pin, then these -- accounting

19   shifts -- or these shifts between the entities could result

20   in the ability to avoid paying any royalty obligations.

21   Q.   Did you see any information that Plastronics H-Pin's

22   margin is lower than it should be?

23   A.   Yes.  So it's difficult to understand the prices and

24   evaluate the prices that are being charged between

25   Plastronics H-Pin and Plastronics Socket Partners.

1          However, we can compare the margins because that

2    information is -- it's a percentage.  So it's a ratio you

3    can compare between companies.  And there's also additional

4    information in the -- available about averages.

5          So Plastronics H-Pin is a manufacturer.  It

6    manufactures a product.  You would normally think that a

7    manufacturer would have a higher gross profit margin than a

8    distributor because a distributor simply takes products that

9    were manufactured and moves them from one place to another.

10          I'm not trying to say distributors aren't

11    important; I'm saying that's usually a lower margin because

12    it's not as much value added in moving a product as it is in

13    making a product.

14          THE COURT:  Dr. Woods, would you mind slowing down

15    as you give some of these lengthy answers, please?

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  That'd be helpful.

18          Let's continue.

19    A.  So I found that there's a service that provides

20    information about the average gross profit margin for

21    wholesale distributors in the electronic industry.

22          And my initial thought would be that the wholesale

23    margin would be less than Plastronics H-Pin's margin, but it

24    turned out to be the other way around.  Plastronics H-Pin's

25    margin was 14 percent lower than the wholesale distributor

1    arrangement, which indicates that the price that Plastronics

2    H-Pin is charging to Plastronics Socket is too low.

3    Q.   (By Ms. DeRieux)   What does this mean to the royalties

4    that are owed to Mr. Hwang?

5    A.   As it works out, that means the royalties are 14 percent

6    too low because of the low price between Plastronics H-Pin

7    and Plastronics Sockets.

8            MS. DERIEUX:   Can we have Slide 50, please?

9    Q.   (By Ms. DeRieux)   Dr. Woods, can you summarize your

10   conclusions for us in this case?

11   A.   Yes.   As I mentioned at the very beginning, I believe

12   that lost profits is not a fair measure of damages in this

13   case.

14           If HiCon Limited infringed the H -- the '602

15   patent, the damages are measured by a reasonable royalty of

16   $622,606.00.

17           And, finally, I concluded that Mr. Hwang is owed

18   $1,361,860.00 in royalties for Plastronics's use of the

19   technology described in the '602 patent.

20   Q.   Thank you.

21           MS. DERIEUX:   I pass the witness, Your Honor.

22           THE COURT:   Cross-examination.

23           MR. BEAR:   Yes, Your Honor.

24           THE COURT:   Proceed when you're ready, Counsel.

25           MR. BEAR:   Thank you, Your Honor.

1                         CROSS-EXAMINATION

2    BY MR. BEAR:

3    Q.   Transactions between related parties cannot be presumed

4    to be arm's length.  That's what you just said, right?

5    A.   That's what the accountant said, yes.

6    Q.   Do you agree with that statement?

7    A.   Yes.

8    Q.   So a related party is one that has common ownership,

9    right?

10   A.   That's one way parties can be related, yes.

11   Q.   A related party could be a corporation and a sole

12   proprietorship owned by the same person, right?

13   A.   I suppose.

14   Q.   It would be a related party under your definition; isn't

15   that right?

16   A.   Yes.  If you're keeping -- if the sole proprietorship

17   has separate books and records and you're accounting for

18   everything separately, then, yes, they would be related.

19   Q.   You didn't talk about books, sir.  You said when there's

20   common ownership.  There's common ownership, isn't there?

21   A.   Yes, there is.

22   Q.   Okay.  HiCon, DBA, is a DBA of Mr. Hwang, right?

23   A.   Yes.

24   Q.   And HiCon Co. Limited is owned majoritively by

25   Mr. Hwang.  Also true, right?

1  A.  I believe that's the testimony, yes.

2  Q.  They're related parties, aren't they?

3  A.  I believe so.

4  Q.  So you cannot presume that they're arm's-length

5  transactions, can you?

6  A.  Generally speaking, no, you cannot presume that.

7         MR. BEAR:  Ms. Bowron, can we go to DX-52, please.

8         Can you go to the third page.  And can you please

9  blow up the Options portion of the document.

10 Q.  (By Mr. Bear)  It says Options, doesn't it, Dr. Woods?

11 A.  Yes, it does.

12 Q.  Doesn't say what he's going to do, does it?

13 A.  It says Options.

14 Q.  It says Options.

15        No. 3, please read that to me.

16 A.  No. 3 says:  Spin off all the H-Pin business into an

17 entity and sell at cost to Plastronics as a master

18 distributor, therefore, never worrying about royalties.

19 Q.  Plastronics H-Pin does not sell at cost to Plastronics

20 Socket Partners.  That's right, isn't it?

21 A.  I believe that that's correct.

22 Q.  They have a 30 percent margin about, between the two

23 entities, yes?

24 A.  I -- I don't remember.  I think it is in that range.

25 Q.  Well, you gave a report, didn't you, in this case?

1   A.   I did.

2          MR. BEAR:   And, Ms. Lockhart, could I please have

3   the ELMO?

4          Counsel, this is going to the expert report of

5   Dr. Woods, February 18th, 2019, Page 12.

6   Q.   (By Mr. Bear)   The average is 28.4 percent.   That's what

7   you put in your report, isn't it?

8   A.   Yes, that's correct.

9   Q.   In fact, the margin is as high as 40 percent in some

10  instances, in some instances; isn't that right?

11  A.   You took the document away.

12  Q.   Right there, sir, where my thumb is, 41.3.   Isn't that

13  what it says?

14  A.   That's what it says.

15  Q.   That's what you saw in the financial statements, right?

16  A.   In the financial information that was provided by

17  Plastronics in this case, yes.

18  Q.   But you don't think that's legitimate, do you?

19  A.   Legitimate?

20  Q.   So you don't have an opinion about whether the margin is

21  legitimate in this case?

22  A.   I don't know what context you're using legitimate.

23  Q.   Well, do you believe it's reasonable?

24  A.   It's difficult to evaluate whether it's reasonable or

25  not because I don't fully understand what Mr. Pfaff and --

1  well, what Plastronics believes the value of the H-Pin is.

2  Q.  So you don't know whether it's legitimate; you don't

3  know whether it's reasonable.  Is that what you're telling

4  these folks?

5  A.  I'm telling you that there's reason to have -- suspect

6  that the numbers are not arm's-length transactions.

7  They're -- the numbers are not determined by the marketplace

8  so that means that they can be manipulated by --

9          MR. BEAR:  Strike as non-responsive, Your Honor.

10  It was a yes or no question.

11          THE COURT:  State your next question.

12          MR. BEAR:  Thank you, Your Honor.

13  Q.  (By Mr. Bear)  I notice when you were testifying up here

14  with Ms. DeRieux, you don't say that it did reduce revenue;

15  you said it could be reducing revenue.  Didn't you say that?

16  A.  Yes.

17  Q.  You don't know for certain whether it did; you just

18  think it's possible that it did; isn't that right?

19  A.  I believe that the divisive merger and the structure

20  that was undertaken by Plastronics provides the opportunity

21  to affect the royalty calculation.

22  Q.  An opportunity.  Is that what you just said?

23  A.  That's correct.

24  Q.  You won't say that it actually happened; it's only an

25  opportunity for it to happen, right?

1    A.   I believe that there's evidence that it did happen, but

2    it provides an opportunity.

3    Q.   No, no.  You just said under oath that there was an

4    opportunity, and it could happen.  That's what you said,

5    right?

6    A.   That's correct.

7    Q.   Okay.  So you are not telling these people that there

8    was actually an illegitimate, unreasonable transaction

9    between the two; isn't that right?

10   A.   That's correct.

11   Q.   You're just saying it's possible.

12   A.   That's correct.

13   Q.   It'd be really suspicious if there was a margin of only

14   10 percent between two entities, right, two related

15   entities?

16   A.   It depends.

17   Q.   Well, 10 is less than 28.4, right?

18   A.   Yes.

19   Q.   So that would be even a lower mark-up, right?

20   A.   It would be, but as I was --

21   Q.   It would.  It would, wouldn't it?

22   A.   It would be.

23   Q.   Okay.

24            THE COURT:  All right.  Let's make sure each

25   finishes before the other one jumps back in.

1              MR. BEAR:  I apologize, Your Honor.

2              THE COURT:   We're going to do this one at a time.

3              MR. BEAR:  I'm sorry about that.

4              THE COURT:  Continue.

5    Q.  (By Mr. Bear)  Profit margins between HiCon Co. Limited

6    and the sole proprietorship is 10 percent, isn't it, on

7    H-Pins?

8    A.  I -- I believe that -- that they -- that those sales are

9    marked up 10 percent, yes.

10   Q.  That's less than the Plastronics Socket Partners and

11   Plastronics H-Pin sales; isn't that right?

12   A.  Yes.

13   Q.  And we just agreed that because the 28.4 percent

14   mark-up, that it could be a lack of an arm's-length

15   transaction for Plastronics, right?

16   A.  Sir, I don't understand your question.

17   Q.  You say that it's possible that these transactions might

18   be avoiding royalties because they're only 28.4 percent.

19   That's what you're saying, right?

20   A.  I'm saying that the structure -- the structure that

21   Plastronics has undertaken in the divisive merger between

22   Plastronics H-Pin and Plastronics Socket Partners provides

23   an opportunity to reduce the royalty paid to Mr. Hwang.

24   Q.  You weren't asked by these folks over here to determine

25   whether the transactions between the Limited company and the

84

1   DBA were legitimate, were you?

2   A.   I was not.

3   Q.   But we've already agreed that it has less of a mark-up

4   than these supposed problematic sales between H-Pin and

5   Socket Partners; isn't that right?

6   A.   The margin is lower.

7   Q.   The margin is lower.  The but-for world in this case is

8   a world where HiCon DBA or HiCon Limited Company are not

9   selling H-Pins and sockets, right?

10  A.   I'm sorry, could you repeat the question?

11  Q.   Are you familiar with the term "but-for"?

12  A.   Definitely.

13  Q.   And we're talking about a but-for world in this case,

14  right?

15  A.   Yes, but I need to get the parties correct.

16  Q.   Okay.  I can understand.  HiCon Co. Limited, right --

17  A.   Yes.

18  Q.   -- and HiCon DBA --

19  A.   Yes.

20  Q.   -- are in the market of selling H-Pins and sockets,

21  right?

22  A.   Yes.

23  Q.   And so the but-for world in this case is a world where

24  those two are not selling products into the United States,

25  right?

1   A.   Yes.   But in the but-for world, the -- the DBA cannot

2   sell into -- into the United States, and we're assuming that

3   the sales were made by HiCon Limited, which would not be

4   selling in the United States.

5   Q.   Right.   So when we're trying to figure out whether a

6   sale would or would not have happened, we're assuming that

7   the HiCon entities are not selling the H-Pins and sockets,

8   right?

9   A.   I believe that's correct.

10  Q.   Okay.   Good.   So let's take your analysis.   You

11  mentioned Sensata, right?

12  A.   Yes.

13  Q.   Okay.   So you're saying that in a world where the HiCon

14  entities are not selling a socket or a pin, that it's

15  possible that a potential customer who selected an H-Pin

16  would buy from Sensata instead of Plastronics, is that --

17  that's what you're saying is possible, right?

18  A.   That's one of the possibilities, yes.

19  Q.   One of the possibilities.

20       The H-Pins for Sensata come from Plastronics;

21  isn't that right?

22  A.   That's correct.

23  Q.   And Sensata has a mark-up on that H-Pin; isn't that

24  right?

25  A.   I -- I would -- would assume.

1    Q.   You would assume, right?

2    A.   Yes.

3    Q.   There would be a normal mark-up.

4             So you're trying to tell these folks that instead

5    of going and buying directly from the manufacturer, these

6    same folks are going to go out and purchase from another

7    distributor who has a mark-up on the same product?  Is that

8    what you're trying to say is possible, sir?

9    A.   We know that that's possible.

10   Q.   That's what you're trying to say is that someone would

11   voluntarily buy an H-Pin at a higher price?

12   A.   People are.  Sensata includes H-Pins in its products and

13   sells those which has nothing to do with this case.

14   Q.   Do you know what their pricing is on sockets?

15   A.   I do not.

16   Q.   Do you know what their sockets actually do as far as

17   their performance capabilities?

18   A.   I do not.

19   Q.   And you're not a technical expert in this case, are you?

20   A.   I am not.

21   Q.   In fact, your -- the way that you got your technical

22   information was from three live interviews, more or less,

23   right?  Mr. Hwang, right?

24   A.   Yes.

25   Q.   Mr. Schubring, who was just on earlier, right?

1   A.   Yes.

2   Q.   And Mr. J.T. Kwon, right?

3   A.   Mr. Kwon provided financial information.

4   Q.   Okay.  He didn't tell you about technical information,

5   did he?

6   A.   He did not.

7   Q.   Okay.  So you don't -- when -- when we went through all

8   of those entities that you say are competitors, you don't

9   know what the performance capabilities of those sockets are,

10  right?

11  A.   I do not.

12  Q.   You don't know what the performance capabilities of

13  those H -- of the contacts that they use is, do you?

14  A.   I do not.

15  Q.   And so when you gave the example of a Ferrari versus a

16  Civic, you know -- generally speaking, you know that there's

17  a difference in horsepower, right?

18  A.   There is.

19  Q.   You would know the performance capability of those two

20  products, right?

21  A.   Yes.

22  Q.   And that's important to determining the difference in

23  the -- the value of the products, right?

24  A.   It's important in evaluating the differences of the

25  products, yes.

1   Q.  Yeah, absolutely.  And it's important in evaluating the

2   reasons why somebody would buy a product, right?

3   A.  Yes.

4   Q.  So if somebody went out and bought a Ferrari and they

5   have Ferrari money, then they presumably want the

6   performance of a V12 engine, right?

7   A.  Well, this is what I was saying before.  That may not be

8   true.  The ability to buy a Ferrari -- it goes beyond money.

9   So there's other things that that purchase could reveal

10  besides the need to have a V12 engine.

11  Q.  Somebody who buys a Ferrari wants a daily commuter; is

12  that what you're telling these folks?

13  A.  No.  Someone buys a Ferrari, may want a Lamborghini or

14  they may want --

15  Q.  They would need something that matches the performance

16  capabilities, right?

17  A.  Not necessarily the same performance capabilities, maybe

18  some -- something different.  You had mentioned specifically

19  V12 engine.  My point is you don't know why they purchase

20  the Ferrari, therefore, it'd be very difficult to determine

21  what other vehicle that they would like.

22          And my point was that when somebody buys a

23  Ferrari, all you know is they bought a Ferrari.  You don't

24  know if they're looking for the status of being a Ferrari

25  owner, and so maybe without the Ferrari, they'd be --

1            MR. BEAR:  Strike as non-responsive, Your Honor.

2            THE COURT:  Overruled.  He can finish his answer.

3            Go ahead.

4            THE WITNESS:  I was done.  Thank you.

5            THE COURT:  All right.  If that's the completion

6    of your answer.

7            Ask the next question.

8            MR. BEAR:  Thank you, Your Honor.

9    Q.  (By Mr. Bear) So you don't know the performance

10   capabilities of the sockets from these competitors that you

11   listed off for these folks?

12   A.  I don't know the specific performance capabilities of

13   the products.  I do know --

14   Q.  Sir, that wasn't my question.  My question was --

15           THE COURT:   Counsel --

16           MR. BEAR:  Sorry.

17           THE COURT:  -- if you believe the witness is

18   non-responsive, raise it with the Court.  Don't take it up

19   with the witness.

20           MR. BEAR:  I apologize, Your Honor.

21   Q.  (By Mr. Bear)  You don't know the performance

22   capabilities, sir, of the contact pins, do you?

23   A.  Which contact pins?

24   Q.  The contact pins of all those companies that you listed

25   for this jury.

1    A.   I do know that Mr. Schubring explained that those

2    competitors provide vertical steel -- vertical springs --

3    provide stamped steel springs for vertical contacts that are

4    similar to the H-Pin.  I don't know the exact performance

5    requirements or specifications of each of those competitors,

6    but I do know that Mr. Schubring explained that they are

7    similar to the H-Pin.

8    Q.   And you're basing it totally off of what Mr. Schubring

9    told you and Mr. Hwang, right?

10   A.   Not completely.  As I explained before in my interview

11   process, before I spoke with Mr. Schubring and Mr. Hwang, I

12   went to websites and looked.  And there are pictures of

13   different types of springs and different -- different types

14   of contacts.

15          Some of them look somewhat similar to an H-Pin,

16   and some of them look completely different.  And this was

17   the process that I went through with Mr. Hwang and

18   Mr. Schubring to understand which ones were similar.

19   Q.   These different sockets have different applications,

20   right, technically?

21   A.   Yes, they do.

22   Q.   They can have vastly different applications, right?

23   A.   I don't know what you mean by vastly different.

24   Q.   Because you're not a technical expert, right?

25   A.   I understand enough about the products to understand

1  there's different applications.  I don't know what you mean

2  by "vastly."

