1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF TEXAS
2                MARSHALL DIVISION

3    PLASTRONICS SOCKET            )(
     PARTNERS, LTD., AND           )(
4    PLASTRONICS H-PIN, LTD.,      )(      CIVIL ACTION NO.
         PLAINTIFFS,               )(
5                                  )(      2:18-CV-14-JRG-RSP
                                   )(
6    VS.                           )(      MARSHALL, TEXAS
                                   )(
7                                  )(
     DONG WEON HWANG,              )(      JULY 11, 2019
8    HICON CO. LTD.,               )(
         DEFENDANTS.               )(      2:00 P.M.
9

10                 TRANSCRIPT OF JURY TRIAL

11        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12            UNITED STATES CHIEF DISTRICT JUDGE

13

14

15   FOR THE PLAINTIFFS:     Ms. Katarzyna Brozynski
                             Mr. Antonio Devora
16                           Mr. Bart Dalton
                             Spencer Fane, LLP
17                           5700 Granite Parkway
                             Suite 650
18                           Plano, Texas  75024

19

20   COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
21                           United States District Court
                             Eastern District of Texas
22                           Marshall Division
                             100 E. Houston Street
23                           Marshall, Texas 75670
                             (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)

```
 1
     FOR THE PLAINTIFFS:        Mr. Brian Bear
 2                              Spencer Fane, LLP
                                1000 Walnut Street
 3                              Suite 1400
                                Kansas City, Missouri  64106
 4
                                Mr. Robert Christopher Bunt
 5                              Parker, Bunt & Ainsworth, PC
                                100 East Ferguson
 6                              Suite 418
                                Tyler, Texas  75702
 7

 8   FOR THE DEFENDANTS:        Ms. Elizabeth DeRieux
                                Capshaw DeRieux, LLP
 9                              114 East Commerce Avenue
                                Gladewater, Texas  75647
10
                                Mr. Russ Emerson
11                              Mr. Charlie Jones
                                Ms. Stephanie Sivinski
12                              Ms. Debbie McComas
                                Ms. Tiffany Cooke
13                              Haynes & Boone, LLP
                                2323 Victory Avenue
14                              Suite 700
                                Dallas, Texas  75219
15
                                Mr. Samuel Lee
16                              Mr. Jay Hoon Byun
                                Yulchon LLC
17                              Parnas Tower, 38F, 521 Teheran-ro
                                Gangnam-gu, Seoul 06164, Korea
18

19

20

21

22

23

24

25
```

```
 1                           P R O C E E D I N G S

 2                (Jury out.)

 3                COURT SECURITY OFFICER:  All rise.

 4                THE COURT:  Be seated, please.

 5                All right.  Are the parties prepared to read into

 6      the record those items from the list of pre-admitted

 7      exhibits used during yesterday's portion of the trial?

 8                MR. BUNT:  Yes, Your Honor, we are.

 9                THE COURT:   Please proceed, Mr. Bunt, for the

10      Plaintiffs.

11                MR. BUNT:  Plaintiffs had the following exhibits

12      come in yesterday:  PX-251, PX-253, PX-902, PX-906, and

13      PX-922.

14                THE COURT:  Any objection from Defendants?

15                MS. COOKE:  No, Your Honor.

16                THE COURT:  Do Defendants have a similar rendition

17      to offer?

18                MS. COOKE:  We do, Your Honor.

19                THE COURT:  Please proceed.

20                MS. COOKE:  DX-14, DX-42, DX-58, DX-65, DX-82,

21      DX-25 -- excuse me, 225, DX-350, DX-353, DX-403, DX-426,

22      DX-441, and DX-443.

23                THE COURT:  Any objection from Plaintiffs?

24                MR. BUNT:  No objection, Your Honor.

25                THE COURT:  All right.  We'll next proceed to
```

1  conduct -- or the Court will proceed to conduct a formal

2  charge conference on the record.

3           I have considered the submissions, both the

4  original and amended submissions from the parties with

5  regard to the final jury instructions and the verdict form.

6  I have met with the parties in chambers through counsel to

7  review those submissions, as well as additions thereto that

8  the Court has added to the process.  I've taken into account

9  the input offered by the parties informally in chambers.

10          I've generated and delivered to the parties what

11 the Court believes to be an appropriate and accurate final

12 jury instruction and verdict form.  The parties have had an

13 opportunity to review the same.

14          And at this time, we'll proceed to conduct a

15 formal charge conference where the parties, through counsel,

16 may offer such objections to the verdict form and the final

17 jury instructions as they believe the best interest of their

18 clients dictate.

19          I'd like to ask whoever is going to speak for both

20 Plaintiffs and Defendants to go to the podium together.

21 We'll begin with the final jury instructions.  I'll go

22 through the document on a page-by-page basis.

23          At any point in that process where either side

24 believes that something has been included that is improper

25 or something has been omitted that is proper and they

1  believe an objection is appropriate and necessary, then they

2  can lodge those objections as we get to that page within the

3  document.

4         By going through each document on a page-by-page

5  basis, it's the Court's intent to ensure that every possible

6  issue is covered and both sides are afforded a full and

7  complete opportunity to make a record with regard to the

8  charge and the verdict form.

9         All right.  Who's going to represent Plaintiffs in

10  this process?

11         MR. DEVORA:   Your Honor, Tony Devora.

12         THE COURT:   Go to the podium.

13         Who's going to represent Defendants?

14         MS. MCCOMAS:   Debra McComas.

15         THE COURT:   All right.  As I said, we'll begin

16  with the final jury instructions.  I'll turn to Page 1 of

17  that document.  Is there objection to anything on Page 1

18  from either Plaintiffs or Defendants?

19         MS. MCCOMAS:  Nothing from Defendants, Your Honor.

20         MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

21         THE COURT:  Turning then to Page 2 of the final

22  jury instructions, is there objection from either party?

23         MS. MCCOMAS:  Nothing from Defendants, Your Honor.

24         MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

25         THE COURT:  Turning to Page 3, are there

1    objections?

2            MS. MCCOMAS:  None from Defendants, Your Honor.

3            MR. DEVORA:  None from Plaintiffs, Your Honor.

4            THE COURT:  Turning to Page 4, are there

5    objections?

6            MS. MCCOMAS:  None from Defendants, Your Honor.

7            MR. DEVORA:  None from Plaintiffs, Your Honor.

8            THE COURT:   Turning to Page 5, are there

9    objections?

10           MS. MCCOMAS:  None from Defendants, Your Honor.

11           MR. DEVORA:  None from Plaintiffs, Your Honor.

12           THE COURT:  Turning to Page 6, are there

13   objections?

14           MS. MCCOMAS:  None from Defendants, Your Honor.

15           MR. DEVORA:  None from Plaintiffs, Your Honor.

16           THE COURT:  Turning next to Page 7, are there

17   objections?

18           MS. MCCOMAS:  None from Defendants.

19           MR. DEVORA:   Your Honor, Plaintiffs object to

20   Page 7 for lack of inclusion of an instruction on inducement

21   by the DBA.

22           THE COURT:  All right.  That objection is

23   overruled.

24           Is there anything else objectionable on or omitted

25   from Page 7 from either party?

1    MR. DEVORA:  None at this time from Plaintiffs,

2  Your Honor.

3    MS. MCCOMAS:  None from Defendants, Your Honor.

4    THE COURT:  All right.  Then turning to Page 8, is

5  there objection from either party?

6    MS. MCCOMAS:  Your Honor, Defendants object to

7  the exclusion of a mere marketing instruction.  The specific

8  instruction Defendants have proposed is found at the joint

9  pre-trial order, Exhibit E, Docket 276-7.  It's at Page 19.

10    THE COURT:  All right.  That objection is

11  overruled.

12    Is there anything else from either party on Page

13  8?

14    MR. DEVORA:  None from Plaintiffs, Your Honor.

15    THE COURT:  Anything further from Defendants?

16    MS. MCCOMAS:  No, Your Honor.

17    THE COURT:  In that case, let's turn to Page 9 of

18  the final jury instructions, is there an objection here from

19  either party?

20    MS. MCCOMAS:  None from the Defendants, Your

21  Honor.

22    MR. DEVORA:  Your Honor, Plaintiffs object to

23  Page 9 for also lack of inclusion of an instruction on

24  inducement by the DBA.

25    THE COURT:  That objection, likewise, is

1   overruled.

2           Anything further on Page 9 from either party?

3           MS. MCCOMAS:  Not from Defendants, Your Honor.

4           MR. DEVORA:  Nothing further from Plaintiffs, Your

5   Honor.

6           THE COURT:  All right.  Then turn to Page 10, and

7   I'll ask if there's objection from either party to anything

8   either included in Page 10 or omitted from Page 10?

9           MS. MCCOMAS:  Nothing from Defendants.

10          MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

11          THE COURT:   Next is Page 11.  Is there any

12   objection to anything on or omitted from Page 11?

13          MS. MCCOMAS:  No objection from Defendants.

14          MR. DEVORA:  None from Plaintiffs, Your Honor.

15          THE COURT:  Turning then to Page 12, is there

16   objection?

17          MS. MCCOMAS:  No objections from Defendants.

18          MR. DEVORA:  No objections from Plaintiffs, Your

19   Honor.

20          THE COURT:  Turning to Page 13, is there

21   objection?

22          MS. MCCOMAS:  Defendant -- excuse me.  Defendants

23   object to the last clause of the first paragraph reflecting

24   Plastronics's positions on damages, and expressly to the

25   reference to a reasonable royalty because Plaintiffs have

1  not put on a case for royalties.

2  THE COURT:  All right.  That objection is

3  overruled.

4  Anything further on Page 13 from Defendants?

5  MS. MCCOMAS:  Nothing, Your Honor.

6  THE COURT:  Anything on Page 13 from Plaintiffs?

7  MR. DEVORA:  None, Your Honor.

8  THE COURT:  Then we'll turn to Page 14 of the

9  final jury instructions.  Is there objection here from

10  either party?

11  MS. MCCOMAS:  Nothing here, Your Honor.

12  MR. DEVORA:  Nothing on Page 14 from Plaintiffs,

13  Your Honor.

14  MS. MCCOMAS:  Let me try that one again.  Nothing

15  from Defendants, Your Honor.

16  THE COURT:  It made it in the transcript the first

17  time.

18  MS. MCCOMAS:  Thank you.

19  THE COURT:  All right.  We're now at Page 15 of

20  the final jury instructions.  Is there any objection here

21  from either party?

22  MS. MCCOMAS:  No objections from Defendants.

23  MR. DEVORA:  No objections from Plaintiffs, Your

24  Honor.

25  THE COURT:  Next is Page 16.  Is there objection?

1          MS. MCCOMAS:   No objection from Defendants.

2          MR. DEVORA:   No objections from Plaintiffs, Your

3     Honor.

4          THE COURT:  Next is Page 17.  Is there objection

5     from either party?

6          MS. MCCOMAS:  Defendants object to the

7     characterization of Plaintiffs' claims as including failing

8     to provide an accounting based on the Judge's construction

9     of the accounting provisions of the Assignment Agreement.

10    There's no claim left for an accounting against Mr. Hwang as

11    a matter of law.  The provision applies only where royalties

12    are due and this Court has already held that Plaintiffs have

13    failed to make that showing.  That's in Docket 287 at 15

14    through 16.

15         THE COURT:  That objection is overruled.

16         Is there anything further from Defendants on

17    Page -- on this page?

18         MS. MCCOMAS:  Nothing further from Defendants.

19         THE COURT:  Anything on this page from Plaintiffs?

20         MR. DEVORA:  No objection from Plaintiffs, Your

21    Honor.

22         THE COURT:  All right.  Then that will bring us to

23    Page 18.  Is there objection here from either party?

24         MS. MCCOMAS:  None from Defendants.

25         MR. DEVORA:  No objection from Plaintiffs, Your

1  Honor.

2          THE COURT:  Next is Page 19 of the final jury

3  instructions.  Is there objection here from either party?

4          MS. MCCOMAS:  No objection from Defendants.

5          MR. DEVORA:  Your Honor, Plaintiffs object to the

6  last sentence of the paragraph starting with Paragraph 3.

7  We believe that this -- the last sentence starting with

8  "royalties and gross sales" is improper characterization of

9  the contract.

10          THE COURT:  All right.  That objection is

11  overruled.

12          Anything further on Page 19?

13          MR. DEVORA:  Nothing further from Plaintiffs, Your

14  Honor.

15          THE COURT:  Anything here from Defendants?

16          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

17          THE COURT:  Then we'll turn to Page 20 of this

18  final jury instruction.  Is there objection here from either

19  party?

20          MS. MCCOMAS:   Nothing from Defendants, Your

21  Honor.

22          MR. DEVORA:  Your Honor, Plaintiffs object to

23  Page 20 as it should include an instruction as to a material

24  breach and what a material breach is of the Assignment

25  Agreement.

1          THE COURT:  That objection is overruled.

2          Anything further from Plaintiffs on Page 20?

3          MR. DEVORA:  Nothing further on Page 20, Your

4     Honor.

5          THE COURT:  Turning then to Page 21.  Is there

6     objection from either party?

7          MS. MCCOMAS:  Your Honor, Defendants object to

8     the paragraph that holds over between Page 21 and 22, and

9     specifically that there's no evidence of lost royalties.

10          In this Court's prior summary judgment rule --

11     ruling -- excuse me -- there's no evidence of lost royalties

12     in this Court's prior summary judgment ruling at Docket 287

13     at 16 through 17 -- would prohibit a lost royalty claim,

14     therefore, the jury should be instructed that any breach

15     prior to January 19, 2014, is barred as a matter of law.

16          THE COURT:  That objection is overruled.

17          Anything further on Page 21 from either party?

18          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

19          MR. DEVORA:  No objections to Page 21, Your Honor.

20          THE COURT:  All right.  That will bring us to Page

21     22.  Is there any objection here from either party?

22          MS. MCCOMAS:  Your Honor, Defendants object to

23     the reference -- the broad reference of the claim for

24     tortious interference and conspiracy, including any business

25     relationship with electrical suppliers and/or manufacturers.

1  The pleadings should limit the Plaintiffs to HiCon USA and

2  HighRel as the only potential actors.

3          THE COURT:  All right.  That objection is

4  overruled.

5          Anything further from either party on Page 22?

6          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

7          MR. DEVORA:  No objections to Page 22 by

8  Plaintiffs, Your Honor.

9          THE COURT:  Turning then to Page 23, is there

10 objection from either party?

11         MS. MCCOMAS:  Nothing from Defendants, Your Honor.

12         MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

13         THE COURT:  Turning to Page 24, is there objection

14 from either party?

15         MS. MCCOMAS:  Nothing from Defendants, Your Honor.

16         MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

17         THE COURT:  Turning then to Page 25, is there

18 objection from either party?

19         MS. MCCOMAS:   No objection from Defendants, Your

20 Honor.

21         MR. DEVORA:   No, objections from Plaintiffs, Your

22 Honor.

23         THE COURT:  Then turning to Page 26, which is the

24 last page of the final jury instructions, is there objection

25 from either party?

1          MS. MCCOMAS:  None from Defendants.

2          MR. DEVORA:  None from Plaintiffs, Your Honor.

3          THE COURT:  All right.  We'll next take up as a

4     part of this formal charge conference the verdict form.

5          Turning to that document, the first page has the

6     style and heading of the case.  Is there any objection to

7     anything on the first page of the verdict form?

8          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

9          MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

10          THE COURT:  Second page of the verdict form has

11     various terms and their definitions or what they refer to.

12     Is there objection here from either party?

13          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

14          MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

15          THE COURT:  Turning to the next page wherein

16     Question 1 is located, is there objection to Question 1 or

17     anything on this page from either party?

18          MS. MCCOMAS:  Nothing from Defendants, Your Honor.

19          MR. DEVORA:   Your Honor, Plaintiffs object to

20     Question 1 because it doesn't include a question as to

21     induced infringement by the DBA.

22          THE COURT:  All right.  That objection is

23     overruled.

24          Turning then to the second question on the next

25     page, anything of an objectionable nature from either party

1 here?

2      MS. MCCOMAS:  No objections from Defendants, Your

3 Honor.

4      MR. DEVORA:  No objections from Plaintiffs, Your

5 Honor.

6      THE COURT:  Turning to the next page wherein

7 Question 3 is found, is there objection from either party?

8      MS. MCCOMAS:  Nothing from Defendants, Your Honor.

9      MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

10      THE COURT:  Turning to the next page where

11 Question 4 is found, is there any objection from either

12 party?