3  Q.  Well, you can't quantify the differences between

4  sockets, right, as far as a technical capability?

5  A.  I can -- I do have knowledge about the markets that the

6  sockets are sold into and what -- the general requirements

7  and the differentiations of those markets.

8         MR. BEAR:  Strike as non-responsive, Your Honor.

9         THE COURT:  Overruled.

10  Q.  (By Mr. Bear)  Sir, going back to the royalty issue, you

11  understand that Mr. Pfaff believes that the royalty should

12  be calculated on net profit, right?

13  A.  I believe that's what Plastronics has -- the witnesses

14  for Plastronics have explained.

15  Q.  You're not here to testify about the meaning of the

16  contract, are you?

17  A.  That's correct.

18  Q.  You have no opinion about what the contract means; isn't

19  that right?

20  A.  No, I think that -- that overstates.  I -- I had to read

21  the contract and operationalize the language in the contract

22  to perform my calculations.  And that's the extent of the

23  opinion I'm providing on the contract.

24  Q.  An interpretation that was advanced by counsel, right?

25  A.  That's not correct.

1   Q.   They don't have that interpretation, sir?

2   A.   I -- I think that they do, but I reached that conclusion

3   independently -- independently while working on the case.

4   Q.   They didn't tell you that that was going to be their

5   theory of the case?

6   A.   They did not.

7   Q.   And you don't have an opinion about liability, right?

8   You're a damages expert?

9   A.   As I explained before, damages experts always assume

10  liability.

11  Q.   You assumed that they're right on their theory of

12  liability, right?

13  A.   Yes.

14  Q.   You don't have an opinion about what this contract

15  means?  You're not here to tell these folks what this

16  contract means, right?

17  A.   That's -- you're asking me two questions, and I think

18  the answers to those two questions are different.

19          THE COURT:   Then say you don't understand,

20  Dr. Woods.

21          THE WITNESS:   Thank you.

22  Q.   (By Mr. Bear)  I notice you were talking about the HiCon

23  entity's revenues.  Did I see that right that in 2015, they

24  sold -- was it 65 -- $64 million worth of pins and sockets

25  in 2015?

1  A.   I don't know -- I don't know what you're speaking of.

2  Q.   Is that about right, they were selling tens of millions

3  of dollars in 2015?

4  A.   I'd rather not speculate.

5  Q.   You highlighted it to the jury, didn't you?  I mean, you

6  went through the slides, right?

7  A.   I -- I did go through the slides, but I don't know what

8  you're specifically referring to.

9  Q.   I want to talk about -- let's go to manufacturing

10 capabilities.  You didn't tour the Plastronics factory, did

11 you?

12 A.   No.

13 Q.   You based this solely off the financial statements,

14 isn't that correct, the sales data?

15 A.   I relied upon Plastronics's financial information and

16 other information they provided in forming my opinions.

17 Q.   So you don't know exactly how many H-Pins that

18 Plastronics H-Pin can produce, do you?

19 A.   No.

20 Q.   You don't have that number, do you?

21 A.   Plastronics has not provide -- provided information

22 about the maximum capacity of H-Pin production that they

23 have.

24 Q.   And so you don't know exactly how much they could expand

25 their operations with, say, including additional capital

1    expenditures, right?

2    A.   I don't.

3    Q.   You do not know, correct?  Right?

4    A.   Correct.  I understand Mr. Furman testified how they

5    could increase H-Pin production capacity.

6    Q.   Mr. Furman is a technical expert, isn't he?

7    A.   In certain areas, I think, he is, yes.

8    Q.   He has more technical expertise about the production of

9    these things than you, right?

10   A.   I believe so.

11   Q.   Going back to the -- to your market analysis, you don't

12   believe that this is a two-party market, do you, with

13   H-Pins?

14   A.   The -- the relevant market is clearly not a two-party

15   market.

16   Q.   You relied on Mr. Hwang's deposition, didn't you, in

17   forming your opinions?

18   A.   I read and reviewed and relied upon many things,

19   including on Mr. Hwang's deposition.

20   Q.   And, in fact, you relied on conversations with Mr. Hwang

21   in forming your opinion, right?

22   A.   As I explained, that was part of the information set

23   that I gathered in my fact finding.

24   Q.   When you interviewed him, he wasn't under oath, right?

25   A.   He was not under oath.

1   Q.   He was under oath in the deposition, though, right?

2   A.   Yes.

3            MR. BEAR:   Ms. Bowron, can we put up that slide,

4   please?

5   Q.  (By Mr. Bear)  This is taken from his deposition, sir.

6            Question -- can you read that highlighted portion,

7   sir?

8   A.   Yes.

9            Question:  Okay.  I'll -- the last sentence that I

10  was referring to was:  "Hwang believes there are only two

11  suppliers of this type of spring pin contact in the United

12  States.  One, HiCon, and, two, Plastronics."

13           Do you agree with that statement, Mr. Hwang?

14           Mr. Emerson:  Form.

15           Answer:  Yes, I do.

16           MR. BEAR:  Thank you, Ms. Bowron.

17  Q.  (By Mr. Bear)  Mr. Hwang believes that there are only

18  two manufacturers of the H-Pin in the market.  That's what

19  that said, right?

20  A.   That is what that said.

21  Q.   And you read that as part of forming your opinions,

22  correct?

23  A.   I did.

24  Q.   But you do not believe it's a two-player market?

25  A.   I do not believe it's a two-player market.

1    Q.   Thank you.

2              MR. BEAR:   I pass the witness, Your Honor.

3              THE COURT:   Is there redirect, Ms. DeRieux?

4              MS. DERIEUX:   There is, Your Honor.

5              THE COURT:   Proceed.

6                    REDIRECT EXAMINATION

7    BY MS. DERIEUX:

8    Q.   Mr. Hwang's testimony that you were just reading, tell

9    me if this is accurate.  He said:   Two people make H-Pins.

10             Is that correct?

11   A.   Yes, that's correct.

12   Q.   Does the fact that only two companies manufacture H-Pins

13   mean that this is a two-player market?

14   A.   No, that -- that has nothing to do with the definition

15   of a relevant market and the analysis that needs to be

16   performed to determine whether lost profits are the

17   appropriate measure of damages in the case.  One needs to

18   understand what the available non-infringing substitutes

19   would be to the H-Pin.  And it turns out there are two

20   manufacturers of H-Pins, but there's -- I think there was

21   eight manufacturers of other pins that are similar enough to

22   be competitive with an H-Pin.

23   Q.   Regarding manufacturing capability of Plastronics's

24   H-Pin, was it your testimony that you didn't know exactly

25   how many H-Pins Plastronics H-Pin could possibly make?

1   A.   That's correct.

2   Q.   Has there been any evidence regarding how many pins they

3   would have to make to make up all of the sales that HiCon

4   Co. Limited made?

5   A.   No, there's no information in the record about the

6   number of pins that would be needed to be manufactured by

7   Plastronics H-Pin to fulfill the needs that would be

8   necessary to make HiCon sales, therefore, you can't conclude

9   that Plastronics H-Pin has the manufacturing capacity to

10  make an indeterminate number of pins.

11  Q.   When you testified earlier and gave your examples about

12  how margins work, I believe you testified that distributor

13  margins are perhaps lower in some circumstances.  Could you

14  explain that?

15  A.   Yes.  In general, one would assume that -- or one would

16  conclude, based on knowledge in the industry and concepts of

17  economics, that a distributor would have a lower margin than

18  a manufacturer.  And when I looked at the actual data for

19  the average distributor in the wholesale market for

20  electronics, it turns out that their margin was higher than

21  Plastronics's H-Pins.

22  Q.   Is it your understanding that the HiCon DBA is a

23  distributor?

24  A.   The HiCon DBA is -- is performing the distribution of

25  HiCon Limited's products.

1   Q.   Is there any information provided to you or evidence in

2   this case about the specific value of an individual, single

3   H-Pin?

4   A.   No.

5   Q.   Can the reasonableness of a particular margin be

6   determined in the abstract without evidence of the specific

7   market and product that you're discussing?

8   A.   No.   That's -- the point I was trying to make is that

9   just because you have numbers, it's very difficult to know

10   whether they're reasonable.   You have to have something to

11   compare it to and an understanding of the relevant market

12   that you're speaking of to understand whether or not that

13   particular percentage is reasonable.

14        MS. DERIEUX:   That's all I have.   I pass the

15   witness, Your Honor.

16        THE COURT:   Additional cross-examination?

17        MR. BEAR:   No, Your Honor.

18        THE COURT:   All right.   Dr. Woods, you may step

19   down, sir.

20        Defendants, call your next witness.

21        MR. EMERSON:   Your Honor, that was our last -- our

22   last witness, and the Defense rests.

23        THE COURT:   All right.   The Defendants have rested

24   their case-in-chief.   Do the Plaintiffs have a rebuttal case

25   to put on?

1          MS. BROZYNSKI:  Yes, Your Honor.  Plaintiff calls

2    Mr. Chase -- Mr. Chase Perry again.

3          THE COURT:  All right.  Mr. Perry, if you'll

4    return to the witness stand as the Plaintiffs' first

5    rebuttal witness.  I remind you, sir, you remain under oath.

6          MS. BROZYNSKI:  May I proceed to the lectern?

7          THE COURT:  Yes, you may.

8          MS. BROZYNSKI:  Thank you.

9          THE COURT:  Proceed when you're ready, Counsel.

10         MS. BROZYNSKI:  Thank you, Your Honor.

11      CHASE PERRY, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN?

12                   DIRECT EXAMINATION

13   BY MS. BROZYNSKI:

14   Q.  Good afternoon, Mr. Perry.

15   A.  Good afternoon.  Excuse me.  Good afternoon.

16   Q.  Did you analyze Panduit factors, sir?

17   A.  Yes, I did.

18   Q.  And could you remind the jurors briefly, what was the

19   structure of that analysis?

20   A.  Dr. Woods took the jury through it.  He enumerated it 1

21   through 4.  I talked about the very same issues with the

22   jury earlier in my direct testimony, and that would be this

23   notion of substitutes, are there substitutes for the HiCon

24   products in the marketplace in the but-for world, whether

25   there's capacity, from a manufacturing and marketing

1  standpoint, for Plastronics to sell the products that HiCon

2  sold, and then what the profit would be in that instance.

3  And we talked about all those issues.

4  Q.  Mr. Perry, did that analysis include a qualitative part?

5  A.  Yes.  I'm sorry.  Absolutely it did.  But my analysis of

6  the substitutes issue necessarily involves a qualitative

7  analysis of the semiconductor testing market, which I did.

8  Q.  I apologize for the pronunciation.

9  A.  No problem.

10  Q.  Did you rely on revealed preference theory for a basis

11  for any calculation?

12  A.  No, I did not.

13  Q.  What is your understanding of who owns the Royalty and

14  Assignment Agreement between the two companies, two

15  Plastronics companies?

16  A.  Plastronics H-Pin currently owns those.

17  Q.  And is it further your understanding that Plastronics

18  H-Pin does not manufacture sockets?

19  A.  Yes, I'm aware of that.  They don't.

20  Q.  Does that necessarily mean that Plastronics H-Pin cannot

21  recover damages for HiCon socket sales with H-Pin in them?

22  A.  No, it doesn't mean that.  My understanding of the

23  framework for damages is that damages on sockets are still

24  available, they're contemplated in the contract, and they

25  were foreseeable.

1    Q.   And, again, what is your opinion regarding Plastronics's

2    H-Pin breach of contract claim?

3    A.   That a fair measure of damages is in the form of lost

4    profits in the amount of about $25.9 million.

5    Q.   And regarding Dr. Woods's opinion of the amount of

6    damages owed to Mr. Hwang for unpaid royalties on

7    Plastronics's H-Pin sale, do you agree with this opinion,

8    sir?

9    A.   No, I do not.

10   Q.   Why not?

11   A.   Because the agreement that Mr. Pfaff had with Mr. Hwang,

12   Plastronics had with Mr. Hwang, was that there would indeed

13   be a subtraction or an accounting for non-reoccurring

14   capital costs but that royalties would only be paid to the

15   extent there were net profits available to pay them.

16   Q.   Can you have a look at your rebuttal report, Page 9,

17   Table 2?

18            MS. BROZYNSKI:   Ms. Lockhart, can I have...

19   Q.   (By Ms. Brozynski)   Okay.

20   A.   Can we go in just a little bit and focus?   I almost have

21   it.

22            Okay.   That's fine.

23   Q.   Can you walk us through this analysis?

24   A.   Sure.   So this is an analysis that is in my rebuttal

25   report to Dr. Woods's analysis.

1          Table 2 is a royalty based on Plastronics's H-Pin

2    sales, so we're just talking about pins here.  And that

3    shows that for the period of 2014 through the third quarter

4    of 2018, which is the latest that Plastronics's financials

5    go through, there were gross sales of about $4.8 million,

6    there were costs of sales of about $3.4 million, so there

7    was a gross margin, but I think I mentioned a minute before

8    that the agreement was that there must be a net margin to

9    actually pay for these royalties.

10          So you have to subtract the total expenses of the

11   company, which are about $2.1 million, and what you get is

12   the next to last line says net income, and the brackets

13   around that $694,233 means it's negative.  So that's a loss.

14          So --

15   Q.  So --

16   A.  Sorry.  So during that period of time that we're talking

17   about breach-of-contract damages, Plastronics H-Pin did not

18   earn a net income.

19   Q.  Which means that -- for royalty purposes, which means

20   what?

21   A.  It means that there's no royalty yet due.  There may be

22   in the future, but there's not yet.

23   Q.  Mr. Perry, did Dr. Woods give an alternative opinion of

24   Mr. Hwang's damages that includes royalty on sockets?

25   A.  Yes.  I think that was his $1.4 million number or so.

1    Q.   And do you have a rebuttal to that figure in the event

2    the jury determines that Mr. Hwang's damages should be

3    determined based on the net sales of Plastronics's H-Pins

4    and H-Sockets?

5    A.   Yes, I do.

6    Q.   What is the appropriate measure of damages in your

7    opinion?

8    A.   Well, it's -- just as here, we would calculate to see if

9    there are unpaid royalties that are due, and that

10   calculation, again, depends on whether there is net income

11   to pay those royalties after subtracting capital costs.

12        So if we go to actually the next page of this

13   rebuttal report, I have a Table 3.  It's doing the exact

14   same thing we just did for Plastronics H-Pin, but this time

15   it's doing for Plastronics Socket.

16        So the numbers are obviously different.  First

17   line, Plastronics Socket had gross sales of 46.7 million,

18   cost of sales of about 20.8 million leaving, again, a gross

19   profit of 25.9 million.

20        But, again, we have to take all expenses into

21   account because that's what the agreement was between the

22   parties.  Total expenses were about 23.1 million, and that

23   does leave net income of about -- well, of $2,737,106.

24        The final step there is the royalty rate which

25   Dr. Woods talked about and which I don't have any

1    disagreement with, 3 percent, and the figure, if you

2    multiply that $2.7 million by 3 percent is about $82,000.

3    Q.  Mr. Perry, you've heard Mr. Schubring testifying on

4    direct today, correct?

5    A.  I did.

6    Q.  And did you hear him talk about quality and delivery

7    issues that HighRel has had with Plastronics?

8    A.  Yes, I did hear him talk about that.

9    Q.  And how does that factor into your analysis, sir?

10   A.  Well, it's something I knew about.  I talked to

11   Mr. Furman about that issue, and my understanding, based on

12   that discussion, was that those issues had been resolved.

13   Q.  And did you also hear Mr. Schubring testifying about

14   relative advantages of those non-H-Pin products?

15   A.  Yeah.  I think he said something to the effect of they

16   have a lot of the advantages.  This is -- I say they.  Let's

17   be clear.

18          So non-H-Pin pins and products have some of the

19   advantages of H-Pin and H-Pin products but not necessarily

20   all and that they may cost less than the H-Pin products.

21   And there has been some different combinations among those

22   other competitors.

23   Q.  Mr. Schubring mentioned integrated solution.

24   A.  Yes, he did, and that was interesting to me.

25   Q.  Why is that?

1   A.   Because there's only two suppliers in the H -- that sell

2   H-Pins, that sell an integrated solution.  And what is meant

3   by that is they manufacture the pin and they manufacture the

4   socket that the pin goes in.  That's Plastronics, and that's

5   HiCon.

6            Sensata sells sockets with H-Pins in them from

7   Plastronics, but they don't make the sockets.  They

8   certainly don't -- they're not Plastronics's sockets.  So

9   you've got sort of two different things here.  You've got

10  these integrated manufacturers, and then you've got this

11  sort of distributor that puts things together.

12           Nothing wrong with that, but the issue that

13  Mr. Schubring brought up is that it's a competitive

14  advantage to have an integrated solution.  Those were his

15  words.  And I think that very much supports what I've been

16  saying here.

17  Q.   Mr. Perry, is there anything that you've heard in this

18  trial that causes you to change your opinion you rendered

19  about damages?