13      MS. MCCOMAS:  Nothing from Defendants, Your Honor.

14      MR. DEVORA:  Your Honor, Plaintiffs object to

15 Question 4 as it should read that there's a material breach

16 of the Assignment Agreement.

17      THE COURT:  All right.  That objection is

18 overruled.

19      Turning next to the next page where Question 5 is

20 found, is there objection here from either party?

21      MS. MCCOMAS:  No objection, Your Honor.

22      MR. DEVORA:  Your Honor, Plaintiffs object to

23 Question 5, again, as it should include a material breach of

24 the Assignment Agreement.

25      THE COURT:  All right.  That objection is

1  overruled.

2          Turning to the next page where Question 6 is

3  located, is there objection here from either party?

4          MS. MCCOMAS:  No objection from Defendants, Your

5  Honor.

6          MR. DEVORA:  No objection from Plaintiffs, Your

7  Honor.

8          THE COURT:  Turning to the next page wherein

9  Question 7 is found, is there objection from either party?

10          MS. MCCOMAS:  No objection from Defendants, Your

11  Honor.

12          MR. DEVORA:  No objections from Plaintiffs, Your

13  Honor.

14          THE COURT:  Turning to the next page of the

15  verdict form wherein Question 8 is located, is there

16  objection from either party?

17          MS. MCCOMAS:  Defendants object to the lack of

18  substantial evidence to even submit this question to the

19  jury, Your Honor.

20          THE COURT:  That objection is overruled.

21          Is there objection to Question 8 or anything on

22  this page from Plaintiffs?

23          MR. DEVORA:  No objection to Question 8, Your

24  Honor.

25          THE COURT:  Turning to the next page of the

1  verdict form wherein Question 9 is located, is there

2  objection from either party?

3          MS. MCCOMAS:  No objection to that question, Your

4  Honor, but we do object to the exclusion of a prior material

5  breach question, the exclusion of the ambiguity questions

6  for the jury to decide, and the omission of a limitations

7  question on the breach of contract.

8          THE COURT:  All right.  Those objections are both

9  noted and overruled.

10          Is there any other objection to Question 9 or

11  anything on that page?

12          MS. MCCOMAS:  Nothing from Defendants.

13          MR. DEVORA:  No objection to Question 9 by

14  Plaintiffs, Your Honor.

15          THE COURT:  Turning to the next page of the

16  verdict form wherein Question 10 is located, is there

17  objection here from either party?

18          MS. MCCOMAS:  None -- none from Defendants, Your

19  Honor.

20          MR. DEVORA:  No objection to Question 10 by

21  Plaintiffs, Your Honor.

22          THE COURT:  Turning to the next page of the

23  verdict form wherein Question 11 is located, is there

24  objection from either party?

25          MS. MCCOMAS:  The Defendants object to the

1    submission of Question No. 11 because there's no substantial

2    evidence to support its submission.

3              THE COURT:  That objection is overruled.

4              Is there any objection to Question 11 from

5    Plaintiffs?

6              MR. DEVORA:   Your Honor, Plaintiffs object to

7    Question 11 for mere consistent reasons, that it should be

8    material breach of the Assignment Agreement.

9              MS. MCCOMAS:   Oh, Your Honor, I'm so sorry.  I

10   misread which one we're on.  We don't object -- no, this is

11   Plastronics submitting against us, right?

12             THE COURT:  Did Plastronics prove that Mr. Hwang

13   breached?

14             MS. MCCOMAS:  I'm sorry, Your Honor.

15             We -- we renew our objection.

16             THE COURT:  Let's just make sure we're completely

17   clear, counsel.

18             Is there objection from either party to Question

19   11 or anything on the page where Question 11 is located

20   within the verdict form?

21             MS. MCCOMAS:  Thank you, Your Honor.

22             Defendants object for the lack of substantial

23   evidence to support submission of Question 11 to the jury.

24             THE COURT:  That's overruled.

25             Do Plaintiffs have an objection to Question 11?

1          MR. DEVORA:   Your Honor, Plaintiffs object to

2   Question 11 as we -- to provide consistency in that it

3   should be a material breach of the Assignment Agreement.

4          THE COURT:  All right.  Consistent with my prior

5   rulings, that is also overruled.

6          Turning next to the following page of the verdict

7   form wherein Question 12 is situated, is there objection

8   from either party?

9          MS. MCCOMAS:   Nothing from Defendants, Your

10  Honor.

11         THE COURT:  Anything from Defendants -- excuse me,

12  Plaintiffs?  Question 12, Mr. Devora?

13         MR. DEVORA:  No objection, Your Honor.

14         THE COURT:  Turning next to Question 13 on the

15  following page of the verdict form, is there objection here

16  from either party?

17         MS. MCCOMAS:  Nothing from Defendants, Your Honor.

18         MR. DEVORA:  Nothing from Plaintiffs, Your Honor.

19         THE COURT:  Turning next to Page -- excuse me,

20  turning next to Question 14 on the following page of the

21  verdict form, is there objection here from either party?

22         MS. MCCOMAS:   Defendants object to the lack of

23  substantial evidence to support submitting a damage question

24  to the jury.

25         THE COURT:  That's overruled.

1          Is there objection from Plaintiffs to anything

2  regarding Question 14?

3          MR. DEVORA:  Your Honor, Plaintiffs object to

4  Question 14 for lack of -- for the sake of consistency.  It

5  should read:  Material breach of the Assignment Agreement.

6          THE COURT:  That's overruled.

7          Turning to the next question wherein Question 15

8  is found, is there objection here from either party?

9          MS. MCCOMAS:  Defendants object to the lack of

10  substantial evidence to support a tortious interference

11  claim going to the jury.

12          THE COURT:  That objection is overruled.

13          Is there objection here from Plaintiffs?

14          MR. DEVORA:  No objection to Question 15 by

15  Plaintiffs, Your Honor.

16          THE COURT:  Turning to the following page wherein

17  Question 16 of the verdict form is found, is there objection

18  here from either Plaintiffs or Defendants?

19          MS. MCCOMAS:  Defendants object to the submission

20  of Question 16 because there's not substantial evidence to

21  support submitting a conspiracy claim against Mr. Hwang.

22          THE COURT:  That objection is overruled.

23          Is there objection here from Plaintiffs?

24          MR. DEVORA:  No objection to Question 16 by

25  Plaintiffs, Your Honor.

1       THE COURT:  Turning to the succeeding page of the

2  verdict form, wherein Question 17 is located, is there

3  objection here from either party?

4       MS. MCCOMAS:  Defendants object to the submission

5  of Question 17 because there's not substantial evidence to

6  support any proximate cause of damages to Plastronics

7  Socket.

8       THE COURT:  That objection is overruled.

9       Is there objection to Question 17 from Plaintiffs?

10       MR. DEVORA:  No objection to Question 17 by

11  Plaintiffs, Your Honor.

12       THE COURT:  Then I'll turn to the following page

13  wherein Question 18 is situated.  Is there objection here

14  from either Plaintiffs or Defendants?

15       MS. MCCOMAS:  Defendants object to Question 18 as

16  there's not substantial evidence to support actual malice.

17       THE COURT:  That objection is overruled.

18       Is there any objection here from Plaintiffs?

19       MR. DEVORA:  No objection to Question 18 by

20  Plaintiffs, Your Honor.

21       THE COURT:  Turning then to Page -- the following

22  page where Question 19 of the verdict form is found, is

23  there objection here from either party?

24       MS. MCCOMAS:   No objections, Your Honor.

25       THE COURT:  Anything from Plaintiffs?

1          MR. DEVORA:  No objection to Question 19, Your

2     Honor.

3          THE COURT:  Then we'll next turn to the following

4     page wherein Question 20 of the verdict form is located.  Is

5     there objection here from either party?

6          MS. MCCOMAS:   Your Honor, Defendants object

7     because there's no evidence to support a malice question.

8          THE COURT:  Any objections here from Plaintiffs?

9          MR. DEVORA:  No objections, Your Honor.

10          THE COURT:  Defendants' objection to Question 20

11     is overruled.

12          Turning to the next page wherein Question 21 is

13     located, is there objection here from either party?

14          MS. MCCOMAS:  Defendants object to Question No. 21

15     for lack of substantial evidence to support a damage

16     question going to Mr. Hwang for exemplary damages.

17          THE COURT:  That objection is overruled.

18          Is there any objection here from Plaintiffs?

19          MR. DEVORA:  No objection from Plaintiffs, Your

20     Honor.

21          THE COURT:  Turning to the next page which is the

22     final page of the verdict form, is there any objection here

23     from either party?

24          MS. MCCOMAS:  No objection from Defendants, Your

25     Honor.

1     MR. DEVORA:  No objection from Plaintiffs, Your

2  Honor.

3     THE COURT:  All right.  That completes the formal

4  charge conference.

5     The Court needs a short additional period of time

6  in which to make duplicate copies of these documents.

7     As you may be aware, it's the Court's practice to

8  deliver to the jury when it retires to deliberate eight

9  copies of the final jury instructions in written form so

10  each juror will have their own hard copy to take with them

11  and refer to during their deliberations.  And I'll also send

12  back to the jury at that time one clean verdict form for

13  their consideration.

14     I'll need a few moments to put these documents

15  together, but as soon as that's done, I intend to return to

16  the bench at which time we will bring in the jury, I'll

17  proceed to give my final instructions to the jury, and we'll

18  proceed with closing arguments from counsel.

19     I'd like to remind all of those present,

20  particularly our guests in the gallery, that in the Court's

21  view, its' final instructions to the jury and counsels'

22  closing arguments are the most serious part of a very

23  serious process.

24     I do not want shuffling of papers.  I do not want

25  whispering.  I do not want noises.  I do not want people

1   coming and going.  I do not want any conduct that would

2   detract from, interrupt, or lessen the attention of the jury

3   on both the Court and counsel when they give their closing

4   arguments.  If there's anything any of you need to do, do it

5   now so that when I come back in and we bring in the jury, I

6   can have complete, unbroken attention of the jury on the

7   process.

8           Is there anything from either Plaintiff or

9   Defendant that needs to be raised with the Court before I

10  recess at this time?

11          MR. EMERSON:  I'd like to use the easel during my

12  closing, sir.

13          THE COURT:  All right.  We'll talk about that in a

14  minute.

15          Does Plaintiff have anything?

16          MR. DALTON:  Nothing from Plaintiffs, Your Honor.

17          THE COURT:  Tell me what your intention during

18  closing with the easel is, Mr. Emerson.

19          MR. EMERSON:  Put up some figures like I did in

20  opening.

21          THE COURT:  I'm not talking about what you're

22  going to put on the easel.  I'm talking about where you're

23  going to put it -- where you're going to stand, how you're

24  going to implement it.

25          MR. EMERSON:  Same as I did before.  I'd like to

1  have it right here so I can write right-handed.

2          THE COURT:  All right.  I'll permit that, with

3  the following caveats:  When you're standing there in front

4  of the podium, you're going to have to be loud enough so

5  that everybody hears you.  We had a little bit of a problem

6  with that earlier.  So let me remind you to be vocal and

7  loud so that everyone in the jury and in the courtroom can

8  understand what you say.

9          Also, opposing counsel, if necessary, has the

10  option during that time to move to the end of the jury box

11  where they can stand and see what's on the easel so that

12  they have a clear view on what opposing counsel does on the

13  easel.

14          Further, when you've completed your use of the

15  easel and the argument that you're presenting -- in your

16  case, the Defendants will give one closing argument, you are

17  to be sure that you take the easel, return it to the

18  position that it's in now, and turn any pages that you've

19  written on over the top of the easel so that they aren't

20  shown and there's a clear sheet remaining on the front of

21  the easel.  Don't rip them off and crumple them up and do

22  anything like that.  Just gently lift them over the top of

23  the easel and fold them back so they're not visible.

24          MR. EMERSON:  I understand.

25          THE COURT:  Any other questions?

1          MR. DALTON:  No questions from Plaintiffs, Your

2     Honor.

3          THE COURT:  All right.  Then the Court stands in

4     recess.

5          COURT SECURITY OFFICER:  All rise.

6          (Recess.)

7          COURT SECURITY OFFICER:  All rise.

8          (Jury out.)

9          THE COURT:  Be seated, please.

10          Ms. Denton, would you please bring in the jury?

11          COURT SECURITY OFFICER:  All rise.

12          (Jury in.)

13          THE COURT:  Please be seated.

14          I told you yesterday afternoon, ladies and

15     gentlemen, this was not an exact science.  I could have been

16     a little closer on my best guess.  I'm sorry you had to wait

17     several hours, but I appreciate your patience in being here.

18          Ladies and gentlemen of the jury, you've now heard

19     the evidence in this case, and I'll now instruct you on the

20     law that you must apply.

21          Each of you are going to have your own hard copy,

22     printed copy of these final jury instructions that I'm about

23     to give you orally, therefore, there's really no need to

24     take notes because you'll have your own hard copies, unless

25     you just particularly want to take notes.

1    It's your duty to follow the law as I give it to

2 you.  On the other hand, ladies and gentlemen, and as I've

3 previously said, you, the jury, are the sole judges of the

4 facts in this case.

5    Do not consider any statement that I have made

6 over the course of the trial or that I make during these

7 instructions as an indication to you that I have any opinion

8 about the facts in this case.

9    You're about to hear closing arguments from the

10 attorneys for the parties.  Statements and arguments of the

11 attorneys, let me remind you, are not evidence.  They are

12 not instructions on the law either.  They're intended only

13 to assist the jury in understanding the evidence and the

14 parties' contentions.

15    A verdict form has been prepared for you.  You'll

16 take this verdict form with you when you retire to the jury

17 room.  And when you have reached a unanimous decision as to

18 the verdict, you will have your foreperson fill in the

19 blanks in the verdict form reflecting your unanimous

20 decisions, date the form, and sign it.  Then advise the

21 Court Security Officer that you have reached a verdict.

22    Answer each question in the verdict form from the

23 facts as you find them to be.  Do not decide who you think

24 should win the case and then answer the questions to reach

25 that result.  Again, let me remind you, your answers and

1    your verdict in this case must be unanimous.

2         In determining whether any fact has been proven in
3    this case, you may, unless otherwise instructed, consider
4    the testimony of all the witnesses regardless of who may
5    have called them.  And you may consider the effect of all
6    the exhibits received and admitted into evidence, regardless
7    of who may have produced or presented those exhibits.

8         You, the jurors, are the sole judges of the
9    credibility and believability of each and every witness and
10   the weight and effect, if any, to be given to the evidence
11   that's been presented in this case.

12        Also, as I've told you previously, the attorneys
13   in this case are acting as advocates for their competing
14   parties and their competing claims, and they have a duty to
15   raise objections when they believe evidence is offered that
16   should not be admitted under the rules of the Court.

17        When the Court sustained an objection to a
18   question addressed to a witness, you are required to
19   disregard the question entirely, and you may not draw any
20   references from its wording or speculate about what the
21   witness would have said if the Court had allowed them to
22   answer the question.

23        On the other hand, if an objection to a question
24   addressed to a witness was overruled, then you're to treat
25   the answer and the question just as if no objection had been

1  made -- that is, like any other question and answer.

2         Now, at certain times during the course of the

3  trial, it was necessary for the Court to talk to the lawyers

4  either here at the bench outside of your hearing or when you

5  were in the jury room and outside of the courtroom.  This

6  happens during the course of a trial because there are

7  things that occur and that arise that don't always involve

8  the jury.

9         You should not speculate, ladies and gentlemen,

10  about what was said during those discussions that took place

11  outside of your presence.

12         Now, there are two types of evidence that you may

13  consider in properly finding the truth as to the facts in

14  this case.

15         One is direct evidence, such as the testimony of

16  an eyewitness.

17         The other is indirect or circumstantial evidence,

18  which is the proof of a chain of circumstances that

19  indicates the existence or non-existence of certain other

20  facts.

21         As a general rule, you should know that the law

22  makes no distinction between direct evidence and indirect

23  evidence, but simply requires that you, as the jury, find

24  the facts based on the evidence presented during the trial,

25  both direct and circumstantial.

1    Now, the parties have agreed or stipulated to some

2    facts in this case, and when lawyers for both sides

3    stipulate as to the existence of a fact, you must, unless

4    otherwise instructed, accept the stipulation as evidence and

5    regard that fact as proven.