20  A.   No.  In fact, what I have heard is confirmatory.

21  Q.   Thank you, Mr. Perry.

22           MS. BROZYNSKI:  Pass the witness.

23           THE COURT:  Cross-examination.

24           MS. SIVINSKI:  Yes, Your Honor.

25           THE COURT:  You may proceed.

1                        CROSS-EXAMINATION

2    BY MS. SIVINSKI:

3    Q.  Good afternoon.

4    A.  Afternoon.

5    Q.  Mr. Perry, you don't have a technical background, do

6    you?

7    A.  I was pre-med for a while, but that's the extent of it.

8    I'll be fair.

9    Q.  Is your undergraduate degree in psychology?

10   A.  It is.

11   Q.  Were you here for Mr. Furman's testimony?

12   A.  Yes.

13   Q.  Did you hear Mr. Furman testify that Plastronics H-Pin

14   would have never lost a sale of a socket?

15   A.  Yes, I agree with that.

16   Q.  And your damages analysis is that Plastronics H-Pin can

17   recover for lost socket sales?

18   A.  That's correct.

19             MS. SIVINSKI:  Mr. Brockwell, can you please bring

20   up PX-30?

21             Can you zoom in, please, on Paragraph 3?

22   Q.  (By Ms. Sivinski)  This is the Royalty Agreement between

23   Plastronics and Mr. Hwang, isn't it?

24   A.  Yes.

25   Q.  And -- excuse me -- you testified that royalties should

1   be calculated after net profit; is that correct?

2   A.   No.   I testified that that is Mr. Pfaff's interpretation

3   of this agreement.

4   Q.   Do you see the word profit in Paragraph 3?

5   A.   No, I don't.

6   Q.   Do you agree with Dr. Woods that gross sales is a

7   clearly defined accounting term?

8   A.   Yes, I do.

9   Q.   And do you agree with Dr. Woods that gross sales are all

10  sales before deduction of any costs?

11  A.   Yes, that's generally correct.

12  Q.   And non-reoccurring capital costs is also well defined,

13  isn't it?

14  A.   I think it's a common term, yes.

15  Q.   And non-reoccurring capital costs do not include rent?

16  A.   Generally not.

17  Q.   And they don't include salaries?

18  A.   Generally not.

19  Q.   And you agree with Dr. Woods that non-reoccurring

20  capital costs do not include utilities?

21  A.   I would generally agree with that.

22  Q.   When calculating whether there are net profits, do you

23  need to deduct cost of goods, rent, salaries, and utilities?

24  A.   Yes, you do.

25              MS. SIVINSKI:   I pass the witness, Your Honor.

 1            THE COURT:  Additional direct?

 2            MS. BROZYNSKI:  Nothing further, Your Honor.

 3            THE COURT:  All right.  You may step down,

 4    Mr. Perry.

 5            Plaintiffs, call your next rebuttal witness.

 6            MR. DALTON:  Plaintiffs rest, Your Honor.

 7            THE COURT:  All right.  Subject to closing

 8    argument, both sides rest and close; is that correct?

 9            MR. DALTON:  That's correct, Your Honor.

10            MR. EMERSON:  That's correct, Your Honor.

11            THE COURT:  All right.  Ladies and gentlemen of

12    the jury, you have now heard all the evidence in this case.

13    There are certain things that I have to take up with counsel

14    for the parties that don't require your presence, and the

15    good news from that reality is that you're going to get to

16    go home early today.  But the other part of the story is I

17    need you back tomorrow.

18            So I'm about to allow you to recess for the day.

19    I'll ask you, as you leave, to leave your juror notebooks

20    closed and on the table in the jury room.  I'll remind you

21    as we get closer and closer to the end of this trial that

22    you should re-double your efforts to comply with all my

23    instructions, including, chief among them, not to discuss

24    this case with yourselves or with anyone else.

25            The matters that I am required to deal with

1   counsel on will probably take the rest of the afternoon,

2   into the evening, and it may well take some of tomorrow

3   morning before I'm prepared and ready to have you back here

4   in court.

5           Consequently, what I'm going to do, ladies and

6   gentlemen, is I'm going to ask you to be here at 10:00

7   o'clock in the morning.

8           Now, this is an art; it's not a science.  I may be

9   done and waiting on you before 10:00 o'clock.  You may get

10   here at 10:00 o'clock and have to wait on us.  So we will

11   just have to see where everybody is.  I cannot promise you

12   with certainty exactly how long it will take the Court to

13   cover those things I have to cover outside of your presence.

14          But you're going to get home early today, and

15   you're going to get to come in late tomorrow.  So I don't

16   think I can do much better than that.

17          If you will plan your travel tomorrow so you can

18   be here assembled in the jury room by 10:00 o'clock, that

19   will be satisfactory.  Travel safely to your homes, follow

20   all my instructions, and we'll see you tomorrow at 10:00

21   a.m.

22          The jury is excused at this time.

23          COURT SECURITY OFFICER:  All rise.

24          (Jury out.)

25          THE COURT:  All right.  Counsel, be seated,

1   please.

2                .

3                .

4            My intention at this juncture is to take about a

5   15-minute recess, and then at approximately 4:00 o'clock, I

6   will hear motions from either Plaintiff or -- Plaintiffs and

7   Defendants -- depending who wants to make them, I'll hear

8   motions from either party -- from both parties, offered

9   under Rule 50(a) of the Federal Rules of Civil Procedure.

10           I expect us to get through those motions today,

11  and we will probably at least begin and hopefully complete

12  the informal charge conference today.

13           The reason I did not ask the jury to back -- be

14  back first thing in the morning is I think we'll need some

15  additional time probably to complete the formal charge

16  conference and be ready to begin with the Court's final

17  instructions to the jury, followed by closing arguments some

18  time toward the middle or latter part of the morning.

19           As I told the jury, this is not an exact science,

20  but it's a best approximation.

21           Also, sometime in the morning, well before the

22  jury returns, I'll expect both sides to be prepared to read

23  into the record those items from the list of pre-admitted

24  exhibits that have been used during today's portion of the

25  trial.

1          That's a brief overview of where we stand in the

2    Court's view.

3          Is there anything we need to take up before we

4    begin that short recess I mentioned?  If not --

5          MR. DALTON:  Nothing from Plaintiffs, Your Honor.

6          MR. EMERSON:  No, sir.

7          THE COURT:  All right.  We stand in recess until

8    4:00 o'clock.

9          COURT SECURITY OFFICER:  All rise.

10         (Recess.)

11         (Jury out.)

12         COURT SECURITY OFFICER:  All rise.

13         THE COURT:  Be seated, please.

14         All right.  Counsel, at this time, the Court's

15   prepared to hear motions from Plaintiffs and/or Defendants

16   that either side or both sides wish to offer under Rule

17   50(a) of the Federal Rules of Civil Procedure.

18         Does Plaintiff have motions to offer under Rule

19   50(a)?

20         MR. DEVORA:  Yes, Your Honor, we do.

21         THE COURT:  All right.  What I'd like you to do,

22   Mr. Devora, without arguing them, is simply identify the

23   matters which you wish to move for relief on under Rule

24   50(a).

25         MR. DEVORA:  First, Your Honor, we have --

1          THE COURT:  And if you would, please, sir, go to

2    the podium.  Then I'm going to ask the Defendants to do the

3    same thing.

4          It's the Court's experience that often there are

5    diametrically opposed motions that can be effectively argued

6    at the same time, so that's what I'm trying to do here is

7    identify what's going to be raised and made an issue of by

8    both sides.

9          So from the Plaintiffs, what do you have?

10          MR. DEVORA:  Thank you, Your Honor.

11          First -- first issue, Your Honor, is Defendants'

12    claims for damages.

13          The second one is Defendants' defense for fraud in

14    inducement.

15          The third one is our inducement infringement

16    claims against both the DBA and HiCon Limited.

17          The fourth --

18          THE COURT:  When you say your inducement claim,

19    you're asking for judgment as a matter of law that the

20    Defendants have induced infringement of the patent-in-suit?

21          MR. DEVORA:  Correct, Your Honor.

22          THE COURT:  Okay.  Fourth one?

23          MR. DEVORA:  Personal jurisdiction.

24          THE COURT:  All right.  Anything further?

25          MR. DEVORA:  Direct infringement.

```
 1                THE COURT:  All right.

 2                MR. DEVORA:  Our breach of contract claims.

 3                THE COURT:  What else?

 4                MR. DEVORA:  Tortious interference.

 5                THE COURT:  What else?

 6                MR. DEVORA:  And willfulness.

 7                THE COURT:  And by that, you mean willful patent

 8    infringement?

 9                MR. DEVORA:  Yes, Your Honor.

10                THE COURT:  Do Plaintiffs have any other matters

11    to raise under Rule 50(a)?

12                MR. DEVORA:   No, Your Honor.

13                THE COURT:  Let me hear from Defendants in the

14    same manner.

15                What issues do you intend to raise and what

16    specific relief are you asking for under Rule 50(a)?

17                MS. COOKE:   Good afternoon, Your Honor.

18                Defendants intend to move under Rule 50(a) on the

19    claims of direct infringement, the claims of indirect

20    infringement, the claims of contributory infringement,

21    Plaintiffs' claim for injunctive relief, patent exhaustion,

22    willfulness for patent infringement, and exceptional case

23    combined, patent damages --

24                THE COURT:   Just a moment.

25                What else after patent damages?
```

1          MS. COOKE:  Plaintiffs' breach of contract claims,

2     conspiracy.

3          THE COURT:  What type of conspiracy?  Conspiracy

4     to commit what?

5          MS. COOKE:  Conspiracy to infringe the patent,

6     conspiracy to commit -- sorry, excuse me, Your Honor,

7     conspiracy to commit patent infringement, conspiracy to

8     breach contract, and conspiracy to commit tortious

9     interference.

10          Also the claims of tortious interference,

11     assisting and encouraging tortious interference, Plaintiffs'

12     claim for attorney's fees, and exemplary damages.

13          And jurisdiction, Your Honor, specifically

14     personal jurisdiction.

15          THE COURT:  All right.  Anything further?

16          MS. COOKE:  No, Your Honor.

17          THE COURT:  Let me say at this juncture the Court

18     intends to hear argument and give you direction from the

19     bench.  However, the Court reserves its prerogative to

20     support whatever rulings you get from the bench with a

21     reasoned opinion setting forth both the applicable

22     precedence and the Court's specific analysis.  But I'm not

23     going to make you wait to get that to see what the Court's

24     rulings are going to be.

25          But the fact that I'm giving you rulings from the

1   bench this evening don't preclude the Court's prerogative to

2   more fully and in a more fulsome manner set forth its relied

3   upon authorities and analysis.

4           All right.  I think the most efficient way to do

5   this is to take those areas that are common to both sides

6   where each is asking for effectively the opposite relief

7   under Rule 50(a) and let me hear arguments from both sides

8   concurrently from the podium.

9           Let's start with the issue of direct infringement,

10  and I'll hear from both Plaintiffs and Defendants on their

11  respective positions with regard to that issue first.

12          And if whoever is going to present for both

13  Plaintiffs and Defendants would simply go to the podium

14  together, I'll hear from both of you in immediate

15  succession.  So let's start with that.

16          And let me hear first from Plaintiff on their

17  position with regard to direct infringement.

18          MR. DEVORA:  Thank you, Your Honor.

19          THE COURT:  Go ahead, Mr. Devora.

20          MR. DEVORA:  For direct infringement, Your Honor,

21  we believe that there's enough evidence in the record right

22  now to -- for judgment on this issue.

23          First, there's evidence of the sales ledgers, the

24  FedEx emails, and emails from employees of HiCon Limited to

25  customers in the United States soliciting and actually

1    showing sales of the accused products in the United States,

2    which were unauthorized sales by HiCon Limited, Your Honor.

3    That includes testimony by both the Defendant, Mr. Hwang,

4    and Mr. Paul Schubring, Your Honor.

5          That's all I have, Your Honor.

6          THE COURT:  Let me hear a response and counter

7    argument from Defendants.

8          MS. COOKE:   Your Honor, we request judgment as a

9    matter of law on the issue of direct infringement against

10   HiCon Company Limited.  There has been no substantial

11   evidence entered into the record that HiCon Limited sells,

12   offers to sell, or imports any of the accused products into

13   the United States.

14         All the evidence entered at trial points to sales

15   being made through Mr. Hwang's DBA.  The only evidence

16   identified by Plastronics are the invoices which

17   Mr. Schubring testified about today, which identify HiCon

18   USA as the importer and specific -- the person who pays to

19   have the products imported into the United States.

20         Plastronics has offered no evidence to contradict

21   those facts.

22         HiCon Limited does not sell, offer to sell, or

23   import.  All those sales are made through Mr. Hwang's DBA.

24         THE COURT:  Anything further?

25         MS. COOKE:   Your Honor, in addition to those,

1   there's no substantial evidence that Limited sells or

2   imports into the United States.  Specifically with respect

3   to HiCon USA, HiCon USA takes title to the products in Korea

4   after -- prior to their importation in the United States,

5   thus they are separate and apart from whether the DBA and

6   HiCon Limited is the party to the Distribution Agreement.

7              THE COURT:  All right.  Anything else, Ms. Cooke?

8              MS. COOKE:  No, Your Honor.

9              THE COURT:  Okay.  I think it'd be appropriate

10  next to hear the parties' arguments with regard to personal

11  jurisdiction.  That may impact other matters.

12             Let me hear from Plaintiff first on this, and then

13  Defendant.  I assume this runs to HiCon Co. Limited.  Is

14  that the target of the personal jurisdiction claims --

15             MR. DEVORA:  That's correct, Your Honor.

16             THE COURT:   -- or dispute?  Okay.  What's

17  Plaintiffs' posture, counsel?

18             MR. DEVORA:  Thank you, Your Honor.

19             There's been enough evidence in the record here at

20  trial to show that this Court should exercise personal

21  jurisdiction over the Defendant, HiCon Limited.

22             First is the signing of the Micron NDA.  Micron

23  has a location, I believe, here in Allen, Texas, which would

24  subject -- which shows that they intentionally subjected

25  themselves to the laws of the state of Texas.

1            Further is the HighRel NDA.  Again, it's another

2   American entity through which they contract and avail

3   themselves to the laws of the United States.

4            Third, with regard to NXP, which has an office

5   here in Austin, Texas.  Mr. Schubring testified here at

6   trial today that all the Defendants are partners, and they

7   approached NXP -- I believe it was shown PX-902 -- and

8   approached customers at BiTS in 2018 to -- to specifically

9   solicit the accused devices.

10           Mr. Schubring then admitted on the stand that they

11  approached NXP in Austin in 2017, which, again, shows that

12  the Defendant, HiCon Limited, purposefully availed itself to

13  the state of Texas.  And that meeting with NXP in Austin in

14  2017 was about H-Pins, which are the accused devices in

15  this -- in this suit, Your Honor.

16           THE COURT:  Let me hear from Defendants, please.

17           MS. COOKE:   Your Honor, even though the Court

18  ruled early on in this case that Plastronics had met its

19  prima facie case and burden to show personal jurisdiction

20  over HiCon Limited, that ruling does not relieve Plastronics

21  of its burden to prove personal jurisdiction by a

22  preponderance of evidence at trial.

23           Plastronics has not offered any evidence during

24  trial that shows HiCon Limited sales into Texas in a way

25  that the accused device -- excuse me, that there is no

1    evidence that the accused device has been sold in Texas.

2           Plastronics offered no evidence that HiCon Limited

3    intentionally targeted sales of the infringing products to

4    Texas.  And what the true issue here is the actual

5    connection to Texas, not the United States.

6           This requires actual sales in Texas.  And this is

7    different from going to trade shows and whatnot.  And I

8    would propose, Your Honor, that counsel even in his argument

9    hasn't differentiated between Limited and Mr. Hwang's sole

10   proprietorship.  There's simply just no evidence that the

11   Limited has intentionally and systemically directed products

12   towards Texas.

13          In addition, Your Honor, HiCon USA's contacts are

14   not reoccurring to the extent that counsel has argued that

15   some sort of relationship with HiCon USA leads to personal

16   jurisdiction.

17          THE COURT:  Tell me why the meeting in 2017 in

18   Austin that undisputedly dealt with the sale of H-Pins does

19   not achieve necessary showing to establish personal

20   jurisdiction.

21          MS. COOKE:   Your Honor, that's HiCon USA's

22   meeting, which has no relationship with HiCon Limited or

23   Mr. Hwang's DBA.

24          THE COURT:   Well, I understand the meeting

25   involved Mr. Schubring who is a HiCon USA officer.  I'm not

1    at all sure that that means there's absolutely no

2    involvement or connection with HiCon Company Limited.

3              MS. COOKE:   Your Honor, I -- I would -- would

4    just say that substantial evidence hasn't been shown that

5    there have been contacts with Texas -- an intent to send

6    products into Texas by HiCon Limited.

7              THE COURT:   And there does not seem to be any

8    dispute.  And if you see it differently, please tell me,

9    Ms. Cooke.  But does not seem to be any dispute that the

10   manufacturer of the H-Pins that would have been discussed in

11   that meeting in Austin is HiCon Company Limited.

12             MS. COOKE:   That's correct, Your Honor.  But,

13   again, that meeting is based on HiCon USA.  And HiCon USA's

14   connection to Texas is not the issue.  We need a Limited

15   contact.