6    Also, certain testimony in this case has been

7    presented to you through what are called depositions.  A

8    deposition is the sworn recorded answers to questions asked

9    to a witness in advance of the trial.

10    If a witness cannot be present in person to

11    testify, the witness's testimony may be presented under oath

12    in the form of a deposition.

13    As I told you earlier, before the trial commences,

14    the attorneys for both sides question and depose these

15    witnesses under oath.  At that time, when the deposition is

16    taken, a court reporter is present, and the witness is sworn

17    and placed under oath.  They are asked questions, they give

18    answers, and the questions and the answers are recorded.

19    You've seen deposition testimony presented to you

20    in this case by way of video recordings, as well as through

21    live readings of testimony by attorneys in the case.

22    Both of these forms of deposition testimony are

23    entitled to the same consideration by you, the jury, as

24    testimony given by a live witness present in the courtroom.

25    Accordingly, you should judge the credibility and

1    the believability and the importance of deposition testimony

2    to the best of your ability, just as if the witness who

3    appeared by deposition had appeared before you in open court

4    and given their testimony from the witness stand.

5              Now, while you should consider only the evidence

6    that's been produced in this case, you, ladies and

7    gentlemen, should understand that you are permitted, as the

8    jury, to draw such reasonable inferences from the testimony

9    and the exhibits that you feel are justified in the light of

10   common experience.  In other words, ladies and gentlemen,

11   you may make deductions and reach conclusions that reason

12   and common sense leads you to draw from the facts that have

13   been established by the testimony and evidence in this case.

14             However, you should not base your decisions on any

15   evidence not presented by the parties in open court during

16   the course of the trial, including your own personal

17   experiences with any particular contracts.

18             Now, unless I instruct you otherwise, you may

19   properly determine that the testimony of a single witness is

20   sufficient to prove any fact, even if a greater number of

21   witnesses may have testified to the contrary, if after

22   considering all of the testimony and evidence you believe

23   that single witness.

24             When knowledge of a technical subject may be

25   helpful to the jury, a person who has special training and

1  experience in that technical field, called an expert

2  witness, is permitted to state his or her opinions on those

3  technical matters to the jury.

4          However, ladies and gentlemen, you're not required

5  to accept those opinions.  As with any other witness, it's

6  solely up to you to decide who you believe and who you don't

7  believe and whether or not you want to rely on their

8  testimony.

9          Now, certain exhibits have been shown to you

10  during the trial that were illustrations only.  We call

11  these type of exhibits demonstrative exhibits.  Sometimes

12  they're simply referred to as demonstratives.

13          Demonstrative exhibits are a party's description,

14  picture, or model to describe something involved in the

15  trial.  If your recollection of the evidence differs from

16  the demonstratives, ladies and gentlemen, then you should

17  rely on your own recollection.

18          Demonstrative exhibits, you should understand, are

19  not evidence.  But the witness's testimony during which a

20  demonstrative is used, that testimony is evidence.

21          Now, in any legal action, facts must be proved by

22  a required amount of evidence known as the burden of proof.

23  The burden of proof in this case is on the Plaintiffs for

24  some issues, and it's on the Defendants for other issues.

25          There are two burdens of proof that you will apply

1   in this case, the preponderance of the evidence and clear
2   and convincing evidence.
3        A preponderance of the evidence means evidence
4   that persuades you that a claim is more probably true than
5   not true.  Sometimes this is talked about as being the
6   greater weight and degree of credible testimony.
7        Clear and convincing evidence means evidence that
8   produces in your mind an abiding conviction that the truth
9   of the party's factual contentions are highly probable.
10  Although proof to an absolute certainty is not required, the
11  clear and convincing evidence standard requires a greater
12  degree of persuasion than is necessary for the preponderance
13  of the evidence standard.
14       If the proof establishes in your mind an abiding
15  conviction in the truth of the matter, then the clear and
16  convincing evidence standard has been met.
17       These standards, ladies and gentlemen, are
18  different from what you may have learned about in criminal
19  proceedings where a fact is to be proven beyond a reasonable
20  doubt.
21       On a scale of the various standards of proof, as
22  you move from a preponderance of the evidence on one end to
23  beyond a reasonable doubt on the other end, where a fact
24  must be proven with a high degree of certainty, you can
25  think of the clear and convincing evidence standard as

1    between these two standards.

2          Now, in this case, every issue, except for one, is

3    to be decided by the preponderance of the evidence standard.

4    Therefore, unless I instruct you otherwise, the

5    preponderance of the evidence standard is the standard you

6    should apply.

7          I will make it clear in the verdict which standard

8    should be applied to each question that you'll be asked to

9    answer.

10         Now, in determining whether any fact has been

11   proven by a preponderance of the evidence or by clear and

12   convincing evidence, you may, unless otherwise instructed,

13   consider the stipulations of the parties, the testimony of

14   all the witnesses, regardless of who called them, and all

15   the exhibits admitted into evidence by the Court and

16   presented during the trial, regardless of who may have

17   produced them.

18         Now, as I did at the start of the case, I'll first

19   give you a summary of each side's contentions in this case,

20   and then I'll provide you with detailed instructions on what

21   each side must prove to win on each of its contentions.

22         As I told you at the beginning of the trial, the

23   Plaintiffs in this case are Plastronics Socket Partners

24   Limited and Plastronics H-Pin Limited.  The parties and I

25   may from time to time simply refer to Plastronics Socket

1  Partners Limited as Plastronics Socket Partners.  You've

2  sometimes heard this called PSP, or you've simply heard it

3  called Plastronics Socket.

4      And you may hear Plastronics H-Pin Limited

5  referred to as Plastronics H-Pin or even just simply H-Pin.

6      Plastronics Socket Partners Limited and

7  Plastronics H-Pin Limited were formed by a divisive merger.

8      Under Texas law, a divisive merger is a process

9  whereby one company splits into two.  I'll refer to the

10  original company that existed prior to this divisive merger

11  simply as Plastronics.

12      The divisive merger whereby Plastronics split into

13  Plastronics Socket Partners Limited and Plastronics H-Pin

14  Limited occurred on December 31st, 2012.

15      The Defendants in this case are Dong Weon Hwang,

16  also known as D.W. Hwang, also known as Dan Hwang,

17  individually and doing business as HiCon Company, a sole

18  proprietorship, and HiCon Company Limited, a Korean business

19  entity.

20      As I instructed you at the beginning of the case,

21  the DBA is Mr. Hwang engaging in business as his sole

22  proprietorship.

23      When I refer to Mr. D.W. Hwang in these

24  instructions, I'll refer to him as Mr. Hwang.  And when I

25  refer to his sole proprietorship, I'll refer to it as the

1    DBA.  So if you hear DBA in these instructions, that refers

2    to Mr. Hwang doing business as HiCon Company.

3            The parties and I may also refer to HiCon Company

4    Limited, the Korean business entity, simply as HiCon

5    Limited.

6            As I told you previously, this case involves

7    allegations of patent infringement.  And as I've already

8    mentioned, there is one single United States patent at issue

9    in this case, and it is United States Patent No. 7,025,602,

10   which has been referred to throughout the trial, and I will

11   refer to in these instructions, simply as the '602 patent.

12           Mr. Hwang is the inventor of the '602 patent and

13   of Korean Patent No. 10-2004-0079649, which was filed

14   October the 6th, 2004, and which I'll refer to as the Korean

15   patent.

16           These patents cover the same invention.

17   Plaintiffs contend that an Assignment Agreement between

18   Mr. Hwang and Plastronics conveyed one-half of all the

19   right, title, and interest in the U.S. patent to

20   Plastronics.

21           Plaintiffs allege that as a part of the divisive

22   merger, Plastronics H-Pin acquired and came into possession

23   of Plastronics's rights to the '602 patent.  However, the

24   Defendants in this case dispute whether the Assignment

25   Agreement is a valid contract.

1    Plastronics H-Pin alleges that HiCon Limited is

2 infringing the '602 patent by making, using, selling, or

3 offering to sell in the United States or importing into the

4 United States a product meeting all the requirements of a

5 claim of the '602 patent without authority or permission to

6 do so.

7    Plastronics H-Pin also alleges that HiCon Limited

8 is indirectly infringing the '602 patent by inducing other

9 entities to infringe without authority or permission to do

10 so.

11    The products that are alleged to infringe the '602

12 patent are the Hi-CONTACT pin, the Hs-CONTACT pin, and the

13 Hr-CONTACT pin.  These may be referred to collectively as

14 the accused products.

15    HiCon Limited denies that it is infringing the

16 '602 patent.  HiCon Limited denies that it is selling the

17 accused products in the United States or inducing other

18 entities to infringe.

19    Instead, the Defendants in this case contend that

20 the DBA sells the accused products into the United States

21 and that because the DBA is Mr. Hwang's sole proprietorship,

22 it enjoys the same rights as Mr. Hwang to sell the accused

23 products in the United States and allow other companies to

24 resell the products here.

25    Now, in most patent cases, ladies and gentlemen,

1   the parties dispute whether the accused products actually

2   meet all of the elements or limitations of the claims within

3   an asserted patent.

4          However, in this case, the parties have agreed and

5   stipulated that the HiCon Hi-CONTACT, the Hs-CONTACT pin,

6   and the Hr-CONTACT pin, the accused products, meet every

7   element or limitation of Claim 1 of the '602 patent.

8          As a result, the only contested issues related to

9   patent infringement are what person or entity, if any,

10  makes, uses, sells, or offers to sell into the United States

11  or imports into the United States the accused products and

12  whether that person or entity or those entities are legally

13  authorized to do so.

14         A patent owner has the right to stop others from

15  using the invention covered by the patent claims in the

16  United States -- in the United States during the life of the

17  patent.

18         If any person makes, uses, sells, or offers to

19  sell within the United States what is covered by the patent

20  claim without the patent owner's permission, that person is

21  said to infringe the patent.

22         Mr. Hwang and Plastronics H-Pin are both owners of

23  the '602 patent.  This means that both Mr. Hwang and

24  Plastronics H-Pin have the right to make, use, sell, or

25  offer to sell within the United States or import products

into the United States that are covered by the patent, and they cannot infringe the '602 patent.

Now, as I've said previously, the DBA is Mr. Hwang acting as a sole proprietorship known as HiCon. As such, the DBA is indistinguishable from Mr. Hwang and has all the rights as an owner of the '602 patent to make, use, sell, and offer to sell within the United States or import products into the United States that are covered by the patent, just the same as Mr. Hwang individually.

The rights to use an invention in a particular country are governed by that country's patent laws. Therefore, a person or entity is authorized to use a patent in one country. Even though they are authorized to use a patent in one country, that does not automatically mean that that person or entity is authorized to use the corresponding patent in another country.

A person can directly infringe a patent without knowledge or without knowing that what it is doing is an infringement of the patent. It may also directly infringe, even though in good faith it believes that what it is doing is not infringement of any patent.

In this case, Plastronics H-Pin Limited asserts that HiCon Limited has both directly and indirectly infringed the '602 patent. HiCon Limited is liable for directly infringing the '602 patent if you find that

Plastronics H-Pin has proven by a preponderance of the
evidence that HiCon Limited made, used, imported, offered to
sell, or sold the invention defined in at least one claim of
the '602 patent in the United States without proper
authority.

HiCon Limited claims that it does not make, use,
sell, or offer to sell within the United States or import
into the United States the accused products.  If you find
that HiCon Limited does not make, use, sell, or offer to
sell within the United States or import into the United
States the accused products, then you must find that HiCon
Limited does not infringe the '602 patent.

Plastronics H-Pin Limited also alleges that HiCon
Limited is liable for indirect infringement by inducing
HiCon USA and/or HighRel to directly infringe the '602
patent.

HiCon Limited is liable for inducement of a claim
only if Plastronics H-Pin Limited proves the following by a
preponderance of the evidence:

(1) that the acts are actually carried out by
HiCon USA and/or HighRel and directly infringe the '602
patent;

(2) that HiCon Limited took action during the time
the '602 patent was in force intending to cause the
infringing acts, if any, by HiCon USA and/or HighRel;

1          (3) that HiCon Limited was aware of the '602

2 patent and knew that the acts, if taken, would constitute

3 infringement of that patent or that HiCon Limited believed

4 that there was a high probability that the acts by HiCon USA

5 and/or HighRel would infringe the '602 patent and HiCon

6 Limited believed there was a high probability that the acts

7 by HiCon USA and/or HighRel infringed the '602 patent and

8 took deliberate steps to avoid learning of that

9 infringement.

10         If you find that HiCon Limited was aware of the

11 '602 patent but believed that the acts it encouraged, if

12 any, did not infringe that patent, HiCon Limited cannot be

13 liable for inducement.

14         In order to establish indirect infringement, it's

15 not sufficient that HiCon USA and/or HighRel directly

16 infringes the '602 patent.  Nor is it sufficient that HiCon

17 Limited was aware of the acts by HiCon USA and/or HighRel

18 that allegedly constitute the direct infringement.

19         Rather, in order to find indirect infringement,

20 you must find either that HiCon Limited specifically

21 intended HiCon USA and/or HighRel to infringe the '602

22 patent or that HiCon Limited believed there was a high

23 probability that HiCon USA and/or HighRel would infringe the

24 '602 patent but deliberately avoided learning the infringing

25 nature of HiCon USA and/or HighRel's acts.

1    The mere fact, if true, that HiCon Limited knew or

2  should have known that there was a substantial risk that

3  HiCon USA and/or HighRel's acts would infringe the '602

4  patent would not be sufficient for inducement of

5  infringement.

6    HiCon Limited contends that it has not induced

7  others to infringe the '602 patent.

8    Now, if any entity has authority to practice a

9  patent, its sales of the accused products do not infringe on

10  that patent, and any subsequent sales of those accused

11  products also do not infringe the patent.

12    Mr. Hwang's DBA shares his rights to practice the

13  '602 patent.  However, the parties dispute whether HiCon

14  Limited has authority to practice the '602 patent.  And

15  likewise, they dispute whether the DBA or HiCon Limited make

16  or induce sales of the accused products in the United

17  States.

18    In this case, Plastronics H-Pin Limited contends

19  that HiCon Limited willfully infringed the '602 patent.  If

20  you determine that HiCon Limited has infringed, you must

21  then address the additional issue of whether or not this

22  infringement was willful.

23    Willfulness requires you to determine whether

24  Plastronics H-Pin Limited proved by a preponderance of the

25  evidence that the infringement by HiCon Limited was willful,

1 wanton, malicious, in bad faith, deliberate, consciously

2 wrongful, flagrant, or characteristic of a pirate.

3 You may not determine that the infringement was

4 willful just because HiCon Limited knew of the '602 patent

5 and infringed it.

6 Instead, willful infringement is reserved only for

7 the most egregious behavior, such as where the infringement

8 is malicious, deliberate, consciously wrongful, or done in

9 bad faith.

10 You may only find that HiCon Limited willfully

11 infringed if you find that HiCon Limited acted egregiously,

12 willfully, or wantonly.

13 You may find that HiCon Limited's actions were

14 egregious, willful, or wanton if HiCon Limited acted in

15 reckless or callous disregard of or with indifference to the

16 rights of Plastronics H-Pin Limited.

17 I'll now instruct you about the measure of damages

18 for patent infringement.  If you find that HiCon Limited

19 infringed the '602 patent, you must then consider what

20 amount of damages to award to Plastronics H-Pin Limited.

21 Now, by instructing you on damages, ladies and

22 gentlemen, I am not suggesting which party should win this

23 case on any issue.

24 If you find that HiCon Limited has not infringed

25 any valid claim of the patent-in-suit, then Plastronics

1   H-Pin Limited is not entitled to any damages.

2          These instructions on damages relate only to

3   Plastronics H-Pin's claims for patent infringement.

4          I will instruct you separately and later on

5   regarding the appropriate measure of damages for the

6   parties' other claims.

7          If you award damages, they must be adequate to

8   compensate Plastronics H-Pin for any infringement of the

9   '602 patent that you may find.

10         You must not award Plastronics H-Pin more damages

11  than are adequate to compensate for the infringement, nor

12  should you include any additional amount for the purpose of

13  punishing HiCon Limited.

14         Damages are not meant to punish an infringer.

15  Your damages award, if you reach this issue, should put

16  Plastronics H-Pin in approximately the same financial

17  position that it would have been in had the infringement not

18  occurred.