16             THE COURT:   But the meetings was about the sale of

17   H-Pins manufactured by HiCon Limited in Texas, even though

18   an officer of HiCon USA was there at the meeting, correct?

19             MS. COOKE:   Correct, Your Honor, but that's not

20   HiCon Limited intending to sell products into the United

21   States -- into Texas.

22             The fact that a separate and apart entity

23   discussed sales in the United States doesn't impugn that on

24   Limited who has never directed its sales to the United

25   States.

1          THE COURT:  All right.  Do you have anything to

2    add in addition, Mr. Devora, before we move on?

3          MS. COOKE:  If I may, Your Honor, I have one

4    point.

5          THE COURT:  That's fine.  Go ahead and make your

6    additional point, Ms. Cooke.

7          MS. COOKE:  In addition, no evidence that

8    Mr. Hwang authorized or targeted that meeting.  It's HiCon

9    Limited.  There's no evidence that HiCon Limited authorized

10   or targeted that meeting.

11         THE COURT:  What about the Distribution Agreement?

12   I understand there's a dispute about whether the active

13   party in that is HiCon, the DBA, or HiCon Company Limited.

14   But to the extent it's HiCon Company Limited, what about the

15   Distribution Agreement that facilitates the sale by that

16   actor of product that would reach the United States,

17   including Texas?

18         MS. COOKE:  Well, I think the first fundamental

19   issue with that is that the evidence has been made clear

20   that the party to the Distribution Agreement is HiCon, the

21   DBA.  And so just posing a hypothetical that it might be the

22   Limited, I would suggest --

23         THE COURT:  You don't believe that's a disputed

24   issue in the case?

25         MS. COOKE:  It is a disputed issue, Your Honor.

1    That's, obviously, one of our points we'd like to raise on

2    JMOL.

3              But simply entering into a contract with a party

4    that isn't located in the United States, that just doesn't

5    meet the -- the preponderance of evidence requirement that

6    HiCon Limited intentionally direct its product to the state

7    of Texas.

8              THE COURT:  All right.  Anything further from

9    Plaintiffs on this issue?

10             MS. COOKE:  No, Your Honor -- oh, I'm sorry.

11             THE COURT:  Mr. Bear?

12             MR. BEAR:  Thank you, Your Honor.

13             I would also point out that there was deposition

14   testimony read into the record from Mr. J.T. Kwon and

15   Mr. J.B. Hwang who both admitted that they are only

16   employees of HiCon Co. Limited.

17             Additionally, the Court may recall that both of

18   those individuals admitted going to BiTS USA to market the

19   accused products and other types of products which shows a

20   purposeful availment of the United States of America.

21             In addition, Your Honor pointed out the

22   Distribution Agreement.  It is certainly a jury question at

23   this point whether that agreement is, in fact, referring to

24   HiCon Co. Limited, given the inconsistencies of language

25   that was pointed out in vigorous cross-examination by

1    Mr. Schubring.

2         Given all these things together, there's

3    purposeful availment of personal jurisdiction of HiCon Co.

4    Limited sufficient for the Court to exercise personal

5    jurisdiction over the corporation.

6         THE COURT:  All right.

7         MS. COOKE:  Your Honor, if I may respond briefly?

8         THE COURT:  Briefly.  We still have a lot of

9    ground to cover.

10        MS. COOKE:  I'll point out, Your Honor, that the

11   BiTS Conference was not in Texas.  And simply availing

12   yourself to the United States is not the standard at issue

13   for personal jurisdiction.  It would have to be directed at

14   the state of Texas.

15        THE COURT:  All right.  Let's move on.

16        Let me hear competing arguments from the parties

17   on -- I'll call it indirect infringement, whether it's

18   contributory infringement or infringement by inducement.

19        I'd like to hear your arguments on any indirect

20   infringement theories.

21        I'll start with Plaintiff and then hear from

22   Defendants.

23        MR. DEVORA:  Thank you, Your Honor.

24        Plaintiffs' position is that there is sufficient

25   evidence in the record to show inducement by Mr. Hwang's DBA

1  to induce infringement by HiCon USA, HiCon Company Limited,

2  and/or HighRel.

3          Even if it is determined that the DBA is a party

4  to the Distribution Agreement, he's still acting on behalf

5  of HiCon Co. Limited.

6          THE COURT:  Mr. Devora, I'm about 10 feet from

7  you, and I'm having to strain to listen.  Pull that

8  microphone over closer, please, sir.

9          MR. DEVORA:  Sorry, Your Honor.

10         So even if the DBA is a party to the Distribution

11 Agreement, the DBA is still acting on behalf of HiCon

12 Limited.  The only reason for the existence of the DBA is to

13 do business on behalf of HiCon Limited.

14         Further, the tax invoices that were shown -- that

15 were entered into the record do not conclusively show that a

16 chain of title or a transfer of title of the accused

17 products from HiCon Limited to the DBA ever took place.

18         There's no evidence to show, for example, that

19 any, quote, unquote, socket actually made its way from that

20 tax invoice to the United States.  There's no evidence to

21 show that a transfer of title happened on the accused

22 devices from HiCon Limited to HiCon, the DBA.

23         Therefore, the proper -- proper title of those

24 goods -- of the accused devices was still with HiCon Limited

25 even though Mr. Hwang may have sold these devices into the

1    United States.

2           HiCon Limited still had proper title to the

3    accused devices, and that's -- and those -- and that is

4    those accused devices -- HiCon Limited's accused devices

5    that have been sold in the United States.

6           THE COURT:  Anything further?

7           MR. DEVORA:  No, Your Honor.

8           THE COURT:  Let me hear a response from

9    Defendants, please, together with, of course, any

10   affirmative arguments you want to put forward.

11          MS. COOKE:  Yes, Your Honor.

12          I'd like to start off by saying that it is not

13   Defendants' burden to prove conclusively that there is no

14   induced infringement.  The burden lies on Plaintiffs to

15   prove there was infringement.

16          Starting with indirect infringement by HiCon

17   Limited, based on the infringement of Mr. Hwang's DBA, we

18   request that the Court grant judgment as a matter of law

19   that there is no indirect infringement by HiCon Limited

20   based on any direct infringement by Mr. Hwang's DBA.

21          The Court has already ordered in Docket 278 --

22   excuse me, I think that's 287 -- that the DBA of Mr. Hwang

23   cannot infringe the '602 patent, and, therefore, there is no

24   underlying direct infringement sufficient to maintain the

25   claim of direct -- indirect infringement against HiCon

1   Limited based on a direct infringement of the DBA.

2           THE COURT:   Well, are you telling me if I were to

3   agree with you, that the DBA, which is Mr. Hwang, who has, I

4   think, undisputed rights in the patent-in-suit, couldn't

5   commit infringement of the patent in which he owns a 50

6   percent interest?  Are you telling me there's no other

7   source of direct infringement that would support an induced

8   or indirect infringement claim?  Just because it's not

9   coming from Mr. Hwang, DBA, or may not be coming from

10  Mr. Hwang, DBA, does that mean it can't be somewhere else?

11          MS. COOKE:   Yes, Your Honor.  And I'll address

12  those issues, as well.

13          THE COURT:   Please.

14          MS. COOKE:   Specifically with respect to

15  Mr. Hwang's DBA being the source of direct infringement, the

16  current and already entered orders of this Court preclude

17  that theory from moving forward.  Mr. Hwang can't infringe.

18  There can be no direct infringement based on Mr. Hwang's

19  activities.

20          Additionally, Your Honor, there can be no indirect

21  infringement against HiCon Limited based on the infringement

22  by HiCon USA or HighRel.  There is no evidence in the record

23  that HiCon Limited did anything.

24          Mr. Paul Schubring testified that HiCon USA did

25  business with Mr. Hwang, his DBA.  Entered into the evidence

1   were emails and a Distribution Agreement which Mr. Schubring

2   testified at length his understanding that he entered into

3   an agreement with Mr. Hwang's DBA.

4          Plaintiffs have offered no contrary evidence that

5   HiCon Limited induced any other authorized sales into the

6   United States.

7          The substantial evidence shows that all asserted

8   patent rights are also exhausted because HiCon USA and

9   HighRel import the accused products through the DBA.  And

10  so, therefore, any sales that route through Mr. Hwang's DBA

11  are also exhausted.

12         There's also no substantial evidence that HiCon

13  Limited intended to cause infringement.  That goes to the

14  intent element required for induced infringement.  All the

15  evidence is to the contrary that Mr. Hwang and HiCon

16  Limited, to the extent it was an actor, went out of its way

17  to avoid infringing by totally changing the way he planned

18  to do his business.

19         Your Honor, we also would like to move on indirect

20  infringement against Mr. Hwang's DBA.  And this is based on

21  direct infringement, again, of HighRel and HiCon USA, but it

22  would be Mr. Hwang's DBA that would be liable.

23         Again, a patent -- this is what I think Your Honor

24  was addressing.  A patent owner -- we found no authority and

25  nor has Plaintiff cited any authority that a patent owner

1    can be liable for induced infringement.  It just goes

2    against the basic logic of patent rights.

3            That's not to say that in the appropriate

4    circumstances and under the right terms, it wouldn't be

5    potentially a breach of contract, but simply saying that a

6    patent owner cannot be liable for induced infringement on

7    its face.

8            This is also true because all of the sales

9    necessarily flow through Mr. Hwang's DBA.  Because

10   Mr. Hwang's DBA has rights to practice the '602 patent and

11   the Korean patent, all such rights downstream are exhausted.

12           HighRel and HiCon USA are actual importers of the

13   products, not Mr. Hwang's DBA.  And a finding that a patent

14   owner can be liable for indirect infringement would be

15   inconsistent with the provisions in 271(d).

16           That provision specifically excludes licensing and

17   authorization of another to perform acts.  If they are

18   performed without the owner's consent, would constitute

19   contributory infringement of the patent for a legal

20   extension of patent rights.

21           So it's basically that principle that a patent

22   owner can license and authorize other people.  And if he had

23   not had that authority, it would be contributory

24   infringement.  And I think that's exactly where we find

25   ourselves today, that Mr. Hwang owns rights in the patent.

1   He's authorized to give and practice that patent, and simply

2   cannot be liable for inducing others to infringe rights he

3   has himself.

4          I have one additional one, Your Honor.

5   Plaintiffs' contributory infringement claim is not included

6   in the jury charge.  It's our understanding that this has

7   been abandoned.  And I think we should probably all agree

8   that that's been dropped.

9          To the extent that Plaintiffs don't agree, there

10  hasn't been any evidence whatsoever entered into the record,

11  and it simply just doesn't make sense.  Contributory

12  infringement generally goes to the issue of importing a

13  portion of an accused product and assembling it in the

14  United States.  And that's just simply not the facts here.

15         THE COURT:   Well, let me ask Mr. Devora.  Does

16  the Plaintiff maintain that there's a live contributory

17  infringement claim here?

18         MR. DEVORA:   May I confer briefly with my

19  co-counsel?

20         THE COURT:  You may.

21         MR. DEVORA:   Your Honor, Plaintiffs are going to

22  withdraw their claim for contributory infringement.

23         THE COURT:  All right.  I'll consider that any

24  claims by Plaintiff for contributory infringement are no

25  longer live in the case and have been abandoned and/or

1    withdrawn.

2              MR. DEVORA:   Thank you, Your Honor.

3              THE COURT:   Anything else related to the overall

4    issue of indirect infringement from either Plaintiffs or

5    Defendants?

6              MR. DEVORA:   Yes, Your Honor.

7              Again, this goes back to chain of title.

8    Mr. Hwang, whether personally or through his DBA, cannot

9    sell something which he does not have.   It cannot be a

10   proper sale to the United States of that accused device,

11   therefore, triggering any patent exhaustion defense, for

12   example, because he does not have proper title to those

13   accused devices.

14             There's no proper title transfer from HiCon

15   Limited to HiCon the DBA.   The accused device still is

16   titled to HiCon Limited, and, therefore, is a device of the

17   accused -- of HiCon Limited.

18             So even if he were to purport to make a sale, that

19   chain of title has not been transferred.   So the accused

20   devices from HiCon Limited to the DBA.

21             THE COURT:   Anything further from Defendants,

22   Ms. Cooke, on indirect infringement?

23             MS. COOKE:   Yes, Your Honor.

24             MR. DEVORA:   One more quick point, Your Honor, and

25   I'll let Ms. Cooke.

1          The other piece of evidence that was entered into

2     the record is the email from Mr. Hwang and I believe

3     Mr. Schubring saying that there's a patent issue with

4     respect to HighRel or HiCon USA.  He makes the comment who

5     will care?  It shows intent to disregard the rights of

6     Plastronics -- rights in the patent, and, therefore, shows

7     inducing HighRel and/or HiCon Limited to infringe the '602

8     patent.

9          THE COURT:  All right.  Anything further from

10     Defendants on this, Ms. Cooke?

11          MS. COOKE:  Sure, Your Honor.  I'm going to go

12     back to the burden on infringement which lies on Plaintiffs'

13     shoulders.

14          There's just no evidence in the record that

15     Limited retains title to these products prior to shipment.

16     The only evidence in the record is Mr. Hwang's testimony to

17     the contrary and the documents in support.  There is no

18     evidence, other than title transferring to Mr. Hwang's DBA

19     prior to shipments out of the country.

20          I would propose, Your Honor, that trying to shift

21     the burden onto Defendants simply isn't standard.  As we all

22     know and we've heard the testimony to support it, these

23     products, even if they are shipping from HiCon Limited to

24     the USA, they -- the title has already transferred at the

25     time that they leave Korea and passed into the United States

1   border.   This is just simply insufficient to support a claim

2   of indirect infringement.

3           THE COURT:   All right.   Next I'd like to hear

4   argument from the parties on their competing positions with

5   regard to willful patent infringement.   I'll start with

6   Plaintiff.

7           MR. DEVORA:   Your Honor, on top of the arguments

8   I made earlier with regard to direct infringement, as far as

9   willfulness, again, Defendants point out there is sufficient

10  evidence in the record.

11          Mr. Schubring and Mr. Hwang were well aware of the

12  rights of Plastronics and the '602 patent.   They

13  deliberately went forth and sought out customers to sell and

14  offer to sell the accused devices, namely, NXP in 2017.

15          Further, again, going back to the "who will care"

16  email, it's a wanton disregard and willful disregard of

17  Plastronics's rights in the '602 patent.   That shows a

18  specific intent to show -- specific intent to infringe the

19  '602 patent.

20          Thank you, Your Honor.

21          THE COURT:   What's Defendants' posture?

22          MS. COOKE:   Your Honor, simply, the standard that

23  Plaintiffs have relied on is -- is not the proper one to

24  apply for willful infringement.

25          The proper standard to apply is evidence of

1    egregious or spiteful conduct to support willfulness.  It's

2    under the Halo case.

3            The evidence showed that Mr. Hwang at every turn

4    in this case in his -- in this issue has tried to comply

5    with both the Assignment Agreement and the Royalty Agreement

6    and his obligations under both of those agreements with

7    respect to patents and associated infringement.

8            Mr. Schubring testified today that he would never

9    intentionally try to commit patent infringement.  And, in

10   fact, the only evidence that has been entered into the

11   record of any sort of spiteful conduct is by -- on behalf of

12   Mr. Pfaff, not Mr. Hwang.  Mr. Hwang sought out counsel of

13   his own attorneys in Korea.  He at every turn tried to work

14   things out with Mr. Pfaff.  And he today has testified that

15   he has done everything in his power to resolve those

16   agreements without dispute.  And most certainly cannot meet

17   the standard of egregious and spiteful conduct required for

18   a finding of willful infringement.

19           THE COURT:  Mr. Bear?

20           MR. BEAR:   Your Honor, I think some of the

21   evidence I'm about to mention will go to a couple of issues,

22   but specifically for this one with willfulness, I would

23   point the Court to the cross-examination of Mr. Schubring

24   today and his admission that the very first thing when he

25   was dealing with the Distribution Agreement was to ask about

1    the patent issues with David -- David being Mr. Pfaff.

2           Additionally, we showed full knowledge of the '602

3    patent, full knowledge of the restrictions on transfer.

4           You know, Ms. Cooke's statement's about

5    Mr. Hwang's subjective state of mind is a credibility

6    determination for the jury to make.  And, therefore, the

7    jury is free to believe or disbelieve and also to infer that

8    perhaps Mr. Hwang is actually actively misleading them as to

9    his intent.

10           Moreover, Your Honor, this is not just speculation

11    on my part.  I would point the Court to PX-922, the BiTS

12    email, where Mr. Hwang on behalf of -- through his son,

13    J.B. Hwang, instructed Mr. Schubring to take down displays

14    at the BiTS conference in response to this lawsuit.

15           Additionally, Your Honor, the jury will see in

16    that email that there was also express direction from

17    Mr. Hwang to do deals in back rooms.

18           Given the totality of the evidence and the intent

19    to conceal, the jury can make a very strong reasonable

20    inference that Mr. Hwang intentionally sought to violate the

21    patent by making unauthorized sales.  And, therefore, the

22    jury should be able to hear this claim and be instructed

23    upon it.