19         Plastronics H-Pin has the burden to establish the

20  amount of its damages by a preponderance of the evidence.

21  In other words, you should award only those damages that

22  H-Pin establishes that it more likely than not suffered as a

23  result of HiCon Limited's infringement of the '602 patent.

24         While Plastronics H-Pin is not required to prove

25  the amount of its damages with mathematical precision, it

1   must prove them with reasonable certainty.

2           H-Pin is not entitled to damages that are remote

3   or speculative.  The patent laws specifically provide that

4   damages for infringement may not be less than a reasonable

5   royalty.

6           Plastronics H-Pin is not entitled to recover

7   damages for sales of the accused products that occurred

8   outside of the United States of America.

9           There are different types of damages that

10  Plastronics H-Pin Limited may be entitled to recover.  In

11  this case, Plastronics H-Pin seeks to recover lost profits

12  or a reasonable royalty.

13          Lost profits consist of any actual reduction in

14  business profits Plastronics H-Pin Limited suffered as a

15  result of HiCon Limited's or HiCon Company's infringement.

16          A reasonable royalty is defined as the amount of

17  money Plastronics H-Pin Limited and HiCon Limited or HiCon

18  Company would have agreed upon as a fee for the use of the

19  invention at the time prior to when infringement began.

20          But regardless of the type of damages that you may

21  choose to award, you must be careful to ensure that the

22  award is no more than needed to fully compensate the party

23  whose patent rights are infringed.

24          I'll give you more detailed instructions regarding

25  damages shortly.  You should note, however, that Plastronics

1  H-Pin Limited is entitled to recover no less than a

2  reasonable royalty for each infringing sale.

3          In this case, Plastronics H-Pin Limited seeks to

4  recover lost profits for some of HiCon Limited's sales of

5  the Hi-CONTACT pin, the Hs-CONTACT pin, and the Hr-CONTACT

6  pin related to acts of infringement in the United States and

7  a reasonable royalty on the rest of HiCon Limited's sales

8  related to acts of infringement in the United States.

9          To recover lost profits, as opposed to reasonable

10  royalties, Plastronics H-Pin Limited must show a causal

11  relationship between the -- the infringement and Plastronics

12  H-Pin Limited's loss of profit.  In other words, Plastronics

13  H-Pin must show that but-for the infringement, there's a

14  reasonable probability that Plastronics H-Pin would have

15  earned higher profits.

16          To show this, Plastronics H-Pin Limited must prove

17  that.  If there had been no infringement, it would have made

18  some portion of the sales that HiCon Limited made of the

19  infringing product.

20          In considering what Plastronics H-Pin Limited

21  would have earned, you should only consider the sales of

22  H-Pins.  You should not take into account any profits of

23  Plastronics Socket Partners Limited or any sales of sockets.

24          Plastronics H-Pin is entitled to lost profits if

25  it establishes each of the following:

(1) that there was a demand for the patented device;

(2) that there were no available, acceptable, non-infringing substitute products;

(3) that Plastronics H-Pin Limited had the manufacturing and marketing capacity to make any infringing sales actually made by HiCon Limited and for which Plastronics H-Pin Limited seeks an award of lost profits. In other words, that Plastronics H-Pin Limited was capable of satisfying the demand;

(4) the amount of profit that Plastronics H-Pin Limited would have made if HiCon Limited had not infringed.

Demand for the patented product can be proven by significant sales of the patentholder's patented product or significant sales of an infringing product containing the patented features.

To be an acceptable, non-infringing substitute, a product must have had one or more of the advantages of the patented invention that were important to people who purchased an alleged infringer's product, not the public in general.

If purchasers of an alleged infringer's product were motivated to buy that product because of features available only from that product and a patentholder's patented product, then some other alternative product is not

1   an acceptable substitute, even if it otherwise competed with

2   the patentholder's and an alleged infringer's products.

3         On the other hand, if the realities of the

4   marketplace are that the competitors other than the patentee

5   would likely have captured the sales made by the infringer

6   despite a difference in the products, then the patentee is

7   not entitled to lost profits on those sales.

8         An alternative product may be considered available

9   as a potential substitute even if the product was not

10  actually on sale during the infringement period.  Factors

11  suggesting the alternative was available include whether the

12  material, experience, and know-how for the alleged

13  substitute were readily available at the time of the

14  infringement.

15        Factors suggesting the alternative was not

16  available include whether the material was of such high cost

17  as to render the alternative unavailable and whether an

18  alleged infringer had to design or invent around the

19  patented technology to develop an alleged substitute.

20        A patentholder is only entitled to lost profits

21  for sales it could have actually made.  In other words,

22  Plastronics H-Pin Limited must show that it had the -- that

23  it had the manufacturing and marketing capability to make

24  the sales that it said it lost.  This means Plastronics

25  H-Pin Limited must prove that it's more probable than not

1  that it could have made and sold or could have had someone

2  else make or sell for it the additional products it says it

3  could have sold but-for the infringement.

4          A patentholder may calculate its lost profits on

5  lost sales by computing the lost revenue for sales it claims

6  it would have made but-for the infringement and subtracting

7  from that figure the amount of additional costs or expenses

8  it would have incurred in making those lost sales, such as

9  cost of goods, sales costs, packaging costs, and shipping

10 costs.

11         Certain fixed costs that do not vary with

12 increases in production or scale, such as taxes, insurance,

13 rent, and administrative overhead, should not be subtracted

14 from a patentholder's lost revenue.

15         Now, what I've just instructed you on is the

16 method for determining whether Plastronics H-Pin is entitled

17 to lost profits as a measure of damages for patent

18 infringement.

19         If you find that Plastronics H-Pin Limited has

20 established infringement, Plastronics H-Pin Limited is

21 entitled to at least a reasonable royalty to compensate it

22 for that infringement.

23         If you find that Plastronics H-Pin Limited has not

24 proved its claim for lost profits or has proved its claim

25 for lost -- lost profits for only a portion of those

1   infringing sales, then you must award Plastronics H-Pin

2   Limited a reasonable royalty for all infringing sales for

3   which it has not been awarded lost profits damages.

4         A royalty is a payment made to a patentholder in

5   exchange for the right to make, use, or sell the claimed

6   invention.  A reasonable royalty is the amount of royalty

7   payment that a patentholder and the alleged infringer would

8   have agreed to in a hypothetical negotiation taking place at

9   a time prior to when the infringement first began.

10        In considering this hypothetical negotiation, you

11   should focus on what the expectations of the patentholder

12   and the alleged -- the alleged infringer would have been had

13   they entered into an agreement at that time and had they

14   acted reasonably in their negotiations.

15        In determining this, you must assume that both

16   parties believe the patent was valid and infringed and that

17   both parties were willing to enter into an agreement.

18        The reasonable royalty you determine must be a

19   royalty that would have resulted from the hypothetical

20   negotiation and not simply a royalty that either party would

21   have preferred.

22        Evidence of things that happened after the

23   infringement first began can be considered in evaluating the

24   reasonable royalty only to the extent that the evidence aids

25   in assessing what royalty would have resulted from a

1    hypothetical negotiation.

2         Although evidence of the actual profits an alleged

3    infringer made may be used to determine the anticipated

4    profits at the time of the hypothetical negotiation, the

5    royalty may not be limited or increased based on the actual

6    profits the alleged infringer made.

7         Do not include any damages related to infringement

8    prior to December the 31st, 2012, the date that H-Pin became

9    the owner of the '602 patent.

10        The parties have also asserted, ladies and

11   gentlemen, breach of contract claims against each other.

12        I'll now instruct you on the law relevant to these

13   breach of contract claims.

14        In order to determine whether any party has

15   breached a contractual obligation, you'll be called upon to

16   answer several questions.

17        First, whether a valid and enforceable contractual

18   obligation existed.

19        Second, whether any party violated any of its

20   contractual obligations.

21        Third, if any party violated any of its

22   obligations, whether there is a defense for that violation.

23        Now, as you've heard, there are two contracts at

24   issue between the parties in this case, a Royalty Agreement

25   and an Assignment Agreement.

1      Generally speaking, the Assignment Agreement

2  grants both Mr. Hwang and Plastronics a 50 percent ownership

3  interest in the invention disclosed in the '602 patent.

4      The Royalty Agreement requires Mr. Hwang and

5  Plastronics to make certain royalty payments to one another

6  under certain conditions if products embodying the -- the

7  invention are sold.

8      Plastronics H-Pin Limited contends that Mr. Hwang

9  breached the Royalty Agreement by licensing the H-Pin

10  invention disclosed in the '602 patent or its Korean

11  counterpart patent without the consent of Plastronics H-Pin

12  Limited and Plastronics Socket Partners Limited.

13      Plastronics H-Pin Limited also contends that

14  Mr. Hwang breached the Assignment Agreement by licensing or

15  transferring an interest in the '602 patent without the

16  consent of Plastronics H-Pin Limited and Plastronics Socket

17  Partners Limited and failing to provide an accounting of his

18  sales.

19      Mr. Hwang denies these allegations and claims that

20  Plastronics fraudulently induced him to enter into the

21  Royalty Agreement and the Assign -- and the Assignment

22  Agreement and that those agreements are not valid and

23  enforceable for that reason.

24      Mr. Hwang also contends that Plastronics H-Pin

25  Limited has breached the Royalty Agreement by failing to pay

royalties to Mr. Hwang and breached the Assignment Agreement by failing to provide an accounting.

To show fraudulent inducement, Mr. Hwang must show three things.

First, that Plastronics made a false statement of material fact, knowing that the statement was false, or that Plastronics made a promise with no intent to keep that promise.

Second, that Plastronics intended for Mr. Hwang to act on that false statement or promise.

And, third, that Mr. Hwang did, in fact, rely on that false statement or promise to his detriment.

In considering whether Mr. Hwang complied with the Royalty Agreement and the Assignment Agreement, you must first decide the scope of the parties' agreements, if any.

The parties disagree on the meaning of certain terms in the two agreements. I have determined the meaning of some of these terms, and I will instruct you as to their meaning.

However, there are a few terms in these contracts that I have found to be ambiguous. Therefore, if you decide that either or both of these contracts are valid and enforceable, then it will be your job to determine what these ambiguous terms mean.

The first of these ambiguous terms is the term

1  "H-Pin Project," which is used in the Royalty Agreement.

2  You'll be asked to decide whether the term "H-Pin Project"

3  includes any rights and interests in the Korean patent.

4        Similarly, you're going to be asked to construe

5  the phrase "throughout the world," which is used in the

6  Assignment Agreement.  And you're going to be asked to

7  determine whether the phrase "throughout the world" was

8  intended to include or exclude South Korea.

9        You'll also be asked to construe the terms "third

10  party" and "another entity" which are used in the Royalty

11  Agreement.  You'll be asked to determine whether the terms

12  "third party" and "another entity" mean any entity that is

13  not a party to the Royalty Agreement or whether they were

14  intended to exclude entities controlled by the parties to

15  the agreement, such as HiCon Limited which is controlled by

16  Mr. Hwang.

17        In determining the meaning of these terms, you

18  should do your best to give them the meaning the parties

19  intended them to have at the time they entered into these

20  contracts, taking into account the business purposes of the

21  contracts.

22        You should consider each contract in the light of

23  the other.  In determining what the parties intended, you

24  should consider the facts and circumstance -- circumstances

25  surrounding the execution of both the Royalty and Assignment

1  Agreement's execution together.

2        You may consider what the parties said and did

3  while forming the contract in light of the surrounding

4  circumstances, including any earlier course of dealing.  You

5  may not consider the parties' unexpressed thoughts or

6  intentions.

7        However, before you determine the meaning of any

8  term, you must first determine whether any of these

9  contracts are valid and enforceable.  And by instructing you

10  on how to determine the meaning of the terms, you should not

11  assume that I have any opinion one way or the other as to

12  whether these contracts are valid and enforceable.  That,

13  ladies and gentlemen, is your issue to decide.

14        Now, as I mentioned before, I've construed some

15  disputed terms in these contracts as a matter of law.

16  You're to accept these interpretations as I give them to you

17  and apply them in determining whether a breach of these

18  contracts has occurred.

19        Paragraph 3 of the Royalty Agreement states:  PSP

20  current handbook policy is to pay 3 percent of gross sales

21  on inventions that are patentable by persons employed at PSP

22  after all non-reoccurring capital costs, which include

23  stamping tools, tooling equipment, assembly equipment, test

24  equipment, and patent costs.  This term requires a royalty

25  payment of 3 percent of gross revenues from the sale of

1    H-Pins after non-reoccurring capital costs have been

2    deducted from those gross revenues.

3           Royalties are not paid on a percentage of profits

4    but on gross sales.  Royalties are to be paid when the gross

5    sales exceed the structured debt service payment

6    attributable to the non-reoccurring capital costs.

7    Royalties on gross sales may not be withheld simply because

8    the entirety of the non-reoccurring capital costs have not

9    been fully discharged.

10          Additionally, Paragraph 6 of the Assignment

11   Agreement states that both -- that both Mr. Hwang and

12   Plastronics, now Plastronics H-Pins, shall be entitled to

13   accounting for any revenue received and for profits, if any,

14   made from the invention.

15          Based on the agreement of the -- of the parties, I

16   instruct you that this term requires each party to provide

17   an accounting only when that party also owes royalties to

18   the other party under the terms of the Royalty Agreement.

19          Now, if you find that Mr. Hwang breached the

20   Assignment Agreement, you must also decide whether

21   Mr. Hwang's failure or failures to comply, if any, are

22   excused by Plastronics or Plastronics H-Pin's previous

23   breach of the Assignment Agreement.

24          A prior breach of the Assignment Agreement by

25   Plastronics or Plastronics H-Pin only excuses Mr. Hwang's

1  subsequent breach if Plastronics or Plastronics H-Pin's

2  prior breach was material.

3          The circumstances to consider in determining

4  whether a breach is material include:

5          (1) the extent to which the injured party will be

6  deprived of the benefit which he reasonably expected;

7          (2) the extent to which the injured party can be

8  adequately compensated for the part of that benefit of which

9  he will be deprived;

10         (3) the extent to which the party failing to

11  perform or to offer to perform will suffer forfeiture;

12         (4) the likelihood that the party failing to

13  perform or to offer to perform will cure his failure taking

14  into account circumstances, including any reasonable

15  assurances;

16         (5) the extent to which the behavior of the party

17  failing to perform or to offer to perform comports with

18  standards of good faith and fair dealing.

19         You must also decide whether Mr. Hwang has shown

20  by a preponderance of the evidence that Plastronics H-Pin

21  failed to comply with the Royalty Agreement by failing to

22  pay royalties and whether Plastronics H-Pin failed to comply

23  with the Assignment Agreement by failing to render an

24  accounting.

25         If you find that Mr. Hwang failed to comply with

his agreements and that his failures were not excused, you should then determine whether Plastronics H-Pin Limited sustained any damages resulting from Mr. Hwang's failure to comply.

Likewise, if you find that Plastronics H-Pin breached its agreements to Mr. Hwang, then you should consider what damages, if any, Mr. Hwang sustained from that breach.

You may find only those damages necessary to put the injured party in the same economic position it would have been in had the breaching party performed the contract.

In this case, Plastronics H-Pin Limited seeks to recover lost net profits sustained in the past.

Net profits means the amount by which Plastronics H-Pin's gross revenues would exceed all of the costs and expenses that would be necessary to produce those revenues.

Lost past net profits are not recoverable unless Plastronics -- Plastronics H-Pin Limited proves that the lost past net profits were a natural, probable, and foreseeable consequence of the breach of contract.

If the lost net profits are not proven with reasonable certainty but are merely speculative, you may not award lost past net profits.

If you find that Plastronics H-Pin breached its agreements to Mr. Hwang, then you should consider what sum

1   of money, if any, if now paid in cash would fairly and

2   reasonably compensate Mr. Hwang for -- for Plastronics

3   H-Pins's breach.

4          In determining the damages to award for Mr. Hwang,

5   you should consider what Plastronics agreed to pay but has

6   not paid to Mr. Hwang.

7          As to the Assignment Agreement, if you find a

8   breach of that agreement occurred before January the 19th,

9   2014, then you should not award any damages for breach of

10  the Assignment Agreement.  Only award damages for breach of

11  the Assignment Agreement that occurred after January the

12  19th, 2014.

13         However, as to the Royalty Agreement, damages for

14  failure to make periodic royalty payments should be made

15  where such periodic payment was called for and due after

16  January the 19th, 2014.

17         You should not award damages for any unpaid

18  periodic royalty payment originally called for and due

19  before January the 19th, 2014.