24           THE COURT:   All right.  Next I want to hear

25    argument from the parties with regard to Defendants' motion

1   under Rule 50(a) concerning injunctive relief.

2            I assume Defendants have --

3            MS. COOKE:  I didn't hear you, Your Honor.

4            THE COURT:   -- I assume Defendants are moving for

5   a judgment as a matter of law that injunctive relief --

6            MS. COOKE:  Yes, Your Honor.

7            THE COURT:  -- does not lie, notwithstanding a

8   determination of infringement?

9            MS. COOKE:  Yes, Your Honor.

10           We acknowledge that this motion may be a bit

11   premature.  But Plastronics -- but, here, Plastronics has

12   pled for injunctive relief, and there are just clearly

13   remedies at law.  We've all stood here in court and listened

14   to them ask for damages.  They're asking -- they've provided

15   no evidence of irreparable harm.  Clearly an adequate remedy

16   of law exists, and no evidence has been put on to the

17   contrary.

18           THE COURT:   Plaintiffs?

19           MR. BEAR:   Your Honor, injunctive relief is not

20   necessarily precluded just because a party may have damages.

21           In this case, injunctive relief would be

22   appropriate given the difficulty in collecting against a

23   Korean-based company.  Although they have stated that HiCon

24   DBA has a bank account in the United States of America, it

25   is also true that HiCon Co. Limited is within the Republic

1    of Korea.  Although we believe -- and we believe that there

2    is substantial and strong evidence of personal jurisdiction,

3    the reality is the practical difficulties of enforcing any

4    type of damage award would be difficult.

5              Therefore, an injunction within the jurisdictional

6    territory of this Court, which is the United States of

7    America, would be appropriate to prevent any type of

8    importation within the United States.

9              Therefore, in order to effect meaningful relief

10   for the Plaintiffs, given the substantial evidence of

11   infringement, an intentional and willful infringement would

12   be to have the Court in its discretion and powers grant an

13   injunction to permanently enjoin HiCon Co. Limited from

14   directly importing or being induced to import accused

15   devices into United States of America without authority.

16             THE COURT:  Anything further on this from

17   Defendants?

18             MS. COOKE:  Yes, Your Honor.

19             A claim for injunctive relief requires a showing

20   of harm, and Plastronics hasn't shown any.

21             Also, an injunctive relief claim requires a

22   showing of inadequate remedy at law.  Plaintiffs have stood

23   up here and for the last several days told us how much money

24   they value their case.  There is an adequate remedy at law,

25   and it -- and it's just -- without -- you can stand up and

1    say there's an adequate remedy at law.  There's just simply

2    no way to also argue an inadequacy of that.

3            And coming in after the fact and suggesting it's

4    based on Mr. Hwang's bank accounts and whatnot when he has

5    brought himself here to this Court to have his trial is just

6    conjecture.  It's Plaintiffs' burden to prove it.  They have

7    to prove inadequate comp -- excuse me, they have to prove an

8    inadequate ability to collect and be compensated for their

9    injury.

10           This requires both that there is a harm and that

11   there is some inadequateability to collect that.  And that's

12   just not been shown.

13           THE COURT:  All right.  Also, Defendants have

14   moved, if I understand it correctly, for judgment as a

15   matter of law with regard to an award of fees under Section

16   285 of the Patent Act.

17           MS. COOKE:  Yes, Your Honor.

18           THE COURT:  I don't know how the Court could

19   properly take that up under Rule 50(a) pre-verdict.

20           Does Defendant have any basis upon which the

21   Court, without knowing who the prevailing party is, can

22   properly take up and rule at this stage on a 285 motion?

23           MS. COOKE:  Sure, Your Honor.  We understand that

24   the Court has already reserved its decision on attorneys

25   fees.  But the contract claims in this case upon which those

1    attorney fees are based fail for the reasons that we'll

2    discuss during this hearing.

3              And there are no remaining bases by which to seek

4    those fees, so because there is no breach of contract and

5    there are no damages, there simply can be no fees.

6              THE COURT:   Well, maybe we're talking about

7    different things, counsel, but I assume we're talking about

8    a request that the Court find that this is an exceptional

9    case under Section 285 of the Patent Act and award fees to

10   the prevailing party.

11             I guess maybe what you're asking me to do is let

12   you win the case on Rule 50(a) and as a part of it, award

13   285 fees as an exceptional case at this juncture.

14             But unless the Court effectively disposes of the

15   case as a whole at this juncture, how could I properly

16   consider a motion under 285?

17             MS. COOKE:   Your Honor, these attorney fees' are

18   for Plastronics's claims that HiCon Limited, HiCon, and

19   Mr. Hwang's DBA breached contract.

20             THE COURT:   So you're not seeking a recovery under

21   Section 285 of the Patent Act?

22             MS. COOKE:   No, Your Honor.

23             THE COURT:   Okay.  I had 285 written down.  I may

24   have misheard you, but I'll take you at your word.

25             MS. COOKE:   That, Your Honor, is that they can't

1   demonstrate that the case is exceptional.

2           THE COURT:  So you're asking me to find as a

3   matter of law at this juncture that the case isn't

4   exceptional, as opposed to asking me to find that it is

5   exceptional?  I'm confused.  What -- what are you -- what's

6   Defendant asking for?

7           MS. MCCOMAS:  This was my fault, Your Honor.  I

8   put it on our list and didn't explain very well.

9           Really, we're focused on the state law claim for

10  attorneys fees, under Chapter 38 --

11          THE COURT:  Which is something totally different

12  than a recovery for 285 for an exceptional case?

13          MS. MCCOMAS:  It is.  And so it's on our list of

14  claims that they've made, and we're checking it off.  But

15  under Chapter 38, you can't recover attorneys' fees unless,

16  one, you win on breach of contract -- excuse me, I'm sorry,

17  I have laryngitis -- and, two, you have to actually recover

18  damages.

19          And when Ms. Cooke finishes her -- when she

20  finishes her arguments today, you're going to learn that

21  there's nothing left on the contract except for perhaps an

22  accounting.  And the accounting doesn't have any damages

23  tied to it.  So if we take those in the right order, there

24  may be an argument that is worth considering.

25          THE COURT:  All right.  Well, for purposes of

1   where we are now, with the parties seeking relief under Rule

2   50(a), I'm going to consider that either a motion for

3   exceptional case status under Section 285 has been withdrawn

4   or I'll deny it without prejudice.

5           I will not foreclose the possibility of either

6   side, in light of what verdict may be returned at a later

7   date, an appropriate time seeking relief under Section 285

8   for exceptional case status.

9           I'm going to deny it at this stage under Rule

10  50(a), but without -- without foreclosing the possibility

11  that after the return of a verdict, a proper 285 motion

12  could be made, okay?

13          MS. COOKE:  Thank you, Your Honor.

14          MR. BUNT:   Your Honor, may I interrupt for just a

15  moment?

16          Would it -- would it be possible for Mr. Dalton to

17  go back to our offices?  He's not going to be participating

18  in any of the JMOL hearing.

19          THE COURT:  As long as each side is adequately

20  staffed at this process, the rest of you are free to leave.

21          MR. BUNT:  Thank you, Your Honor.

22          MR. DALTON:  Thank you, Your Honor.  May I be

23  excused now, sir?

24          THE COURT:  You may.

25          MR. DALTON:  Thank you.

1          THE COURT:  Mr. Dalton, before you leave, do we

2     know at this juncture who will be presenting closing

3     arguments for Plaintiff, or is that a premature decision?

4          MR. DALTON:  That will be me, Your Honor.

5          THE COURT:  Both the first and the second

6     Plaintiffs' closing?

7          MR. DALTON:  That's correct, Your Honor.

8          THE COURT:  Okay.

9          MR. DALTON:  Thank you.

10         THE COURT:  You certainly can spend your time

11    preparing for that.

12         MR. DALTON:  Thank you.

13         THE COURT:  You're excused.

14         MR. DALTON:  Thank you.

15         THE COURT:  Let me ask you this, Mr. Bunt.  Since

16    we've paused in the 50(a) process, we are now 22 minutes

17    after 5:00.

18         Where are Plaintiffs as far as submitting the

19    updated jury charge and verdict form that I instructed both

20    sides on yesterday to be done by 5:00 o'clock today?

21         MR. BUNT:  We are still working on it.  I believe

22    our paralegals are in the break-out room working on it.  I

23    think Mr. Devora may be able to provide some insight into

24    what has happened with the papers.

25         MR. DEVORA:  Yes.  So we received Defendants'

1   proposed amended jury instruction and verdict form in the

2   middle of the night.  We have been working throughout the

3   day to get our edits back to -- to the Defendants for their

4   consideration.

5            We have not been able to get a -- a Word version

6   of the marked up -- of the mark-ups.  We've received the

7   mark ups in PDF form, but, obviously, have not been able to

8   use that mark-up version in Word.  So we're working

9   diligently to try and figure out what changes have been made

10  so we can provide our input now and hopefully allow

11  Defendants to review before we submit it to the Court.

12           THE COURT:  Why would Defendants have given

13  Plaintiffs their version in a non-editable PDF, as opposed

14  to Word?

15           MR. DEVORA:  For clarification, they did give a

16  clean version in Word, and they gave a mark-up version in

17  PDF.

18           MS. MCCOMAS:   Your Honor, may I approach?  This

19  is what we gave them at 2:00 a.m.

20           THE COURT:   Well, let me just say this.  When we

21  finish the motions under Rule 50(a), I want what the parties

22  have, whether it's completely ready or not, as far as a

23  joint submission for an amended and updated final jury

24  instruction and verdict form.

25           MR. DEVORA:  Understood, Your Honor.

1          THE COURT:  And your remaining trial teams can

2    continue to work on it in the interim, okay?

3          MS. MCCOMAS:  To clarify, I feel like I've been

4    impugned a little bit.  We gave them a Word version, and we

5    gave them a redline of everything we changed.  There's a lot

6    of colors, so I'm not blaming anybody on not being able to

7    read it.  We gave them a very -- what I thought was a

8    substantially complete version, admittedly in the middle of

9    the night, but -- and have tried to confer on specific

10   issues all day.  And they just haven't sent it back to us.

11         THE COURT:  All right.  Well --

12         MS. MCCOMAS:  We do have the verdict if -- and I

13   think they've agreed -- oh, this is the one I sent you.  I

14   don't have yours.

15         MR. DEVORA:  Yes, we have sent back our proposed

16   verdict form.  And I believe we have juxtaposed each of our

17   respective proposed verdict forms against each other with --

18   organized by cause of action.  So we have exchanged those,

19   Your Honor.

20         THE COURT:  Well, continue to work on it, but

21   when we finish the process of taking up and considering the

22   Court ruling on these 50(a) motions, I'm not going to be

23   able to indulge the luxury of continuing to let you work on

24   it.  I'm going to need whatever you have in whatever form

25   it's in, okay?

1          MR. DEVORA:  Understood, Your Honor.

2          THE COURT:  All right.  Let's return to the

3   motions under Rule 50(a).  And I think it goes without

4   saying that whatever I get needs to be in Word format so

5   that it's --

6          MS. MCCOMAS:  Yes, sir, it was, I promise.

7          THE COURT:   All right.  Before we get into the

8   motions under Rule 50(a) related topically to breach of

9   contract and tortious interference, there are some motions

10  still pending, as I understand it, with relation to damages

11  issues concerning the patent claims.

12         Let me hear what the parties' motions related to

13  patent damages might be under Rule 50(a), and let's take

14  those up next.

15         Defendants -- excuse me, Plaintiffs have indicated

16  that they have a motion with regard to Defendants' claim for

17  damages.  I assume that's patent damages.

18         And Defendants have indicated they have a motion

19  under Rule 50(a) regarding patent damages.

20         So clarify both of -- clarify for me what both

21  parties are seeking as far as relief under 50(a) in that

22  regard.

23         MR. DEVORA:  With respect to damages, Your Honor,

24  Plaintiffs are moving for JMOL on Defendants' claim for

25  damages under their breach of contract theories, not our --

1    not our patent infringement damages.

2            THE COURT:   Well, let's save -- let's save breach

3    of contract until we complete an argument on all the

4    patent-related issues.

5            MR. DEVORA:   Understood.

6            THE COURT:   Do Defendants have a motion for relief

7    under Rule 50(a) regarding damages related to patent

8    infringement?

9            MS. COOKE:   Yes, Your Honor.

10           THE COURT:   Let me hear from you on it.

11           MS. COOKE:   Substantial evidence shows that

12   Mr. Hwang and his DBA, foreign damages for Plastronics's --

13   allegations of foreign damages are unsupported by the

14   evidence of domestic infringement.

15           Under the WesternGeco case, there are -- damages

16   are allowed for foreign activity only when there is evidence

17   of an underlying act of domestic infringement.  For the

18   reasons that we've just laid out for Mr. Hwang's Asia sales,

19   those products never touch the United States when they

20   come -- I'll rephrase that.

21           When Mr. Hwang sells his products in Asia, those

22   products never make it to the United States.  And so,

23   therefore, under the underlying act of domestic infringement

24   and foreign damages are just unsupported as a matter of law.

25           In addition, Your Honor, we propose that there is

1   no evidence of a two-market -- two-player market, and there

2   has been insufficient evidence of causation associated with

3   patent infringement.

4              THE COURT:   What's Plaintiffs' response?

5              MR. BEAR:    Your Honor, WesternGeco is the case in

6   question.   And I believe that today with Mr. Schubring, we

7   established a sufficient nexus within the United States to

8   make international infringement a foreseeable and proximate

9   cause.

10             You may recall, Your Honor, that when we -- when I

11  was cross-examining Mr. Schubring, he admitted that there is

12  a qualification process that occurs throughout the United

13  States and including specifically Texas, with NXP, and that

14  that qualification is a requisite that must be found in

15  order to sell throughout their entire market in --

16  internationally.

17             WesternGeco, as Your Honor may recall, involved an

18  issue of international usage that originates or at least has

19  a firm nexus within the United States.   There is now

20  evidence within the record to establish that, Your Honor,

21  given the qualification process.   And it will become a jury

22  issue to determine the credibility of that, and I believe

23  that the jury should be instructed.

24             As to the latter issue with regards to two-party

25  market, there are competing experts in this case.   And it is

1  up to the jury to decide whether Mr. -- Dr. Woods or

2  Mr. Perry's analysis of the two-player market is credible.

3            Additionally, there is substantial evidence to

4  establish a two-party market.  Your Honor may recall that

5  the only two manufacturers of H-Pins in the entire world are

6  Plastronics H-Pin and the Defendant HiCon Co. Limited.  That

7  is a fact that is not contested at this point.  And,

8  therefore, the jury can make a determination of the

9  competitiveness with other types of pins.

10            Additionally, Your Honor, I'd point out the

11  inconsistencies on the facts from Plaintiffs, given the

12  laudatory praises of the H-Pin and its revolutionariness,

13  but established that there is a clear preference within the

14  market to support Mr. Perry's analysis.  I believe the jury

15  should be instructed on it.

16            Thank you.

17            THE COURT:   Anything further from Defendants on

18  this?

19            MS. SIVINSKI:   Your Honor, the Magistrate Judge's

20  ruling that Your Honor confirmed says that there's a fact

21  issue about whether there's an underlying act of domestic

22  infringement.  For example, if under the Distribution

23  Agreement an infringing product is sold or imported into the

24  United States and then further sold into Canada or Mexico,

25  that that may be an underlying act of domestic infringement

1    to support lost sales in Canada or Mexico, for example.

2           There's no evidence that any of the sales that

3    either HiCon party made, depending on the resolution of that

4    fact issue, that any of those foreign sales first touch the

5    United States first.  I don't quite -- I don't think I quite

6    track Mr. Bear's argument that a product being qualified in

7    the United States is somehow an underlying act of

8    infringement.

9           There was no evidence that a product was imported

10   into the United States and then sold back outside of the

11   United States by HiCon Co. Limited, or HiCon, whichever --

12   entity is applicable.

13           THE COURT:  Can you -- can you address that

14   briefly, Mr. Bear?

15           MR. BEAR:  Yes, Your Honor.

16           I'd point to two pieces of evidence within the

17   record and also a proposition of law.

18           Certainly, you know, there is an offer of sale

19   that is being made through the qualification process within

20   the United States.

21           Moreover, I would direct the Court to the

22   Distribution Agreement -- and I apologize, I don't have the

23   exact section number -- but we went through it with

24   Mr. Schubring on cross-examination.  And there is a specific

25   clause that states that HiCon USA is entitled to proceeds

1  for sales that are qualified from the United States -- from

2  its territory, if they're international.

3          Given this and given the fact that as Defendants

4  have clearly argued, that there is a chain of title through

5  HiCon USA and HighRel, I believe that there is sufficient

6  evidence to fall within the purview of WesternGeco and,

7  therefore, I reiterate that the jury should be instructed on

8  this damage amount.

9          THE COURT:  All right.  Let's move on to the next

10 issue.

11         MS. DERIEUX:  May I be excused, Your Honor?

12         THE COURT:  You may, Ms. DeRieux.

13         MS. DERIEUX:  Thank you.

14         THE COURT:  Let me ask this for clarification.  Is

15 either party aware of matters that have been urged by either

16 or both sides under Rule 50(a) that relate to the general

17 area of patent infringement that the Court has not taken up

18 or considered or heard argument on?  If not, we'll move on

19 to the breach of contract issue.