20         Do not add any amount for interest to damages you

21  award, if any.

22         I'll now instruct you on the law relevant to

23  Plastronics Socket Partners's tortious interference and

24  conspiracy claims.

25         Plastronics Socket Partners claims that HiCon

1  Limited tortiously interfered with prospective business

2  relationships with electrical suppliers and/or

3  manufacturers.

4         You may find that HiCon Limited tortiously

5  interfered with Plastronics Socket Partners's prospective

6  business relations if you determine that:

7         (1) there was a reasonable probability that

8  Plastronics Socket Partners would have entered into a

9  business relationship;

10        (2) HiCon Limited committed an independently

11 tortious or unlawful act that was a substantial factor in

12 preventing the contractual or business relationship from

13 occurring;

14        (3) HiCon Limited acted with a conscious desire to

15 prevent the relationship from occurring or knew the

16 interference was certain or substantially certain to occur

17 as a result of this conduct;

18        And (4), the interference proximately caused

19 injury to Plastronics Socket Partners;

20        And (5), Plastronics Socket Partners suffered

21 actual harm or damage as a result of the interference.

22        Now, as I just mentioned, tortious interference

23 requires that HiCon Limited committed an independently

24 tortious or unlawful act.  An independently tortious or

25 unlawful act is a wrongful act that would itself be

1  separately actionable.

2         If you find that Plastronics Socket Partners has

3  proved its claim for tortious interference with prospective

4  relationship against HiCon Limited, then you'll need to

5  decide what sum of money, if any, paid now in cash would

6  fairly and reasonably compensate Plastronics Socket Partners

7  for its damages, which are proximately caused by such

8  interference.  Do not add any amount for interest on

9  damages, if any.

10        Damages may include the loss of benefits or

11  consequential losses, including lost profits, resulting from

12  Defendants' interference with a prospective contractual

13  relationship.

14        Plastronics Socket Partners claims that Mr. Hwang,

15  HiCon Limited, HiCon USA, and/or HighRel, conspired to

16  tortiously interfere with Plastronics Socket Partners

17  Limited and Plastronics H-Pin Limited's prospective business

18  relations.

19        To be part of a conspiracy, one person and another

20  person or persons must have had knowledge of, agreed to, and

21  intended a common course of action that resulted in the

22  damages to Plastronics Socket Partners.  One or more persons

23  involved in the conspiracy must have performed some act or

24  acts to further the conspiracy.

25        It's not enough for Plastronics Socket Partners to

1   show that a person engaged in conduct that resulted in an

2   injury.  Rather, the purpose of the conspiracy must be to

3   cause injury.

4            Plastronics Socket Partners seeks exemplary

5   damages from Mr. Hwang and HiCon Limited.  Exemplary

6   damages, ladies and gentlemen, means an amount that you may,

7   in your discretion, award as a penalty or by way of

8   punishment.

9            You may only award exemplary damages against HiCon

10  Limited if you find that HiCon Limited acted with actual

11  malice.

12           Similarly, you may only award exemplary damages

13  against Mr. Hwang if you find that Mr. Hwang acted with

14  actual malice.

15           Actual malice means a specific intent to cause

16  substantial injury to Plastronics Socket Partners.

17  Plastronics Socket Partners must prove malice by clear and

18  convincing evidence.

19           If you find by clear and convincing evidence that

20  HiCon Limited or Mr. Hwang acted with actual malice, then

21  you'll need to consider whether Plastronics Socket Partners

22  should be awarded exemplary damages to punish HiCon Limited

23  or to punish Mr. Hwang.

24           Factors to consider in awarding exemplary damages,

25  if any, are:

1          (A) the nature of the wrong;

2          (2) the character of the conduct involved;

3          (3) the degree of culpability of HiCon Limited or

4     Mr. Hwang;

5          (4) the situation and sensibilities of the parties

6     concerned;

7          (5) the extent to which such conduct offends a

8     public sense of justice and propriety;

9          And, 6, the net worth of Defendants.

10          Now, ladies and gentlemen with those instructions

11     from the Court, we're ready to hear closing arguments from

12     the attorneys for the parties in this case.

13          Mr. Dalton, you may present the Plaintiffs' first

14     closing argument.

15          MR. DALTON:  May it please the Court, Your Honor.

16          THE COURT:  Would you like a warning on your time,

17     sir?

18          MR. DALTON:  10-minute warning, please, Your

19     Honor.

20          THE COURT:  When 10 minutes have been used or when

21     10 minutes are remaining?

22          MR. DALTON:   10 minutes remaining, Your Honor.

23          THE COURT:   Out of your total?

24          MR. DALTON:  Yes, sir.

25          THE COURT:  I'll warn you when you have 10 minutes

1  remaining.

2          You may proceed with closing argument.

3          MR. DALTON:  Good afternoon.  We're at the point

4  of this trial where in a little while you're going to have

5  to go back into the jury room and we're going to give this

6  case to you and you're going to have to deliberate on this

7  case.

8          There's going to be two jobs that you're going to

9  have back there.  The first job is going to be to answer the

10 Judge's questions that he's going to give you.  They're

11 going to be on -- a stack of papers right here.

12          The second job you're going to have is to tell

13 other jurors why you want to answer the way you want to

14 answer.  And so with that in mind, I want to give you some

15 ways in which you can do that.

16          I don't have a lot of time, so we've got a lot of

17 questions to go through.  So I'm going to call out some

18 exhibit numbers.  And if you want to write those down, all

19 these exhibits are going to be there for you in the jury

20 room.  So if there's something that I'm speeding through and

21 you want to look at, just write it down and you can check it

22 -- check me on it when you get back into the -- the jury

23 room.

24          The first thing that you're going to notice on

25 these questionnaires is it's the burden of proof.  It's --

1    we have to prove our case by a preponderance of the

2    evidence.

3            Judge Gilstrap, at the opening of the trial, told

4    you about the Lady Justice over there and how the balanced

5    scales, that it's a tight -- just a slight tip in the favor,

6    then that's -- that meets the burden of preponderance of the

7    evidence.

8            You could look at it also like a football field.

9    There's the 50-yard line, and we get the -- the nub of the

10   football over that 50-yard line, that means we met our

11   burden of proof.  And so that's -- that's what you have --

12   when you consider this case, that's the burden of proof that

13   you have to consider.

14           A lot of these questions in here can resolve

15   themselves when we look behind the curtain of Mr. Hwang's

16   DBA.  The purpose -- you know, we know that the purpose of

17   this DBA is to get around his obligations to Plastronics and

18   try to get around Plastronics's patent rights here in the

19   United States.

20           They're trying to convince you that some sale

21   occurred between Mr. Hwang and himself.  And, you know,

22   where there's no piece of paper or there's no evidence of

23   any funds going back and forth or even any movement of

24   products.  They're trying to do that because they can prove

25   that to you or show you that or just convince you, then they

1  get away with what they're trying to pull off here against

2  Plastronics.

3        First things we should do is just talk about

4  HiCon.  It's a shell company.  It has no assets.  The only

5  person in this thing is Mr. Hwang.  He -- he keeps -- he has

6  the same address as HiCon Company Limited.  It's got the

7  same email address, the same contact information.

8  Everything is the same for HiCon Company, the DBA.

9        When -- they wanted you to think that there were

10  legitimate transactions going on between Mr. Hwang and

11  himself.  Their neutral witness to this was -- was a

12  Mr. Schubring.  As you remember, he was on the stand

13  yesterday.  This was the guy that -- he's neutral and he's

14  going to tell you, yeah, this is -- I'm getting these from

15  Mr. Hwang's DBA.

16        So what did we learn about this neutral witness

17  yesterday?  Well, we learned that he came out to Marshall

18  with Mr. Hwang and his lawyers, and he's been there since

19  Friday.

20        We learned that he was prepared for his testimony

21  by Mr. Hwang's lawyers.

22        We learned that when the question was asked, he

23  referred to Mr. Hwang's lawyers as his lawyers.

24        And we also learned that his very success as a

25  business person is tied to Mr. Hwang's success.

1          And as a matter of fact, he's in the audience

2  today.  He's -- he's there.  He's sitting behind Mr. Hwang

3  just making sure that whatever he's pulling off here, that

4  if this thing goes through, because he's hitched to this

5  guy's wagon.

6          If Mr. Hwang really wanted to give you the truth

7  of who is selling products in the United States, they would

8  have brought a neutral witness in here.  They would have

9  brought somebody from Micron or ON Semi or some of these

10  other big computer chip manufacturers that we've been

11  talking about here.

12          And I can guarantee you, if they brought somebody

13  in from Micron and they asked, if you think -- do you think

14  you're buying products from Dong Hwang's DBA, HiCon Company,

15  they'd be scratching their head.  They wouldn't know what

16  you're talking about.  And if there was some problem that

17  Micron was having with some of these pins and sockets, you

18  better believe that they're going to be calling HiCon

19  Company Ltd. to try to get somebody on the phone.  And

20  they're not going to be chasing down Mr. Hwang on a cell

21  phone on the golf course.  It just doesn't make sense.

22          But let's go through what Mr. Schubring showed us

23  yesterday.

24          This is PX-043.

25          Can y'all see that?

1          Here's the Distribution Agreement that they say

2     proves that sales were made.  We've got HiCon.  No

3     differentiation between Ltd. or HiCon, the DBA.

4          It says:  A duly organized company under the laws

5     of South Korea.

6          Here on the witness list, HiCon has been in the

7     business of developing, manufacturing, and selling

8     throughout the world.  Well, we know there's only one

9     manufacturer, and it's HiCon Limited.

10          When we go to the signature page, again, we have

11     Mr. Hwang and his title, the president and CEO.

12          You can go to Exhibits PX-44, PX-48, and those are

13     the business registrations of the sole proprietorship, the

14     DBA, and HiCon Limited.  And you can look for yourself which

15     one names himself as a president, and that's HiCon Company

16     Limited.

17          Then they showed you an email that came from an

18     employee of Plas -- of HiCon Limited, J.B. Hwang.  I think

19     that's Mr. Hwang's son.  And Mr. Hwang was also copied on

20     this.  And this was -- they said the email from

21     Mr. J.B. Hwang saying that we're going to change the name of

22     the -- on this Distribution Agreement from HiCon Company

23     Limited to the -- the DBA.

24          But interestingly, the Defendants didn't tell you

25     about this line at the bottom.  It says:  This is just for

1   the name on the document that shows on PO.

2          Didn't say the real seller of this thing and the

3   real shipper of this thing is this -- the DBA.  It says this

4   is just the name.

5          Now, they left that lingering out there to give

6   you the impression that this thing was legitimate.  But they

7   didn't call in J.B. Hwang to explain what he meant by that,

8   and you have to ask yourself why they didn't do that.

9          Also through Mr. Schubring, they tried to show us

10  these invoices to say that this is -- everybody knows that

11  HiCon Company is sending these things and not HiCon Company

12  Limited.  Well, of course, it's a -- this is an invoice from

13  the vague HiCon to HiCon USA to Mr. Schubring.

14         The first hurdle you're going to have to overcome

15  if you think this is legitimate, is you're going to have to

16  believe that Mr. Hwang was typing this thing out on his

17  computer because he's the only employee of -- of the DBA.

18         And if you think that the guy who -- he says he's

19  so busy as an engineer that he doesn't know what he pays

20  himself is out here typing these things out on a computer,

21  then I think he's pulled one over on all of us.

22         In the left-hand corner, we see these -- maker,

23  HiCon Company Limited.  We see HiCon Korea --

24  differentiating between the two.  But let's look at a --

25  another invoice to another person.

1    Here's the same invoice to somebody here in the

2  United States in San Jose.  This is D -- DX-47.  The other

3  one I showed you was DX-285.

4    Well, look at the left-hand corner down here.

5  Where are those -- where does it make the differentiation

6  between HiCon Limited and HiCon?  Doesn't exist.

7    If you look at this, you have no idea who it comes

8  from.  It just says HiCon.  It doesn't differentiate between

9  HiCon Company Limited.  It doesn't differentiate between the

10  DBA.  Here again, they're trying to fool people here.

11    And really the -- the bigger issue in all of this

12  is that even if these invoices -- they don't prove a thing.

13  There's no proof of sale from HiCon Company Limited to the

14  DBA.  And there's no proof of any payment made from the DBA

15  to HiCon Company Limited.

16    And you have to ask yourself is why is this so

17  difficult to show?  If I told you that I went down to the

18  coffee shop this morning and I got a cup of coffee and I --

19  and I wanted to show it to you, I would show you the

20  receipt.  And it would say, yeah, he bought a cup of coffee

21  for two bucks down there.  I wouldn't show you 10 years of

22  tax records to prove up that I went down to the coffee shop

23  and I bought something.

24    So then we go behind this scheme that Mr. Hwang

25  has put together, and this is DX-140.  And you'll notice I'm

1  using a lot of Defendants' exhibits here, and it's rare that

2  I'm able to use Defendants' exhibits in my closing argument.

3        So DX-140 is the supply agreement that Mr. Hwang

4  made with himself.  So it's between HiCon and HiCon Company

5  Limited, signed by Mr. Hwang on behalf of HiCon Company

6  Limited and signed by Mr. Hwang in his individual capacity.

7        So if we look down to Article 4, Order and Supply,

8  this is -- this is how Mr. Hwang arranged with himself how

9  he was going to do this.

10       No. 1:  To facilitate promptness and convenience,

11  we're not -- we're not going to have any receipts.  It's not

12  going to happen.  We're just going to -- you know, I'm going

13  to tell myself that I don't need to give myself any

14  paperwork for this.

15       Section 2:  I'm not going to supply any supply

16  certificates, which all of this is standard in this

17  industry.  They've shown you -- they've tried to bring reams

18  and reams of these things, invoices to places outside the

19  country, outside of the United States, but they can't do

20  it -- can't show the one that really matters, which is

21  between HiCon Company Limited and the DBA.  It doesn't

22  exist.  They can't show it to you.

23       So without that, they -- they move to, well, let's

24  show you some of these tax invoices from -- from Korea.

25  That proves that these sales were made.

1          So let's look at a legitimate -- so we learned

2    from Mr. Hwang that's in Korea that if somebody sells

3    something to somebody -- another business in Korea, that

4    they charge a 10 percent tax on the product.  And that's

5    called VAT.

6          So here's -- here's a -- this is one of these tax

7    invoices from HiCon Company Limited to -- called standard

8    CWP at Korea.

9          So here in this example, we've got an item -- very

10   particular part number, test socket.  Under standard, it's

11   got a serial number, it's got a quantity.  It's got a unit

12   price, a value of supply, which says 2,580,000 Won.  And

13   there's a VAT of 258,000, which is 10 percent.

14         So this is a legitimate transaction between one

15   Korean company to the other.

16         So then we'll move to what Defendants put in front

17   of us to try to prove this.  They -- this is DX-282.

18         So here's the tax invoice of HiCon Company Limited

19   to HiCon, the DBA.  The address is the same.  The email --

20   the person at HiCon Company Limited, she emails it to

21   herself.  The product doesn't have any markings on it,

22   doesn't say what product -- what it was.  It just says:

23   Socket.  Doesn't have any specifications what it is like the

24   other example.  You have one quantity and unit price on it

25   is 45 million Won.  So that's a -- that's a very expensive

1    socket, if you -- if you haven't determined that by now

2    which you've heard from this.

3           And what is the tax amount?  It's zero.  So this

4    is supposedly a legitimate transaction between a Korean

5    business to another Korean business, but they don't take the

6    taxes out.

7           So Mr. Hwang tells us that, well, no, no, this was

8    meant for export.  This is why there's no zero taxes, that

9    if -- if somebody -- if a company sends something overseas,

10   then they don't charge that customer overseas a 10 percent

11   tax.

12          So what this really means is that HiCon Company

13   Limited is the exporter because they're not -- if it's a

14   legitimate transaction, the receiving company, they're going

15   to have -- if they're a Korean company, they're going to

16   have to pay that tax.  It's only when they ship that out.

17          So by HiCon Company Limited doing that, they are

18   admitting that they are the exporter of these goods.  It's

19   the only way they get to take that deduction, if they are

20   the exporter.

21          And if you -- you're having any reservations about

22   HiCon Company Limited being the exporter of these goods,

23   this was an exhibit that came a couple days ago.  And this

24   is marketing materials that HiCon Company Limited sends out

25   to -- it's in English.  They send it out to the United

States.