20         MS. COOKE:  The only one left I have, Your Honor,

21 is exhaustion of the '602 patent.

22         THE COURT:  I thought we'd heard argument on that.

23         MS. COOKE:  If we have, then that's fine.

24         MR. BEAR:  I think we took it up with direct

25 infringement.

1          MS. COOKE:  I have an independent one for that.

2     If Your Honor has felt like we've addressed --

3          THE COURT:  If you want to make an independent

4     argument briefly, I'll let you.

5          MS. COOKE:  Your Honor, Defendants have moved

6     with an affirmative defense of exhaustion.  The substantial

7     evidence shows that products made by HiCon Limited are sold

8     through Mr. Hwang's DBA.

9          Since the DBA is authorized, all downstream sales

10    into the United States would be exhausted -- would be

11    applicable to HighRel and Hi -- HiCon USA.

12         THE COURT:  All right.  Anything else from

13    Plaintiffs on this?

14         MR. BEAR:  Your Honor, I'll be very brief, and I

15    promise it is true this time.

16         For the same reasons --

17         THE COURT:  Going to be true one of these times.

18         MR. BEAR:  One of these times, yes.

19         Your Honor, for the same reasons that we believe

20    there's a genuine issue of material fact of infringement,

21    exhaustion cannot occur if the sale in question was actually

22    made by HiCon Co. Limited.

23         There is enough evidence within the record for

24    that to be a jury question, and, therefore, it'd be

25    inappropriate to grant an affirmative defense of which they

1    bear the burden on when there's substantial evidence for the

2    jury to find against it.

3            THE COURT:  All right.  Let's move on, unless

4    there's something else.

5            Let me hear from the parties on their competing

6    positions under Rule 50(a) with regard to the Plaintiffs'

7    breach of contract claims.

8            MR. DEVORA:  Thank you, Your Honor.

9            I believe there's sufficient evidence in the

10   record to show that we believe we're entitled to judgment as

11   a matter of law on our breach of contract claims,

12   specifically for licensing the Korean patent.

13           The Korean license is still in effect today.

14   We've heard testimony on that by Mr. Hwang admitting to that

15   fact.  Given that there's a license within the statute of

16   limitations within the last four years, the license is still

17   in effect.  So, therefore, there has been a license within

18   the statute of limitations that -- that amount to a breach

19   of contract.

20           MR. BEAR:  I apologize, Your Honor.

21           MR. DEVORA:  Given that this license is still in

22   effect, that license to -- from Mr. Hwang to HiCon Limited

23   amounts to a breach of contract under the Royalty Agreement.

24           THE COURT:  All right.  Let me hear from

25   Defendants.

1          MS. COOKE:   Your Honor, I have these addressed in

2     a little bit broken out fashion.  If you don't mind, I can

3     address them as the Korean patent -- or the Korean license

4     issue, the ad hoc license issue, and then generally breach

5     of contract claims if that makes sense for Your Honor.

6          THE COURT:  Okay.

7          MS. COOKE:  Specifically with respect to

8     Plaintiffs' claim of breach of contract based on the license

9     in Korea, the only theory that was pleaded by Plastronics

10    was for a breach of contract based on the Distribution

11    Agreement between HiCon USA or HighRel.

12         They have been urging the Court to allow it to

13    pursue a breach of contract based on licensing this Korean

14    patent, and this is simply an unpleaded theory that should

15    be disposed of.

16         In addition, Your Honor, any breach of contract

17    claim based on the Korean patent is barred by a four-year

18    statute of limitations.  As the Magistrate has already

19    ruled, there is no continuing theory that allows extension

20    of this statute of limitations for a breach of contract

21    claim.

22         Given that Mr. Hwang entered into the Korean

23    patent license in 2008, there is no dispute, that it is

24    simply barred by the statute of limitations.

25         In addition, Your Honor, HiCon Limited sells

1    the -- in Korea.  And Plastronics has shown, again, as we

2    mentioned earlier, no damages based on actual activity

3    within Korea.

4            Mr. Perry testified that he removed sales from his

5    damage analysis for within Korea.

6            So pursuing any sort of breach of contract based

7    on the Korean license should simply be disposed of as a

8    matter of law.

9            THE COURT:  All right.

10           MS. COOKE:  Moving on.

11           THE COURT:  Go ahead.

12           MS. COOKE:  The next issue, Your Honor, is the

13   breach -- breach of contract based on the ad hoc implied

14   license.

15           Again, Your Honor, this is another theory that

16   Plastronics had been urging that is not found within the

17   scope of their pleadings.  There actually is no such thing

18   as an ad hoc de facto implied license, which is the actual

19   language that they use.

20           Also, whether a license exists is a question of

21   law for the Court, so we propose that now is as good a time

22   as any to dispose of this issue.

23           Also, Mr. Hwang doesn't need a license to

24   manufacture in Korea.  As the evidence has showed, Mr. Hwang

25   has rights to the patent and a hundred percent rights to his

1    Korean patent.  So implying that there's some sort of breach

2    of contract based on an implied license in Korea just simply

3    isn't supported by the facts of law.

4              Also, it's an interesting situation because there

5    is actually a Korean license.  And so when there's a

6    physical license, an express license, implying a theory of

7    an ad hoc de facto license in the presence of an actual

8    express license legally makes no sense.  It's just --

9    there's no continuing tort theory, also like I had

10   mentioned, that should apply to this, as well.

11             That's all I have for that one.

12             I'll move on to the larger claim, unless Your

13   Honor has questions.

14             THE COURT:  Go ahead.

15             MS. COOKE:  The breach of contract claim against

16   Hwang.  Now, this is for the Distribution Agreement --

17   excuse me, the Royalty Agreement and the Assignment

18   Agreement.

19             We request and move for judgment as a matter of

20   law on these breach of contract claims for the following

21   reasons:

22             We understand and acknowledge that ambiguity is an

23   issue that goes to the jury, but it was established as a

24   matter of law --

25             THE COURT:  Please slow down just a little bit.

1            MS. COOKE:  Yes, Your Honor.

2            THE COURT:  It's been a long day.

3            MS. COOKE:   I apologize, Your Honor.

4            It has been established as a matter of law that

5    the term "third party" and "another entity" excludes any

6    entity that Mr. Hwang controls.

7            Substantial evidence has shown that the parties

8    intended to allow Mr. Hwang to sell himself and through his

9    own company that he controls.  This is evidenced by

10   documents, emails, and Mr. Hwang's own testimony.

11           The only evidence that Plastronics has offered

12   into the record to contradict these agreements and

13   Mr. Hwang's own understanding is the parol evidence and

14   testimony of Mr. Pfaff during trial.  This is just simply

15   insufficient to send the issue to the jury.

16           We have also established as a matter of law that

17   the term "H-Pin Project" in the Royalty Agreement excerpt --

18   activity -- excuse me, excerpt's activities in Korea.  Thus,

19   Mr. Hwang has a hundred percent of his own patent rights.

20           We've seen multiple emails, testimony, and

21   documents suggesting that Mr. Hwang and everybody agreed --

22   Pfaff, included -- that Mr. Hwang had -- entering into these

23   two agreements, would retain his rights to practice in

24   Korea.

25           All claims of breach of contract are also excluded

1   as a result of Plastronics's prior material breach.

2   Specifically, Your Honor, Plastronics breached the

3   Assignment Agreement by failing to provide Mr. Hwang with an

4   accounting.

5         Any breach of contract claim against Mr. Hwang

6   based on failure to provide an accounting was excused for

7   Plastronics's prior material breach.

8         There is also insufficient evidence of damages for

9   breach of contract.

10        Plastronics is asking for lost socket sales, but

11  H-Pin is sole breach of contract Plaintiffs.  So only H-Pin

12  has challenged -- is party to the contract, and it is a

13  breach of contract Plaintiff.

14        And evidence has established that H-Pin doesn't

15  make or sell sockets.  In fact, H-Pin sells its H-Pin 2

16  socket, and Mr. Furman admitted that H-Pin actually never

17  lost any sales of sockets.

18        Again, Your Honor, we would propose that there is

19  no evidence of a two-player market and insufficient evidence

20  to establish causation.

21        Finally, with respect to the accounting agreement,

22  there can be no evidence of the damages for the Assignment

23  Agreement.  Although Plastronics has challenged an alleged

24  breach based on Mr. Hwang's failure to provide the

25  accounting, we also remedied that during the course of

1  litigation, and Plastronics has since been provided an

2  accounting.  So there simply are no damages associated with

3  the breach of the Assignment Agreement claims against

4  Mr. Hwang.

5          Finally, Your Honor, limited -- any claim is

6  limited to sales in Korea for which Plastronics, as we had

7  just discussed, has shown no damages.

8          THE COURT:  All right.  What's Defendant -- excuse

9  me, what's Plaintiffs' position?

10         MR. BEAR:   Your Honor, where would you like me to

11 start?

12         I will start with the fact that there is a

13 credibility determination to be made here as to the

14 ambiguity.  Mr. Pfaff proffered his interpretation of the

15 agreement.  Mr. Hwang proffered his interpretation of the

16 agreement.  The jury is free to believe all, none, or part

17 of anyone's testimony.  And they're free to disbelieve

18 Mr. Hwang in his entirety and believe Mr. Pfaff in his

19 entirety.  And, therefore, this idea that there is not a

20 jury question about the interpretation of this contract when

21 the two parties who signed it and drafted it have a dispute

22 about those terms is not tenable, and, therefore, should be

23 submitted to the jury.

24         Your Honor, as to the issue of a prior material

25 breach, this touches on an issue that I believe came up over

1   cross-examination regarding the unpaid royalties that

2   Mr. Hwang admitted that he had paid himself a royalty but

3   didn't split it with Plastronics.  We absolutely do not have

4   any claim for it, Your Honor.  But it is still probative for

5   the jury.

6           If we can prove -- and I believe that there's

7   evidence in the record -- that Mr. Hwang failed to pay a

8   royalty, even if we don't have a claim for damages, it shows

9   a material breach.  And more importantly, it shows a

10  material breach in 2009, which would preclude royalties

11  being due under the interpretation of the Royalty Agreement

12  by Mr. Pfaff.

13          Therefore, there's sufficient evidence within the

14  record to find that Mr. Hwang's performance under the

15  contract is not excused because he admitted on the stand

16  under oath in this proceeding that he had breached it in

17  2009.

18          And I believe it's appropriate for the jury to

19  hear that information, Your Honor.  And even though we don't

20  have a claim for damages, it should factor in, in that

21  regards.

22          Regarding the -- the statute of limitations issue

23  that was brought up, as briefed before the Magistrate, there

24  are instances within Texas law that deal with continuing

25  breaches and contracts that are divisible.

1          Within this case, there are clearly divisible

2    parts of this contract and subsequent discrete acts that are

3    at issue, especially when dealing with the licensing issue.

4          In fact, their entire theory of the case

5    contradicts what -- their statute of limitations theory, and

6    here's why.  Under their theory, there has never been sales

7    into the United States by HiCon Co. Limited.  Instead, what

8    they have urged this Court to believe is that HiCon Co.

9    Limited stays within the -- within Korea and only practices

10   the Korean license.

11         The moment -- if we can prove that during the

12   statute of limitation's period that HiCon Co. Limited sells

13   directly within the United States, that is the same effect

14   as granting them an express license because it was directed

15   to produce the accused products and ship them into the

16   United States by Mr. Hwang.

17         And I believe that there's substantial evidence

18   within the record regarding that.

19         Moreover, Your Honor, it is clear within the

20   record that Mr. Pfaff never gave consent for Mr. Hwang to

21   license any of the patents at issue, the Korean patent, or

22   the -- the '602 patent in the United States to HiCon Co.

23   Limited.  And that has been very conclusively shown that

24   Mr. Pfaff withheld his consent.  And, in fact, is a theory

25   of the case presented by the Defendants.

1    And, therefore, it'd be inappropriate to rule as a

2    matter of law on any of the breach of contract claims.

3    There are valid contacts.  Those contracts are at issue.

4    There is a dispute about the interpretation.  And there's a

5    dispute about the facts of whether there has been a license

6    granted without authority to HiCon Co. Limited.

7    And, therefore, this issue should go to the jury,

8    Your Honor.

9    I believe -- yeah, okay.  Thank you.

10    THE COURT:  All right.  Anything further on this

11    before we move on?

12    MS. COOKE:  Your Honor, I would propose that

13    submitting something to the jury that Plaintiffs have

14    admitted they have no claim for, prior material breach or

15    damages for, would be simply improper.  Submitting something

16    to the jury that Mr. Hwang committed a prior material breach

17    is not something that Plastronics has ever claimed as a

18    defense or affirmative claim.  It's just not something that

19    should go to the jury if it's unclaimed and we're hearing

20    about it for the first time.

21    Also, Mr. Pfaff's testimony from trial is

22    contemporaneous.  Under the parol evidence rule when we're

23    interpreting these contracts, we're looking at testimony,

24    documents, emails, parties' positions at the time the

25    contracts were entered into and kind, you know, local to

1  those times.

2          The fact that Mr. Pfaff sat on the stand and

3  testified today that that was not his intent is completely

4  outside the scope of what can be considered under the parol

5  evidence rule.  What can be considered --

6          THE COURT:  So you're telling me if he testified

7  today, what his intent was then, it can't be considered?

8          MS. COOKE:  I think it's highly biased testimony

9  in the face of documents that were entered into the record

10  with both parties going back and forth, expressing their

11  clear intent at the time the contract was entered into.  I

12  think that those documents would be much more highly

13  persuasive in favor of a ruling as a judgment as a matter of

14  law than a witness's biased testimony on the day of trial.

15          Lastly, Your Honor, the Magistrate has already

16  ruled that there's no continuing tort theory applicable to

17  breach of -- of contract based on these licenses, so any

18  breach of contract based on this Korean license that

19  occurred in 2008 is barred.

20          THE COURT:  I've read the Magistrate's report and

21  recommendation on that carefully.  I do not read it as

22  Defendants read it.  While the initial breach may be beyond

23  the statute of limitations and barred, each subsequent

24  breach, there is a basis, in my view, upon which recoveries

25  within the four-year statute are still available or still

1    can be breached.

2           Failure to pay royalties can still be recovered

3    even if the initial failure to pay is outside the limitation

4    period.  And I don't believe the Magistrate's report and

5    recommendation, which the District Court has adopted, is

6    contrary to that.  Nonetheless, we'll continue on right now.

7           Okay.  I want to hear from the parties on the

8    fraud issue.  Plaintiffs have moved for judgment as a matter

9    of law on Defendants' claims of fraud.  And Defendant --

10   Defendants, rather, have moved affirmatively on their fraud

11   claim.

12          So what is -- what are the parties' arguments with

13   regard to relief under Rule 50(a) related to the issue of

14   fraud?

15          MR. BEAR:  Thank you, Your Honor.

16          I think this deals with whether there's

17   substantial evidence within the record to show that

18   Mr. Pfaff formed a fraudulent intent at the time that the

19   contracts were entered into to fraudulently not perform.

20          The key things that have been cited by Defendants

21   and urged to the contrary as evidence of this fraudulent

22   intent are subsequent actions, sometimes close to a decade

23   removed with the divisive merger and also with regards to

24   royalty payments which are disputed as to whether or not

25   they're due.

1          In fact, Mr. Pfaff has proffered a reasonable

2    interpretation of the contract.  And, therefore, there's

3    nothing within the record to -- to support the idea that at

4    the time of signing the contract, that being in 2005, that

5    Mr. Pfaff actually formed the intent to defraud Mr. Hwang.

6          You know, I'd also point out Ms. Cooke's argument.

7    I -- I do think that there are some jury issues with --

8    dealing with subsequent testimony.

9          But certainly, if that logic holds sound, Your

10   Honor, it should hold sound as to their fraudulent

11   inducement claim because the conduct that they point to is

12   so far removed from the negotiation of the contract so as to

13   vitiate the nexus between the intent formed previously and

14   the subsequent actions.

15         Additionally, I don't believe that they have

16   actually identified an express statement other than "you'll

17   be hugely rich" which for the reasons we pointed out in the

18   briefing we believe is puffery.

19         THE COURT:  All right.  What's Defendants'

20   posture?

21         MS. SIVINSKI:  First is a matter of

22   clarification, Your Honor.  I -- I don't believe we have an

23   affirmative Rule 50 motion on the fraud issue.  I believe

24   we're just defending their --

25         THE COURT:  All right.  I took it that you were

1    asking the Court to grant judgment as a matter of law that

2    the Plaintiffs had engaged in fraud with regard to

3    Mr. Hwang, but you're not doing that.

4              MS. SIVINSKI:  No, sir.

5              THE COURT:   Okay.  Then respond defensively to

6    their motion.

7              MS. SIVINSKI:   Yes, sir.

8              The case law is clear that while the question is

9    what Mr. Pfaff -- what Plastronics' intent was at the time,

10   Plastronics entered the agreements.  Evidence after the

11   negotiation or after the signing of the agreement is

12   relevant.