And you'll see the top left, HiCon Company Limited tells a little bit about themselves.  Here at the bottom, it says:  Won $20 million exporter's award on 53 Trade day. That's a -- that's a trophy that was given out to HiCon Company Limited for exporting.

When I asked Mr. Hwang what this was, he said, well, it was an award for -- for -- I think he said combined exports or something like that, like assuming that both this was, you know -- it was for the -- I think he called it indirect, that's right.  He said this is indirect exporting, meaning that it was his DBA.

My Korean is not the best, but I can guarantee you that that doesn't say 20 -- HiCon Ltd. $20 million worth of exports through Dong Weon Hwang's DBA, HiCon Company.

So when you're thinking about this, just think about this trophy, and you'll know who's really shipping these goods to the United States.

So here's the first question that's going to be posed to you by Judge Gilstrap that you're going to have on the -- the verdict form.

It says:  Did Plastronics H-Pin prove by a preponderance of the evidence that HiCon Limited directly infringed or induced infringement of Claim 1 of the '602 patent?

1          This is basically saying that -- is HiCon Company

2  Limited sending these H-Pins into the United States or are

3  they inducing people to do it, helping people to do,

4  assisting people to do it?

5          I say that we've met our burden.  We've gotten the

6  football over the 50-yard line.  I would urge you to answer

7  yes to this.

8          Second question for you is:  Did Plastronics H-Pin

9  prove by a preponderance of the evidence that the infringing

10  conduct of HiCon Limited was willful?

11          For you to consider that, I'm going to show you a

12  couple of exhibits here.

13          We've got PX-245.  This is from Mr. Hwang to

14  Mr. Schubring when they were negotiating the -- the HiCon

15  USA Distribution Agreement.  Questions came up about patent

16  issues that might arise -- shipping products in the U.S.

17  infringe upon Plastronics's patent here.

18          Well, Mr. Hwang just says:  Hey, one thing.  If

19  HighRel get legal/patent issue from competitors in the U.S.,

20  who will care?  Well, he's got one competitor in the U.S.,

21  and it's Plastronics.

22          Then after this lawsuit was filed, HiCon Company

23  Limited and HiCon USA were going to go to a show, and they

24  were going to show some of the H-Pins here in the United

25  States.

1    So here we have an employee, Mr. Hwang -- I think

2  this is another one of Mr. Hwang's sons who is an

3  employee -- sending this to Mr. Schubring, telling him:  We

4  must be careful because anything we have in the booth can be

5  evidence against us.  And if we lose the lawsuit, evidence

6  is showing international breaking of a contract can increase

7  compensatory payment to three times larger.  Please do not

8  show any pictures of the H-Pin or Hr products.

9    So they knew once they got to the United States

10  what they were doing was bad, and they continued to do it.

11  And that shows willfulness.  And it shows it right here.  I

12  don't have to convince you.  You can look for yourself in

13  this exhibit.

14    Third question to you is:  What sum of money, paid

15  in cash today, would reasonably compensate Plastronics H-Pin

16  for HiCon Limited's infringement up to the time of trial?

17    I would ask you to give Mr. Perry, our expert's,

18  number.  2,575,388 was the figure that Mr. Perry gave you.

19    Fourth question to you is a claim that Mr. Hwang

20  has against Plastronics:  Did Mr. Hwang prove by a

21  preponderance of the evidence that Plastronics H-Pin

22  breached the Assignment Agreement?

23    The provision that Mr. Hwang is suing us over is a

24  provision that we have to -- Plastronics has to provide an

25  accounting to them.  And as Judge Gilstrap instructed you,

1    and you'll be -- have your jury instructions, a breach would

2    have to be material, which means it has to be important, has

3    to be essential to the agreement.  You can't just pick

4    something out and say you breached it, so that's fine.

5           So this provision was not material, and there was

6    really no reason for it because neither side gave each other

7    an accounting.  So I'd ask you to answer no on this.

8           Mr. Hwang never presented any evidence of how he

9    could be compensated money for not getting a royalty

10   agreement.  We had their -- their expert on there, never

11   gave an opinion about this.  And I think the only fair

12   return is to say that this is worth zero dollars because he

13   hasn't shown any harm to it.

14          Question No. 6:  Did Mr. Hwang prove by a

15   preponderance of the evidence that Plastronics H-Pin

16   breached the Royalty Agreement?

17          This has to do with the reoccurring capital cost

18   provision.  We've had Mr. Pfaff, we've had Mr. Furman

19   telling y'all about what it took to get this thing to

20   market, to take this idea that Mr. Hwang had and to actually

21   make it into a product.  They kind of came and had these big

22   models of snapping it together and look how easy this is.

23   But you've got to -- you've got to realize that this is --

24   these things are as thin as a human hair, so you can imagine

25   what -- what -- you know, building machines from scratch

that are going to be able to assemble those things, piece them together, that costs a lot of money.

Now, their expert said, well, you know, there might have been something, but he couldn't really determine what -- what that would actually be.

Now, our -- our expert -- he actually did the -- did the analysis. He looked at all the costs. It says that Plastronics is $20,000.00 in the hole on this. So I'd answer no.

Since Mr. Hwang -- there was no breach, you're going to answer no to this. No money.

Next question for you: Plastronics H-Pin prove by a preponderance of the evidence that Mr. Hwang breached the Royalty Agreement?

These are -- these are a fairly easy exercise for you. I'm going to put out PX-30.

No. 5: Licensing the H-Pin Project patent rights: Neither PSP or Hwang can grant a license for the patent covering the H-Pin Project without the approval from the other party.

This is PX-300. This is the licensing agreement between Mr. Hwang and HiCon Company Limited, the very thing that was prohibited on the contract.

If there's any question about what was meant -- what the H-Pin Project was, all you have to do is look at

1    the agreement.  The agreement says that it's -- the H-Pin

2    Project is defined as the -- the invention, the Korean

3    patent.  It's up in the top.  You can read it for yourself.

4    It's referenced there.

5          PX-16 is the Assignment Agreement.  This is

6    between Mr. Hwang and Plastronics.  Both agree that they're

7    not going to license the invention and said application,

8    which this is -- this is the U.S. application, but the

9    invention disclosed in said application was the Korean

10   patent.  That's what was agreed to.  Look at the licensing

11   agreement.  It's exactly what Mr. Hwang did.  He licensed

12   that application -- the invention in that application, to a

13   third party, which is prohibited under the contract.

14         Now, there's going to be a question about what a

15   third party meant under the agreement or whether it was

16   restricted worldwide, what the parties meant by all this.  I

17   think you only have to consider why -- you know, the motive

18   behind Mr. Pfaff wanting that language in there is to stop

19   exactly what's going on here today, that he would have

20   Mr. Hwang learn all the manufacturing processes, learn the

21   customers, learn everything, and take all that knowledge

22   back to Korea, start his own company, and start flooding the

23   market here in the U.S. with cheaper H-Pins.  It's exactly

24   what Mr. Pfaff was trying to prohibit.

25         To this day, this trial is exactly what he was

1    trying to prohibit by having that language in there.

2          No. 9:  Did Mr. Hwang prove by a preponderance of

3    the evidence that Plastronics fraudulently induced Mr. Hwang

4    into entering into the Royalty Agreement?

5          This question is the -- the theory that somehow

6    that Mr. Pfaff defrauded Mr. Hwang, you know, in the -- in

7    the negotiations.  When you're considering this question,

8    you're going to have to consider the -- kind of the dual

9    personalities that Mr. Hwang has been portraying himself as

10   here.  When he is talking about negotiating with Mr. Pfaff,

11   he's -- he's kind of a bumpkin off the street that doesn't

12   really know much about anything and kind of let David Pfaff

13   railroad him and pull one over on him.

14         But when he -- on the other hand, though, he --

15         THE COURT:   10 minutes remaining.

16         MR. DALTON:    -- when he comes here, he's, you

17   know, the captain of industry.  He's got lawyers from two

18   continents here to represent him.  So he's the savvy

19   businessman.  He told you about how much money he's making

20   at HiCon Limited, how great he was at the company before

21   Plastronics, how he started this company and made it

22   millions of dollars.  So he's got to be one or the other.

23   He's -- he's either a bumpkin that can get the -- you know,

24   wool pulled over his eyes in a negotiation, which is -- both

25   parties had same bargaining power.  Or he's the captain of

1    industry that he's portraying today with all his lawyers.

2            So I'd ask you to answer no to this question.

3            Next question is:  What sum of money, if paid

4    today in cash, would compensate H-Pin for what Mr. Hwang has

5    done to them through a breach in the Royalty Agreement?

6            Again, I'd ask you to take Mr. Perry's analysis,

7    almost $26 million.  That's the harm that Mr. Hwang's HiCon

8    Company Limited has put upon Plastronics.

9            Did Plastronics prove that Mr. Hwang breached the

10   Assignment Agreement?  Same thing holds.  He licensed the

11   Korean patent without the consent of Plastronics.

12           If you find that he breached the Assignment

13   Agreement, you're going to have to find he breached the

14   Royalty Agreement.  Same conduct.

15           Mr. Hwang proved by a preponderance of the

16   evidence that he was excused.  This has to do with an

17   accounting, so he wants to be excused that he wasn't getting

18   an accounting.  So he should be able to get away with

19   whatever -- what he was trying to do to Plastronics here,

20   what he has done to them, taken away their business.  I

21   would say no to this question.

22           Same question has to do with the Assignment

23   Agreement, fraudulently induced.  Same things hold.  He was

24   a sophisticated businessman.  He was entering into an arm's

25   length negotiation.  He needed Plastronics's help.  He

1   wanted their help.  He wanted their technical expertise, and

2   he wanted them to put up their own money to try to develop

3   this.

4           For breach of the Assignment Agreement, give you

5   the same figure, $26 million figure that Mr. Perry gave you

6   yesterday.

7           Next question has to do with tortious

8   interference.  This has to do with HiCon Company Limited

9   taking Plastronics's customers.  You know, they inferred

10  here that, well, you know, look, business is business, you

11  know.  This is -- this is what happens, you know.  And that

12  very well might be true.  If Walmart wants to take Target's

13  customers by giving them coupons, yeah, that's -- that's

14  fair.

15          But when you enter into a fraudulent scheme and

16  set up a fraudulent company to make phantom transactions in

17  order to sell a product and tell people that you have

18  permission to do something that you don't really have

19  permission to do, that's fraud.  And that's an independent

20  tortious act.  And when you use that to try to steal

21  someone's customers, that's tortious interference.  And

22  that's exactly what happened here.

23          Same question.  This time did Mr. Hwang conspire

24  with HiCon Company Limited?  I think the evidence shows that

25  Mr. Hwang was the -- was right along with all of this.  So I

1  would answer yes to the conspiracy question.

2         The amount of damages for tortious interference.

3  I ask you to give Plastronics for the harm caused the number

4  proposed by Mr. Perry, $11,231,676.00.

5         Did we prove malice by clear and convincing

6  evidence?  Well, we showed you the email.  We showed you --

7  it's right there in black and white.  They knew what they

8  were doing was wrong when they came to the United States,

9  and they knew -- they tried to hide the evidence so that

10  Plastronics wouldn't see it.  That's clear and convincing as

11  far as can I see.

12         Question 19 has to do with exemplary damages.

13  This is how they could be compensated.  This is when you

14  guys get to determine what these bad acts -- you know, what

15  the harm was, what's the -- how are you going to tell HiCon

16  Company Limited what they did was wrong?

17         I would -- and that's -- that's your decision.  I

18  would -- I would say -- my recommendation was to give them

19  the number that they knew what was going to happen in that

20  email where they said:  Let's hide this stuff because a

21  Texas jury might return three times the damages against us.

22  Let's give them the three times, exactly what they knew was

23  going to happen.  So I'd multiply their award by three.

24         Question 21, same thing, malice.  Clear and

25  convincing.  Gave you the exhibit numbers for the emails.

1    You can read them yourself.  I'd answer yes.

2            Exemplary damages for their conduct -- again,

3    multiply any damage award by three.  Give them what they

4    knew was going to happen.

5            I'm going to be able to come back after

6    Mr. Emerson talks to you, and I'll be able to rebut what he

7    has to tell you.  So thank you very much.

8            THE COURT:  Defendants may now present their

9    closing argument to the jury.

10            MR. EMERSON:  Thank you, Your Honor.

11            THE COURT:  Mr. Emerson, would you like a warning

12    on your time?

13            MR. EMERSON:   I would love to have five and one,

14    Your Honor.

15            THE COURT:  I will warn you when you have five

16    minutes and one minute remaining.

17            You may proceed with Defendants' closing argument.

18            MR. EMERSON:  Thank you, Your Honor.

19            And may it please the Court, Court staff,

20    Mr. Dalton, and ladies and gentlemen of the jury.

21            As I told you Monday afternoon, for Mr. Hwang,

22    this case is not about the money.  This trial is not about

23    the money.  This trial is about his invention and his right

24    to practice his own invention, both here in the United

25    States and back home in South Korea without Plastronics's

1   permission and without Plastronics's interference.

2          Now, there's no dispute that Mr. Hwang invented

3   the H-Pin.  There's no dispute that Mr. Hwang on his own --

4   his own decision decided to share that with Plastronics

5   after he came to Plastronics.  He invented it before he was

6   at Plastronics.  Plastronics had nothing to do with

7   inventing the H-Pin.

8          And he decided to share it with someone who

9   essentially lied to him, who essentially stole this

10  invention from him, promised him he was going to get rich.

11  That testimony was never rebutted.  That he'd never have to

12  work again.

13         And then they set out from the very beginning to

14  figure out every way to keep him from actually practicing

15  his own invention.

16         So Mr. Hwang, from the outset, even before he

17  joined Plastronics, made it clear to Mr. Pfaff that he

18  intended some day to go back to Korea.  And he made it clear

19  that he needed to be at least a co-owner on all the

20  inventions and all the patents that arose from his time at

21  Plastronics.

22         He told them he was not willing to give up

23  ownership of his intellectual property.  He told them when

24  he left that he expected and hoped to be business partners

25  with them.  And he wanted to help Plastronics.  You've seen

1  those emails where he says:  How can we work together?  How
2  can I help you?
3      And Mr. Pfaff patted Mr. Hwang on the back, called
4  him his Korean brother, and then he set out to take what was
5  really his prized possession, this H-Pin invention.
6      And you saw him on the stand, and you saw how he
7  lit up describing this thing.  And you saw Mr. Schubring, as
8  well.  This really was a revolutionary invention in their
9  world.  Means nothing to us.  I'd never heard of an H-Pin
10  before I took on this case.  Never heard of a socket.  But
11  it changed the world.
12      And, again, you don't have to take my word for it.
13  You can take Mr. Pfaff's word for it.
14      Now, they've never paid him a penny on this, even
15  though they've made a ton of money.  And we've heard a lot
16  about what Mr. Pfaff and Plastronics did for Mr. Hwang when
17  he came over.  And you heard Mr. Hwang tell you about that
18  himself.  He was thrilled to come over.
19      Mr. Hwang started this socket company in Korea
20  called MCS, made it into a success.  Gave that up to come
21  here to the United States because he wanted his sons to be
22  educated here.
23      So he was grateful for the opportunity, and he
24  remains grateful.  He told you that on the stand just the
25  other day.

1          So, yes, Plastronics was very helpful, and the

2     Pfaff family was very helpful to Mr. -- to Mr. Hwang.  But

3     they certainly got a lot out of it, didn't they?

4          In a moment, I'm going to put some of those

5     numbers back up.  And I've got a couple of new numbers that

6     we learned this week that I will put up there, as well.

7          But what Mr. Hwang wants here, what he wants

8     today, and whenever you are done deliberating is to be free

9     of these people who lied to him, who refused to do business

10    honorably with him, who in the business of suing him,

11    ridiculing him behind his back, bad mouthing him to his

12    customers.  And you, ladies and gentlemen, have the power to

13    give that to him.  You can cut him free of Mr. Pfaff and

14    Plastronics.

15          Now, do you all remember the Korean Conflict

16    document?  That's DX-52.

17          If you can pull that up, please?

18          This is Option No. 6 in the Korean Conflict

19    document:  Wait him out until he's completely out of cash

20    and has to sell his IP and block all deals until I get what

21    I want.

22          Well, that was 2011.  And that didn't happen.  He

23    didn't go out of business.  He wasn't forced to sell

24    everything to Mr. Pfaff.  And so that's why we're here.