13             We have established a chain of events starting in

14   2006 and extending all the way to the present of Mr. Pfaff

15   telling other people he didn't want to pay, reconstructing

16   his company in a way to make it so that he didn't have to

17   pay royalties.  He told Mr. Schubring in 2008 that he didn't

18   want to pay royalties.  And he owed royalties starting in

19   2006 and didn't pay them.

20             This is sufficient evidence to bring this defense

21   to the jury.  The fact that we don't have one single

22   document from Mr. Pfaff from 2005 that says I don't intend

23   to pay royalties is not dispositive of the claim.

24             Further, the express statements made by Mr. Pfaff

25   fall into two buckets.  We've got one that relates to the

1    non-reoccurring capital costs which the express statements

2    were made very clear in the emails about what he told

3    Mr. Pfaff non-reoccurring capital costs meant.

4        And then immediately after the agreement was

5    signed, he began calculating royalties in a manner that was

6    inconsistent with his statements about what non-reoccurring

7    capital costs were.

8        The second bucket is his intent to pay royalties.

9    The express statement, in addition to his statements to

10   Mr. Hwang about you'll be rich, is the one he made in the

11   agreement when he signed an agreement that requires you to

12   pay royalties.  A party's agreement or promise to pay

13   royalties with the lack of intent to do so or intent not to

14   do so is sufficient to form the basis of a fraudulent

15   inducement claim or defense, excuse me.

16       THE COURT:  All right.  Let's move next to

17   Plaintiffs' motion for judgment as a matter of law with

18   regard to Defendants' claim for damages regarding breach of

19   contract.

20       What is Plaintiffs' motion regarding Defendants'

21   claim for breach of contract damages?

22       MR. DEVORA:  Thank you, Your Honor.

23       We move for judgment as a matter of law that

24   defense should not be able to claim damages against

25   Plastronics Socket.  They simply don't have a cause of

1  action or a theory of liability to collect damages from

2  Plastronics Socket.

3          They even admitted that in their -- in the summary

4  judgment motion briefing that they're abandoning a claim for

5  damages beyond 2014.

6          During that time, Plastronics H-Pin was a party to

7  the contract.  There simply is no claim for damages against

8  Plastronics Socket in this case.

9          Even in the briefing this morning, they even admit

10 that there is no claim for liability against Plastronics

11 Socket, in which they collect damages on.

12          Therefore, we move for judgment as a matter of law

13 that Defendants should not be able to claim damages against

14 Plastronics Socket because they don't have a cause of action

15 against Plastronics Socket, Your Honor.

16          THE COURT:  Let me hear from Defendants.

17          MS. SIVINSKI:  Give me one moment, Your Honor.

18 I'm sorry.

19          THE COURT:  Do you have something else to add,

20 Mr. Bear, for Plaintiffs?

21          MR. BEAR:  Yes, Your Honor.  And this is probably

22 my bad handwriting to Mr. Devora.

23          This argument is also directed to what we may have

24 discussed earlier in chambers.  I understand the Court's

25 position on this, but just for the record, I wanted to make

1   it.

2          We believe there's no evidentiary support for

3   their royalty calculations to include sockets.  The report

4   of their damages expert was premised on a theory of

5   liability towards Plastronics Socket Partners.  As

6   Mr. Devora just said, Plastronics Socket Partners has no

7   viable theory of liability against it.  And, therefore, just

8   for purposes of making a record, we believe that it would be

9   appropriate to grant a JMOL on the subject and limit their

10  damages to what the evidentiary record supports from their

11  damages expert, $106,000.00, Your Honor.

12          THE COURT:   Now I'll hear from Defendants.

13          MS. SIVINSKI:  Yes, Your Honor.

14          I apologize.  I wasn't in chambers this morning

15  when you discussed this issue -- issue, but my understanding

16  from my team is that Your Honor's position was that

17  Plastronics H-Pin stepped into the shoes of Plastronics

18  Socket through the divisive merger.

19          So even though there is no claim against

20  Plastronics Socket, that does not mean that Plastronics

21  H-Pin cannot be liable for damages based on socket sales.

22          Based on my understanding of the Court's

23  instructions this morning, JMOL on this claim is not

24  appropriate.

25          THE COURT:  All right.  I want to save these

1    conspiracy issues until the end.

2              Are there other related requests for relief by

3    either party under Rule 50(a) related to the general area of

4    breach of contract that have not been covered?  If there are

5    not, then we'll move on to tortious interference with the

6    business relationship.

7              MS. COOKE:  Not from us, Your Honor.

8              THE COURT:  All right.  Plaintiffs move for

9    judgment as a matter of law regarding tortious interference,

10   and Defendants have, as well.  So let me hear from both

11   sides on that issue.

12             What's Plaintiffs' request under Rule 50(a)

13   regarding the subject of --

14             MR. BEAR:  Your Honor --

15             THE COURT:  -- tortious interference?

16             MR. BEAR:  I apologize, Your Honor.

17             This is related to our previous JMOLs.  I believe

18   that given the -- some of the evidence that has come in on

19   the stand, especially an express email of acknowledgement

20   from HighRel that the Distribution Agreement at issue in

21   this case specifically was designed and intended to exclude

22   Plastronics from any type of market of H-Pins and sockets,

23   and that those sales and sockets would be replaced with

24   infringing devices and devices that were in violation of the

25   contract shows tortious action as a matter of law.

1        Additionally, I believe that PX-922, the

2   concealment of material evidence in relation to the -- to

3   the tortious interference action of which the Defendants in

4   this case participated through, along with HighRel, is

5   sufficient proof of malice, intent, and also a -- a

6   purposefulness that interfering with the business expectancy

7   of -- of Plaintiffs in this regard.

8        Additionally, there have been damages that have

9   been adduced through the testimony of Mr. Chase Perry, and,

10  therefore, it would be appropriate for the Court in its

11  discretion to grant judgment as a matter of law as to this

12  claim.

13        THE COURT:  What's Defendants' response?

14        MS. COOKE:  I'll just note quickly the scienter

15  evidence that counsel just referenced was related to HiCon

16  USA.  HiCon USA is not a Defendant in this case.  As we all

17  know, it's HiCon Limited.  No evidence has been inserted

18  into the record of any malintent on -- on behalf of HiCon

19  Limited.

20        That said, I'd like to start off generally with

21  the fact that tortious interference with prospective

22  business relationships is preempted by federal patent law.

23  This is an issue that we have briefed in our bench briefs

24  for Your Honor.

25        But there is limited case law available on this,

1    but the few cases that have addressed it, one being which

2    says if a Plaintiff bases its tort in action -- tort

3    actions, excuse me, on conduct that is protected --

4              THE COURT:  Is this the case from the Western

5    District of Pennsylvania?

6              MS. COOKE:  Yes, Your Honor.

7              THE COURT:  I'm familiar with it.

8              MS. COOKE:  Thank you, Your Honor.

9              So just simply, Your Honor, that -- we contend

10   that the tortious interference claim is based on patent

11   infringement, which is the only theory of tortious

12   interference that Plastronics has pled is preempted by

13   federal patent law.

14             THE COURT:  All right.  So in effect, Plaintiffs

15   are asking me to find as a matter of law that tortious

16   interference has occurred with regard to their affirmative

17   claim against Defendants, and Defendants are asking me to

18   find that as a matter of law, the Plaintiffs' claim is

19   preempted and should not be submitted to the jury?

20             MS. COOKE:   That's correct, Your Honor.

21             THE COURT:  Okay.

22             MS. COOKE:  In addition to that, there are other

23   theories that Plastronics appears to be arguing based on

24   other torts beyond patent infringement.  We think judgment

25   as a matter of law would be appropriate for those theories.

1          If I may briefly, Your Honor.  Plastronics has

2    alleged, first and foremost, breach of contract -- or

3    tortious interference of prospective business relations.

4          I'd like to note for the record that the evidence

5    of prospective business relationships for H-Pin, H-Pin only

6    sells its socket.  That was testimony that was elicited

7    today.

8          If H-Pin only has one customer, Plastronics has

9    not shown any loss or interference with a prospective

10   business relationship.  So a finding of tortious

11   interference on a prospective business relationship would be

12   insufficient.  There is just simply insufficient evidence on

13   it, and a judgment as a matter of law would be appropriate.

14         There is also no evidence of requisite scienter

15   for the intentional tort.  To the extent that Your Honor

16   finds that this claim is not preempted by patent law, the

17   evidence put on in the record shows only that Mr. Hwang

18   thought he was complying with patent law.

19         There's similarly no conduct that is independently

20   tortious.  As we've talked about with respect to patent

21   infringement, we believe those claims should be dismissed as

22   a matter of law.

23         And, again, on the damages issue we've previously

24   just discussed, but just for the record, Mr. Perry testified

25   only as to damages of H-Pin.  Mr. Perry never testified

1   about any damages for Socket.  And, therefore, any claims

2   brought should be dismissed as a matter of law because there

3   are no evidence of damages of H-Pin -- of Socket, excuse me.

4           Additionally, Your Honor, I have one -- one

5   moment.  That's all I have, Your Honor.

6           THE COURT:  All right.  There are motions before

7   the Court under Rule 50(a) raised by Defendants regarding

8   three different alleged types of conspiracy, conspiracy to

9   commit patent infringement, conspiracy to commit breach of

10  contract, conspiracy to commit tortious interference with a

11  business relationship.

12          And additionally, I'll add assisting and

13  encouraging tortious interference.

14          Let me hear from the parties on these.  These are

15  all motions for judgment as a matter of law under Rule 50(a)

16  raised by Defendants.  So let me hear from Defendants first

17  on these, and then I'll hear a response from Plaintiffs.

18          MS. COOKE:  Your Honor, with respect to

19  conspiracy to infringe a patent alleged against Mr. Hwang

20  and HiCon Limited, we request judgment as a matter of law,

21  given the Court's instructions in chambers.  We believe

22  there is no such thing as a conspiracy to commit patent

23  infringement, and it should be denied -- their claim should

24  be dismissed on that ground.

25          THE COURT:  All right.  What about the conspiracy

1    to commit breach of contract?

2          MS. COOKE:  Similarly, Your Honor, given the

3    instruction in chambers, we would move as a matter of law

4    that there is no such thing as a conspiracy to commit breach

5    of contract, and it should be dismissed, as well.

6          THE COURT:   And what's your position with regard

7    to conspiracy to commit tortious interference?

8          MS. COOKE:  With respect to conspiracy to commit

9    tortious interference, Your Honor, we would propose that

10   this is also preempted by federal patent law.  The

11   underlying tort -- tortious interference alleges as patent

12   law.  Tortious interference is preempted by that federal

13   patent law, and it follows that conspiracy to commit

14   tortious interference based on patent law would also be

15   preempted.

16          Notwithstanding if Your Honor finds that

17   preemption is not applicable to conspiracy to commit

18   tortious interference based on patent law, Plastronics has

19   not offered proof of an underlying tort of infringement for

20   the reasons that we've already discussed.  And there's no

21   substantial infringement -- evidence of infringement so

22   there can be no evidence of conspiracy.

23          Also, Your Honor, it's unclear who the two or more

24   persons are that Plastronics allege are the conspirators.

25   Hwang and his DBA are the same person.

1          Similarly, Hwang is in control of HiCon Limited.

2          Plastronics can't show two or more persons set out

3    to harm Plastronics because the evidence is clearly to the

4    contrary.

5          Plastronics offered no evidence of harm or

6    malintent, and there is no evidence that HiCon Limited did

7    or intended any malintent.  And simply, Mr. Hwang is the

8    party at issue here, and it would be most difficult to

9    conspire with yourself.

10          THE COURT:  What's the response from Plaintiffs?

11          MR. BEAR:   Your Honor, as to the breach or

12    conspiracy to commit patent infringement, Plaintiffs will

13    not be moving forward with it.

14          As to the conspiracy to commit breach of contract,

15    Plaintiffs will not be moving forward with it.

16          So that should reduce the issues before the Court.

17          THE COURT:  You're telling me those claims are

18    withdrawn by the Plaintiffs?

19          MR. BEAR:  Correct.

20          THE COURT:  And abandoned.

21          MR. BEAR:   And we will not be moving to instruct

22    or urging an instruction as to that with regards to the jury

23    tomorrow.

24          THE COURT:  Then I'll consider any claims by

25    Plaintiffs for conspiracy to commit patent infringement or

1  conspiracy to commit breach of contract to have been

2  abandoned by Plaintiffs per the announcement from

3  Plaintiffs' counsel, and they are no longer live issues in

4  the case.

5          MR. BEAR:  Yes, Your Honor.

6          THE COURT:  Okay.  You agree with that?

7          MR. BEAR:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. BEAR:  As to conspiracy to commit tortious

10  interference, as to the federal preemption, I think we've

11  argued that, and I just reiterate my arguments as to that.

12          As to the two or more persons, I believe the

13  testimony today within the court as to Mr. Schubring shows

14  that there is a common purpose and plan or at least that the

15  jury can find substantial evidence of that between

16  Mr. Schubring and Mr. Dong Hwang that shows a purposeful and

17  intent to frustrate the business expectancy of Plaintiffs.

18  Specifically there has been evidence within the record to

19  establish it.

20          And I understand that it has been discussed that

21  that is -- can be a high bar, but I would summarize the

22  evidence as follows, Your Honor:  You may recall that

23  Mr. Schubring, on the stand, admitted that when that

24  relationship and that agreement between them and -- that

25  started with the Distribution Agreement, Mr. Schubring was

1    intimately aware of the contracts at issue and the patent

2    issues that might arise.

3         Additionally, Mr. Hwang candidly in an email,

4    which Ms. Cooke urged should take precedence as far as

5    credibility in a previous argument regarding the parol

6    evidence shows that Mr. Hwang was aware of the patent issues

7    and said, who will care.  That's very significant as far as

8    an evidentiary piece.

9         Additionally, Your Honor, I believe that the act

10   of concealment to preclude the discovery of evidence that

11   might be used in this very lawsuit, which was PX-922, which

12   was directed by Mr. Hwang to HiCon USA personnel, including

13   Mr. Schubring, shows conscious disregard of that.

14        Additionally, we have an admission from within

15   that email of Mr. Gordon Cowan, Mr. Schubring's boss, with

16   the words, be bold, courageous, and unrelenting, which shows

17   very much an intent to be unrelenting and frustrate the

18   business of Plaintiffs.

19        It is a difficult thing to prove, but, Your Honor,

20   I believe we have the evidence in the record to instruct the

21   jury on this, and indeed, if the Court was so inclined, to

22   grant our JMOL as a matter of law as to tortious

23   interference and also to instruct the jury on a conspiracy

24   charge regarding the same.

25        THE COURT:  Let me ask you this, Mr. Bear.

1          MR. BEAR:  Yes.

2          THE COURT:  For the Court's benefit, with regard

3   to any claim of conspiracy to commit tortious interference,

4   who do you assert the conspiracy to be between?  Who are the

5   acting parties in such a conspiracy?

6          MR. BEAR:  HiCon Co. Limited, Your Honor,

7   Mr. Hwang additionally, J.T. Kwon, an officer of HiCon Co.

8   Limited, who was on that email, the 9/22 email, J.B. Hwang

9   who was also on the email and relayed his father's orders to

10  remove material from BiTS Conference in response to this

11  lawsuit, Mr. Paul Schubring, Mr. Gordon Cowan in order to

12  frustrate the business expectancy that Plastronics has

13  enjoyed for 23 years with HighRel and -- HighRel Company,

14  Your Honor.

15         THE COURT:  So you're not telling me that the

16  conspiracy theory that you have regarding tortious

17  interference is limited to a potential conspiracy between

18  Mr. Hwang and Mr. Hwang doing business as HiCon Company.

19         MR. BEAR:  I believe so, Your Honor.  Let me check

20  with Mr. Devora for a second.

21         THE COURT:  Because, quite honestly, I don't see

22  any way that an individual can conspire with themselves as a

23  sole proprietor.

24         MR. BEAR:  I think that's a fair proposition, Your

25  Honor.

1          THE COURT:  Are you asserting a conspiracy with

2    regard to commission of tortious interference between

3    Mr. Hwang and HiCon USA?

4          MR. BEAR:  Yes, Your Honor.

5          THE COURT:  Okay.  All right.  Defendants have

6    also raised an issue under Rule 50(a) with regard to

7    assisting and encouraging tortious interference.  I don't

8    believe that's been covered yet.

9          What's Defendants' request for relief under

10   Rule 50(a) in this regard?

11         MS. COOKE:  Your Honor, we're aware of the

12   conversations that occurred in chambers on the issue of

13   assisting and encouraging.  We just want to reiterate for

14   the record that assisting and encouraging is not something

15   that has currently been adopted under Texas law.

16         Even to the extent the courts have adopted it in

17   other jurisdictions, they have applied a very high scienter

18   application.  Generally, it's a highly dangerous conduct and

19   activities, like street racing, that is applicable to a

20   claim of assisting and encouraging.  And, again, this is

21   assisting and encouraging tortious interference.

22         And here we're talking about patent infringement.

23   Assisting and encouraging tortious interference based on

24   patent infringement, which is highly, highly unlikely, if

25   not impossible, to rise to the level of a highly dangerous

1   conduct that would fall within the scope of assisting and

2   encouraging to the extent Your Honor finds that it does, in

3   fact, fall within the scope of Texas law.