25    Mr. Pfaff wants to get what he wants.  He thought he could

1    wait Mr. Hwang out.  Instead, we're here.

2           And he wants your help.  He wants your help to

3    give him what he wants.  And you can say no, and we're going

4    to ask you to say no today.

5           So every trial is a story, and you've heard two

6    different stories this week from two different sets of

7    lawyers and sets of witnesses.  But there's only one ending.

8    And I don't write that ending.  And Mr. Dalton doesn't write

9    that ending.  You all write that ending.  You guys have the

10   power to decide this.  You guys write the final chapter.

11          So with the Court's permission, can I go to the

12   easel?

13          THE COURT:  You may.

14          MR. EMERSON:  So here are some of the numbers

15   that we discussed on Monday afternoon, and I think you'll

16   remember them.

17          First, we have 90 million, which represents the 90

18   million H-Pins that Plastronics has made.

19          65 million, which represents the $65 million that

20   Plastronics has made off of Mr. Hwang's invention.

21          I'm going to leave a little space here under 65

22   million.

23          60 percent, that is the proportion of their total

24   business that is attributable to Mr. Hwang's invention.

25          Zero, and that's what they've paid him.

1          $26 million, that's what they want.

2          It is not enough, ladies and gentlemen, that

3     Mr. Hwang shared his invention with Plastronics, and they

4     paid him nothing.  Now they want their own profits from

5     every single sale that we've made.  It's not enough that

6     they haven't given him anything.  They want everything he's

7     made.

8          Now, what did it cost for Plastronics to make or

9     rather to develop the H-Pin?  Well, let's go back to what --

10    Mr. -- what Mr. Dalton told us on Monday morning.

11         And if you could pull up Day 1 p.m., Line 44 --

12    or, rather, Page 44, Lines 8 through 10.  Here's what

13    Mr. Dalton told you:  Well, it took millions of dollars to

14    do this, millions of dollars to do this project.

15         Let's go to Page 55.

16         He says:  You're going to hear from Mr. Pfaff

17    about the millions of dollars that Plastronics spent on this

18    thing.

19         So what did Mr. Pfaff actually say?

20         Same day, please, Page 113.

21         And here are the questions:  So from start to

22    finish, for Plastronics to come up with a way of building

23    his H-Pins in a cost-efficient manner, it was how long?

24         Two and a half years.

25         Okay.  And roughly how much did that cost

1  Plastronics?

2       Go down to the bottom, and he says:  But it was a

3  million dollars in hard cost that we spent.

4       A million dollars, okay?  So that's their cost.

5  Again, that's not from me or any of my witnesses.  That's

6  from Mr. Pfaff, $1 million.

7       And I don't want to minimize what a million

8  dollars is.  A million dollars is a lot of money.  I'd love

9  to have a million dollars myself.  But they got a pretty

10 good return out of that, didn't they?  65 times over the

11 last 14 years.

12      Mr. Dalton told you on Monday that the development

13 costs were so high that Plastronics could not pay royalties.

14 Those are your development costs right there, $1 million.

15 You know what the gross revenues were, $65 million.

16      So let's talk about some of the key facts in

17 this -- in this case and some of the key questions that

18 you're going to be asked to answer.

19      The first of those is:  Who sells the H-Pins?  Who

20 sells them outside of Korea, that is?  Inside of Korea,

21 Plastronics -- or rather, HiCon Limited sells internally.

22 Who sells outside of Korea?

23      Let's remember why Mr. Hwang set up the DBA.

24 Mr. Dalton says this is all a fraud.  It's all pulling the

25 wool over Mr. Pfaff's eyes.

1          Would you pull up DX-198, please, Mr. Brockwell?

2          Let's go back to 2009, and let's remember how we

3   first got into this situation.  Mr. Hwang has started his

4   own company.  He's starting to sell into the United States,

5   or at least trying to.  He gets sued by Mr. Pfaff and

6   Plastronics.  They have a dispute or a disagreement over

7   whether his own company is considered another entity or a

8   third party under the -- under the agreement.

9          Mr. Hwang disagrees with that, but in order to

10  resolve the dispute, he says:  Okay.  Fine.  Please give me

11  your consent.  Give me your consent.

12         And Mr. Pfaff doesn't give him his consent.  He

13  never says no, he never says yes, he never gives him a

14  straight answer for several months.

15         So Mr. Hwang goes off and starts his -- his DBA,

16  because even under Mr. Pfaff's reading of the contracts,

17  Mr. Hwang has every right to practice his own patents.  So

18  that's what he does.  And he explains all of this to

19  Mr. Pfaff.  He tells him:  Look, give me your consent,

20  please.  If you give me your consent, I will pay you the

21  royalty, one and a half percent on gross.  Gladly do it,

22  just to get this behind us.  He doesn't get an answer.

23         So he says:  Okay.  Fine, I can sell through my

24  sole proprietorship.  And that's what he does.  And he says:

25  Again, if you have -- this is my understanding.  If you have

1    another opinion, let me know.

2            And Mr. Pfaff never came back and said, no, I have

3    another opinion, and here's why.

4            And then a little while later, the lawsuit is

5    gone, and Mr. Hwang thinks problem solved, right?  2009,

6    problem solved.  Unfortunately, it's a hassle for him, but

7    the problem's solved.

8            So what did Mr. Dalton say about the DB [sic] on

9    Monday?

10           If we could pull up Page 54?

11           He said:  You're going to see at some point in

12   2009, Mr. Hwang started using this generic name HiCon.  And

13   basically he was trying to kind of make it murky between who

14   was it -- was it HiCon Company Limited or was it HiCon

15   Company?  And you'll see that -- the reason why he did this

16   is he wanted it both ways, right?

17           Well, what do the documents say?  And we talked

18   about these.  I thought what was interesting about

19   Mr. Dalton's "opening close" is that their best evidence of

20   their case is to tell you not to believe our evidence.

21           Ladies and gentlemen, I urge you to look at the

22   documents, and they will not be back there with you.  If you

23   want to see a document, you need to request it, okay?  So

24   they're not going to all be back there with you.

25           So what documents do we have that -- that document

1   this DBA and -- and Limited and the difference between them?

2          Well, we have Defendants' Exhibits 260 and 261.

3   Those are the business registration certificates.  Those are

4   the official Korean documents.  They have the -- the

5   business registration number on them that tell -- that

6   identifies the business.

7          And so when you look at things like invoices, you

8   can see by the number -- even if you're confused by the word

9   HiCon, you can see by the number who was actually doing

10  what.

11         We have DX-262.  That is HiCon's bank book, and

12  that tells you the account number.  And you can match that

13  account number with the account number on the invoices.  And

14  you can see who's getting paid.  And generally speaking, the

15  entity that's selling is the one that's getting paid.  So

16  you can match this number up with the invoices.

17         What else?  We have DX-140.  DX-140 is the supply

18  agreement between the DBA and Limited, and it sets forth the

19  parties' respective duties and obligations under that

20  agreement.  Ladies and gentlemen, he did all of this upright

21  and official.  There is no fraud here.

22         And then we go to the invoices.  DX-477 is the

23  stack of invoices to Micron.

24         DX-474 is the stack of invoices to ON

25  Semiconductor.

 1          And DX-285 is the stack of invoices to HiCon USA.

 2          And you will see that they all show HiCon is the

 3     shipper/exporter.  They show HiCon, the DBA, down in the

 4     lower right.  They show the bank account for HiCon, the DBA,

 5     and the account name, HiCon.

 6          Next, the tax receipts.  Once again, official

 7     Korean documents that are filed with the government of

 8     Korea.  The government of Korea requires businessmen or

 9     businesses to report to the government their sales.  And so

10     he does this every month.  Yes, that's right.  They are not

11     always done out by every single product.  These are

12     cumulative.  They're able to do it once a month, okay?  So

13     once a month, they submit one of these things to the Korean

14     government.

15          Now, Mr. Hwang explained to you all why there's no

16     tax on many of these, if not most of them, and that's

17     because if a -- if a product is destined for export, the

18     Korean government doesn't have -- doesn't require you to

19     collect taxes on them.

20          What else do we have?  We have Mr. Hwang's

21     personal tax returns.  You learned that Mr. Hwang has to pay

22     personal income tax at a much higher rate on the net income

23     that he gets from his business, HiCon.

24          Those are at DX-272 through 280.  And I wish I'd

25     put those all in one exhibit for you on Tuesday because I

1    know it was somewhat tedious walking through those, okay?

2    But if you want to see those, you can get those.  And every

3    one of them has a line item for HiCon.

4           You have the Distribution Agreement which says

5    what it says.  It says -- and that's DX-82 -- that it's with

6    HiCon, not HiCon Limited.  He signs it for HiCon, not HiCon

7    Limited.  Yes, he calls himself president and CEO of his

8    sole proprietorship, and he told you why he did that, too,

9    because generally, in Korea, where titles are important, any

10   business owner calls himself president or CEO or both.

11          And then we have Jae Hwang's email.  That is

12   DX-285.  And here he explains exactly why they're doing what

13   they're doing, which is exactly what Mr. Hwang explained to

14   Mr. Pfaff back in 2009, right?  They're doing this to comply

15   with the agreements.  Not to avoid them, but to comply with

16   the agreements.

17          And this is why, because the patent belongs to

18   HiCon Company.  We can only sell through HiCon Company in

19   the U.S. market, and this is what we have been doing with

20   all U.S. markets.

21          So they would have you think that Mr. Hwang's son

22   is just lying here.  And there's no evidence to suggest

23   that.  Yes, this is just for the name and on the document it

24   shows on PO, yes, because the documents have to be right.

25   The invoices have to be right.  The purchase orders have to

1   be right.

2          So all of this is documented.  His DBA is

3   documented.  The receipts show who sells what to whom.  We

4   report all of this to the Korean government.  And you have

5   the opportunity to look at those documents if you'd like.

6          All right.  The next issue I want to talk with you

7   about is whether or not these agreements cover Mr. Hwang's

8   Korean patent, okay?  So remember the first patent was in

9   Korea for the H-Pin.  There's no dispute that Mr. Hwang owns

10  that complete one, 100 percent.

11         And the question that you'll have to answer is

12  whether these agreements cover Korea.  And Mr. Dalton told

13  you that all you have to do is look at the document.  And

14  that is just not so, ladies and gentlemen.

15         The Court here has held that that is an ambiguous

16  matter.  If it wasn't, he would answer it for you.  But when

17  it's ambiguous, it's your job.  So that's why you have to

18  answer this question.  If the document itself was so clear

19  on its face, then you wouldn't have this question, okay?  So

20  you have to think about and look at what the evidence shows.

21         So if you could pull that up, please.

22         This is the Royalty Agreement.

23         Call out Paragraph 5, please.

24         Paragraph 5 states that neither PSP nor Hwang can

25  grant a license for patents covering the H-Pin Project

1   without approval.

2          Let's go to Paragraph 1.

3          And this makes clear that the patents on the H-Pin

4   Project exclude Korea.

5          Now, that is -- there is some question there

6   obviously because this is a question for you guys, but we

7   would respectfully submit that this indicates, at least,

8   that the parties understood that the Korean patent was

9   excluded from these agreements.

10         The Assignment Agreement, you will need to

11  construe alongside the Royalty Agreement.  And what happened

12  there is this.  The Assignment Agreement calls for an

13  assignment of -- of these patents worldwide.  Every -- every

14  foreign counterpart of the '602 patent, if you go by the

15  literal terms of the Assignment Agreement, is supposed to be

16  assigned 50/50 between them.

17         But they never did that.  And no one's claiming

18  that that was wrong.  So when we're talking about H-Pin

19  Project and the Assignment Agreement, we submit that those

20  would exclude Korea.

21         You can also use logic.  The Court told you that

22  you're going to need to determine what the parties' intent

23  was.

24         Now, why would Mr. Hwang ever agree to give

25  Mr. Pfaff control over a patent that he hasn't assigned to

1    Plastronics to give him control over what he can and cannot

2    do back in Korea when Plastronics has no rights there?

3           We also know from the negotiations that Mr. Hwang

4    made it clear that he was excluding Korean.  And you can

5    look at DX-157 and DX-252 there for emails where Mr. Hwang

6    has come out and told Mr. Pfaff, hey, I need to exclude

7    Korea.  I'm keeping Korea for myself.

8           And let's look at -- let's go back to the Korean

9    Conflict.  That's DX-52.  And I want to go to the pros and

10   cons.  I believe that's on Page 2.  All right.  Let's go to

11   the pros.

12          No. 5:  Hwang can't enter any market other than

13   Korea without our approval, since he needs to license his

14   own company.  Okay.  He can't enter any other market than

15   Korea without our approval, meaning he can enter the Korean

16   market with his approval -- without the approval because he

17   doesn't need that approval to license his own company in

18   Korea.  He's saying it right here, that they don't -- that

19   he doesn't need approval in Korea.

20          And if you can pull up Cons No. 3.

21          We do not have any rights in Korea.  Again, this

22   is Mr. Pfaff talking.  They do not have any rights in Korea.

23   That's no rights.  No rights in the patent, no rights to

24   stop Mr. Hwang from practicing his patent, nothing.  There's

25   no qualification there.

1          Take that down.  Thanks.

2          Now, I'm going to go through a few of these

3   questions on the verdict form with you, and I'm not going to

4   go through all of them, but I'm going to go through several.

5          And the first question is whether Plastronics

6   H-Pin proved by a preponderance of the evidence that HiCon

7   Limited directly infringed or induced infringement of Claim

8   1 of the '602 patent.  And you saw this earlier.

9          And the answer to this question is:  Well, who

10  sold into the United States?  And to answer that question,

11  you look at the documents.  What do the -- what do the

12  invoices say?  So the answer to that question should be no.

13         And I think the others will follow on from that.

14         And now we're going to get into the breach of the

15  contract.  The first question here is Question No. 4, which

16  is did Mr. Hwang prove by a preponderance of the evidence

17  that Plastronics H-Pin breached the Assignment Agreement?

18         And I'll have to agree with my colleague,

19  Mr. Dalton here.  There really probably are no damages here.

20  It has been breached, though, because as the parties agree,

21  an accounting is due when royalties are due.  And I'm going

22  to show you that royalties are due.  But we never got an

23  accounting, so there is a breach here on Question No. 4.  I

24  don't think there are any -- there are any damages on that,

25  though.

1    But when we get to Question No. 6, did Mr. Hwang
2    prove by a preponderance of evidence that Plastronics H-Pin
3    breached the Royalty Agreement, well, how did they breach
4    the Royalty Agreement?  The Royalty Agreement requires that
5    Plastronics pay a royalty to Mr. Hwang on all sales of
6    H-Pins and all sales of H-Pins with sockets.  And that
7    royalty is based on gross sales minus NREs.
8    And you heard from Mr. Pfaff and you heard also
9    from Mr. Perry that -- well, really what we're doing here is
10   we're looking at profits, and we're deducting NREs from
11   profits.  That was their position.  Well, the Court's
12   resolved that.
13   Royalties are not paid based on a percentage of
14   profits, but on gross sales.  Royalties are to be paid when
15   gross sales exceed the structured debt service payments
16   attributable to the non-reoccurring capital costs.
17   Royalties on gross sales may not be withheld simply because
18   the entity -- the entirety of the non-reoccurring capital
19   costs have not been fully discharged.  So that answers your
20   question there about whether we're going to take NREs off of
21   profits or gross revenues.
22   So that should be a yes on Question 6.
23   Question 7:  What is the number -- the sum of
24   money if paid today in cash that would compensate them?  And
25   I have that number.  That number is $1,361,860.00.

1        And if you're doing the math quickly in your head,

2   it's not quite 3 percent of this minus this because,

3   unfortunately, we can't go back all the way.  We can only go

4   back four years from the date of suit.  So we don't get the

5   royalty on all of this because Mr. Hwang didn't sue

6   Plastronics when he had the opportunity to years ago when he

7   didn't get royalties because he wouldn't have sued had he

8   not been sued here this week.

9        Question No. 8.  Now we're on the alleged breaches

10  by Mr. Hwang.  Did Plastronics H-Pin prove by a

11  preponderance of evidence that Mr. Hwang breached the

12  Royalty Agreement?

13       Well, the -- the alleged breach of the Royalty

14  Agreement here is licensing the patents, the '602 patent and

15  the Korean patent.  We believe that you all should find the

16  Korean patent is not at issue here.  It was -- we told you

17  Monday that it was signed long ago, that they really waited

18  too long to sue.  You can see that on that -- that license

19  agreement.  It was -- it was signed in October of 2008.