4           THE COURT:  What's Plaintiffs' posture on this

5   issue?

6           MR. BEAR:  Your Honor, I would reiterate our

7   arguments on this.  I do believe that there has been a high

8   showing of this.

9           In addition to the patent infringement, I believe

10  we've elicited testimony that there may have been sabotage

11  in the -- in the effort to conceal the underlying purpose,

12  which was to commit patent infringement and also other

13  wrongful acts.

14          And so I think we've met that burden.  I believe

15  that there is sufficient -- you know, Defendants have not

16  cited any law that says that this is not a viable action

17  under Texas law.  And, therefore, I think it'd be

18  appropriate to instruct the jury regarding the same.

19          THE COURT:  All right.

20          MS. COOKE:  If I may briefly, Your Honor?

21          THE COURT:  Very briefly.

22          MS. COOKE:  We would also propose that because

23  assisting and encouraging is based on tortious interference

24  for patent infringement, it would similarly be preempted by

25  federal patent law.

1           THE COURT:  I thought that's what you were going

2   to say.

3           Okay.  The Court's going to reserve the issue of

4   attorneys' fees.  If there's a finding by the jury of breach

5   of contract or another statutory basis for an award for

6   attorneys' fees, I'll take that up post-verdict.

7           The last issue I have before me, at least from my

8   list, counsel, of what's been raised under the specter of

9   relief under Rule 50(a) is the issue of exemplary --

10  exemplary damages raised by Defendants.

11          I assume that relates to the assertions of

12  tortious interference.  Let me hear briefly from Defendants

13  on this.

14          MS. COOKE:  Yes, Your Honor, that's correct.

15          We would move as a -- for a motion as a matter of

16  law -- or judgment as a matter of law that the only

17  supportive claim is tortious interference.  Plastronics

18  can't show tortious interference for the reasons we've

19  already described, and, therefore, there is no basis for

20  exemplary damages.

21          As with willful infringement, we've already

22  discussed the statutory standard is malice, which requires a

23  showing of spite or will, which is clearly not the case here

24  based on the testimony of Mr. Hwang and Mr. Schubring, who I

25  would like to note for the record that he would never do

1   anything intentionally to commit patent infringement.

2          Not a single line of evidence supports a finding

3   of intent to tortiously interfere on the basis of patent

4   infringement, and, therefore, an award of exemplary damages

5   would be improper.

6          THE COURT:  What's the response from Plaintiffs?

7          MR. BEAR:  Your Honor, I would reemphasize PX-922.

8   I would -- I understand that that was the testimony of

9   Mr. Schubring, but he was vigorously cross-examined as to

10  it.

11         You know, as far as malice, you know, the -- the

12  Defendants went out of their way to put into the record the

13  numerous times that Mr. Hwang asked and requested and

14  demanded consent from Mr. Pfaff, and Mr. Pfaff properly, as

15  is his right under the contract, did not grant such consent.

16         Therefore, I think that there is substantial

17  evidence that a jury could infer that Mr. Hwang did form an

18  intent to actually injure the business of Plastronics with a

19  common scheme with Mr. Schubring who was previously fired by

20  Plastronics.

21         The conduct of those emails with intentionality,

22  with knowledge of the patent rights, was the very first

23  thing out of Mr. Schubring's email to Mr. Hwang referring to

24  the patent issues with David, Mr. Pfaff.

25         In addition, the act of concealment of evidence in

1   this case, as shown in that email, as ordered by Mr. Hwang,

2   is all consistent with malice and intent.

3            Additionally, Your Honor, I think that there is

4   sufficient evidence of the tortious interference with a

5   23-year business expectancy and relationship.  It's

6   sufficient for the jury to hear this evidence, to get that

7   instruction, because they can find clear and convincing

8   evidence in that regard.

9            THE COURT:  All right.  Well, are there any issues

10  or requests for relief from either party under Rule 50(a)

11  that the Court has not heard from you on?

12            MR. DEVORA:  Nothing further, Your Honor.

13            THE COURT:  Anything further from the Defendants?

14            MS. COOKE:  Nothing further, Your Honor.

15            THE COURT:  Okay.  All right, counsel.  As I said

16  earlier, the Court's going to reserve the right to address

17  these issues in a considered and fulsome opinion at a later

18  date to be issued setting forth both the authorities the

19  Court believes are applicable and the analysis that leads

20  the Court to reach the conclusions that it is reaching.

21            However, given our posture, the parties need to

22  know the Court's ultimate position on these matters, and I'm

23  going to give you that in the record now.

24            With regard to the issue of direct patent

25  infringement, requests from either party under Rule 50(a)

1    are denied.

2           With regard to requests for relief under 50(a)

3    concerning personal jurisdiction of HiCon Limited, that

4    request for relief under Rule 50(a) is denied.

5           With regard to the issue of indirect patent

6    infringement, I will grant the JMOL that there can be no

7    indirect infringement by the individual acts of Mr. Hwang

8    both in his personal and individual capacity and in his

9    posture as a sole proprietorship.

10          Otherwise, I will deny the request for relief

11   under Rule 50(a) regarding the issue of indirect

12   infringement.

13          I will, however, grant relief under Rule 50(a) as

14   to the issue of contributory infringement.  I see no basis

15   for that.

16          With regard to the issue of willful patent

17   infringement, that's denied.

18          With regard to the requests for relief from both

19   parties as to the issue of patent exhaustion under Rule

20   50(a), that is denied.

21          With regard to the issue of injunctive relief

22   raised by Defendants, the Court is going to grant

23   Defendants' motion under Rule 50(a) that injunctive relief

24   does not lie in this case given the request for compensatory

25   damages which form the basis of the lengthy damages case put

1    on by Plaintiffs, as well as the damages relief requested by

2    Defendants.

3            I see no basis for a grant of injunctive relief.

4    The harms complained of by Plaintiff, they have clearly

5    sought to be compensated for with the money judgment, and,

6    therefore, I see no basis to find that the harms, if

7    established, as asserted by Plaintiffs, would support a

8    finding of irreparable harm that's necessary to grant

9    injunctive relief.

10           So the issue of injunctive relief is granted.

11           With regard to any claim under Section 285 of the

12   Patent Act, I believe the parties have made it clear that

13   they don't believe that's appropriate at the 50(a) stage and

14   did not mean to raise it, even though it's been discussed

15   with the Court.

16           To the extent it's been raised, it's not going to

17   be granted at the 50(a) stage, but it's clear in the Court's

18   mind, and I want to make it clear to the parties, that after

19   a verdict is returned, the Court will entertain an

20   appropriate motion under Section 285 for exceptional case

21   status if either party believes that's proper.

22           With regard to the Defendants' motion for relief

23   under Rule 50(a) regarding patent damages, I will grant the

24   motion as to all non-U.S. sales, but I will deny it as to

25   all domestic U.S. sales.

1          With regard to the asserted breach of contract

2     claims by the Plaintiff, the Plaintiffs' motion for judgment

3     as a matter of law establishing their claims for breach of

4     contract is denied.

5          The Defendants' motion for judgment as a matter of

6     law thwarting the claims of breach of contract asserted by

7     Plaintiff are denied.  That issue will go to the jury.

8          The Court does find that the failure to make

9     periodic payments where the first failure occurs more than

10    four years in advance of filing suit can be recovered when

11    the periodic payments that are subsequently unpaid come due

12    and should have been periodically paid within four years of

13    the time the suit was filed.

14         So as to the statute of limitations argument

15    raised by Defendants, any periodic payment that was due and

16    should have been, in the ordinary course of business, paid

17    more than four years from the date the sued was filed will

18    be barred and excluded.

19         Any periodic payment that would have been paid in

20    the ordinary course of business within four years from the

21    time the suit is filed is a live claim for damages under a

22    breach-of-contract theory and is not barred by limitations.

23         With regard to the issue of fraud, the Plaintiffs'

24    motion under Rule 50(a) to foreclose that issue is denied,

25    and the issue will be submitted to the jury.

1          With regard to the Defendants' claim regarding

2    damages from the Plaintiff for breach of contract, I will

3    grant the motion for relief under Rule 50(a) foreclosing a

4    recovery of breach-of-contract damages against Plastronics

5    Socket -- is it Partners, PSP?

6          MR. BEAR:  Yes, Your Honor.

7          THE COURT:  But I will deny that claim as to

8    Plastronics H-Pin -- or I'll deny that relief as to

9    Plastronics H-Pin.

10          It is the Court's view that the subsequent

11    corporate realignment post the entering of the contract

12    cannot serve as a shield with regard to Plastronics H-Pin,

13    and they can potentially be liable for those sales that

14    would have occurred but for -- would have occurred under the

15    contract and unrelated to the subsequent corporate

16    realignment or restructuring.

17          With regard to tortious interference, the

18    Plaintiffs' request for relief under Rule 50(a) that

19    tortious interference has been established as a matter of

20    law against the Defendants is denied.

21          And with regard to the Defendants' claim that the

22    issue of tortious interference is preempted and cannot be

23    properly brought before this jury or this Court in the

24    current posture is also denied.

25          With regard to conspiracy to commit patent

1    infringement and conspiracy to commit breach of contract,

2    the Plaintiffs have abandoned those earlier claims, and

3    they're no longer live before the Court.

4            With regard to the claim by Plaintiffs against

5    Defendants that they're liable for conspiracy to commit

6    tortious interference -- excuse me -- I believe that's the

7    Defendants' motion to foreclose any recovery by Plaintiffs

8    on their claim of conspiracy to commit tortious

9    interference, I'll grant that as to any conspiracy that

10   would have existed solely between Mr. Hwang individually and

11   Mr. Hwang DBA HiCon, the sole proprietorship.

12           Otherwise, as to potential conspiracy to commit

13   tortious interference, that would have existed between other

14   co-conspirators, the motion by Defendants to foreclose and

15   prevent any recovery for conspiracy to commit tortious

16   interference is denied, including Defendants' argument that

17   it's preempted.

18           With regard to the claim by Plaintiffs that

19   Defendants are liable for assisting and encouraging tortious

20   interference, there is some question as to whether Texas has

21   adopted that doctrine.

22           There's authority that does say, if the Court were

23   to, it would require an exceptionally high level of harmful

24   conduct to the broader public, and the Court finds that no

25   reasonable jury could conclude that that kind of conduct has

1    occurred between these parties under these facts in this

2    case, and I will grant the Defendants' motion for relief

3    under Rule 50(a) regarding Plaintiffs' assertion of

4    assisting and encouraging tortious interference.

5            With regard to Defendants' motion to foreclose any

6    possible recovery of exemplary damages with regard to

7    tortious interference, that motion is denied.

8            With regard to the Defendants' motion for relief

9    under Rule 50(a) regarding contractual attorneys' fees, I've

10   indicated that I would effectively reserve that.  I think,

11   procedurally, I have to deny the motion under Rule 50(a),

12   and procedurally, for that purpose, I'm going to deny

13   formally any request for relief under Rule 50(a) raised by

14   Defendants concerning the issue of contractual attorneys'

15   fees or attorneys' fees related to breach of contract.

16           Now, are there any other issues raised by either

17   party under Rule 50(a) that you do not believe have been

18   covered by the guidance and rulings I've given you from the

19   bench?

20           MR. BEAR:  From Plaintiffs, no, Your Honor.  We

21   thank the Court for its indulgence and this late hour.

22           THE COURT:  Defendants, are you aware of anything

23   that's been overlooked?

24           MS. SIVINSKI:  Your Honor, I would just like

25   clarification on one of your rulings.  With respect to this

1  statute of limitation, I think I understood Your Honor's

2  ruling to be relative to a claim of unpaid royalties.

3  My understanding from the dispositive motions is

4  the Plaintiffs no longer have a claim for unpaid royalties,

5  and the claim, based on the Korean patent is a claim based

6  on the breach of a license or transfer provision.  So I just

7  wanted to make sure that I was clear.

8  THE COURT:  With regard to any attempt at recovery

9  by the Plaintiffs against the Defendants for breach of

10  contract, if that theory of breach of contract anticipates

11  or is based upon a series of periodic payments, the failure

12  to make one or more of those payments outside the four-year

13  statute of limitations does not, in the Court's view, bar

14  the potential recovery of periodic payments that would have

15  been due otherwise during and within the four-year statute

16  of limitations.

17  So to that extent, the Defendants' motion under

18  Rule 50(a) is denied.

19  Is that clear?

20  MS. SIVINSKI:  Yes.  I just wanted to clarify that

21  there's no remaining claim for unpaid royalties.

22  THE COURT:  Whether we call it a claim for

23  royalties or whether we call it a claim for breach of

24  contract, if it is a contractual obligation that would have

25  been paid in the ordinary course within four years of the

1   time the suit was filed, the Court finds it's not barred by

2   the statute of limitations.

3           Understood?

4           MS. SIVINSKI:  Not really, but I appreciate

5   your -- the Court's indulgence on that.

6           THE COURT:  Well, I will do my best to see that

7   whatever resulting charge to the jury and verdict form

8   comports with these rulings under Rule 50(a).

9           MS. SIVINSKI:  Thank you, Your Honor.

10          THE COURT:  All right.  That completes motions

11  under Rule 50(a) from both Plaintiffs and Defendants.

12          It is 6:33.  Where are we, Mr. Bunt, on the

13  submission of updated and proposed -- jointly updated and

14  proposed jury instructions and verdict form?

15          MR. BUNT:  Your Honor, we are about to forward to

16  your clerks the joint proposed verdict forms, which we sent

17  out our revisions to the Defendants' proposal a few hours

18  ago, and we are also going to be attaching a revised version

19  of the mutually proposed jury instructions.

20          And I want to point out that the Defendants have

21  not had a chance to see that because we literally have just

22  finished editing it.  I believe Mr. Devora told you earlier

23  about the issue about not having a Word document and going

24  back and forth between a PDF.

25          I'm not positive that we have captured all the

1   most recent changes from the Defendants, but we have tried

2   to make sure that wherever they had anything that they

3   wanted, it's captured in their color, and ours is captured

4   in our color, and where there appears to have been an

5   agreement, we have put that in black print so it's all

6   designated for the Court to see.

7          So that -- that's where we are, and we'll be

8   emailing that very shortly.

9          THE COURT:   Well, while I have counsel for both

10  sides here before me, here's what I'm going to do in that

11  regard.

12         I'm going to order both sides to continue their

13  late efforts to meet and confer and generate an updated and

14  current jointly submitted proposal with regard to final jury

15  instructions from the Court to the jury and a verdict form

16  to be submitted to the jury until 8:00 p.m. this evening.

17         And at 8:00 p.m. this evening, no matter what, no

18  excuses, drop dead time table, that's to be forwarded --

19  whatever it is and whatever is stated, it's to be forwarded

20  to the Court in care of my law clerks at 8:00 p.m. this

21  evening.

22         MR. BUNT:   Understood, Your Honor.

23         THE COURT:   Defendants understand?

24         MS. MCCOMAS:   Yes, Your Honor.

25         THE COURT:   Okay.   Use the time between now and

1    then effectively, please.  And then we will take up the

2    informal charge conference in the morning.

3            I'll be in chambers by 7:30, against the prospect

4    that there might be disputes concerning demonstratives to be

5    used in closing argument, but at sometime tomorrow morning,

6    I'll convene an informal charge conference.

7            Counsel should be available to the Court at or

8    around 7:30, and I will give you an idea about when I

9    anticipate beginning that informal charge conference, after

10   which, as I've indicated earlier, I'll take your comments

11   and suggested changes into account, generate what I believe

12   is the proper and appropriate final jury charge and verdict

13   form, give it to you, allow you an opportunity to review it,

14   and then conduct a formal charge conference on the record.

15           I would anticipate, for the benefit of your

16   co-counsel who are not here, that if we are fortunate and

17   all work together, before noon tomorrow, I should be in a

18   position to charge the jury, let the parties present their

19   closing arguments, and then give the case to the jury, all

20   right?

21           Any questions?

22           MS. MCCOMAS:  No, Your Honor.

23           MR. BUNT:  No, Your -- oh, one more question, Your

24   Honor.  You said before noon.  Do you anticipate charging

25   the jury before noon and then them taking a lunch break and

1    then arguing?

2           THE COURT:  Well, it depends on what we get done

3    in the morning.

4           MR. BUNT:  Okay.

5           THE COURT:  We all need to work as hard as we can.

6           MR. BUNT:  Yes, Your Honor.

7           THE COURT:  Okay.  With those rulings and

8    instructions, the Court stands in recess until tomorrow

9    morning.

10           COURT SECURITY OFFICER:  All rise.

11           *************************

12

13

14                        CERTIFICATION

15

16                I HEREBY CERTIFY that the foregoing is a

17    true and correct transcript from the stenographic notes of

18    the proceedings in the above-entitled matter to the best of

19    my ability.

20

21

22    /s/Shelly Holmes                      7/10/19
      SHELLY HOLMES, CSR, TCRR                Date
23    OFFICIAL COURT REPORTER
      State of Texas No.: 7804
24    Expiration Date: 12/31/20

25