20       The only -- and that is the only license agreement

21  that they showed you.  Mr. Dalton put that license agreement

22  up here twice.  And the question I have for you or for him,

23  rather, is:  Where's the license to the '602 patent?  Have

24  they put a license to the '602 patent up here?  They have

25  not.  The only license here is the license to the Korean

1    patent.

2              Mr. Hwang doesn't need to license the '602 patent

3    to his Korean corporation because his Korean corporation

4    doesn't practice the '602 patent, because it doesn't do

5    anything in the United States.  It makes everything in

6    Korea.

7              And then his DBA -- as he explained to Mr. Pfaff

8    back in 2009, his DBA sells all those goods overseas.  So he

9    hasn't shown you a license, and there's no need for one

10   anyway.

11             So that would be a no, I believe.

12             All right.  Question 9 is fraudulent inducement.

13   And that question is:  Did Mr. Hwang prove by a

14   preponderance of the evidence that Plastronics fraudulently

15   induced Mr. Hwang into entering into -- into the Royalty

16   Agreement?  And we would respectfully ask that you answer

17   that yes.

18             Why is that?  Well, fraudulent inducement is

19   basically tricking someone to entering into a contract.

20   There are three elements, intent -- I'm sorry, the false

21   statement, intent to deceive, and reliance on that false

22   statement.

23             And you heard Mr. Hwang say, which, of course,

24   makes sense:  I would never have signed these agreements had

25   I known that they were never going to pay me a penny.

1     You also learned that Mr. Pfaff didn't even have

2  the authority to sign the Royalty Agreement in 2005.  All

3  right.  He -- Mr. Pfaff told Mr. Hwang that several years

4  later.  And you heard Mr. Hwang say:  No, I would not have

5  entered into that agreement had I known that Mr. Pfaff

6  didn't have the authority to enter into that agreement.

7     So we would ask that you answer Question 9,

8  fraudulent inducement, yes.

9     We don't think that Plastronics is entitled to any

10  money.  But I do want to talk about damages just a little

11  bit.

12     The only measure of damages that they asked for is

13  lost profits in this case.  And lost profits requires that

14  Plastronics can prove that they would have made the sales

15  that HiCon made, okay?  And that generally means showing

16  that there's no one else out there selling a product that's

17  a substitute.

18     You heard from Mr. Schubring and also from

19  Mr. Hwang that there are a number of products out there.

20  You also heard from Mr. Pfaff in the -- in "you changed the

21  world" email, that all the stamped spring probe companies --

22  all the -- all the stamps -- all the spring probe companies

23  are coming out with stamped spring probes, something along

24  those lines, okay?

25     Mr. -- Mr. Schubring went through a list of 8 or

1    10 different manufacturers that are making this type of

2    thing because Mr. Hwang did change the world, like Mr. Pfaff

3    said, and everyone was coming up with similar products.  So

4    they haven't been able to show this but-for causation that

5    but for HiCon selling these products, Plastronics would have

6    sold them.

7         Now, did Plastronics prove by -- this is Question

8    11:  Did Plastronics H-Pin prove that Mr. Hwang breached the

9    Assignment Agreement?

10        Again, well, there are two -- there are two

11   possible breaches here.  One is licensing or assigning one

12   of the patents without permission.  And the other is this

13   accounting, right?

14        Mr. Hwang doesn't owe an accounting because he

15   doesn't owe any royalties.  And he doesn't owe any royalties

16   because he is the one, through his DBA, selling into the

17   United States.  So he doesn't owe any royalties, and because

18   he doesn't owe any royalties, he doesn't owe an accounting.

19        The other thing is assigning -- again, assigning

20   or licensing the patents.  The -- again, same issue here.

21   They showed you the Korean patent license.  They did not

22   show you a license to the '602 patent.  So where is that?

23        Question 13 is another fraudulent inducement

24   question.  Did Mr. Hwang prove by a preponderance of the

25   evidence that Plastronics fraudulently induced Mr. Hwang to

1   enter into the Assignment Agreement?  And the answer to that

2   would be the same for No. 13, which is a yes.

3                THE COURT:   Five minutes remaining, counsel.

4                MR. EMERSON:  Thank you, Your Honor.

5                We don't believe there are any damages due.

6                No. 15 is tortious interference.  And here's what

7   they have to show to prove up tortious interference, that

8   Mr. Hwang committed an independent tortious act, which here

9   is supposedly either breaching the -- the -- the agreements

10  or somehow inducing patent infringement or something like

11  that.

12               But here's the thing.  They have to show that

13  Mr. Hwang intended to harm Plastronics.  And I don't think

14  they have shown you any of that.  I also don't think they

15  have shown you any of the underlying torts that would

16  support a tortious interference count.

17               And those are all of the questions I'm going to go

18  over.

19               The last thing I want to talk about is this

20  Exhibit PX-922 that Mr. Dalton talked about a little bit on

21  his opening and Mr. Bear, you may recall, talked to

22  Mr. Schubring about yesterday.  And that is the email chain

23  between Mr. Hwang and -- and HighRel about the 2018 BiTS

24  show.  So let's reset the scene here.

25               It is January of 2018.  Mr. Hwang and HiCon USA,

1 HighRel, have entered into this partnership where Mr. Hwang

2 has hired HighRel to be the distributor for his company's

3 products.

4 　　　　This is their first BiTS show to do together. And

5 you may recall that in 2009, Mr. Pfaff sued Mr. Hwang at the

6 BiTS show, had him served at the BiTS show. In fact, had a

7 process server serve him and his wife at the BiTS show.

8 　　　　So now we're at another BiTS show nine years

9 later, and Mr. Hwang is understandably concerned because

10 he's just gotten sued.

11 　　　　Would you put it up, please?

12 　　　　So let's go down to -- no, let's go back to the

13 first page -- the second page, please.

14 　　　　This is PX-922, and they think this is an

15 important document, so it is. And so we want you to look at

16 it, too, because I don't think it says what they say it

17 says. They say it says that he essentially admitted to

18 wrongdoing here. And that is not what he's doing. He's

19 being careful. He has been sued. He is trying to be as

20 prudent as he possibly can.

21 　　　　Let's go up to the very first email on the first

22 page.

23 　　　　And here he explains what he's doing and why.

24 This time is very important to me and HiCon. We are busy

25 developing new technologies. I need to concentrate on this,

1    but Plastronics filed a lawsuit, and I have to fight against

2    Plastronics with a very good Korean law firm and a Dallas

3    law firm.  So no need -- so need to pay pretty much for

4    legal issue, and also going to lose a lot of important time

5    on this.

6              And so he's trying to minimize the harm or the

7    risk to his company.

8              THE COURT:  One minute remaining.

9              MR. EMERSON:  Thank you.

10             Can we go to the second page, please?

11             And what's im -- what I want you to focus on here

12   is this.  There is an email from Mr. Gordon Cowan.  Gordon

13   Cowan is Paul Schubring's boss.  And what he tells Mr. Hwang

14   is important.  What he tells Mr. Hwang is:  You can't give

15   into the bully.  If we demonstrate fear, they will believe

16   they have the right to bully HiCon.  Don't give into the

17   bully.

18             Ladies and gentlemen, that's why we are here.

19   Mr. Hwang is not giving into the bully.  Mr. Hwang is

20   standing up for himself.

21             In 2009, he backed down a little bit.  He changed

22   his business arrangement so that he sold through his DBA and

23   not through his corporation.  But now his -- his business

24   and his livelihood is on the line.  He would like to do what

25   the Pfaffs have done.  Wayne Pfaff built a great business.

1  He passed it on to his son.  Mr. Hwang would like to do the

2  same thing.

3          And so we ask for your verdict.  We thank you very

4  much for your time and your attention.  It has been a

5  privilege to spend the week with you.  Thank you very much.

6          THE COURT:  All right.  Counsel, if you'll

7  replace the easel.

8          And, Mr. Dalton, you may proceed with the

9  Plaintiffs' final closing argument.  You have two minutes

10  and 14 seconds left.  Would you like any warning?

11          MR. DALTON:  Two minutes, Your Honor.

12          THE COURT:  That means 14 seconds in, I'm going to

13  warn you.

14          MR. DALTON:  Oh, I'm sorry.

15          THE COURT:  You have two minutes and 14 seconds

16  remaining.

17          MR. DALTON:  Thank you.  Yes, if you could give me

18  a two-minute warning -- on the additional, that would be 12,

19  and that's 14 seconds, Your Honor?

20          THE COURT:  You have a total of two minutes and 14

21  seconds of your time left.

22          MR. DALTON:  Oh, thank you.  Okay.  Understood.

23          THE COURT:  Proceed with your final closing

24  argument.

25          MR. DALTON:  You know, couple years ago, I had

1    this experience, and I got to sit on a jury.  And it kind of
2    changed my approach to how I do things up here.  And I
3    remember when I was sitting in your seat, I kind of thought
4    to myself -- what I was thinking was, man, I've heard this
5    50 times.  Why do you keep telling me this?  But this is --
6    this is so important to Plastronics, the people who work
7    there, Mr. Pfaff, and they have entrusted me in trying to
8    get the truth to you.  And I need to get this truth out to
9    you.  So if I am repeating myself or this is something you
10   already know, I apologize.
11        I was trying to write down of all the flawed
12   argument and the falsehoods said by Mr. Emerson, but I kind
13   of ran out of paper.
14        The first thing here is that, you know, this
15   notion that Mr. Pfaff didn't have authority from Plastronics
16   Socket Partners.  There's no evidence of that.  Mr. Pfaff
17   had the authority to sign on behalf of Plastronics Socket
18   Partners.  This had something to do with general
19   partnerships and limited partnerships, and at the time
20   Mr. Pfaff's father had the right to sign agreements for the
21   IRS.  That's -- that's all that's going on here.  That's --
22   that's kind of a -- that's a Hail Mary right there.
23        Mr. Emerson also said during his close, he said
24   that Mr. -- Mr. Hwang hired HighRel to sell his company's
25   products.  So there you go.  I think he just admitted that,

1    you know, his company -- his company being HiCon Limited.

2            It's interesting -- I shouldn't be surprised at

3    the Defense's argument because usually when -- it's a tactic

4    when you -- when you don't have the facts, you try to, you

5    know, explain away something that should be really simple

6    with complexity and hope that people think that such a

7    complex issue, that, you know, it must be right.  But it's

8    very simple.  If there were sales made between HiCon Company

9    Limited and the DBA, there would be an invoice, and there'd

10   be an actual invoice saying a price, supply, and everything

11   else, and it would have been in -- evidence of a

12   transaction.  We don't have any of that there.

13           Then they're just going to throw hundreds of

14   documents at you.  And Mr. Emerson said, well, all those

15   documents -- you know, if you want those -- I know there's a

16   lot of them, so go fish it out because we don't have any

17   evidence which would be very simple.  Yes, I bought this on

18   this day for this amount.

19           I want to talk a little bit about the -- these

20   agreements and what they do and what they say and what they

21   don't say.

22           PX-300 is the -- the Royalty Agreement.  You know,

23   Mr. Emerson said that, well, look, there's some question

24   about, you know, what patent was at issue here.

25           Look at PX-230 --

1          THE COURT:  Mr. Dalton, you have 30 seconds left.

2          MR. DALTON:  If you look at the Assignment

3   Agreement, read the -- read the -- read the document for

4   yourself.  It says what a third party is.  Mr. -- Mr. Pfaff

5   never wanted a third party company to compete against him.

6   That's what he was trying to fight against.

7          Definition, H-Pin Project is that Korean patent.

8   So always -- always have the obligation to limit how he

9   could transfer that license, wasn't limiting his ability to

10  practice it by himself in his garage by himself, but not

11  through a company.

12         Thank you.

13         THE COURT:  All right.  Ladies and gentlemen of

14  the jury, I'd like to provide you with a few final

15  instructions before you begin your deliberations.  You must

16  perform your duty as jurors without bias or prejudice as to

17  any party.

18         The law does not permit you to be controlled by

19  sympathy, prejudice, or public opinion.

20         All parties expect that you will carefully and

21  impartially consider all the evidence.  Follow the law as I

22  have given it to you, and reach a just verdict, regardless

23  of the consequences.

24         Answer each question in the verdict form from the

25  facts as you find them to be in this case, following the

1   instructions that the Court has given you.

2          As I said before, do not decide who you think

3   should win and then answer the questions accordingly.  Your

4   answers and your verdict in this case must be unanimous.

5          You should consider that this is a case involving

6   a dispute or disputes between persons of equal standing and

7   of equal worth holding the same or similar stations in life.

8   This is true between corporations, partnerships, sole

9   proprietorships, and individuals.

10         The law recognizes no distinction among types of

11  parties.  All of these entities and individuals stand equal

12  before the law, and regardless of their size or who owns

13  them, they're to be treated as equals.

14         When you retire to the jury room to deliberate on

15  your verdict, you're going to each have a copy of these

16  instructions that I've given you.  However, if you desire to

17  review during your deliberations any of the exhibits that

18  the Court has admitted into evidence during the course of

19  the trial, then you should advise me of that exhibit or

20  those exhibits which you wish to see by a written note

21  written and signed by your foreperson and delivered to the

22  Court Security Officer.  The Court Security Officer will

23  bring that note to me, and I will return those exhibits --

24  that exhibit or those exhibits to you.

25         Once you retire, you should first select your

1    foreperson and then conduct your deliberations.

2           If you decide to recess during your deliberations,

3    follow all the instructions that the Court has given you

4    about your conduct throughout the trial.

5           After you've reached a verdict, your foreperson is

6    to fill in your unanimous answers to the questions in the

7    verdict form, date the verdict form, and sign the verdict

8    form.

9           Do not reveal your answers until such time as

10   you're discharged, unless otherwise instructed by me.  And

11   you must never disclose to anyone, not even to me, your

12   numerical division on any question.

13          Any notes that you may have taken over the course

14   of the trial are aids to your memory only.  If your memory

15   should differ from your notes, rely on your memory and not

16   your notes.  The notes are not evidence.

17          And a juror should, who has not taken notes,

18   should rely on their own independent recollection of the

19   evidence and should not be unduly influenced by the notes of

20   other jurors.

21          Notes, ladies and gentlemen, are not entitled to

22   any greater weight than the recollection or impression that

23   each juror has about the testimony.

24          If during your deliberations you want to

25   communicate with me at any time, you should give a written

1 message or a question in written form signed by your

2 foreperson to the Court Security Officer who will bring it

3 to me.  And I will then respond as soon as possible, either

4 in writing with a note sent back to you or by having you

5 brought back into the courtroom where I can address you

6 orally.

7 However, I will always first disclose to the

8 attorneys in the case for both sides your question and my

9 response before I send a response or an answer to you.

10 After you have reached a verdict and after I have

11 discharged you from your duty as jurors in this case, at

12 that point, ladies and gentlemen, you are not required to

13 talk with anyone about your service in this case unless the

14 Court orders otherwise.

15 By the same token, at that time, after you have

16 returned a verdict that I have accepted and I have excused

17 you as jurors, you are then free to talk about your service

18 as jurors with anyone of your choosing.  At that point in

19 time, that choice will be totally and 100 percent up to each

20 of you.

21 I'm now going to hand eight copies of these

22 written jury instructions for each of you to the Court

23 Security Officer, along with one clean copy of the verdict

24 form.

25 Ladies and gentlemen of the jury, you may now

1  retire to the jury room and conduct your deliberations.  We

2  await your verdict.

3          COURT SECURITY OFFICER:  All rise.

4          (Jury out.)

5          THE COURT:   Counsel, before you should -- before

6  you leave the courtroom, and you are certainly welcome to

7  wait in the courtroom and in the courthouse while the jury

8  deliberates, but should you choose to leave the courthouse,

9  be sure that my law clerks have a good cell phone number so

10 that you can be called if we should receive a note or a

11 return of a verdict, and we can get you back here quickly.

12          Pending either a note from the jury or the return

13 of a verdict, we stand in recess.

14          (Jury deliberations.)

15          ********************************

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/Shelly Holmes                                    7/11/19
SHELLY HOLMES, CSR, TCRR                              Date
OFFICIAL COURT REPORTER
State of Texas No.: 7804
Expiration Date: 12/31/20